| UNITED STATES BANKRUPTCY COURT **DISTRICT OF COLORADO** | **PROOF OF INTEREST** |

| Name of Debtor: | Case Number: | |
|---|---|---|

**1. Name of holder of the Equity Interest** (The person or entity holding an Equity Interest in the Debtor. Referred to hereinafter as the "Interest holder"):

☐ Check box if you are aware that anyone else has filed a proof of interest relating to your interest.  Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court

Telephone Number:

☐ Check box if this address differs from the address on the envelope sent to you by the court.

If you have already filed a proof of interest, you do not need to file again.

**THIS SPACE FOR COURT USE ONLY**

Account or other number by which Interest holder identifies Debtor:

Check here if this claim:
☐ replaces a previously filed Proof of Interest dated: _____
☐ amends a previously filed Proof of Interest dated: _____

**2. Name and Address of any person or entity that is the record holder for the Equity Interest asserted in this Proof of Interest:**

**3. Date Equity Interest was acquired:**

Telephone Number:

**4. Total amount of member interest:**

**5. Certificate number(s):**

**6.      Type of Equity Interest:**

Please indicate the type of Equity Interest you hold:

☐   Check this box if your Equity Interest is based on actual member interest held in the Debtor.

☐   Check this box if your Equity Interest is based on anything else and describe that interest:

_____

**7. SUPPORTING DOCUMENTS:** _Attach copies of supporting documents,_ such as stock certificates, option agreements, warrants etc.
     DO NOT SEND ORIGINAL DOCUMENTS.  If the documents are not available, explain.  If the documents are voluminous, attach a summary.

**8. DATE-STAMPED COPY:**   To receive an acknowledgment of the filing of your proof of interest, enclose a stamped, self-addressed envelope and copy of this proof of interest.

☐   I am the creditor.
☐   I am the creditor's attorney or authorized agent.
☐   I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐   I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this _Proof of Interest_ serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this _Proof of Interest_ and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**THIS SPACE FOR COURT USE ONLY**

DATE

SIGN _____

Name: _____
Title: _____
Company: _____
Address: _____
_____
Phone: _____ Email: _____

_Penalty for presenting fraudulent claim is a fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 AND 3571_

**Greeley Flats Investors, LLC Member List**

As of :                    7/8/2024

| | Investor Last | Investor First | Invested |
|---|---|---|---|
| 1 | Allen | Jeffrey | 250,000 |
| 2 | Boyd | Nancy | 200,000 |
| 3 | Brown | David | 565,000 |
| 4 | Cheaney | Phil | 244,245 |
| 5 | Cox | Walter/Jane | 117,000 |
| 6 | Crabtree | Richard | 100,000 |
| 7 | Dawar | Sunjay | 167,151 |
| 8 | Dykes | Hugh (Chip) | 83,000 |
| 9 | Dykmans | Max | 100,000 |
| 10 | Erickson | Ken | 439,071 |
| 11 | Esposito | Vito | 25,000 |
| 12 | Fare | Gerald | 103,000 |
| 13 | Fong-Ching Li | Emily | 400,000 |
| 14 | Gelbart | Jay | 212,000 |
| 15 | Goodman | Martin | 1,600,000 |
| 16 | Greenhut | Doug | 100,000 |
| 17 | Kessler | Henry | 1,400,000 |
| 18 | Kroll | Josh | 419,320 |
| 19 | Lafortune | Brian | 161,993 |
| 20 | Mellano | Maria | 25,000 |
| 21 | Nadel | Mark | 170,000 |
| 22 | Naumann | Annie | 280,000 |
| 23 | Saltzman | Frank | 90,000 |
| 24 | Simon | William | 247,611 |
| 25 | Sims | Judy | 228,500 |
| 26 | Susa | Ron | 25,000 |
| 27 | Van Steennis | Peter | 200,000 |
| 28 | Viet | Susan | 66,000 |
| 29 | Warner | Ian | 50,000 |
| 30 | Wong | George | 250,000 |
| 31 | Woodward | Jeffrey | 186,000 |
| | | | 8,504,891 |

Offering proceeds per PPM        11,113,000

% of Total
Investmnt                  76.53%

Memorandum No. _____

**AMENDED AND RESTATED CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**
**GREELEY FLATS, DST**

_____
Beneficial Interests:
Minimum Purchase: $50,000 (0.4499% of Equity)
Maximum Offering Amount: $11,113,000
_____

     Greeley Flats, DST (the "**Trust**"), is a recently formed Delaware statutory trust that is offering to sell (the "**Offering**") beneficial interests in the Trust (the "**Interests**") to accredited investors ("**Investors**") pursuant to this Amended and Restated Confidential Private Placement Memorandum (including the exhibits attached hereto, the "**Memorandum**").[(1)] This Offering is being sponsored by Nelson Partners, LLC, a Utah limited liability company ("**Nelson Partners**" or the "**Sponsor**").

     The Trust has acquired the student-housing apartment complex commonly known as University Flats, located near the University of Northern Colorado at 1758 6th Avenue, Greeley, Colorado (the "**Property**"). The Property consists of 93 units with 262 beds.

     The Trust acquired the Property from Greeley Realty Investors, LLC, a Colorado limited liability company ("**Seller**"), for a purchase price of $21,907,000, plus closing and related transactional costs. The Trust closed on the purchase of the Property on April 6, 2018. The Trust financed the acquisition of the Property by obtaining a loan in the original principal amount of $13,301,000 (the "**Loan**") from Arbor Commercial Funding I, LLC ("**Lender**"), which Loan is expected to be subsequently assigned to Fannie Mae. The Loan is secured by the Property and evidenced by a promissory note and other typical financing agreements (collectively, the "**Loan Documents**").

     The Property is subject to a lease (the "**Master Lease**") with Greeley Flats LeaseCo, LLC, a Delaware limited liability company (the "**Master Tenant**") and an affiliate of the Sponsor and the Original Sponsor (as hereinafter defined). The initial term of the Master Lease is ten years and three months, commencing on the date the Property was acquired by the Trust and ending on the date that is ten years and three months thereafter. The Master Tenant has the right to extend the Master Lease for three successive renewal terms of five years each. The Master Tenant is responsible for all costs of operating, managing, leasing and maintaining the Property during the term of the Master Lease other than capital expenses, which are the responsibility of the Trust. The Property is also subject to an agreement with the Master Tenant whereby the Master Tenant has agreed to make certain annual supplemental payments to the Trust during the first five years of term of the Master Lease (the "**Supplemental Payment Agreement**"). Finally, the Property is subject to space leases between the Master Tenant, as landlord, and the tenants (collectively, the "**Property Tenants**") pursuant to the terms of existing and future leases (collectively, the "**Leases**"). The Property Tenants are subtenants of the Master Tenant. The Master Tenant has entered into a property management agreement with Nelson Brothers Property Management, Inc., a California corporation and affiliate of the Sponsor (the "**Property Manager**"), to perform some or all of its property and asset management duties. The Property Manager may subcontract its obligations to third parties. The Master Tenant is responsible for any management fees payable to the Property Manager.

     **These securities have not been approved or disapproved by the U.S. Securities and Exchange Commission ("SEC") or the securities regulatory authority of any state, nor has the SEC or any securities regulatory authority of any state passed upon the accuracy or adequacy of this Memorandum. Any representation to the contrary is a criminal offense.**

     **This Offering is being made in reliance on Rule 506(b) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"). The securities offered hereby have not been registered under the Securities Act or the securities laws of any state and are being offered and sold in reliance on exemptions from the registration requirements of the Securities Act and such laws. These securities are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws, pursuant to registration or exemption therefrom. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.**

**GFI's Exhibit 18, Page 1 of 221**

| | Price to Investors | Selling Expenses[2] | Proceeds to Trust[3] |
|---|---|---|---|
| Per 0.4499% Interest[1] | $50,000 | $4,963 | $45,037 |
| Maximum Offering Amount | $11,113,000 | $1,103,000 | $10,010,000 |

**This Memorandum is dated July 24, 2018**

(1)     Offers and sales of Interests will be made on a "best efforts" basis by broker-dealers (the "**Broker-Dealers**") who are members of the Financial Industry Regulatory Authority ("**FINRA**"). Patrick Capital Markets, LLC will be the managing Broker-Dealer (the "**Managing Broker-Dealer**").  The Managing Broker-Dealer is not affiliated with Patrick Nelson, Nelson Partners, Nelson Brothers Professional Real Estate, LLC or the Trust. The commonality of the names of Patrick Capital Markets, LLC and Patrick Nelson is purely coincidental. Additional information about the Managing Broker-Dealer and its principals can be found at www.patrickcapital.com and https://files.brokercheck.finra.org/firm/firm_16518.pdf.

(2)     The expenses of the offering ("**Selling Expenses**") include (i) commissions and other fees payable to the Broker-Dealers of up to 9% of the proceeds of the Offering (the "**Offering Proceeds**"), and (ii) reimbursement to Sponsor for legal, syndication, organization and offering costs equal to approximately 0.93% of the Offering Proceeds. Reimbursements to Sponsor may include reasonable charges for services provided by Sponsor's internal legal staff and by Sponsor's staff working on organizational and offering tasks. If the actual legal, syndication, organization and offering costs paid by the Sponsor are less than 0.93% of the Offering Proceeds, the difference will be retained by the Trust and will be added to and become part of a reserve to be held by the Trust containing all reserves funded from the Offering Proceeds or the Loan (the "**Trust Reserve**"). Certain employees of the Sponsor are registered representatives of the Managing Broker-Dealer and receive commissions in connection with the sale of Interests to Investors for whom such employees are the registered representatives. Selling Expenses do not include a total of $345,000 for the Trust Reserve, an acquisition fee payable to the Sponsor, a broker's commission payable to the Property Manager, due diligence costs, legal fees relating the Trust's acquisition of the Property and the Offering, title and closing costs, and other miscellaneous expenses (all of such expenses, the "**Offering Expenses**," and together with the Trust Reserve, the "**Offering Expenses and Reserves**"), all of which will be funded out of the Offering Proceeds or the Loan. See "PLAN OF DISTRIBUTION" and "ESTIMATED USE OF PROCEEDS." **The Trust reserves the right to pay reduced Selling Expenses and Offering Expenses or waive such sums with respect to Interests acquired by certain affiliates and other persons.**

(3)     Amounts shown are proceeds after deducting Selling Expenses, but before deducting the Offering Expenses and Reserves.  See "ESTIMATED USE OF PROCEEDS."

**GFI's Exhibit 18, Page 2 of 221**

**The Interests offered hereby are highly speculative. An investment in an Interest involves substantial risks. Investors must read and carefully consider the discussion set forth under "RISK FACTORS" for a further discussion of risks. Risks of an investment in an Interest include, among other things, the following:**

- complete reliance on the Master Tenant to pay the Rent (as defined below) and to operate the Property;
- limited control over the operation of the Property;
- lack of liquidity;
- the holding of a beneficial interest in the Trust without any voting rights;
- the long-term nature of the Master Lease;
- lack of diversity of investment;
- various conflicts of interest among the Sponsor, the Trust, and their affiliates;
- various risks associated with ownership of real estate generally and specifically with ownership of student housing in Greeley, Colorado;
- the Property will be highly leveraged; and
- certain tax risks.

The minimum purchase price (the "**Minimum Investment**") is $50,000 for Investors acquiring an Interest by means of an exchange (each, an "**Exchange Investor**") pursuant to Section 1031 ("**Section 1031,**" and such an exchange a "**Section 1031 Exchange**") of the Internal Revenue Code of 1986, as amended (the "**Code**"), or in cash. An investment of $50,000 is approximately equal to a 0.4499% beneficial interest in the Trust. The Trust may waive these Minimum Investment requirements in its discretion. In addition, for purposes of determining liabilities assumed with respect to the Property in connection with an Exchange Investor's Section 1031 Exchange, each Interest will have a pro rata percentage of the Loan made to the Trust (equal to approximately $59,841 per 0.4499% Interest). In connection with the acquisition of the Interests, each Investor will execute and deliver such documents as may be required by the Sponsor and the Lender. See "HOW TO PURCHASE" and "SUMMARY OF THE PURCHASE AGREEMENT."

The mailing address of the Trust for purposes of this Offering is Greeley Flats, DST, 16B Journey, Suite 200, Aliso Viejo, CA 92656, Attn: Cindy Yearout, the telephone number: (949) 916-7300, fax number: (949) 916-7311, and email: cindyy@nelsonpartners.com.

**Purchase of the Interests involves significant risks. Prospective Investors must read and carefully consider the discussion set forth in this Memorandum in "RISK FACTORS" and consult with their own legal, tax and financial advisors prior to purchasing the Interests. Purchase of the Interests is suitable only for persons of substantial means who have no need for liquidity in their investment. Investors should carefully consider the following:**

1.      Prospective Investors are not to construe the contents of this Memorandum as legal or tax advice to them. **Each Investor should consult his or her own independent legal counsel, accountant and/or business advisor (collectively, "Advisors") as to legal, tax and related matters concerning this investment.**

2.      The securities offered hereby may be offered and sold only to persons or entities who meet the investor suitability requirements set forth under "WHO MAY INVEST" in this Memorandum.

3.      No person has been authorized by the Trust or the Sponsor to make any representations or furnish any information with respect to the Trust and/or the Interests other than as set forth in this Memorandum or other documents or information furnished by the Trust or the Sponsor upon request. However, authorized representatives of the Trust will, if such information is reasonably available, provide additional information requested by a prospective Investor (or his or her representatives) for the purpose of evaluating the merits and risks of the Offering.

4.      This Memorandum has been prepared solely for the benefit of persons interested in the proposed private placement of the Interests offered hereby. Any reproduction or distribution of this Memorandum, in whole or in part, or the disclosure of any of its contents without the prior written consent of the Trust is expressly prohibited. The recipient, by accepting delivery of this Memorandum, agrees to return this Memorandum and all documents furnished herewith to the Trust or its representatives immediately upon request if the recipient does not purchase any of the Interests, or if the Offering of the Interests is withdrawn or terminated.

5.      The Trust may reject the Purchase Agreement of a prospective Investor for any reason. The Purchase Agreement will be rejected for failure to conform to the requirements of the Offering or such other reasons as the

**GFI's Exhibit 18, Page 3 of 221**

Trust may determine in its sole and absolute discretion. Except as expressly set forth herein, the Purchase Agreement may not be revoked, canceled, or terminated by the Investor for any reason.

6. The Offering is made exclusively by this Memorandum. This Memorandum contains a summary of certain provisions of various documents, including the Purchase Agreement and Trust Agreement (as hereinafter defined), but only the full text of such documents contains complete information concerning the rights and obligations of the parties thereto. This Memorandum contains summaries of certain other documents, which summaries are believed to be accurate, but reference is hereby made to the full text of the actual documents for complete information concerning significant factual matters and assumptions, as well as the rights and obligations of the parties thereto. All documents relating to this investment and related documents and agreements will be made available to a prospective Investor or his or her advisors upon request.

7. Because the Interests are not registered under the Securities Act or the securities laws of any state, Investors must hold them indefinitely unless: (i) the Interests are registered under the Securities Act and any applicable state securities laws, which registration the Sponsor does not expect to occur, or (ii) the Sponsor, with the advice of counsel, concludes that registration of the Interests is not required under the Securities Act and applicable state laws. The Loan Documents contain restrictions on the sale, transfer, or other disposition of the Interests by the Investors in certain circumstances. No public market currently exists for the Interests and none is expected to develop.

8. The Trust has obtained a tax opinion (the "**Tax Opinion**") of Special Tax Counsel (as hereinafter defined), which states that an Investor's acquisition of an Interest "should" be treated as a direct acquisition of an interest in the Property for purposes of Section 1031. **No ruling will be obtained from the Internal Revenue Service ("IRS") with respect to any tax issues affecting the Interests**. The Tax Opinion is specifically limited to the treatment of an Interest for purposes of Section 1031, and such opinion does not address any other tax issues that may be of interest to Investors based on their own particular circumstances. Moreover, the Tax Opinion was provided to the Trust by Special Tax Counsel to support the marketing of the Interests, and cannot be used to avoid penalties that may be imposed under federal tax law (although other facts can be used to avoid penalties, such as evidence of an Investor's good faith reliance on advice from the Investor's own independent counsel or the existence of substantial legal authority). See "FEDERAL INCOME TAX CONSEQUENCES" in this Memorandum.

**In making an investment decision, prospective Investors, together with their respective Advisors, if any, must rely on their own examination of the terms of the Offering, including without limitation the merits and risks involved in investing in the Property and the Interests, as well as the person or entity issuing the securities.**

**The Securities Act and the securities laws of certain jurisdictions grant purchasers of securities sold in violation of the registration or qualification provisions of such laws the right to rescind their purchase of such securities and to receive back their consideration paid. The Sponsor believes that the Offering described in this Memorandum is not required to be registered or qualified.  Many of these state laws granting the right of rescission also provide that suits for such violations must be brought within a specified time, usually one year from discovery of facts constituting such violation. Should any Investor institute such an action on the theory that the Offering was required to be registered or qualified, the Sponsor contends that the contents of this Memorandum constitute notice of the facts constituting such violation.**

**This Memorandum does not constitute an offer or solicitation by anyone in any jurisdiction in which such an offer or solicitation is not authorized, or in which the person making such an offer is not qualified to do so, or to any person to whom it is unlawful to make an offer or solicitation.**

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

iv

**GFI's Exhibit 18, Page 4 of 221**

# TABLE OF CONTENTS

Page

WHO MAY INVEST ................................................................................................. 1
INVESTOR SUITABILITY REQUIREMENTS ...................................................... 1
HOW TO PURCHASE ............................................................................................. 4
SUMMARY OF THE OFFERING .......................................................................... 5
SUMMARY OF THE PURCHASE AGREEMENT ................................................ 10
    General .............................................................................................................. 10
    Submission of Offer to Purchase ..................................................................... 10
    Closing .............................................................................................................. 10
    No Tax Advice .................................................................................................. 10
    Termination of the Purchase Agreement ........................................................ 10
    Indemnity .......................................................................................................... 10
    Arbitration ........................................................................................................ 10
SUMMARY OF THE TRUST AGREEMENT ........................................................ 11
    General .............................................................................................................. 11
    Purposes of the Trust ....................................................................................... 11
    Term of the Trust .............................................................................................. 11
    Authority and Duties of the Trustees ............................................................... 11
    Compensation and Reimbursement of the Trustees ........................................ 12
    Limitation on Authority of the Trustees .......................................................... 12
    Authority of Investors ...................................................................................... 12
    Cash Flow ......................................................................................................... 12
    Right to Transfer Interests ............................................................................... 12
    Property Rights ................................................................................................. 13
    Bankruptcy; Termination upon Risk of Default .............................................. 13
    Tax Status of Trust ........................................................................................... 13
SUMMARY OF THE MASTER LEASE .................................................................. 14
    General .............................................................................................................. 14
    Term .................................................................................................................. 14
    Rent ................................................................................................................... 14
    Capitalization .................................................................................................... 16
    Master Tenant Profits ....................................................................................... 16
    Property Expenses ............................................................................................ 16
    Casualty and Condemnation ............................................................................ 17
    Insurance ........................................................................................................... 17
    Rights and Duties of Master Tenant ................................................................ 17
    Property Management ....................................................................................... 17
    Sales Commission ............................................................................................ 17
    Disposition Fee ................................................................................................. 17
SUMMARY OF THE SUPPLEMENTAL PAYMENT AGREEMENT AND THE SUPPLEMENTAL
    COLLATERAL AGREEMENT ....................................................................... 18
    General .............................................................................................................. 18
    Supplemental Payments ................................................................................... 18
    Supplemental Collateral ................................................................................... 18
DESCRIPTION OF THE PROPERTY, PROPERTY TENANTS AND LEASES ... 20
REGIONAL, LOCAL AREA AND MARKET ANALYSIS .................................... 22
ACQUISITION AND FINANCING ........................................................................ 58
PLAN OF DISTRIBUTION ..................................................................................... 60
    Capitalization .................................................................................................... 60
    Qualifications of Investors ............................................................................... 60
    Sale of Interests ................................................................................................ 60
    Marketing of Interests ...................................................................................... 60
    Limitation of Offering ...................................................................................... 61
    Ownership by the Sponsor, Original Sponsor or Affiliates ............................. 61
    Ownership by the Preferred Equity Provider .................................................. 61
    Acceptance of Investors ................................................................................... 62
ESTIMATED USE OF PROCEEDS ........................................................................ 63
    Estimated Uses of Offering Proceeds ............................................................. 63
    Estimated Sources and Uses of Offering and Loan Proceeds ......................... 63

**GFI's Exhibit 18, Page 5 of 221**

RISK FACTORS.................................................................................................................65
   REAL ESTATE RISKS...............................................................................................66
   RISKS RELATING TO THE LOAN............................................................................70
   RISKS RELATING TO THE TRUST STRUCTURE....................................................71
   RISKS RELATING TO PRIVATE OFFERING AND LACK OF LIQUIDITY................72
   RISKS RELATING TO THE PREFERRED EQUITY.....................................................73
   RISKS RELATING TO THE MASTER LEASE AND THE MANAGEMENT OF THE PROPERTY ..........73
   INCOME TAX RISKS.................................................................................................75
   ERISA RISKS.............................................................................................................77
COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES ................78
FIDUCIARY DUTIES OF THE SPONSOR, THE TRUSTEES AND THE MASTER TENANT .........80
CONFLICTS OF INTEREST ..........................................................................................80
   Competition for Tenants ...........................................................................................80
   Obligations to Other Entities.....................................................................................80
   Interest in Other Activities ........................................................................................80
   Resolution of Conflicts of Interest.............................................................................80
   Sponsor May Retain or Acquire Interest in Trust .......................................................80
   Ownership of the Excess Land by Affiliate of Sponsor...............................................80
MANAGEMENT ...........................................................................................................82
   Original Sponsor ......................................................................................................82
   Sponsor ....................................................................................................................82
   Management of Sponsor ............................................................................................82
   Master Tenant Management.......................................................................................84
PRIOR INVESTMENT PERFORMANCE ........................................................................85
RESTRICTIONS ON TRANSFERABILITY ......................................................................85
FEDERAL INCOME TAX CONSEQUENCES ..................................................................86
   Classification for Purposes of Section 1031 ...............................................................86
   Receipt of Boot ........................................................................................................87
   Tax Deficiency, Penalties and Interest.......................................................................88
   Taxable Income ........................................................................................................88
   Net Income and Loss of Each Investor .......................................................................88
   Taxation of Tax-Exempt Investors ............................................................................88
   Tax Impact of Sale of Property ..................................................................................90
   Tax Legislation.........................................................................................................90
   State and Local Laws................................................................................................91
   Tax Opinion .............................................................................................................91
ERISA CONSIDERATIONS...........................................................................................92
   Treatment of the Trust under ERISA .........................................................................92
REPORTS.......................................................................................................................93
LITIGATION...................................................................................................................93
   Pending Matters........................................................................................................93
   Resolved Matters......................................................................................................93
ADDITIONAL INFORMATION .....................................................................................93

EXHIBITS:

| | |
|---|---|
| A | Form of Purchaser Questionnaire |
| B | Form of Purchase Agreement |
| C | Form of Trust Agreement |
| D | Form of Master Lease |
| E | Form of Supplemental Payment Agreement |
| F | Form of Supplemental Collateral Agreement |
| G | Financial Forecast |
| H | Tax Opinion of Special Tax Counsel |
| I | Organizational Chart |
| J | Investment Performance – Managed Properties |
| K | Investment Performance – Non-Managed Properties |

GFI's Exhibit 18, Page 6 of 221

The following documents are or will be available upon request:

- Property Purchase Agreement
- Property Condition Assessment
- Appraisal
- Survey
- Title Policy and Underlying Documents
- Phase I Assessment
- Leases (subleases to the Master Lease)
- Loan Documents
- Form of Lease

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 7 of 221**

## WHO MAY INVEST

The offer and sale of the Interests is being made in reliance on an exemption from the registration requirements of the Securities Act. The Trust may declare any prospective Investor ineligible to purchase an Interest for any reason in its sole and absolute discretion. **The Interests will be sold only to Accredited Investors (as described below)**.

## INVESTOR SUITABILITY REQUIREMENTS

Investment in the Interests involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in this investment. The Interests will be sold only to persons or entities who (i) make the Minimum Investment (which may be waived by the Trust in its discretion), (ii) represent in writing that they meet the Investor suitability requirements established by the Trust and as are required under federal or state law, and (iii) furnish the Trust with documentation required under federal law that demonstrates satisfaction of the suitability requirements.

Each prospective Investor must represent in writing and furnish the trust with satisfactory documentation that he or she meets, among others, __ALL__ of the following requirements:

(a)       He or she, together with his or her Advisors, if any, has received, read, and fully understands the Memorandum, including all exhibits and other materials provided to the Investor (collectively, the "**Memorandum Materials**").  He or she is basing his or her decision to invest on the Memorandum.  He or she has relied only on the information contained in said materials and has not relied upon any other documents or information or representations made by any other person; and

(b)       He or she understands that an investment in the Interests involves substantial risk and is fully cognizant of and understands all of the risk factors relating to a purchase of the Interests, including, without limitation, those risks set forth below in the section entitled "RISK FACTORS"; and

(c)       His or her overall commitment to investments that are not readily marketable is not disproportionate to his or her individual net worth, and his or her investment in the Interests will not cause such overall commitment to become excessive; and

(d)       He or she has adequate means of providing for his or her financial requirements, both current and anticipated, and has no need for liquidity in this investment; and

(e)       He or she can bear and is willing to accept the economic risk of losing his entire investment in the Interests; and

(f)       He or she is acquiring the Interest for his or her own account and for investment purposes only and has no present intention, agreement or arrangement for the distribution, transfer, assignment, resale or subdivision of the Interests; and

(g)       He or she is an "**Accredited Investor**" (as defined in Rule 501 of Regulation D under the Securities Act and as described below).

For purposes of calculating an Investor's net worth herein, "net worth" is defined as the difference between total assets and total liabilities.

In addition to certain institutional entities, a person or entity that meets one of the following tests will qualify as an Accredited Investor:

1

(i)     the Investor is a natural person who had individual income in excess of **$200,000** in each of the two most recent years, or joint income with that person's spouse in excess of **$300,000** in each of those years, and has a reasonable expectation of reaching the same income level in the current year; or

(ii)    the investor is a natural person whose individual net worth, or joint net worth with that person's spouse, exceeds **$1,000,000** at the time of purchasing the Interests, provided that for purposes of calculating such net worth (A) the investor's primary residence shall not be included as an asset; (B) indebtedness that is secured by the investor's primary residence, up to the estimated fair market value of the primary residence at the time of the closing of the investor's acquisition of an Interest, shall not be included as a liability, *provided, however,* that if the amount of such indebtedness outstanding at the time of the closing of the investor's acquisition of an Interest exceeds the amount of indebtedness outstanding 60 days before such time, other than as a result of the acquisition of the primary residence (such as, for example, if the investor takes out a home equity loan that is not used to acquire a primary residence during such 60-day time frame), the amount of such new indebtedness shall be included as a liability; and (C) indebtedness that is secured by the investor's primary residence is in excess of the estimated fair market value of the primary residence shall be included as a liability; or

(iii)   The Investor is an organization described in Section 501(c)(3) of the Code, or a corporation, business trust, or partnership, not formed for the specific purpose of acquiring the Interests, with total assets in excess of **$5,000,000**; or

(iv)    the Investor is a trust with total assets in excess of **$5,000,000**, not formed for the specific purpose of acquiring the Interests, whose purchase is directed by a "sophisticated person" as defined in Rule 506(b)(2)(ii) of Regulation D under the Securities Act; or

(v)     The Investor is an entity (including an individual retirement account or Keogh plan) in which all of the equity owners (or beneficiaries, in the case of an individual retirement account or Keogh plan) are Accredited Investors as defined in subparagraphs (i) through (iv) above.

In addition, the Investor and each subsequent transferee must represent that either:

(a)     The Interests are being purchased by or on behalf of (1) an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), whether or not it is subject to Title I of ERISA, (2) a plan described in Code Section 4975 (including but not limited to an individual retirement account or a Keogh plan), or (3) an entity whose underlying assets include "**plan assets**" as defined in Department of Labor ("**DOL**") Regulation Section 2510.3-101 (the "**Plan Asset Rules**") by reason of a plan's investment in such entity (including but not limited to an insurance company general account) (all such investors, "**Benefit Plan Investors**").  Additionally, all or part of the assets to be used to purchase the Interests constitute assets of one or more Benefit Plan Investors; or

(b)     The Interests are not being purchased by or on behalf of Benefit Plan Investors.

Representations with respect to the foregoing and certain other matters must be made by each Investor in the Purchase Agreement and Purchaser Questionnaire, forms of which are attached as exhibits to this Memorandum.  The Trust will rely on the accuracy of each person's or entity's representations set forth therein and requires evidence, as set forth in the Purchaser Questionnaire, that any such person or entity meets the applicable standards at any time prior to the Trust's acceptance of the Purchase Agreement.  An Investor is obligated to supply the evidence demonstrating its status as an Accredited Investor.  The Trust shall reject any Investor who fails to supply such evidence.

**If you do not meet the requirements described above, do not read further and immediately return this Memorandum to the Trust or the applicable Broker-Dealer.  If you do not meet such requirements, this Memorandum does not constitute an offer to sell the Interests to you.**

**GFI's Exhibit 18, Page 9 of 221**

Also, each prospective Investor must represent and warrant that:

**The Investor understands that neither the Sponsor nor the Trust has obtained a ruling from the IRS that the Interests will be treated as undivided interests in real estate as opposed to partnership interests or interests in another entity that is separately taxable rather than disregarded for tax purposes. The Investor understands that the tax consequences of an investment in an Interest, especially the qualification of the Interests under Section 1031, are complex and vary with the facts and circumstances of each individual Investor. The Investor represents and warrants that: (i) he or she has consulted his or her own independent tax advisor regarding an investment in an Interest and the qualification of the transaction under Section 1031, (ii) he or she is not relying on (a) the Trust, the Sponsor, any of their Affiliates, or their agents, including their counsel and accountants, or (b) any Broker-Dealer or the representatives of a Broker-Dealer through whom the Interest is purchased, for any tax advice regarding the qualification of the Interest under Section 1031 or any other matter, and (iii) except as expressly provided in the Tax Opinion, which is based on numerous assumptions and qualifications that may not be applicable to the Investor, he or she is not relying on any statements made in this Memorandum regarding the qualification of the Interests under Section 1031.**

The investor suitability requirements stated above represent the Trust's minimum suitability requirements for Investors. However, satisfaction of these requirements by any person or entity will not necessarily mean that an Interest is a suitable investment for such person or entity, or that the Trust will accept such person or entity as an Investor. Furthermore, the Trust, as appropriate, may modify such requirements, and such modification may raise the suitability requirements for Investors.

The written representations made by the prospective Investors together with the documentary evidence provided will be reviewed to determine the suitability of such person or entity for investment in the Trust. The Trust may refuse an offer to purchase the Interests if the Trust believes that a person or entity does not meet the applicable investor suitability requirements or the Interests otherwise constitute an unsuitable investment for a person or entity for any legal reason.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 10 of 221**

## HOW TO PURCHASE

The Interests may only be purchased by Accredited Investors, as described above in "WHO MAY INVEST." Prospective Investors who would like to purchase an Interest must carefully read the Memorandum Materials. Prospective Investors must complete, execute, and deliver to the Trust the Purchaser Questionnaire and Purchase Agreement, the forms of which are attached as **Exhibit A** and **Exhibit B**, respectively, to this Memorandum. Upon receipt of the signed Purchase Agreement and Purchaser Questionnaire and verification of the prospective Investor's investment qualifications, the Trust will decide whether to accept the prospective Investor's investment. Upon the Trust's acceptance of a prospective Investor for the purchase of an Interest, the Trust will so notify the prospective Investor.

Upon acceptance of a prospective Investor's Purchase Agreement, the Trust will circulate various additional documents to the prospective Investor to be signed and returned. Investors whose subscriptions are accepted by the Trust must remit the entire purchase price for their Interests to an account of the Trust that has been, or will be, opened with a bank to be designated by the Trust by wiring such funds or delivering a check for the purchase price not less than five business days before closing the acquisition of such prospective Investor's Interest. Unless otherwise directed by the Trust, the documents should be mailed or delivered to the Trust:

<div align="center">

Greeley Flats, DST
16B Journey, Suite 200
Aliso Viejo, CA 92656
Attn: Cindy Yearout

</div>

The Investor's purchase price will be fully refunded by the Trust if the terms and conditions of the Offering differ materially and adversely from the description of the Offering set forth herein and the Investor elects on that basis not to complete the purchase of the Interest. Otherwise, the purchase price will be nonrefundable.

<div align="center">

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

</div>

**GFI's Exhibit 18, Page 11 of 221**

## SUMMARY OF THE OFFERING

The following summary provides selected limited information regarding the Offering and should be read in conjunction with, and is qualified in its entirety by, the detailed information appearing elsewhere in this Memorandum. EACH PROSPECTIVE INVESTOR IS INSTRUCTED TO READ THE ENTIRE MEMORANDUM BEFORE INVESTING IN AN INTEREST.

| | |
|---|---|
| Interests Offered: | The Trust will sell beneficial interests (the "**Interests**") to Accredited Investors for the minimum purchase price of $50,000, which minimum may be waived by the Trust in its discretion. In addition, for purposes of determining liabilities assumed with respect to the Property in connection with an Exchange Investor's Section 1031 Exchange, each Interest will have a pro rata percentage of the Loan made to the Trust, in the approximate amount of $59,841 per 0.4499% Interest. See "PLAN OF DISTRIBUTION." |
| Investment Objectives | The investment objectives of the Trust are to acquire and manage the Property to generate income with tax benefits, preserve principal and provide the potential for long-term growth. |
| Property – Description: | The Trust has acquired the Property, which consists of the student housing apartment complex commonly known as University Flats, located at 1758 6th Avenue, Greeley, Colorado. The Property consists of 93 units with 262 beds. See "DESCRIPTION OF THE PROPERTY, PROPERTY TENANTS AND LEASES." |
| Property – Acquisition: | The Trust acquired the Property from the Seller on April 6, 2018 for a purchase price of $21,907,000, plus estimated closing and other transaction costs of $635,000 (including tax and insurance deposits, but not including an acquisition fee to the Sponsor, Selling Expenses and the Trust Reserve). The purchase price was funded with the Offering Proceeds, the capital provided by the Preferred Equity Provider (defined below) and the $13,301,000 Loan from the Lender. The difference between the purchase price for the Interests ($11,113,000) and the cash portion of the purchase price for the Property ($8,606,000) equals $2,507,000, which includes transaction costs, an acquisition fee to the Sponsor, Selling Expenses and Offering Expenses and Reserves. See "ESTIMATED USE OF PROCEEDS," "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES" and "ACQUISITION AND FINANCING." |
| | Concurrently with the closing of the acquisition of the Property, the Seller transferred to an Affiliate of the Sponsor for no additional consideration approximately 1.227 acres of excess land located adjacent to the Property (the "**Excess Land**"). The purchase price paid by the Trust for the Property was not discounted, nor did the Trust receive any direct consideration as a result of the transfer of the Excess Land to the Affiliate of the Sponsor. The Seller previously obtained conceptual approval from the city to construct additional multi-family units on the Excess Land, and the Sponsor is currently evaluating the feasibility of any such development. Except as set forth in the Supplemental Collateral Agreement (defined below), the Trust will not receive ownership or other rights in or to the Excess Land or any subsequent project or projects developed on such land. The Excess Land is not included in the appraised value of the Property. See "ACQUISITION AND FINANCING," "RISK FACTORS – REAL ESTATE RISKS – Determination of Purchase Price/Valuation." and "CONFLICTS OF INTEREST – Sponsor Ownership of the Excess Land." |

**GFI's Exhibit 18, Page 12 of 221**

| | |
|---|---|
| Property – Financing: | The Trust financed the acquisition of the Property with the Loan in the amount of $13,301,000 from the Lender. The Loan has a term of twelve years, maturing on the date that is twelve years from the acquisition of the Property. The interest rate on the Loan is fixed at a rate of 4.47%. The Loan Documents require monthly payments of interest only for the first 5 years of the Loan and require monthly payments of principal and interest based on a 30-year amortization during years 6 through 12 of the Loan. The Loan Documents allow prepayment, but if the Loan is prepaid within the first 138 months of the Loan term, a prepayment premium will be required in an amount equal to the greater of a yield maintenance payment or one percent (1%) of the outstanding principal balance of the Loan. Thereafter, a prepayment premium equal to one percent (1%) of the outstanding principal balance of the Loan will be due upon prepayment, except during the last three (3) months of the Loan term, when no prepayment premium will be due if the Loan is prepaid. The Lender required initial capital reserves of $163,625, which amount is included in the Trust Reserve. The Lender is also requiring initial annual capital reserve payments of $39,300. Reserves funded from the Offering Proceeds or the Loan comprise the Trust Reserve. The Trust Reserve belongs to the Trust and any funds remaining in such reserve when the Property is sold will be distributed to the Investors pro rata in accordance with their Interests. Reserves funded by the Master Tenant not from the Offering or the Loan will belong to the Master Tenant (the "**Master Tenant Reserve**" and, together with the Trust Reserve, the "**Reserves**"), and any funds remaining in such reserve when the Loan is repaid will be returned to the Master Tenant. The Master Tenant may use the Reserves to pay for Capital Expenses, Operating Costs and Impositions to the extent permitted under the Loan Documents. See "RISK FACTORS – RISKS RELATING TO THE LOAN" and "ACQUISITION AND FINANCING." |
| Preferred Equity: | In order to close the acquisition of the Property prior to sufficient Interests being sold to raise the minimum required closing equity, a preferred equity provider contributed $4,575,000 of capital to the Trust, through Affiliates of the Trust, which capital was used to close the acquisition. Terra University Flats Pref, LLC, an Affiliate of Terra Capital Partners, provided the preferred capital (the "**Preferred Equity Provider**"). The Trust paid or will pay fees and interest to the Preferred Equity Provider for the contribution of such equity, some of which has been or may be paid by the Sponsor or its Affiliates and reimbursed by the Trust to the Sponsor or its Affiliates. |
| | Upon the sale of Interests, the net proceeds, less commissions and fees paid to broker-dealers and their representatives, will be used to repay capital contributed by the Preferred Equity Provider. Subject to limited exceptions, only after all capital contributed by the Preferred Equity Provider is repaid will net proceeds from the sale of Interests be used to pay the fees and other expense items that were not paid at the closing of the acquisition, including fees and commissions due to the Sponsor and its Affiliates. See "PLAN OF DISTRIBUTION – Ownership by the Preferred Equity Provider." |
| | The Organizational Chart attached as **Exhibit I** shows the indirect interest in the Trust held by the Preferred Equity Provider. An Affiliate of the Original Sponsor (NB JV Partner, LLC) and the Preferred Equity Provider have formed Greeley Flats JV, LLC, which is the owner of Greeley Flats |

IB, LLC, which in turn is the owner of all unsold Interests in the Trust. The $4,575,000 invested by the Preferred Equity Provider was contributed to Greeley Flats JV, LLC and then through Greeley Flats IB, LLC to the Trust. When Interests are sold, net proceeds are distributed to Greeley Flats JV, LLC and then to the Preferred Equity Provider until its entire investment is repaid. See "PLAN OF DISTRIBUTION – Ownership by the Preferred Equity Provider."

| | |
|---|---|
| Trust Agreement: | The ownership of the Property is governed by the Trust Agreement of the Trust, the form of which is attached as **<u>Exhibit C</u>** to this Memorandum. The Trust Agreement sets forth the rights and duties of the Investors and the Trustees (as hereinafter defined) with respect to the Property. Pursuant to the Trust Agreement, the Investors do not have any say in the operation and ownership of the Property.  See "SUMMARY OF THE TRUST AGREEMENT." |
| Property – Master Lease: | The Trust entered into the Master Lease with the Master Tenant for an initial term of ten years and three months, commencing on the date on which the Property was acquired by the Trust and expiring on the date that is ten years and three months thereafter. The form of the Master Lease is attached as **<u>Exhibit D</u>** to this Memorandum. The Master Tenant has the right to renew the Master Lease for three successive renewal terms of five years each. Generally, neither the Trust nor the Master Tenant has the right to terminate the Master Lease during the initial term of the Master Lease. The Master Tenant is obligated to pay Rent (as hereinafter defined) plus all costs of operating, maintaining, repairing and leasing the Property, except Capital Expenses. See "SUMMARY OF THE MASTER LEASE," "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES" and "CONFLICTS OF INTEREST." |
| Property – Supplemental Payment Agreement | The Trust entered into the Supplemental Payment Agreement with the Master Tenant providing for certain annual supplemental payments to be made to the Trust by the Master Tenant during the first five years of the term of the Master Lease. The form of Supplemental Payment Agreement is attached as **<u>Exhibit E</u>** to this Memorandum.  See "SUMMARY OF THE SUPPLEMENTAL PAYMENT AGREEMENT AND THE SUPPLEMENTAL COLLATERAL AGREEMENT," "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES" and "CONFLICTS OF INTEREST." |
| Property – Supplemental Collateral Agreement | In connection with the execution of both the Master Lease and the Supplemental Payment Agreement by the Trust, the Sponsor has entered into a supplemental collateral agreement with the Master Tenant (the "**Supplemental Collateral Agreement**"), whereby the Sponsor will contribute, or cause to be contributed, to the Master Tenant certain capital proceeds generated from the Excess Land (up to a maximum of $700,000) in the event such proceeds are required by the Master Tenant to meet its payment obligations to the Trust under the Master Lease and the Supplemental Payment Agreement. The form of Supplemental Collateral Agreement is attached as **<u>Exhibit F</u>** to this Memorandum. See "SUMMARY OF THE SUPPLEMENTAL PAYMENT AGREEMENT AND THE SUPPLEMENTAL COLLATERAL AGREEMENT," "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES" and "CONFLICTS OF INTEREST." |
| Property – Management: | The Master Tenant entered into a property management agreement with the Property Manager to perform some or all of its property and asset management duties, and the Property Manager may subcontract its |

**GFI's Exhibit 18, Page 14 of 221**

obligations to third parties. The Master Tenant is responsible for any management fees payable to the Property Manager. The Property Manager is an Affiliate of the Sponsor, which is an owner of the Master Tenant through a joint venture with the Preferred Equity Provider. See "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES" and "CONFLICTS OF INTEREST."

| | |
|---|---|
| Property – Leases: | In connection with the Trust's purchase of the Property and the execution of the Master Lease between the Trust and the Master Tenant, the Master Tenant assumed the Leases. As of July 12, 2018, the Property was approximately 75.57% occupied, and approximately 100% pre-leased for the 2018-19 academic year. See "DESCRIPTION OF PROPERTY, PROPERTY TENANTS AND LEASES" for further details regarding each Lease. A copy of each Lease is available upon request. |
| Conflicts and Compensation of the Sponsor and Affiliates: | The Sponsor and its Affiliates will receive substantial fees and compensation from the Offering and operation of the Property and have conflicts of interest, as described in this Memorandum. See "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES" and "CONFLICTS OF INTEREST." |
| Investor Suitability Standards: | The Offering is strictly limited to persons who are Accredited Investors and who meet certain minimum financial requirements as to income and/or net worth, among other requirements. See "WHO MAY INVEST." |
| Use of Proceeds: | The Offering is being made for purposes of acquiring the Property, establishing the Trust Reserve and paying all related fees and expenses. See "ESTIMATED USE OF PROCEEDS" and "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES." |
| Deposits with Trust: | Any deposits or other payments made by any prospective Investor to an account designated by the Trust (at a bank selected by the Trust) will be retained in the account pending closing on the purchase of the Interest. See "ACQUISITION AND FINANCING." |
| Income Tax Considerations: | Irvine Venture Law Firm, LLP is "**Special Tax Counsel**" to the Trust and provided the Tax Opinion, which states that the acquisition of an Interest by an Investor should be treated as the direct acquisition of the Property by the Investor for purposes of Section 1031. The Tax Opinion is specifically limited to the treatment of an Interest for purposes of Section 1031, however, and does not address any other tax issues that may be of interest to Investors based on their own particular circumstances. Accordingly, all prospective Investors must consult their own independent legal, tax, accounting and financial advisors and must represent that they have done so as an investment requirement. In addition, the Tax Opinion was provided to the Trust to support the marketing of the Interests, and is not intended to be used and cannot be used to avoid penalties that may be imposed under federal tax law (although other facts can be used to avoid penalties, such as evidence of an Investor's good faith reliance on advice of his own independent counsel or the existence of substantial legal authority). See "FEDERAL INCOME TAX CONSEQUENCES" below. |
| Tax Exempt Investors: | Prospective tax-exempt investors should be aware that investment in the Trust is likely to generate income treated as unrelated business taxable income ("**UBTI**") for U.S. federal income tax purposes. See "FEDERAL INCOME TAX CONSEQUENCES – TAXATION OF TAX-EXEMPT INVESTORS." |

**GFI's Exhibit 18, Page 15 of 221**

| | |
|---|---|
| Defined Terms: | An "**Affiliate**" of any person or entity (i.e., a natural person, corporation, partnership, trust, unincorporated association or other legal entity) means any person or entity directly or indirectly controlling, controlled by or under common control with another person or entity. |
| Selling Expenses and Offering Expenses: | The Selling Expenses payable in connection with the Offering shall include (i) commissions and other fees payable to the Broker-Dealers of up to 9% of the Offering Proceeds, and (ii) reimbursement for legal, syndication, organization and offering costs equal to 0.93% of the Offering Proceeds. Reimbursements to Sponsor may include reasonable charges for services provided by Sponsor's internal legal staff and Sponsor's staff working on organizational and offering tasks. If the actual legal, syndication, organization and offering costs paid by the Sponsor are less than 0.93% of the Offering Proceeds, the difference will be retained by the Trust and will be added to and become part of the Trust Reserve. Certain employees of the Sponsor are registered representatives of the Managing Broker-Dealer and receive commissions in connection with the sale of Interests to Investors for whom such employees are the registered representatives. Selling Expenses do not include the Offering Expenses and Reserves, an acquisition fee payable to the Sponsor, due diligence costs, legal fees relating the Trust's acquisition of the Property and the Offering, title and closing costs, and other miscellaneous expenses, all of which will be funded out of the proceeds of the Offering and the Loan. The Trust reserves the right to pay reduced Selling Expenses and Offering Expenses or waive such sums with respect to Interests acquired by certain Affiliates and other persons.  See "PLAN OF DISTRIBUTION" and "ESTIMATED USE OF PROCEEDS." |

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 16 of 221**

## SUMMARY OF THE PURCHASE AGREEMENT

**General**

Each Investor will be required to execute a Purchase Agreement in the form attached as **Exhibit B** to this Memorandum. Prospective Investors should review the entire Purchase Agreement with their own independent legal counsel before submitting an offer to purchase an Interest. The following is merely a summary of some of the significant provisions of the Purchase Agreement and is qualified in its entirety by reference thereto.

**Submission of Offer to Purchase**

A summary of the procedures for the offer and purchase of an Interest is set forth in the section of this Memorandum entitled "HOW TO PURCHASE." Investors should read that section in its entirety.

**Closing**

Prior to an Investor's closing, each Investor is required to deliver to the Trust (i) the Purchaser Questionnaire (including the requisite documentary evidence listed therein), (ii) the Purchase Agreement, (iii) an executed signature page for the Trust Agreement, (iv) the purchase price for the Interest, and (v) such other documents as may reasonably be requested by the Trust and the Lender. At the closing of an Investor's purchase of an Interest, the Investor shall receive an Interest in the Trust.

**No Tax Advice**

**Other than the Tax Opinion issued by Special Tax Counsel and attached as <u>Exhibit H</u> to this Memorandum, the Investors will acquire their Interests without any representations from the Trust or the Sponsor regarding the tax implications of the transaction. Each Investor must consult his or her own independent attorneys and other tax advisors regarding the tax implications of the Investor's acquisition of an Interest in the context of his or her own particular circumstances, including whether such acquisition will qualify as part of a proposed Section 1031 Exchange, if one is contemplated. See "FEDERAL INCOME TAX CONSEQUENCES."**

**Termination of the Purchase Agreement**

An Investor's Purchase Agreement will be terminated and his or her purchase price will be fully refunded by the Trust if the terms and conditions of the Offering differ materially and adversely from the description of the Offering set forth herein and the Investor elects on that basis not to complete the purchase of the Interest. Otherwise, the purchase price will be nonrefundable.

**Indemnity**

The Purchase Agreement contains an indemnity provision whereby each Investor will be required to indemnify, defend and hold harmless the Trust, the Sponsor, the Master Tenant, the Lender and certain other parties and their Affiliates from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of the Investor's failure to fulfill all of the terms and conditions of the Purchase Agreement or untruth or inaccuracy of any of the representations, warranties, covenants or agreements contained therein.

**Arbitration**

Each Investor voluntarily waives the right to have any dispute arising out of the Purchase Agreement litigated in a court or decided by jury trial. Any dispute or controversy arising out of, or relating to, the Purchase Agreement will be resolved by final and binding arbitration brought in Orange County, California.

**GFI's Exhibit 18, Page 17 of 221**

## SUMMARY OF THE TRUST AGREEMENT

**General**

The Property is subject to the Trust Agreement of the Trust (the "**Trust Agreement**").  The form of the Trust Agreement is attached as **Exhibit C** to this Memorandum. The Delaware Trustee of the Trust is Corporation Service Company and the Signatory Trustee of the Trust is Greeley Flats ST, LLC, a Delaware limited liability company and an Affiliate of the Original Sponsor (the Delaware Trustee and the Signatory Trustee are collectively referred to as the "**Trustees**"). The rights and obligations of the Investors and Trustees with respect to the Property are governed by the Trust Agreement. The following is a summary of some of the significant provisions of the Trust Agreement and is qualified in its entirety by reference to the full Trust Agreement. Each prospective Investor should carefully review the full text of the form of Trust Agreement before purchasing an Interest.

**Purposes of the Trust**

The purposes of the Trust are: (a) to acquire, own, conserve, protect, operate and dispose of the Property; (b) to enter into and comply with the terms of the Loan Documents, the Master Lease and other transaction documents that relate to the Property; and (c) to take such other actions as the Trustees deem necessary or advisable to carry out the foregoing.  As required by the Lender, the Trust is a "bankruptcy remote" entity, which means, among other things, that it may not perform any act in violation of the Loan Documents, loan money to any person, commingle its assets with those of any other person, declare bankruptcy, convey the Property or dissolve or liquidate without the Lender's consent.

**Term of the Trust**

The Trust will terminate on the earlier of (a) December 31, 2068, or (b) the sale or other disposition of the Property.

**Authority and Duties of the Trustees**

The Trustees have the sole authority to manage, control, dispose of or otherwise deal with the Property in a manner that is consistent with their duty to conserve and protect the Property. The Trustees do not owe any fiduciary duties to the Investors, and the Trustees are not individually liable for their actions except (a) in the event of their own willful misconduct or gross negligence, (b) for the inaccuracy of their representation that the Trust Agreement has been authorized, executed and delivered by each of the Trustees, (c) for engaging in any Prohibited Action (as defined in "Limitation on Authority of Trustees" below), (d) for their failure to use ordinary care in disbursing monies to Investors pursuant to the terms of the Trust Agreement, and (e) for their own income taxes based on fees, commissions or compensation received in the capacity of Trustee. The Trustees will be indemnified by the Trust from any damages and liability they incur in connection with the Property, except if such damage or liability results from actions described in clauses (a) through (e) above. To the maximum extent allowed by law, the Trustees are entitled to advancement of expenses incurred in defending a claim prior to its final disposition, subject to repayment if a court renders a final, non-appealable judgment that the applicable Trustee is not entitled to indemnification.

The duties of the Delaware Trustee are limited to acting as Trustee in the State of Delaware to satisfy the requirement of the Delaware Statutory Trust Act that the Trust have at least one Trustee with a principal place of business in Delaware. All other duties under the Trust Agreement reside with the Signatory Trustee, including, but not limited to: (a) acquiring, owning, conserving, protecting and disposing of the Property; (b) entering into or assuming and complying with the terms of the Loan Documents, the Master Lease and any other transaction documents; (c) conserving and maintaining the Property in a manner consistent with the Trust's obligations under the Master Lease; (d) collecting rent payments from the Master Tenant and distributing such payments (less expenses and reserves) to Investors; (e) entering into agreements to enable Investors to complete Section 1031 Exchanges; (f) notifying relevant parties of any default by them under the transaction documents; (g) entering into an asset management agreement for purposes of fulfilling the management obligations of the Trust; and (h) solely in the event of a default by the Master Tenant (or any subsequent tenant), entering into a new lease of the Property (or a new Master Lease) or renegotiating or refinancing the Loan.

**GFI's Exhibit 18, Page 18 of 221**

**Compensation and Reimbursement of the Trustees**

The Trust will pay the Delaware Trustee an initial fee, monthly fees, and document execution fees for its services. The Signatory Trustee shall serve without compensation. The Trustees shall be entitled to be reimbursed for their reasonable expenses related to the performance of their duties.

**Limitation on Authority of the Trustees**

To protect the tax-free exchange status for the Investors under Section 1031, the Trust Agreement will prohibit the Trustees from taking any action to the extent such action would "vary the investment" of the Investors as defined by Treasury Regulation Section 301.7701-4(c)(1) (any such action that would "vary the investment" of the Investors a "**Prohibited Action**"). Specifically, any one of the following actions may constitute a Prohibited Action: (a) reinvesting money held by the Trust except as provided in the Trust Agreement, (b) renegotiating the terms of the Loan, enter into new financing, renegotiate the Master Lease or enter into new leases except in the event of the bankruptcy or insolvency of the Tenant, (c) making repairs other than minor non-structural modifications of the Property, except as required by law, (d) after the formation and capitalization of the Trust, accepting any additional capital contributions from any Investor, or any contributions from any prospective new investor, or (e) taking any other action that would in the opinion of tax counsel cause the Trust to be treated as a "business entity" for federal income tax purposes.

**Authority of Investors**

Investors will have no say in the operation and ownership of the Property, and their sole authority over the Trust is limited to selecting replacement Trustees in certain circumstances described below. Nevertheless, before the Trust enters into a binding contract to sell or convey the Property, the Signatory Trustee will canvass the Investors regarding their views of the potential transaction. The Signatory Trustee will consider the Investors' views and opinions in good faith but will not be bound by their opinions, and the decision to sell or convey the Property will rest solely with the Signatory Trustee.

Investors holding a majority of the Interests may remove a Trustee only if the Trustee has engaged in willful misconduct, fraud or gross negligence with respect to the Trust as determined by a final, non-appealable judgment of a court of competent jurisdiction. In addition, the prior written consent of the Lender will be required for the removal and replacement of any Trustee, and the Signatory Trustee may not be removed without its prior written consent until it and each of its Affiliates have been fully removed from any guaranty or indemnity obligations they may have under the Loan Documents. Upon the resignation or removal of a Trustee, Investors holding a majority of the Interests may appoint a successor Trustee.

**Cash Flow**

The Investors will be entitled, based on their respective Interests in the Trust, to all operating cash flow of the Trust, if any, and all net cash proceeds from any sale, exchange, or refinancing of the Property, after payment of amounts due under the Loan and reimbursement of the Trustees for expenses and reserves for amounts necessary to pay anticipated ordinary current and future expenses of the Trust. Cash flow for Interests that have not yet been sold to Investors is paid to Greeley Flats IB, LLC, which is the initial holder of the Interests. Any such cash flow will be distributed on a monthly basis. Amounts retained may be invested only in certain short-term government obligations or certificates of deposit in banks or trust companies having a minimum stated capital of $50,000,000.

**Right to Transfer Interests**

No proposed assignment, pledge, encumbrance, or transfer of an Interest (or any portion thereof) is effective or binding at law, or in equity upon the Trust or the Trustees without the prior written consent of the Signatory Trustee. The Signatory Trustee's consent to each proposed interest transfer is subject to the satisfaction of the following as determined by the Signatory Trustee in its sole discretion: (a) the proposed transfer's compliance with all applicable securities laws, (b) the proposed transfer's compliance with all transfer restrictions and requirements stated in the Loan Documents, including that the transfer does not constitute an event of default under the Loan Documents, (c) a

**GFI's Exhibit 18, Page 19 of 221**

determination that the proposed transfer would not result in the Trust having to register as an investment advisor or require the Trust or any Trustee to register as an investment advisor under the Investment Company Act of 1940, (d) determination that the proposed transfer would not cause the Trust Property to become "plan assets" (as defined in the Trust Agreement), (e) the execution by the proposed transferor and transferee(s) of documents to effectuate the transfer that are satisfactory to the Signatory Trustee, and (f) the payment of all expenses related to the proposed transfer by the transferor.  See "RISK FACTORS - Risks Relating to the Loan - Restrictions on Transfer and Encumbrance."

**Property Rights**

The Trust, and not the Investors, holds legal title to the Property. The Investors will not be entitled to share in the use of the Property or to any in-kind distribution of the Property.

**Bankruptcy; Termination upon Risk of Default**

Investors will not have liability for the debts or obligations of any other Investor, whether with respect to the Property or otherwise, and the Trust Agreement cannot be terminated by reason of the bankruptcy or insolvency of any Investor.  During the term of the Loan, if the Signatory Trustee determines that the Property is in jeopardy of being lost due to an actual or imminent default on the Loan, and the Signatory Trustee is prohibited from taking action with respect to such default because such action would "vary the investment" of the Investors, the Signatory Trustee is directed to terminate the Trust by converting it into (or effecting the contribution of the Property to) a limited liability company (an "**LLC**"). As a result of such transaction: (a) each of the Investors would become members of a new LLC converted from the Trust, owning an interest in the LLC identical to its Interest in the Trust, and (b) the Signatory Trustee would become the manager of the LLC. As a result of the conversion, the Signatory Trustee, in its new capacity as manager of the LLC, would be able to take actions to conserve and protect the Property that it would not have been able to take had it not terminated the Trust.

**Tax Status of Trust**

The Trust Agreement provides that the Trust is intended to qualify as a fixed investment trust and grantor trust for federal income tax purposes, and not as a partnership or association taxable as a corporation. Thus, although the Trust is respected as a separate entity for state law purposes, each Investor should be treated as owning a direct interest in the Property for purposes of Section 1031. See "FEDERAL INCOME TAX CONSEQUENCES." Each Investor is required to report its interest in the Trust in a manner that is consistent with the foregoing.

<div align="center">

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

</div>

**GFI's Exhibit 18, Page 20 of 221**

## SUMMARY OF THE MASTER LEASE

**General**

The Trust, as landlord, and the Master Tenant, as tenant, entered into a long-term Master Lease for the Property in its entirety. The form Master Lease is attached as **Exhibit D** to this Memorandum. The following is a summary of some of the significant provisions of the Master Lease and is qualified in its entirety by reference to the full Master Lease. Each prospective Investor should carefully review the full text of the form of Master Lease before purchasing an Interest.

**Term**

The Master Lease is for an original term of ten years and three months (the "**Original Term**"), commencing on the date the Property was acquired by the Trust. In addition, the Master Tenant has the right, in its sole discretion, to exercise three successive renewal terms of five years each (each a "**Renewal Term**"; together with the Original Term, the "**Term**"). The Master Tenant is required to give the Trust 60 days' prior written notice of its intention to exercise a Renewal Term. However, the Master Tenant cannot exercise a Renewal Term if it is then in default of the Master Lease. During the Term, the Master Tenant is obligated to pay the Rent and bear all costs of operating, maintaining, repairing, and leasing the Property. The Master Lease may be terminated prior to the end of a Term in circumstances that include the following: (a) by the Trust in the event of an uncured default by the Master Tenant; or (b) upon a sale of the Property, in which case the Master Lease terminates automatically.

**Rent**

Rent consists of: (i) an amount equal to the then annual debt service due to the Lender pursuant to the terms of the Loan Documents, other than, for the avoidance of doubt, any balloon payments of principal on the Loan (the "**Base Rent**"), and (ii) an additional amount specified in the Master Lease (the "**Stated Rent**," and together with the Base Rent, the "**Rent**"). The Master Tenant will pay the Base Rent by making monthly Debt Service payments to the Lender on behalf of the Trust. The Stated Rent will be paid in arrears to the Trust monthly.

The schedule of Rent for the Original Term is as follows:

| Lease Year | Base Rent | Annual Gross Stated Rent* | Total Annual Rent | Estimated Annual Gross Stated Rent as % of Equity |
|---|---|---|---|---|
| Lease Years 1 and 2 | The "Annual Note Payments"** | $668,340 | The total of Base Rent and Stated Rent when determined | 6.00% |
| Lease Years 3 and 4 | The "Annual Note Payments"** | $679,479 | The total of Base Rent and Stated Rent when determined | 6.10% |
| Lease Year 5 | The "Annual Note Payments"** | $690,618 | The total of Base Rent and Stated Rent when determined | 6.20% |
| Lease Years 6 and 7 | The "Annual Note Payments"** | $668,340 | The total of Base Rent and Stated Rent when determined | 6.00% |
| Lease Year 8 | The "Annual Note Payments"** | 679,479 | The total of Base Rent and Stated Rent when determined | 6.10% |
| Lease Years 9 and 10 | The "Annual Note Payments"** | $690,618 | The total of Base Rent and Stated Rent when determined | 6.20% |

\*    Before distribution of Stated Rent to Investors, the Trust will incur Delaware trustee fees, bank fees, legal fees, tax return preparation charges and other expenses currently estimated to be $5,000 per year.

14

GFI's Exhibit 18, Page 21 of 221

**        "Annual Note Payments" shall mean the aggregate payments falling due during each Lease Year under the Loan Documents (other than, for the avoidance of doubt, any balloon payments of principal required in respect of the Loan). Notwithstanding the foregoing, if at any time during the Term the amount of the Annual Note Payments or the then-annual debt service, as applicable, changes for any reason (for example, as a result of payment of additional principal, payment in full of any financing affecting the Property, or a resizing of the debt), then in such event the Base Rent and Stated Rent shall be equitably adjusted to take such change into account. In the event of an increase in Annual Note Payments, such change may include, at the election of the Master Tenant and if sufficient cash flow from the Property is available, a deemed payment of Stated Rent by the Master Tenant to the Trust up to the amount that would otherwise be paid to the Trust as Stated Rent, followed by a remission of such deemed payment by the Master Tenant on behalf of the Trust to the Lender in satisfaction of the Trust's additional obligations under the Loan Documents or such other financing that affects the Property.

The expected schedule of Rent for the Renewal Terms is as follows:

| Renewal Term 1 | The Total Annual Rent for each Lease Year of Renewal Term 1 shall be equal to the sum of the Stated Rent for the last Lease Year of the Original Term (calculated on a full year basis) plus the then-annual debt service applicable in each year of Renewal Term 1, with a floor equal to the Total Annual Rent payable during the final Lease Year of the Original Term and a maximum equal to 1.05 times the Total Annual Rental during the final Lease Year of the Original Term. |
|---|---|
| Renewal Term 2 | The Total Annual Rent for each Lease Year of Renewal Term 2 shall be equal to the sum of the Stated Rent for the final Lease Year of the Renewal Term 1 (calculated on a full year basis) plus the then-annual debt service applicable in each year of Renewal Term 2, with a floor equal to the Total Annual Rent payable during the final Lease Year of Renewal Term 1 and a maximum equal to 1.05 times the Total Annual Rental during the final Lease Year of Renewal Term 1. |
| Renewal Term 3 | The Total Annual Rent for each Lease Year of Renewal Term 3 shall be equal to the sum of the Stated Rent for the final Lease Year of the Renewal Term 2 (calculated on a full year basis) plus the then-annual debt service applicable in each year of Renewal Term 3, with a floor equal to the Total Annual Rent payable during the final Lease Year of Renewal Term 2 and a maximum equal to 1.05 times the Total Annual Rental during the final Lease Year of Renewal Term 2. |

Notwithstanding the foregoing, the Master Tenant may defer payment of Stated Rent as long as Base Rent and all other Operating Costs and Impositions for the Property are timely paid by the Master Tenant, and all other Master Tenant Net Cash Flow (as defined below) is paid to the Trust (such Net Cash Flow being a partial payment of Stated Rent), with any unpaid portion of Stated Rent to accrue and be payable out of future Net Cash Flow and to accrue interest at the rate of 2% per annum until repaid. "Net Cash Flow" means, for each month of the Term, the positive difference between (a) gross revenue from the Property, reduced by (b)(i) Base Rent and (ii) all Operating Costs and Impositions paid by the Master Tenant during such month. For the avoidance of doubt, the Master Tenant is obligated under the Master Lease to pay all Base Rent, Operating Costs and Impositions regardless of Net Cash Flow. If the Master Tenant is in default of the Master Lease, any accrued and unpaid Stated Rent would become immediately due and payable without regard to any Net Cash Flow limitation. Any deferred Stated Rent that is not paid prior to the expiration or earlier termination of the Master Lease would be payable in full (subject to the terms of the Loan Documents) no later than 91 days after (a) the applicable loan is repaid in full, or (b) the Property is sold or exchanged by the Trust.

**GFI's Exhibit 18, Page 22 of 221**

## Capitalization

Although the Master Tenant had limited capital upon the outset of the Master Lease, comprised of a demand note issued by the Original Sponsor in the amount of $150,000 and any amounts contributed pursuant to the Supplemental Collateral Agreement, the Master Tenant intends to satisfy its obligations with the demand note, any amounts contributed pursuant to the Supplemental Collateral Agreement and with any net after-tax profits it determines are necessary for the Master Tenant to satisfy its obligations under Master Lease (the "**Master Tenant Capitalization**"). The Master Tenant Capitalization is available for use by the Master Tenant in its discretion to satisfy its obligations under the Master Lease. The Master Tenant has no obligation to replenish any portion of the Master Tenant Capitalization once it has been used. Any remaining Master Tenant Capitalization upon a sale of the Property by the Trust will be retained by the Master Tenant.

## Master Tenant Profits

The Master Tenant is entitled to the net income from the Property equal to the difference, after taxes owed by the Master Tenant, between (a) the gross revenues the Master Tenant receives from the Property, and (b) the expenses it incurs in maintaining the Property and its payment and other financial obligations under the Master Lease, including its obligations to pay Rent, Impositions and Operating Costs.

## Property Expenses

The Trust is financially responsible for all "**Capital Expenses**" at the Property, which means all costs and expenses incurred in connection with the Property that are normally capitalized under generally accepted accounting principles, including but not limited to repairs and replacements to water heaters, flooring, window treatments, appliances, HVAC, plumbing and electrical fixtures, in each case to the extent such costs are not the responsibility of the Property Tenants. The Master Tenant is financially responsible for all costs and expenses incurred in connection with the Property that are not Capital Expenses, including fuel and utilities, repair costs, property management fees and employment costs for persons providing services to the Property, collection costs, reasonable attorneys fees, overhead and service agreements relating to the Property (the "**Operating Costs**"), and real estate taxes, assessments, water and sewer rents, and other charges for public utilities (the "**Impositions**"), except in each case to the extent such amounts are borne by and actually paid by the Property Tenants. Although the Trust is responsible for paying Capital Expenses, the Master Tenant will be fully responsible for performing all maintenance, repairs and replacements to the Property and the Trust shall not be required to actually perform any maintenance of the Property.

In order to help the Trust defray the cost of certain immediate expenses and potential future Capital Expenses and to pay for the Master Tenant's obligations under the Master Lease, the Trust and the Master Tenant established the Reserves. The Reserves include the Trust Reserve, which is a $345,000 reserve funded by the Trust for the benefit of the Trust to be used by the Master Tenant to pay for any Capital Expenses incurred in connection with the Property. The Trust Reserve includes an initial capital reserve of $163,625 required by the Lender. The Trust Reserve will belong to the Trust and any funds remaining in such reserve when the Property is sold will be distributed to the Investors pro rata in accordance with their Interests. The Reserves also include annual capital reserve deposits required by the Lender in the initial annual amount of $39,300. Reserves funded by the Master Tenant not from the Offering or the Loan will be part of the Master Tenant Reserve. The Master Tenant Reserve will belong to the Master Tenant and any funds remaining in such reserve when the Loan is repaid will be returned to the Master Tenant. The Master Tenant may use the Reserves to pay for Capital Expenses, Operating Costs and Impositions to the extent permitted under the Loan Documents. To the extent the Master Tenant uses Reserves established by the Trust to pay expenses that are not the responsibility of the Trust, the amount used will be treated as a non-interest-bearing loan from the Trust to the Master Tenant that is to be repaid by the Master Tenant on or before the sale or exchange of the Property. If the Master Tenant expends funds for payment of Capital Expenses (which are the obligation of the Trust) from Reserves established by the Master Tenant, then the amount expended will be treated as a non-interest-bearing loan from the Master Tenant to the Trust, and the Master Tenant will be entitled to reduce Stated Rent in order to be reimbursed for such expenditures, and will be entitled to be fully repaid for any such expenditures on or before the Trust's sale or exchange of the Property and to recover such advances out of the sales proceeds for the Property if not repaid prior to such date.

**GFI's Exhibit 18, Page 23 of 221**

**Casualty and Condemnation**

In the event of a casualty or condemnation, the Trust (or the Master Tenant on the Trust's behalf) will, to the extent permitted by law and the Loan Documents, restore the Property using the insurance proceeds or award, as applicable. If either the insurance proceeds or award, as applicable, exceeds the cost to restore the Property, then the excess will be treated as Monthly Rent and paid to the Trust.

**Insurance**

The Master Tenant must obtain, at its sole cost, all insurance required under the Loan Documents, including, without limitation, comprehensive, replacement-cost casualty insurance with not less than 12 months of loss of rent coverage and personal liability and property damage insurance. The Trust will be named as an additional insured or loss payee, as the case may be, on the insurance policies obtained by the Master Tenant.

**Rights and Duties of Master Tenant**

The Master Tenant has the sole and exclusive right and obligation to manage, lease, operate, repair and maintain the Property during the Term. Among other things, the Master Tenant has the right to negotiate and enter into subleases of the Property, to incur costs and expenses and pay the operating costs and expenses of the Property from the Property cash flow or reserves (including the Reserves), and to enter into property and asset management agreements with third parties or Affiliates. There can be no assurance that the Master Tenant will perform these duties as expected or that any failure to perform such duties will be discovered by the Trust on a timely basis.

**Property Management**

The Master Tenant entered into a property management agreement with the Property Manager to perform some or all of its property and asset management obligations. The Property Manager is an Affiliate of the Sponsor, which is an owner of the Master Tenant through a joint venture with the Preferred Equity Provider. The Property Manager is permitted to subcontract some or all of its obligations to third parties. The Master Tenant is responsible for any management fee payable to the Property Manager.

**Sales Commission**

The Master Tenant or another Affiliate of the Sponsor will be entitled to a sales commission when the Property is marketed and sold. Such commission will be based upon market commission rates and will not exceed 3% of the gross sales price of the Property. A third-party broker may also be retained to provide services in connection with the marketing and sale of the Property and may receive a separate fee or commission for such services. See "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES."

**Disposition Fee**

If the Property is sold or exchanged during the term of the Master Lease, then the Trust will pay the Master Tenant a disposition fee equal to 1% of the gross sales price of the Property (the "**Disposition Fee**"). The Disposition Fee will be paid to the Master Tenant at the closing of the sale or exchange of the Property. The Master Tenant may choose to waive any or all of the Master Tenant Disposition Fee. See "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES."

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

GFI's Exhibit 18, Page 24 of 221

## SUMMARY OF THE SUPPLEMENTAL PAYMENT AGREEMENT
## AND THE SUPPLEMENTAL COLLATERAL AGREEMENT

**General**

The Trust and the Master Tenant entered into the Supplemental Payment Agreement, the form of which is attached as **Exhibit E** to this Memorandum. In addition, the Sponsor and the Master Tenant entered into the Supplemental Collateral Agreement, the form of which is attached as **Exhibit F** to this Memorandum. The following is a summary of some of the significant provisions of both the Supplemental Payment Agreement and the Supplemental Collateral Agreement and is qualified in its entirety by reference to the full agreements. Each prospective Investor should carefully review the full text of the forms of Supplemental Payment Agreement and Supplemental Collateral Agreement before purchasing an Interest.

**Annual Supplemental Payments**

As additional consideration for the Trust entering into the Master Lease, the Master Tenant has agreed to make certain annual supplemental payments to the Trust pursuant to the terms of the Supplemental Payment Agreement (the "**Annual Supplemental Payments**") for the first five years of the term of the Master Lease. The schedule of Annual Supplemental Payments is as follows:

| Year | Annual Supplemental Payment |
|:---:|:---:|
| Years 1 and 2 | $109,570 |
| Years 3 and 4 | $109,544 |
| Year 5 | $103,962 |

The Annual Supplemental Payments are due and payable by the Master Tenant to the Trust at the same time Stated Rent is due under the Master Lease. In addition, the Annual Supplemental Payments may be accrued by the Master Tenant in the same manner and at the same time that Stated Rent may be accrued under the provisions of Section 3.07(b) of the Master Lease. The Annual Supplemental Payments shall not be deemed to be rent under the Master Lease and the Supplemental Payment Agreement shall not be considered to be a modification or supplement to the Master Lease.

**Supplemental Collateral**

In order to induce the Trust to enter into the Master Lease with the Master Tenant, the Sponsor entered into the Supplemental Collateral Agreement with the Master Tenant to provide additional capital to the Master Tenant in accordance with the terms and conditions of the Supplemental Collateral Agreement. Generally, the Sponsor has agreed to contribute "Available Capital" to the Master Tenant, when and as such capital becomes available to the Sponsor, if such capital is required by the Master Tenant in order to make Rent payments to the Trust under the Master Lease or Annual Supplemental Payments to the Trust under the Supplemental Payment Agreement.

For purposes of the Supplemental Collateral Agreement, "Available Capital" means the following capital proceeds that are generated from the Excess Land at any time when the Excess Land is owned or controlled, directly or indirectly, by the Sponsor: (i) net sale proceeds available to be distributed to the Sponsor upon a sale of the Excess Land, or any project developed subsequent to the date hereof on the Excess Land, (ii) net finance or refinance proceeds available to be distributed to the Sponsor following the placement of a lien upon the Excess Land, except to the extent such finance or refinance proceeds are intended to be used for the development or operation of the Excess Land, and (iii) net casualty and/or net condemnation proceeds that are available to be distributed to the Sponsor, except to the extent such casualty and/or condemnation proceeds are intended to be used to reconstruct or improve the Excess Land.

If Available Capital becomes available to the Sponsor at a time when the Master Tenant has sufficient funds to make all required payments of Stated Rent and all required Annual Supplemental Payments, then the Sponsor will contribute, or cause the owner of the Excess Land to contribute, the Available Capital to the Master Tenant, which Available Capital will be held and used by the Master Tenant for future payments of Stated Rent or Annual Supplemental Payments. Alternatively, the Sponsor or the owner of the Excess Land may hold such Available Capital

**GFI's Exhibit 18, Page 25 of 221**

as restricted capital, to be contributed to the Master Tenant when and as additional capital is required to pay Stated Rent or Annual Supplemental Payments.

The maximum amount of Available Capital that the Sponsor shall be required to contribute to the Master Tenant under the Supplemental Collateral Agreement, in the aggregate, is $700,000. All contributions of capital from the Sponsor, or on behalf of the Sponsor, to the Master Tenant, other than payments on the demand note issued by the Original Sponsor, shall reduce future amounts of Available Capital required to be contributed to the Master Tenant. The Supplemental Collateral Agreement does not restrict or limit the right of the Sponsor or its affiliates to lease, develop and/or operate the Excess Land. In addition, the Sponsor is not required to sell, finance or refinance the Excess Land in order to generate Available Capital.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**DESCRIPTION OF THE PROPERTY, PROPERTY TENANTS AND LEASES**

The following is a summary of the Property's features and specifications based on information from various sources.

| | |
|---|---|
| *Property Information:* | The Property is a garden-style, walk-up, student-housing apartment community located near the University of Northern Colorado. The Property is located on approximately 4.12 acres at 1758 6th Avenue, Greeley, Colorado. The Property consists of eight three-story apartment buildings with 93 units and 262 beds, along with a single-story pool building. The Property has a swimming pool, fitness center, clubhouse and leasing office. The Property is accessed from 18th Street. |
| *Description of Leases:* | The Trust leased the Property to the Master Tenant pursuant to the Master Lease. The Master Tenant assumed the existing Leases and will enter into new Leases with the Master Tenant as the sub-landlord and the Property Tenants as the subtenants. A form of the student lease is available upon request. |
| *Occupancy:* | As of July 12, 2018, the Property was approximately 75.57% occupied, and approximately 100% pre-leased for the 2018-19 academic school year. |
| *Date Constructed:* | The Property was constructed in 2014. |
| *Foundation:* | Foundation consists of reinforced concrete spread footings supporting a concrete slab-on-grade. |
| *Construction:* | The apartment buildings and pool house are conventional, wood-framed structures with isolated areas of concrete masonry unit walls. Wall structures primarily consist of conventional wood framing finished with a combination of brick veneer, painted fiber cement board siding, painted board-and-batten siding, split-face CMUs and areas of corrugated metal panel accent siding. Upper floors are constructed with wood joists sheathed in plywood topped with lightweight concrete and supported by interior wooden columns. Pitched and flat roof structures consist of engineered-wood trusses with oriented strand board sheathing. Pitched roofs are covered with asphalt composite shingles and standing seam metal panels. Flat roofs are covered with a singly-ply thermoset membrane. Windows are double-pane operable units with vinyl frames. Unit entry doors are painted, insulated metal set in wooden frames. The entrance to the leasing office and clubhouse consists of a pair of aluminum-framed doors with full height glazing set in an aluminum storefront system. |
| *HVAC:* | Apartment units are cooled by residential split systems with roof-mounted condensing units and heated by natural gas water heaters with ceiling-mounted fan coils. Heating and cooling of the leasing office and clubhouse is provided by direct expansion split systems with roof-mounted condensing units and gas-fired heating coils. Mechanical rooms are heated by electric resistance, cabinet unit heaters. |
| *Stairs/Elevators:* | Upper-level apartment units are accessed by a combination of open stairs and breezeways and interior stairs. Exterior stairs are steel-framed with precast concrete treads supported by angle brackets. Interior stairs are constructed of steel stingers and closed risers with steel treads finished with a rubber surface. No elevators are present on the Property. |

**GFI's Exhibit 18, Page 27 of 221**

| | |
|---|---|
| *Unit Descriptions:* | The Property consists of 93 units of the following configurations: |
| |   2 – studio units (583 square feet);<br>13 – 2 bedroom, 2 bath units (785 square feet); and<br>78 – 3 bedroom, 3 bath units (1,294 square feet). |
| *Parking:* | The Property has 126 open-air, at-grade parking spaces, including five ADA-designated spaces. |
| *Adjacent Uses:* | North:  Single-family residential and 17th Street.<br>South:  18th Street and University of Northern Colorado field sports complex.<br>East:    Multi-family residential.<br>West:   6th Avenue and single-family residential. |
| *Fire Sprinklers:* | The residential building is protected by a wet-pipe automatic sprinkler system, along with portable fire extinguishers. |
| *Wind Zone:* | The Property is located in Wind Zone II, an area with design wind speeds up to 160 miles per hour. |
| *Flood Zone:* | The Property is in Zone X (unshaded). Zone X includes both moderate and minimal risk areas. |

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 28 of 221**

## REGIONAL, LOCAL AREA AND MARKET ANALYSIS

The market information on the following pages is excerpted from an appraisal of the apartment complex prepared by an MAI appraiser at CBRE – Valuation and Advisory Services with a valuation date of January 18, 2018 (the "**Appraisal**"). The Appraisal was compiled using data and information obtained from various third-party services. Appraisals, the data used to compile them, and the results that they predict are, by definition, somewhat subjective and may be subject to various interpretations. Based upon the foregoing, information in or from the Appraisal may not accurately reflect or predict all information relevant to the market area or the Property. **None of the Trust, the Sponsor, the Original Sponsor or the Master Tenant has independently verified any of the data included in the Appraisal.**

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 29 of 221**

## Area Analysis



Moody's Economy.com provides the following Greeley, CO metro area economic summary as of Nov-17.  The full Moody's Economy.com report is presented in the Addenda.

4

**CBRE**

| GREELEY, CO - ECONOMIC INDICATORS | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indicators | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Gross Metro Product (C09$ Bil) | 9.0 | 9.3 | 9.9 | 11.1 | 11.5 | 11.3 | 11.6 | 12.1 | 12.4 | 12.7 | 13.2 | 13.7 |
| % Change | 3.3 | 3.4 | 6.3 | 12.1 | 3.6 | -1.4 | 2.4 | 4.1 | 3.2 | 2.0 | 3.7 | 3.8 |
| Total Employment (Ths) | 81.6 | 85.5 | 90.1 | 98.2 | 100.5 | 99.2 | 102.2 | 104.7 | 106.3 | 106.9 | 108.2 | 110.1 |
| % Change | 4.1 | 4.8 | 5.4 | 9.0 | 2.4 | -1.3 | 3.1 | 2.4 | 1.5 | 0.5 | 1.2 | 1.8 |
| Unemployment Rate (%) | 8.6 | 7.7 | 6.4 | 4.4 | 3.8 | 3.4 | 2.3 | 2.3 | 2.6 | 3.6 | 4.0 | 4.0 |
| Personal Income Growth (%) | 8.4 | 7.9 | 5.4 | 11.1 | 9.6 | 1.6 | 2.6 | 6.0 | 5.9 | 5.2 | 5.4 | 5.5 |
| Median Household Income ($ Ths) | 54.4 | 56.3 | 59.4 | 64.0 | 64.6 | 63.4 | 63.8 | 66.3 | 68.7 | 70.6 | 72.8 | 75.1 |
| Population (Ths) | 258.6 | 264.0 | 270.2 | 276.2 | 285.1 | 294.9 | 300.5 | 305.3 | 309.9 | 314.3 | 318.7 | 323.2 |
| % Change | 1.8 | 2.1 | 2.3 | 2.2 | 3.2 | 3.5 | 1.9 | 1.6 | 1.5 | 1.4 | 1.4 | 1.4 |
| Net Migration (Ths) | 2.0 | 3.0 | 3.8 | 3.5 | 6.3 | 7.3 | 3.1 | 2.4 | 2.2 | 2.0 | 2.0 | 2.2 |
| Single-Family Permits (#) | 792.0 | 1,182.0 | 1,616.0 | 1,995.0 | 2,624.0 | 2,463.0 | 2,854.7 | 3,940.6 | 3,057.6 | 2,706.5 | 2,801.1 | 2,932.5 |
| Multifamily Permits (#) | 97.0 | 59.0 | 319.0 | 713.0 | 562.0 | 546.0 | 907.5 | 547.0 | 470.3 | 419.7 | 432.3 | 479.6 |
| Fhfa House Price (1995Q1=100) | 150.1 | 153.5 | 163.2 | 181.3 | 202.2 | 225.7 | 247.7 | 258.3 | 261.2 | 261.5 | 263.7 | 269.1 |

Source:  Moody's Economy.com

### RECENT PERFORMANCE

Buoyed by a rebound in the energy industry, Greeley is a top performer nationally. The metro ea
is adding jobs at almost the fastest pace in the country, and year-ago job growth is more than
twice the Colorado average. Every major industry has added jobs over the past year, with
construction and mining as particular standouts. Consumer-oriented industries are also
performing well. The labor force is expanding as quickly as at the height of the oil boom. This
has pushed the unemployment rate up slightly since midyear, but at 2.4%, it remains among the
lowest in the country. The return of high-paying energy jobs and the tight labor market have also
pushed up Greeley's average hourly wage. The housing market barely stuttered when oil prices
tanked, and it is now gaining strength, with prices rising rapidly and homebuilding accelerating.

### OIL

Stable oil prices will keep the energy industry on a steady footing, but job growth will slow.
Heightened geopolitical tensions, sustained OPEC cuts, and a drawdown of capital expenditures
by U.S. drillers have pushed oil prices to their highest level since mid-2015. With the price per
barrel of West Texas Intermediate hovering around $58, Greeley drillers are comfortably within
profitable territory. The Quarterly Survey of Employment and Wages, a highly accurate but less
timely count of jobs, shows Greeley mining employment surged 30% over the year ending in
June. This is much stronger than that shown by the payroll survey and indicates an early rebound
in investment. The metro area's rig count has been stalled in the low 20s for the past year,
however, and with the price of oil forecast to remain near its current level through 2020, drilling
operations will not accelerate, restraining further hiring. By the end of the decade, Greeley will
have regained only a quarter of the mining jobs lost when prices crashed in 2014.

### CATTLE

Low calf prices will weigh on Greeley's ranchers, but cheap feed and strong export demand will
support feeders and packers. The metro area is one of the country's top beef producers, with

5



**GFI's Exhibit 18, Page 31 of 221**

extensive cattle ranching operations, feed lots, and processors. Prices for cattle edged up 8% from the nearly six-year low reached last year, but they remain far from 2014's all-time high. Cow-calf producers are still struggling with low prices, but cattle feeders benefited from low corn prices and a wide spread between calves and fed cattle over the first half of 2017. Growing herds will put still more downward pressure on calf prices in 2018. Strong overseas demand will absorb some of the market's oversupply, however, as U.S. beef exports hit a record high in the third quarter. Low input prices and strong exports will be a boon to the local meatpacking industry, which is dominated by top employer JBS USA.

## CONSUMERS

Although Greeley's rapidly expanding population and the return of well-paying energy jobs will drive job additions in consumer-facing industries, weak secondary drivers will restrain demand. Greeley's population grew at the fourth fastest pace in the country in 2016, expanding the metro area's internal market for retail and leisure/hospitality and driving demand for housing. A poor industrial mix outside of energy will be a drag on household income gains, however. Low educational attainment, especially relative to Colorado, will restrain growth in knowledge-based industries and keep nonenergy wages low relative to the state average.

## CONCLUSION

Greeley will not regain the growth rates reached in the first half of the decade, but it will remain a standout. The energy industry will drive up incomes, which will support consumer spending and housing and offset persistent drag from agriculture. Strong demographics ensure job and income gains will be among Colorado's strongest over the long term.

6

**CBRE**

**GFI's Exhibit 18, Page 32 of 221**

## Neighborhood Analysis



Map data ©2018 Google

**LOCATION**

The subject is in the City of Greely and is considered a suburban location within in Weld County. The subject is located in south central Greeley, a short distance to the south of Downtown Greeley.

**BOUNDARIES**

The neighborhood boundaries are detailed as follows:

7

CBRE

**GFI's Exhibit 18, Page 33 of 221**

| | |
|---|---|
| North: | 10th Street |
| South: | Route 34 |
| East: | Route 85 |
| West: | 17th Avenue |

## LAND USE AND GROWTH PATTERNS

Land uses within the subject neighborhood consist of predominantly single family homes surrounding the University of Northern Colorado. Commercial properties are located along major thoroughfares including Route 34, Route 85, and 9th Street. The neighborhood's notable demand drivers include the following:

- The University of Northern Colorado, located less than a mile southwest of the subject, features over 12,000 students and 500 academic staff. The University, established in 1889, has an endowment of over $81 Million and partakes in NCAA Division I athletics.

- The North Colorado Medical Center, located approximately one mile west of the subject, hosts nearly 3,000 employees and operates under the Banner Health health system. The state of the art facility is renowned for its burn and trauma care, cardiac program, and cancer care program.

Retail uses within the subject neighborhood consist mainly of service oriented and fast food retail developments concentrated along Route 34, Route 85, and 9th Street. Greeley's most prominent retail developments include the following:

- University Square, featuring over 200,000 SF of retail, was constructed in 1971 and renovated in 2003. The shopping center is anchored by a King Soopers grocery store and a Big Lots and is located approximately one mile south of the subject.

- Greeley Mall, featuring over 500,000 SF of retail, was constructed in 1973 and renovated in 2004. The mall's anchor tenants include Cinemark, Sears, JCPenney, and At Home. The mall is located approximately 2 miles southwest of the subject.

- Centerplace of Greeley features approximately 400,000 SF of retail over multiple phases and is located on Centerplace Drive in southwest Greeley. The shopping center is anchored by Target, Best Buy, Hobby Lobby, and T.J. Maxx and is located approximately 4 miles southwest of the subject.

Office uses in Greeley were mostly constructed in the 1960's and 1970's. The most prominent concentration of office uses are located at the corner of 8th Avenue and 8th Street, approximately one mile north of the subject. A newer concentration of office uses, built in the early 2000's, is located near the far west edge of Greeley and includes State Farm's regional office and Swift & Company office space. Industrial uses are concentrated along the eastern side of Greeley along the rail road tracks and near Greeley Weld County Airport.



**GFI's Exhibit 18, Page 34 of 221**

*Neighborhood Analysis*

With regards to multifamily development, Greeley has seen relatively little activity over the last five years, including no significant planned developments. The majority of development occurring in western Greeley:

- Legend Flats, located at 3301 Abbey Road, is a garden style community built in 2013 that features 176 units.

- Homestead Apartments, located at 3547 W 29th Street, is a garden style property built in 2014 that features 288 units.

- Creek View Apartments, located at 8200 W 20th Street, is a garden style community built in 2015 that features 348 units.

- Porter House Apartments, located at 5580 W 29th Street, is a garden style property built in 2017 that features 100 units.

## ACCESS

Primary access to the subject neighborhood is provided by US Highways 85 and 34. Highway 85 is a north-south United States highway that runs for 1,479 miles in the Midwestern United States. The southern terminus of the route is at the United States-Mexico border in El Paso, Texas, and the northern terminus is at the United States-Canada border in Fortuna, North Dakota. Highway 85 is an important regional transportation facility in northeast Colorado. It provides connection from Greeley and other smaller communities in Weld County to the Denver metropolitan area. It is the most direct route from these communities to Denver International Airport (DIA) and downtown Denver.

Additionally, east-west access is primarily provided via US Highway 34. U.S. Route 34 is an east–west United States highway that runs for 1,122 miles from the western suburbs of Chicago to north-central Colorado. Through Rocky Mountain National Park it is known as the Trail Ridge Road where it reaches 12,183 feet making it the highest paved through highway in the United States. The highway's eastern terminus is Berwyn, Illinois. Its western terminus is Granby, Colorado.

Because of the existence of these two highways, access to the neighborhood is considered good. The two highways are feed by streets such as 8th Avenue, which runs north-south, and connects Greeley to the north with neighboring Evans to the south; as well as, 11th Avenue, which is towards the western border of the neighborhood. Eleventh Avenue is generally considered a major thoroughfare in Greeley, as it bisects the campus of the University of Northern Colorado. The university is considered by most the foremost feature of the city of Greeley. As a result, 11th Avenue sees substantial traffic day-in and day-out

9



**GFI's Exhibit 18, Page 35 of 221**

## DEMOGRAPHICS

Selected neighborhood demographics in 1-, 3-, and 5-mile radii from the subject are shown in the following table:

| SELECTED NEIGHBORHOOD DEMOGRAPHICS | | | |
|---|---|---|---|
| 1758 6th Avenue<br>Greeley, CO | 1 Mile | 3 Miles | 5 Miles |
| Population | | | |
| 2022 Total Population | 18,405 | 85,373 | 130,612 |
| 2017 Total Population | 17,410 | 81,024 | 123,253 |
| 2010 Total Population | 15,994 | 74,004 | 110,983 |
| 2000 Total Population | 16,445 | 69,632 | 94,212 |
| Annual Growth 2017 - 2022 | 1.12% | 1.05% | 1.17% |
| Annual Growth 2010 - 2017 | 1.22% | 1.30% | 1.51% |
| Annual Growth 2000 - 2010 | -0.28% | 0.61% | 1.65% |
| Households | | | |
| 2022 Total Households | 6,276 | 30,339 | 46,304 |
| 2017 Total Households | 5,871 | 28,771 | 43,717 |
| 2010 Total Households | 5,248 | 26,433 | 39,673 |
| 2000 Total Households | 5,246 | 24,941 | 33,632 |
| Annual Growth 2017 - 2022 | 1.34% | 1.07% | 1.16% |
| Annual Growth 2010 - 2017 | 1.62% | 1.22% | 1.40% |
| Annual Growth 2000 - 2010 | 0.00% | 0.58% | 1.67% |
| Income | | | |
| 2017 Median Household Income | $29,468 | $40,025 | $49,172 |
| 2017 Average Household Income | $41,271 | $53,047 | $65,438 |
| 2017 Per Capita Income | $15,612 | $19,437 | $23,683 |
| 2017 Pop 25+ College Graduates | 1,479 | 8,500 | 16,513 |
| Age 25+ Percent College Graduates - 2017 | 20.7% | 18.6% | 22.4% |
| Source:  ESRI | | | |

## CONCLUSION

The neighborhood appears to be in the stability stage of the real estate life cycle. Because of westward expansion of the City of Greeley in the past few decades, the neighborhood had slid into decline. However, that has seemingly changed, as many users have been priced out of newer construction alternatives in the western sector of the City. Moreover, City-led efforts to revitalize downtown have seen modest success in attracting retailers and restaurants to the neighborhood's downtown core. While demand for uses in the neighborhood is likely to continue to prove favorable for the foreseeable future, we expect that growth will be tempered by developers' apparent preference for the western portion of the city and the protracted recovery of the oil and gas sectors.

10

**CBRE**

**GFI's Exhibit 18, Page 36 of 221**

## Market Analysis

The market analysis forms a basis for assessing market area boundaries, supply and demand factors, and indications of financial feasibility.  Primary data sources utilized for this analysis includes the Third Quarter 2017 Colorado Multifamily Housing Vacancy and Rental Survey, covering Colorado Springs, Fort Collins/Loveland, Grand Junction, Greeley and Pueblo. This is the most recent survey for Greeley.

The subject is in the Greeley market and is considered a Class A mid-rise style property.  Due to the degree of student housing in the subject market area, we have included an overview on the national student housing market.

### STUDENT HOUSING INDUSTRY

#### Overview

Over the past decade, the student housing industry has experienced significant growth, fueled in large part by the demographic trends supporting it. The adjacent chart illustrates the population growth projections according to the National Multi-Housing Council (NHMC). These "Echo Boomers" are defined as the children of the Baby Boom generation, 15-24 years in age or of college age. This Echo Boomer segment of the population is experiencing a significant spike, peaking around 2011-2013 as more and more children chose to attend college.  University enrollments across the nation have experienced marked growth following this population segment since the early 2000's.  In addition, more students are choosing to stay in college to pursue additional or advanced degrees due to the depressed job market, and individuals are returning to college for retraining and or higher degrees.



Along with this growth, many universities have outgrown their existing on-campus housing facilities.  At the same time, many on-campus housing facilities have become functionally obsolete, offering small shared bedrooms, common bathrooms and few amenities.  As student populations have grown, specialized student housing developers have stepped in and built off-campus housing alternatives with many offering leasing by-the-bedroom formats, luxury amenities specifically tailored to student needs, roommate matching and individual leases backed by parental guarantees in slightly modified garden style apartment communities.  Today, these communities are purpose-built specifically to meet the demands of today's students, in many

**CBRE**

**GFI's Exhibit 18, Page 37 of 221**

cases offering private bedrooms and private bathrooms, wireless high-speed internet access throughout the property, computer labs, tanning booths, movie theatres, large resort style swimming pools and hot tubs, and many more common area amenities.

Student housing is one of the only cyclical marketing assets in commercial real estate. This is due to the timing created by the typical nine or ten-month University calendar. Student properties follow a very cyclical leasing season that hinges on the start of the fall school academic year. The tenant turnover window for student properties is extremely short; typically, about two weeks in total just before the Fall move-in date. After this point, it is very unlikely that a property will sign any additional leases for the next twelve months, unless a student starts in January for the Spring semester. Occasionally some projects will offer short term leases, including spring semester leases with a premium monthly up-charge if offered at all by the management company. These properties will see some minor fluctuation in occupancy at the end of the calendar year. The softest student markets offer nine month leases and see a dramatic drop off in occupancy during summer months. The vast majority of student operators nationwide offer only twelve-month lease terms in order to avoid the economic losses that come with short term (nine month-academic year) leasing.

Strong markets will usually begin their leasing season for the following school year during the early winter months, sometimes signing leases ten to eleven months in advance of lease commencement. The majority of many student housing leasing seasons begin around February and can last through the end of the University calendar year in May, while the softest markets will often continue leasing all the way through the summer or until the start of the school year.

Student housing sales typically occur year-round, however the ideal student housing sales time frame is from the early summer to the end of each calendar year. Assuming an asset shows enough leasing velocity by early summer, investors will underwrite the property taking into account the upcoming fall rent roll. This gives current ownership the potential benefit of higher pricing based on improved rent growth for the upcoming school year. This assumes that they will close on the transaction after the start of the school year. This enables the student buyer to accurately forecast the upcoming months of income through the end of the student lease term in late summer. Once school has started, most investors will underwrite based on only the income that is in place for the remainder of the school academic year.

Some of the key differences from traditional multi-family apartment assets include the following items. Typically, student housing capitalization rates are 50 to 100 basis points above a similar conventional multi-family asset in the same market area. Lease terms are typically 12 months, with occasional 6 or 9 month leases in softer markets or in older properties with occupancy concerns. One of the primary attractions for renters is connected with the parental guarantees, which allow parents to only be responsible for their students rent, and not any delinquent rent of roommates. Fully furnished units and roommate matching are common and partial or all-inclusive utility packages are seen in many markets. In some markets with older University dorm

28



GFI's Exhibit 18, Page 38 of 221

product, developers have built modern student dorm projects better suited to the current needs of University students with larger and more private accommodations with on-site cafeterias and modern amenities. All leases end and begin on the same day for each tenant and this is tied to the start of the University calendar each year.

Location and access to a local bus system or other public transportation is a critical factor for success. The supply and quality of on-campus housing is also an important factor of success, along with the residency requirements at the individual University and the potential for change in these policies and any new construction planned by the University. Two other important factors of success are the level of growth in enrollment and the percentage of commuter students living at home with parents along with the level of off-campus student housing competition at the current time and planned for the future. The level of barriers to entry of new product are also vital concerns for any student housing developer or owner.

From 2000 to 2010, the industry has seen a consolidation, with several public REITs forming and acquiring large portfolios of student housing. Similarly, the capital markets focused more on the segment and both investment and development of the product type increased. By-the-bed student housing saw its peak in investment and development from 2005-2007, fueled in part by the easy access to construction and acquisition financing. Unfortunately, the student housing niche is not immune to the credit constraints experienced by the rest of the commercial real estate market. In the current economic environment, the industry has experienced a significant slow-down in new development which has only been seen in the best of markets. Student housing brokers cite that there is a healthy amount of investment capital earmarked for student housing waiting patiently on the sidelines. As the national financial market stabilizes, the brokers expect to see an increase in investment activity. Some of this will be centered on existing distressed product, and by class A product in the best markets and large growing Universities.

### Supply

Although the vast majority of area projects are leased by the student population and are oriented to student occupancy, only a minority fill the criteria of 'student housing.' The specific qualifications for our definition of student housing include design considerations, exclusive student tenancy, lease basis of individual bedrooms (rather than by units), and an above-standard amenity level. The properties filling these criteria in the local market include the subject and all of those properties identified in the competitive set.

Today, most students grow up with their own bedroom and many times with their own bathroom. When parents and students visit on campus housing, they find old buildings made of cinder block with little or no privacy. These aging facilities with deferred maintenance cannot meet the demands of this generation. Although universities have begun to renovate their housing facilities, they cannot meet the immediate needs of today's college students. Funding these renovations has been an obstacle for universities due to the recent decreases in state and federal funding of

**CBRE**

**GFI's Exhibit 18, Page 39 of 221**

universities. Because on campus housing is suffering from aged facilities and deferred maintenance on campus occupancy rates now average approximately 90% nationwide.

Properties that are above ten years of age generally have few on-site amenities and lack conveniences that are typical in new properties, in response to current demand trends. New market properties are being built to include business centers, elaborate fitness facilities, controlled access, in-unit security systems, and high-speed internet access.  Student housing incorporates some or all of these amenities plus many offer private baths with each bedroom. In both the short and long term, newer, higher quality complexes will continue take majority market share to the detriment of the older properties, especially those properties that lack timely maintenance and suitable management. Throughout the area, the majority of multifamily housing is over ten years old. The older properties have few on-site amenities and lack modern conveniences that are becoming standard.

With rising costs and aged facilities, on campus housing has lost most upper-class students to off campus apartment communities. These communities offer the amenities that today's students demand, including cable and computer connections, higher electrical capacity, exercise equipment, carpeting, no required meal plan, and private bedrooms. Nevertheless, many off-campus apartment communities have also aged, creating a need for a new product.

### Demand

During the past ten years, multi-family developers identified a niche in providing new, high quality student housing for college students.  They concluded that the existing housing stock serving many major colleges and universities was inadequate, old and overpriced.  Several factors were identified which contributed to this situation:

- The student housing market was largely ignored by private developers during the past 20-30 years
- The tightening budgets of most U.S. colleges and universities, and the on-campus availability of university owned land, do not allow for the expansion of student housing.
- Baby-boomer parents and grandparents are providing students with sufficient funding to support a more comfortable living arrangement.

In the few instances where a private development group has recognized this opportunity, the results have been very successful.  Because most campuses have not seen new construction in the past 5-10 years, the absorption and retention rate of these properties is significantly higher than traditional university related apartment projects.  Project and unit amenities are designed to promote effective time management and tools necessary to compete in the competitive college environment, while also providing for recreational time activities on the housing site.  These tools include internet access in every bedroom and living area, direct access to university shuttle bus stops, individual bedrooms for each student, and a comfortable and safe living environment. These unit types are typically two, three and four bedroom units which lease on a per bedroom/student basis which individual leases to each student/tenant.

30



**GFI's Exhibit 18, Page 40 of 221**

Few students prefer dormitory housing. Dorms do not offer the privacy or amenities found in most apartment communities. Most of the dorms have communal restrooms and baths; many do not have individual in-room sinks; and some dorms do not have air conditioning.  On a cost basis, the dorms are significantly cheaper than most apartments in our survey of private student housing. One of the cost advantages of dorm residence is a per-semester lease term. Market properties require a 12-month lease, which typically begins in mid-August or the first of September.  Also, dorm rent includes utilities, which are generally not included in market properties.

According to most university housing directors at universities, price is not a factor that constrains most students.  Students and their parents are willing and able to pay more than dorm cost for rent and utilities – typically 40% to 50% more to live off campus.  Students indicate in surveys a desire for fewer rules and less supervision.  A recent survey of college freshmen reported 93% didn't share a bedroom while living at home – shared bedrooms having been more commonplace in previous generations, in those generations when the university's dorms were constructed.  General perceptions among freshmen are that dormitories are lacking in cleanliness and privacy.

### Enrollment Trends

The following information was obtained from research provided by the CBRE National Student Housing Brokerage Group.  The Fall 2016 national college and university enrollment is expected to be approximately 20.5 million, according to the National Center for Education Statistics (NCES), which represents a 34% increase since Fall 2000. Additionally, the NCES projects enrollment to increase by over 3,000,000 between 2014 and 2025 to a total of 23.3 million students. New international student enrollment continues to climb nationally, with the 2015-2016 school year seeing a record high of 1,043,839 students. This was a 7% increase over the previous year, and an 85% increase over the 2005-2006 year. According to the Open Doors report in 2015, 65% of funds for international students comes directly from the students, themselves, or their families, demonstrating the ability of these students to afford quality off-campus housing. Currently, on average, the largest universities in the country are only able to house 21.8% of their undergraduate student body in on-campus housing according to Axiometrics data. The remaining 78.2% of undergraduate students and graduate students are left to find off-campus housing options. This pent-up demand continues to force the vast majority of students off-campus, driving rents and ultimately values of student housing assets.

CBRE

GFI's Exhibit 18, Page 41 of 221



Source: National Center for Education Statistics; actuals through 2014

### Historical Enrollment by Institution

Further dissection of historical enrollment by type of four-year institution brings about an important differentiation in trends between non-profit and for-profit universities. Four-year public institutions, non-profit private institutions, and for-profit private institutions grew 38.1%, 32.6%, and 460.0%, respectively, between 1999 and 2014 according to the NCES. However, the trend at for-profit private institutions in the most recent years has dramatically shifted; national enrollment at four-year, for-profit private universities reached a peak in 2010 and decreased by more than 320,000 through 2014. Conversely, four-year public institutions and non-profit private institutions experienced continued enrollment growth in this same period, swelling by an additional 477,067 students. Consistent growth at four-year public and non-profit private universities across the nation is a positive indicator for the student housing industry, as these are the institutions at the forefront of student housing investment activity.

32

**CBRE**

35





Source: National Center for Education Statistics

### Transaction Volume

The student housing industry experienced a staggering year in 2016 with total transaction dollar volume of $9.8B, which represents a $4.2B increase from 2015 and more than three times the volume achieved in 2014. Approximately $3.3B of the $9.8B transacted in 2016 is attributed to the large Campus Crest Group and University House entity acquisitions. However, even when

33

**CBRE**

GFI's Exhibit 18, Page 43 of 221

**Market Analysis**

excluding these two large capital events, transaction volume in 2016 still exceeded 2015. Please note that equity recapitalizations and partnership acquisitions are not included in CBRE's charts.



This graph examines the total transaction dollar volume, excluding the large portfolio entity transactions in 2012 and 2016. The industry saw an increase in overall transaction volume from 2015 of $874 million dollars or 16% higher. 2016 marks the sixth consecutive year of all-time record transaction dollar volume and all-time record number of properties transacted. The aggregate number of total transactions, however, did not increase in 2016, which indicates the average dollar amount of each transaction was larger than in 2015.



This chart compares the total dollar volume of individual asset and portfolio transactions. In the past three years, the number of portfolio transactions has more than tripled. Total portfolio transaction dollar volume reached $2.2 billion dollars in 2016 with 22 portfolios consisting of 98 assets. This

34

**CBRE**

37

**Market Analysis**

marks a 66% increase in portfolio transaction dollar volume from 2015. Conversely, individual asset transaction volume remained constant over the last two years. Therefore, the total increase in transaction dollar volume from 2015 to 2016 can be fully attributed to an increase in portfolio volume.

CBRE defines a portfolio as the transaction of two or more assets from the same seller to the same buyer; this includes sister properties and scattered site portfolios. Only three of the 22 portfolios transacted in 2016 were larger than $125 million dollars. The majority of portfolios sold in 2016 were not large-scale offerings, but thoughtful groupings of homogeneous assets. Of the 22 portfolios transacted in 2016, only one portfolio included more than 8 assets; overall, the portfolios averaged less than 4.5 assets and $92 million dollars each.



## Cap Rate Trends

The average cap rate for 2016 was 5.87% for student housing transactions. In comparison, multifamily cap rates averaged 5.67% for 2016, representing a 20 basis point spread between multifamily and student housing cap rates for the year. The larger cushion between student and multifamily cap rates bodes well for student housing owners looking to sell since investors can enter the asset class and achieve better yields. Additionally, student housing yields offer a larger spread over current interest rates, which allows for less of an impact to cap rates for student housing product. 2016 marks the first year in history for the cap rate to average below 6.00% for each of the four quarters and the second consecutive year with the average annual cap rate below 6.00%.

**CBRE**



| | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 | 1Q16 | 2Q16 | 3Q16 | Q416 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SH Cap Rate | 6.57% | 6.76% | 5.65% | 6.20% | 5.91% | 6.14% | 5.92% | 5.85% | 5.99% | 5.77% | 5.96% | 5.76% |
| MF Cap Rate* | 6.20% | 6.30% | 6.00% | 6.00% | 6.10% | 6.00% | 5.91% | 5.81% | 5.80% | 5.64% | 5.65% | 5.59% |

*Represents Average Quarterly Cap Rates for all well-qualified Multifamily transactions in the United States with minimum consideration of $2.5M according to Real Capital Analytics Trends and Trades report.

When analyzing cap rates based on the properties' distance to campus, it is evident that there is a strong correlation between proximity to campus and the transaction cap rate. Specifically focusing on the 2016 data, there are two large differentials worth noting. Assets between one quarter mile and one-half mile from campus traded at 15 basis points lower than assets between a half mile and one mile from campus. The largest differential between any of the tranches in 2016, which was 20 basis points, occurred between assets one half to one mile from campus and those greater than one mile. Though cap rates for all student assets have compressed over the last two years, the cap rate spread between the pedestrian assets compared to those furthest from campus has continued to decline.



| | 2014 | 2015 | 2016 |
|---|---|---|---|
| Less Than 0.25 Miles | 5.75% | 5.77% | 5.69% |
| Between 0.25 and 0.5 Miles | 6.34% | 5.74% | 5.76% |
| Between 0.5 and 1.0 Miles | 6.45% | 5.77% | 5.91% |
| Greater Than 1.0 Miles | 6.30% | 6.19% | 6.11% |

36

**CBRE**

**GFI's Exhibit 18, Page 46 of 221**

In the graph below, CBRE analyzes how a Division I (or FBS) football designation impacts overall cap rates. There is a noticeable premium for assets serving Division I football schools relative to Non-Division I properties.

Further demonstrating the continued significance of D-I schools and student housing, there were more than double the number of transactions at Division I universities than non-Division I universities in 2016. Drilling down deeper, within the Division I schools, there were over two times as many transactions at Power 5 Conference schools. Power 5 universities are those with football programs in The Atlantic Coast, Big Ten, Big 12, Pac-12, and Southeastern Conferences (Notre Dame was included). Additionally, cap rates at Power 5 schools were 22 basis points lower than non-Power 5 Division I schools. There was an enormous 65 basis point spread between Power 5 schools and non-Division I schools in 2016, further demonstrating a strong investor preference for assets at Power 5 schools, specifically.

To demonstrate why investment at Power 5 schools is in such high demand, CBRE performed analysis on enrollment growth at Power 5 schools from 2014 to 2016 and found that these 63 schools grew by an estimated 66,000 students over the last two years.



*Power 5 consists of universities with football programs in The Atlantic Coast Conference, Big Ten Conference, Big 12 Conference, Pac-12 Conference, and Southeastern Conference

Analysis excludes transactions in California; New York, NY; Washington, DC; Chicago, IL.

### Pricing Trends

National student housing pricing trends on a per bed basis reached another record high in 2016, as the per bed price for the year was at $66,386. CBRE attributes this continued increase in pricing to rental rate increases, predominantly, but also cap rate compression. According to Axiometrics, national average per bedroom rental rates increased 3.6% and occupancies increased 0.5% year-over-year, driving net operating incomes for assets that transacted in 2016.

CBRE

GFI's Exhibit 18, Page 47 of 221



Properties built within the last ten years traded on average for $92,914 per bed in 2016, with the highest pricing exceeding $345,000 per bed for urban core assets. Older product traded for an average $64,652 per bed. CBRE noted that properties older than 10 years that traded in 2016 were 34% further from campus on average than newer transactions. It is worth observing that eight transactions of assets over ten years old traded above $100,000 per bed. These trades were comprised predominantly of extremely well-located, conventionally developed assets in core, urban markets and had an average bed to unit ratio of 2:1.



2016 experienced the highest per bed pricing level ever for assets located within one half mile of campus. CBRE attributes this increase in pricing to developers continuing to push the envelope on rental rates, as well as continued cap rate compression. A significant spread continues to exist between the per bed pricing of assets within one half mile of campus versus those outside that threshold, which CBRE attributes to the large discrepancy nationally between rental rates of pedestrian assets and non-pedestrian assets.

38

**CBRE**

41



## Capital Markets

The student housing lending environment was equally dynamic in 2016. In fact, the remarkable rise in student housing acquisitions last year was made possible by the availability of debt capital from an array of sources and at favorable borrowing rates. At the same time, and of particular significance to the long-term health of the industry overall, lenders also maintained safe levels of leverage—typically between 65% and 75% loan-to-values (LTVs)—below the high levels experienced during the pre-recession boom.

At the top of the list of debt financing providers was Freddie Mac and Fannie Mae, both of which achieved another record year having purchased a combined $112 billion in mortgages in 2016, an impressive 25% overall year-over-year growth. Over $4.2 billion of that total was from student housing loan purchases, up a dramatic 27% from 2015. The most notable 2016 change was that, between the two agencies, Fannie Mae provided the majority share. However, both lenders provide an array of fixed and floating rate products that provide attractive financing alternatives for student housing owners. Additionally, each lender has enacted specialized programs that have been especially impactful for student housing owners. These include structured credit facilities for portfolio acquisitions as well as programs with pricing incentives for properties that have either achieved specific energy conservation certifications or plan to enact energy conservation improvements.

Life companies continued to serve as an important source of capital for certain student housing deals in 2016. Life companies are typically more selective with their focus on the best Class A assets in major markets. When assets fit their criteria, life company financing is likely to be very attractive on several levels including price, early rate lock options and flexible pre-payment provisions. Most loans are made at lower loan-to-value (LTV) levels (typically 65% or less), although for some notable exceptions, life companies have stretched up to as high as 75% LTV.

39

**CBRE**

GFI's Exhibit 18, Page 49 of 221

CMBS did fill some void for certain student housing transactions in 2016 but was not a significant provider of student housing financing last year. As a whole, the CMBS industry has struggled to gain traction and has been acutely affected by credit market volatility and a lack of liquidity in the broader bond market. Going into 2017, that market has had to undertake a structural change with the implementation of new regulations on the securitizations. The adjustments to the structural changes to their model will ultimately impact its ability to be competitive in the long term. The positive news is that there have already been a number of recent securitization pools that have complied with those regulations and traded at lower than expected yields. When working effectively, the CMBS market provides a valuable option for a segment of the student housing market.

Construction financing continues to pose challenges for student housing developers. Banks have traditionally been a major source of financing for development. New banking regulations combined with a notable amount of banks becoming full on their multifamily and student housing allocations have created a much tougher lending environment for construction financing. The supply and demand imbalance has resulted in less leverage, higher pricing and tougher credit terms.

For all types of commercial real estate, the most recent Federal Reserve Bank Senior Loan Officers Opinion Survey reflected weaker construction loan demand at large banks, but stable at medium/small banks. Local or regional banks did fill a void in some 2016 and more recent financings. The challenge is that increased land and construction costs have produced larger loan size requests that are more challenging for the smaller banks, necessitating finding multiple lenders on one transaction.

In 2017, the pullback on construction lending by banks is expected to continue. However, other non-bank lenders have entered the construction financing market and have been successful in filling the void by providing the required leverage terms albeit at higher over cost for that capital. Combining the increased scarcity and affordability of attractive land sites as well as higher building and financing costs, it comes as no surprise that we find a moderation of new supply that is expected to  be delivered overall for student housing over the coming years. Quantifying that, CBRE has observed a decline from a high point of over 62,000 beds delivered in 2014 down to 46,000 beds delivered in 2016 and less than 30,000 beds observed in the pipeline for 2018. While challenging to developers, the upside is that the new supply pipeline is likely to decline, helping to

40

CBRE

**GFI's Exhibit 18, Page 50 of 221**

preserve the strong property market fundamentals which benefit current owners and their capital providers



### Seller Profile

This graph represents investor market share based on total dollar volume in regards to disposition activity in the student housing sector. The most notable changes in seller profile between 2015 and 2016 occurred in the Developer and fund categories. While both the average dollar size and bed count of developer dispositions increased in 2016, nine fewer sales occurred, contributing to a reduction in their seller share.

The sector also experienced an upswing in Fund dispositions after a dip in 2015. The increase was predominately driven by maturities of two student housing funds and one large portfolio transaction. We anticipate the fund dispositions will remain strong in 2017 as the remaining assets in these maturing funds are sold and higher-return funds sell their merchant built assets. TIC transactions will decrease as the majority of TIC assets were purchased before 2007 and their 10-year debt window has ended or is coming to an end.

41

**CBRE**

GFI's Exhibit 18, Page 51 of 221

**Market Analysis**



### Investor Profile

This slide represents investor market share based on total dollar volume in regards to acquisition activity in the student housing sector. The buyer profile in 2016 remained relatively consistent with 2015. The most dramatic shifts in the buyer profile market share from year-end 2015 were the reduction of the Fund and Public REIT buy side transactions. Public REITs acquired few assets through arm's length transactions in 2016. However, even if the Public REITs' partnership acquisitions were included, the Public REIT buyer profile would only increase to 6% of the market, still a nearly 2% drop from 2015. The drop in Public REIT and Fund investor market share was predominately captured by institutional and private buyers, who made up the majority of the 17 new entrants to the industry in 2016. These 17 new entrants accounted for 16% of the 155 transactions and 35% of the total dollar volume in 2016.



42

**CBRE**

**GFI's Exhibit 18, Page 52 of 221**

CBRE compares the buyer profile for the ten largest transactions in 2015 and 2016 in this chart. In 2015, Funds accounted for 54% of the ten largest transactions in the sector. Private investors accounted for only 24% of the ten largest transactions and institutional investors accounted for no transactions.

The buyer profile for the ten largest transactions in 2016 shifted dramatically. Of the ten largest transactions last year, five were portfolios, four of which were acquired by Private investors. For that reason, Private investors outpaced funds and captured 42% of the market share. Therefore, illuminating the fact that many private investors in the sector are able to acquire large acquisitions if they can diversify the risk across multiple assets.

Public REITS were reduced to zero percent of the ten largest transactions in the market and Institutional investors earned 12%, all through single asset acquisitions. Institutional investors are beginning to get a footing in the student housing sector, as shown by their increase in market share over 2015. Not only does this further institutionalize the industry, but also drive competition for $100-million-dollar and larger assets, which previously appealed to a shallow pool of investors consisting predominately of funds and Public REITs



### Industry Conclusions

With numerous portfolios on the market, 2017 is expected to see higher volumes than 2016. Funds and investors have significant student housing allocations that are expected to drive acquisitions, with dispositions driven by maturities of debt and fund vehicles, as well as changes in strategies. Considering current stable economic conditions, demand for superior quality properties should continue, though older properties are likely to face an increasingly competitive environment.

### UNIVERSITY/COLLEGE INFLUENCE

The subject neighborhood apartment market is tied to the University of Northern Colorado. The following is the Fall 2017 summary from AXIOMetrics



GFI's Exhibit 18, Page 53 of 221



UNIVERSITY of NORTHERN COLORADO

**University of Northern Colorado**
**Greeley, CO**
**Fall 2017**

2017 AXIOMETRICS a RealPage company

## University Report Summary

**U.S. News National Ranking*: NR / 220**

* US News & World Report 2017

### Key Takeaways

1. Starting fall 2017, students applying to Northern Colorado can do so through the Common Application online platform and college planning website. The system provides a steam-lined process for students when applying and additional resources related to financial aid and scholarship opportunities.
2. Enrollment growth at the University of Northern Colorado is expected to remain well above the long-term average over the next six years, growing by 1.5% or 190 new students per year.
3. With minimal supply in the pipeline, occupancy and rent growth for privately owned student housing properties are projected to average 96% and 3.1%, respectively.

### University Ranking

| | |
|---|---|
| **Revenue Growth** | |
| University-Owned Properties | 18/175 |
| Privately-Owned Properties | 129/175 |
| **New Supply** | |
| University-Owned Beds | 128/175 |
| Privately-Owned Beds | 133/175 |
| **Demand** | |
| Enrollment Growth | 48/175 |
| Change in Enrollment | 91/175 |
| College Age Pop. Growth (State) | 11/175 |
| **Affordability / Tuition** | |
| In-State Tuit vs Med State HH Inc | 133/175 |
| Out-of-State Tuit vs Med US HH Inc | 124/175 |
| **Ranking** | 34 |
| **Overall Index** | 128 |
| **Living Requirement:** | Freshman |

### Key University Trends

| *As of Fall* | **2017F** | **2018F** |
|---|---|---|
| **Total Enrollment** | 12,493 | ↑ |
| **Enrollment Growth** | 1.9% | ↓ |
| **Tuition** | | |
| *In-State* | $7,286 | ↑ |
| *Out-of-State* | $18,991 | ↑ |
| **Tuition vs. Household Income** | | |
| *In-State vs. Med State* | 10.5% | ↑ |
| *Out-of-State vs. Med U.S.* | 32.0% | ↑ |
| **New Supply** | | |
| *University-Owned Beds* | 89 | |
| *Privately-Owned Beds* | 0 | |
| **Col. Age Pop. Growth (State** | 0.8% | ↑ |
| **New Beds as % of Tot. Enroll.** | | |
| *University-Owned Beds* | 0.7% | |
| *Privately-Owned Beds* | 0.0% | |
| **PT Students % of Tot. Enrol** | 24.1% | ↑ |

### Rent/Occupancy Trends

| **2017F** | | **2017F-2021F** | |
|---|---|---|---|
| University-Owned Housing | | | |
| 2.6% | 95.0% | 2.9% | 94.6% |
| Privately-Owned Housing | | | |
| 2.7% | 96.1% | 3.0% | 96.0% |

### Supply Risk

| | **2017F** |
|---|---|
| University-Owned Housing | Low Below AVG |
| Privately-Owned Housing | Low Below AVG |

Based upon each category's percent share of its housing supply to total enrollment to 175 university average

University Website
Strategic/Master Plan

### University-Owned Housing Market

| *As of Fall* | **2017F** | **2018F** | **2019F** | **2020F** | **2021F** | **5 Yr. Avg.** |
|---|---|---|---|---|---|---|
| **Rent / Occupancy** | | | | | | |
| Double Occ. Rent | $5,233 | $5,337 | $5,487 | $5,662 | $5,877 | **$5,519** |
| *YOY Change* | *2.6%* | *2.0%* | *2.8%* | *3.2%* | *3.8%* | ***2.9%*** |
| Occupancy Rate | 95.0% | 94.0% | 94.2% | 94.8% | 95.0% | ***94.6%*** |
| *YOY Change* | *-0.8%* | *-1.0%* | *0.2%* | *0.6%* | *0.2%* | ***-0.2%*** |
| **Demand/Supply** | | | | | | |
| Enrollment | 12,493 | 12,618 | 12,769 | 12,999 | 13,259 | **12,828** |
| Enrollment Growth | 1.9% | 1.0% | 1.2% | 1.8% | 2.0% | **1.6%** |
| Total Beds | 3,128 | 3,230 | 3,197 | 3,144 | 3,239 | **3,188** |
| Beds Growth | 89 | 102 | (33) | (53) | 95 | **40** |
| *YOY Change* | 2.9% | 3.3% | -1.0% | -1.7% | 3.0% | **1.3%** |
| Occupied Beds | 2,973 | 3,036 | 3,012 | 2,981 | 3,077 | **3,016** |
| Beds as % of Enroll. | 25.0% | 25.6% | 25.0% | 24.2% | 24.4% | **24.9%** |

### Privately-Owned Housing Market

Aggregated results for purpose-built and competitive student housing properties

| *As of Fall* | **2017F** | **2018F** | **2019F** | **2020F** | **2021F** | **5 Yr. Avg.** |
|---|---|---|---|---|---|---|
| **Rent / Occupancy** | | | | | | |
| Rent/Bed | $595 | $605 | $622 | $643 | $671 | **$627** |
| *YOY Change* | *2.7%* | *1.7%* | *2.8%* | *3.4%* | *4.3%* | ***3.0%*** |
| Occupancy Rate | 96.1% | 95.1% | 95.5% | 96.1% | 97.0% | **96.0%** |
| *YOY Change* | *0.2%* | *-1.0%* | *0.4%* | *0.6%* | *0.9%* | ***0.2%*** |

**Source:** Data for charts, metrics and housing summary is from university websites, government websites, and university personnel. Med. HH income data from Bureau of Labor Statistics. Calculations performed by Axiometrics Inc.
**Disclaimer Notice:** This report is prepared from data believed reliable but not guaranteed by AXIOMETRICS INC. and its directors, officers, employees, and contractors, without verification or investigation. The facts and forecasts contained herein are not guaranteed to be complete or error-free. The forecasts expressed in this report are subject to change without notice. Use at your own risk.

## University Residency Requirement

The university requires freshmen to live on campus.

## Rent & Occupancy Trends – On Campus

The following data reflects rental rate and occupancy data for the subject on-campus student housing market.



### University of Northern Colorado
### Greeley, CO
### Fall 2017

| University Owned Housing and Tuition Trends | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017F | 2018F | 2019F | 2020F | 2021F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Beds | 3,186 | 3,030 | 3,030 | 3,135 | 3,113 | 3,109 | 3,109 | 3,094 | 3,088 | 3,039 | 3,128 | 3,230 | 3,197 | 3,144 | 3,239 |
| Occupied Beds | 2,756 | 2,590 | 2,491 | 2,457 | 2,736 | 2,819 | 2,362 | 2,651 | 2,762 | 2,913 | 2,972 | 3,036 | 3,011 | 2,980 | 3,077 |
| Beds +/- | 52 | -156 | 105 | -22 | -4 | | -15 | -6 | -49 | 89 | 102 | -33 | -53 | 95 | |
| Net Demand | 247 | -166 | -99 | -34 | 279 | 83 | -457 | 289 | 111 | 151 | 59 | 63 | -24 | -31 | 96 |
| | | | | | | | | | | | | | | | |
| Occupancy | 86.5% | 85.5% | 82.2% | 78.4% | 87.9% | 90.7% | 76.0% | 85.7% | 89.4% | 95.0% | 95.0% | 94.0% | 94.2% | 94.8% | 95.0% |
| Vacancy | 13.5% | 14.5% | 17.8% | 21.6% | 12.1% | 9.3% | 24.0% | 14.3% | 10.6% | 4.1% | 5.0% | 6.0% | 5.8% | 5.2% | 5.0% |
| Vacancy Change | -6.4% | 1.0% | 3.3% | 3.8% | -9.5% | -2.8% | 14.7% | -9.7% | -3.7% | -6.5% | 0.9% | 1.0% | -0.2% | -0.6% | -0.2% |
| | | | | | | | | | | | | | | | |
| Room | $3,456 | $4,120 | $3,950 | $4,188 | $4,570 | $4,708 | $4,800 | $4,800 | $5,000 | $5,100 | $5,232 | $5,337 | $5,486 | $5,662 | $5,877 |
| Monthly Rent Level by Bed | $384 | $457 | $438 | $465 | $507 | $523 | $533 | $533 | $555 | $566 | $581 | $593 | $609 | $629 | $653 |
| Room Growth | 6.0% | 19.2% | -4.1% | 6.0% | 9.1% | 3.0% | 2.0% | 0.0% | 4.2% | 2.0% | 2.6% | 2.0% | 2.8% | 3.2% | 3.8% |
| | | | | | | | | | | | | | | | |
| Board | $3,886 | $3,664 | $4,420 | $4,732 | $4,980 | $5,130 | $5,340 | $5,560 | $5,560 | $5,670 | $5,840 | $5,991 | $6,177 | $6,393 | $6,656 |
| Board Growth | 8.8% | -5.7% | 20.6% | 7.1% | 5.2% | 3.0% | 4.1% | 4.1% | 0.0% | 2.0% | 3.0% | 2.6% | 3.1% | 3.5% | 4.1% |
| | | | | | | | | | | | | | | | |
| Combined Room and Board | $7,342 | $7,784 | $8,370 | $8,920 | $9,550 | $9,838 | $10,140 | $10,360 | $10,560 | $10,770 | $11,072 | $11,329 | $11,664 | $12,056 | $12,533 |
| Room and Board Growth | 7.5% | 6.0% | 7.5% | 6.6% | 7.1% | 3.0% | 3.1% | 2.2% | 1.9% | 2.0% | 2.8% | 2.3% | 3.0% | 3.4% | 4.0% |
| | | | | | | | | | | | | | | | |
| Tuition | | | | | | | | | | | | | | | |
| In-State | $3,600 | $3,942 | $4,296 | $4,680 | $5,100 | $5,214 | $5,448 | $6,024 | $6,372 | $6,906 | $7,286 | $7,614 | $7,994 | $8,426 | $8,932 |
| Change | 9.9% | 9.5% | 9.0% | 8.9% | 9.0% | 2.2% | 4.5% | 10.6% | 5.8% | 8.4% | 5.5% | 4.5% | 5.0% | 5.4% | 6.0% |
| | | | | | | | | | | | | | | | |
| Out-Of-State | $12,180 | $13,344 | $13,344 | $14,664 | $16,422 | $16,488 | $16,692 | $17,568 | $17,958 | $18,492 | $18,991 | $19,466 | $20,186 | $21,155 | $22,298 |
| Change | 2.7% | 9.6% | 0.0% | 9.9% | 12.0% | 0.4% | 1.2% | 5.2% | 2.2% | 3.0% | 2.7% | 2.5% | 3.7% | 4.8% | 5.4% |
| Fees | 712 | 738 | 1155 | 1323 | 1548 | 1525 | 1570 | 1934 | 2044 | 1981 | | | | | |

| Privately-Owned Housing Trends | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017F | 2018F | 2019F | 2020F | 2021F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occupancy | | | | | | 91.0% | 97.3% | 97.2% | 100.0% | 98.2% | 99.1% | 96.9% | 95.9% | 96.1% | 97.0% |
| Rent Level by Bed | | $360 | $362 | $331 | $346 | $454 | $483 | $551 | $572 | $580 | $595 | $605 | $622 | $641 | $671 |
| Rent Growth | | | -2.1% | -9.2% | 4.4% | 23.7% | 5.9% | 12.5% | 3.6% | 1.3% | 2.7% | 1.7% | 2.8% | 3.4% | 4.3% |

During the survey period the market has averaged an on-campus occupancy rate of 85.8% for university owned student housing properties and 97.0% for privately owned student housing.

### Rent & Occupancy Trends – Off Campus

The following data reflects rental rate and occupancy data for the subject off-campus student housing market.

CBRE

GFI's Exhibit 18, Page 55 of 221

*Market Analysis*



During the survey period the off-campus market has ranged from 95% to 100% for student housing properties.

## ENROLLMENT TRENDS

The following data summarizes estimated enrollment trends for the University of Northern Colorado.

**University of Northern Colorado**
Greeley, CO
**Fall 2017**

### Enrollment Trends

| Year | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017F | 2018F | 2019F | 2020F | 2021F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enrollment | 12,219 | 11,925 | 12,148 | 12,358 | 12,599 | 12,497 | 12,084 | 11,784 | 11,936 | 12,260 | 12,493 | 12,618 | 12,769 | 12,999 | 13,259 |
| *Enrollment Change* | (762) | (294) | 223 | 210 | 241 | (102) | (413) | (300) | 152 | 324 | 233 | 125 | 151 | 230 | 260 |
| Enrollment Growth | -5.9% | -2.4% | 1.9% | 1.7% | 2.0% | -0.8% | -3.3% | -2.5% | 1.3% | 2.7% | 1.9% | 1.0% | 1.2% | 1.8% | 2.0% |
| | | | | | | | | | | | | | | | |
| Full-Time Undergrad | 9,229 | 8,863 | 8,996 | 9,189 | 9,299 | 9,110 | 8,723 | 8,324 | 8,180 | 8,331 | | | | | |
| Part-Time Undergrad | 948 | 988 | 977 | 901 | 932 | 992 | 987 | 1,100 | 1,214 | 1,172 | | | | | |
| Total Undergrad | 10,177 | 9,851 | 9,973 | 10,090 | 10,231 | 10,102 | 9,710 | 9,424 | 9,394 | 9,503 | | | | | |
| | | | | | | | | | | | | | | | |
| Full-Time Grad | 839 | 915 | 976 | 1,035 | 1,000 | 1,001 | 985 | 924 | 968 | 1,022 | | | | | |
| Part-Time Grad | 1,203 | 1,159 | 1,199 | 1,233 | 1,368 | 1,394 | 1,389 | 1,436 | 1,574 | 1,735 | | | | | |
| Total Grad | 2,042 | 2,074 | 2,175 | 2,268 | 2,368 | 2,395 | 2,374 | 2,360 | 2,542 | 2,757 | | | | | |
| | | | | | | | | | | | | | | | |
| Total Applied | 6,163 | 5,609 | 6,136 | 6,410 | 8,169 | 6,823 | 7,602 | 7,831 | 7,143 | 6,784 | | | | | |
| Acceptance Rate | 90.9% | 92.5% | 92.3% | 88.1% | 72.8% | 89.1% | 69.6% | 70.9% | 89.3% | 90.3% | 89.9% | 89.7% | 90.2% | 90.6% | 91.2% |
| | | | | | | | | | | | | | | | |
| Freshman | 3,313 | 3,220 | 3,867 | 3,696 | 3,181 | 3,053 | 2,735 | 2,644 | 2,667 | 2,754 | | | | | |
| Sophomore | 2,134 | 2,000 | 1,884 | 2,170 | 2,066 | 1,961 | 1,921 | 1,844 | 1,824 | 1,831 | | | | | |
| Junior | 2,039 | 1,926 | 1,919 | 1,977 | 2,163 | 2,084 | 1,971 | 1,958 | 1,928 | 2,012 | | | | | |
| Senior | 2,497 | 2,383 | 2,620 | 2,621 | 2,688 | 2,850 | 2,898 | 2,658 | 2,496 | 2,498 | | | | | |
| | | | | | | | | | | | | | | | |
| State High School Grad Rate | 75.0% | 71.9% | 74.6% | 72.0% | 74.0% | 75.0% | 76.9% | 77.3% | 77.3% | 77.6% | 77.2% | 77.0% | 77.5% | 77.9% | 77.4% |
| Freshman Retention Rate | 66.2% | 69.7% | 68.4% | 69.2% | 70.9% | 64.9% | 66.0% | 68.1% | 71.4% | 70.1% | 69.7% | 69.5% | 70.0% | 70.4% | 71.0% |
| University Graduation Rate | 48.0% | 48.0% | 48.0% | 46.0% | 46.0% | 45.0% | 46.0% | 46.0% | 47.6% | 48.4% | 48.2% | 48.4% | 47.6% | 47.0% | 46.4% |
| | | | | | | | | | | | | | | | |
| Financial Aid Share of Total Budget | 11.9% | 13.1% | 16.2% | 17.4% | 17.2% | 17.3% | 20.4% | 19.0% | 20.0% | | | | | | |
| | | | | | | | | | | | | | | | |
| State Pop 18-24Y (000) | 466 | 470 | 503 | 492 | 501 | 512 | 513 | 524 | 528 | 534 | 538 | 544 | 551 | 561 | 568 |
| Annual Change | 0.0% | 0.9% | 7.2% | -2.2% | 1.7% | 2.1% | 0.2% | 2.2% | 0.7% | 1.1% | 0.8% | 1.1% | 1.3% | 1.9% | 1.2% |

46

**CBRE**

**GFI's Exhibit 18, Page 56 of 221**

Student enrollment has shown relatively little growth over the past 10 years with less than a 1% enrollment increase; however, enrollment trends are forecasted for growth of 8% between 2017 and 2021.

## DEMOGRAPHIC ANALYSIS

Demand for residential properties is a direct function of demographic characteristics analyzed on the following pages.

### Housing, Population and Household Formation

The following table illustrates the population and household changes for the subject neighborhood with primary focus on the three-mile radius of the subject.

| POPULATION AND HOUSEHOLD PROJECTIONS | | | |
|---|---|---|---|
| Population | 1 Mile | 3 Miles | 5 Miles |
| 2022 Total Population | 18,405 | 85,373 | 130,612 |
| 2017 Total Population | 17,410 | 81,024 | 123,253 |
| 2010 Total Population | 15,994 | 74,004 | 110,983 |
| 2000 Total Population | 16,445 | 69,632 | 94,212 |
| Annual Growth 2017 - 2022 | 1.12% | 1.05% | 1.17% |
| Annual Growth 2010 - 2017 | 1.22% | 1.30% | 1.51% |
| Annual Growth 2000 - 2010 | -0.28% | 0.61% | 1.65% |
| Households | | | |
| 2022 Total Households | 6,276 | 30,339 | 46,304 |
| 2017 Total Households | 5,871 | 28,771 | 43,717 |
| 2010 Total Households | 5,248 | 26,433 | 39,673 |
| 2000 Total Households | 5,246 | 24,941 | 33,632 |
| Annual Growth 2017 - 2022 | 1.34% | 1.07% | 1.16% |
| Annual Growth 2010 - 2017 | 1.62% | 1.22% | 1.40% |
| Annual Growth 2000 - 2010 | 0.00% | 0.58% | 1.67% |

Source:  ESRI

As shown, the subject's neighborhood is experiencing positive increases in population and households.

### Income Distributions

Household income available for expenditure on housing and other consumer items is a primary factor in determining the price/rent level of housing demand in a market area.  In the case of this study, projections of household income, particularly for renters, identifies in gross terms the market from which the subject submarket draws. The following table illustrates estimated household income distribution for the subject neighborhood.

47

CBRE

**GFI's Exhibit 18, Page 57 of 221**

| HOUSEHOLD INCOME DISTRIBUTION | | | |
|---|---|---|---|
| Households by Income Distribution - 2017 | 1 Mile | 3 Miles | 5 Miles |
| <$15000 | 26.37% | 16.49% | 12.80% |
| $15000-$24999 | 16.35% | 13.84% | 11.33% |
| $25000-$34999 | 13.88% | 12.29% | 10.56% |
| $35000-$49999 | 16.61% | 17.58% | 15.97% |
| $50000-$74999 | 12.33% | 17.89% | 19.06% |
| $75000-$99999 | 7.65% | 10.28% | 11.75% |
| $100000-$149999 | 4.51% | 8.51% | 12.16% |
| $150000-$199999 | 1.60% | 1.83% | 3.63% |
| $200000+ | 0.66% | 1.28% | 2.74% |
| Source: ESRI | | | |

The following table illustrates the median and average household income levels for the subject neighborhood.

| HOUSEHOLD INCOME LEVELS | | | |
|---|---|---|---|
| Income | 1 Mile | 3 Miles | 5 Miles |
| 2017 Median Household Income | $29,468 | $40,025 | $49,172 |
| 2017 Average Household Income | $41,271 | $53,047 | $65,438 |
| 2017 Per Capita Income | $15,612 | $19,437 | $23,683 |
| Source: ESRI | | | |

An analysis of the income data indicates that the submarket is generally comprised of lower to middle-income economic cohort groups, which include the target groups to which the subject is oriented.

### Employment

An employment breakdown typically indicates the working class characteristics for a given market area. The specific employment population within the indicated radii of the subject is as follows:

48

CBRE

**GFI's Exhibit 18, Page 58 of 221**

*Market Analysis*

| EMPLOYMENT BY INDUSTRY | | | |
|---|---|---|---|
| Occupation | 1 Mile | 3 Miles | 5 Miles |
| Agric/Forestry/Fishing/Hunting/Mining | 3.83% | 4.08% | 4.53% |
| Construction | 5.98% | 9.10% | 8.66% |
| Manufacturing | 8.17% | 10.69% | 9.74% |
| Wholesale Trade | 1.27% | 2.24% | 2.78% |
| Retail Trade | 12.59% | 13.31% | 13.27% |
| Transportation/Warehousing/Utilities | 2.03% | 4.31% | 4.18% |
| Information | 1.04% | 1.11% | 1.21% |
| Estate/Rental/Leasing | 3.12% | 4.65% | 5.63% |
| Prof/Scientific/Tech Services | 3.06% | 3.20% | 3.83% |
| Mgmt of Companies/Enterprises | 0.00% | 0.05% | 0.07% |
| Admin/Support/Waste Mgmt Srvcs | 6.15% | 7.27% | 6.27% |
| Educational Services | 16.26% | 9.57% | 9.43% |
| Health Care/Social Assistance | 8.21% | 11.05% | 12.54% |
| Arts/Entertainment/Recreation | 3.42% | 2.00% | 2.07% |
| Accommodation/Food Services | 18.44% | 11.08% | 9.05% |
| Other Services (excl Publ Adm) | 4.70% | 3.70% | 3.93% |
| Public Administration | 1.72% | 2.60% | 2.80% |

Source: ESRI

The previous table illustrates the employment character of the submarket, indicating a predominantly lower to middle-income, with the majority of the population holding retail trade, accomodation/food services, or education related jobs.

### Outlook

Based on this analysis, the immediate area surrounding the subject is projected to experience positive increases relative to households and population into the near future. Given the area demographics, it appears that demand for both comparable surrounding area apartment units and the subject will continue to be favorable.

### NORTHERN COLORADO OUTLOOK BY PROPERTY TYPE | MULTI-FAMILY

The *Colorado Division of Housing Multi-Family Housing Vacancy and Rental Survey* considers the overall apartment market in various areas in Colorado, including: Colorado Springs, Fort Collins, Eagle County, Cortez, Durango, Greeley, and several other areas. The Colorado Division of Housing has sponsored this report as a service to the multi-family housing industry in Colorado. The purpose of this survey is to report vacancy and rent levels for multi-family housing in selected markets.

The survey is conducted quarterly to provide residents, owners and managers of rental property, local and state government officials, and investors and developers with accurate and up-to-date information on the multi-family rental housing industry. The study is sponsored by the Colorado

49



**GFI's Exhibit 18, Page 59 of 221**

Division of Housing and survey management and analysis is performed by Dr. Ron Throupe, Ph.D. of the University of Denver.

The subject property is located in the Eastern portion of the Greeley area. As of the third quarter of 2017, the Greeley area had a total of 3,390 units surveyed. The vacancy rate for the Greeley area was 1.4% as of the third quarter of 2016.

### DEMAND

Apartment demand is affected by many factors including population and job growth, household formation and household size trends, and other demographic trends including household income and in-migration. The unemployment rate for Greeley, CO was 2.4% as of October 2017 according to the Bureau of Labor Statistics. That is a significant decrease from the most recent peak of 9.8% in January 2011.

Most economists expect growth in the Colorado area to continue. Based on recent and projected population and job growth, Colorado should continue to outperform most other major markets for multi-family investment.

### VACANCY ANALYSIS

As of the third quarter of 2017 the vacancy rate for the Greeley MSA was 1.4% down from the most recent cyclical high of 8.4% in the first quarter of 2009. The vacancy rate for the Greeley and Fort Collins/Loveland MSA can be seen in the following table.

50

CBRE

GFI's Exhibit 18, Page 60 of 221

*Market Analysis*

| | Fort Collins/ Loveland MSA | Fort Collins | Northwest | Northeast | Southeast | Southwest | Loveland | Greeley MSA |
|---|---|---|---|---|---|---|---|---|
| | | | **HISTORICAL VACANCY RATES** | | | | | |
| | | | **FORT COLLINS/LOVELAND & GREELEY MSA** | | | | | |
| 1Q '00 | 3.4% | 3.6% | 0.9% | N/A | 3.4% | 6.4% | 1.9% | 3.8% |
| 1Q '01 | 2.6% | 2.6% | 0.6% | N/A | 4.0% | 1.9% | 2.8% | 1.7% |
| 1Q '02 | 7.0% | 7.3% | 3.1% | 4.8% | 9.6% | 9.0% | 3.0% | 4.9% |
| 1Q '03 | 16.1% | 13.7% | 18.5% | 2.8% | 14.9% | 15.0% | 19.6% | 10.7% |
| 1Q '04 | 13.4% | 13.9% | 16.9% | 15.8% | 8.8% | 14.8% | 10.8% | 14.5% |
| 1Q '05 | 12.7% | 12.9% | 13.6% | 10.1% | 13.1% | 12.8% | 10.5% | 12.1% |
| 1Q '06 | 8.8% | 8.8% | 12.7% | 7.2% | 7.7% | 7.7% | 6.3% | 8.1% |
| 1Q '07 | 8.8% | 7.0% | 13.7% | 6.8% | 2.9% | 4.5% | 12.8% | 7.2% |
| 1Q '08 | 5.2% | 4.8% | 7.1% | 3.6% | 4.4% | 4.2% | 5.6% | 7.3% |
| 1Q '09 | 4.4% | 4.0% | 3.8% | 3.4% | 4.5% | 4.2% | 6.1% | 8.4% |
| 1Q '10 | 4.9% | 5.2% | 5.9% | 5.5% | 3.7% | 5.6% | 3.8% | 6.9% |
| 1Q '11 | 4.0% | 4.0% | 5.3% | 2.3% | 3.6% | 3.6% | 4.1% | 3.8% |
| 1Q '12 | 3.0% | 2.6% | 0.7% | 3.6% | 2.8% | 3.9% | 4.5% | 5.8% |
| 2Q '12 | 3.5% | 3.5% | 0.6% | 0.0% | 3.1% | 6.0% | 3.5% | 5.4% |
| 3Q '12 | 2.1% | 2.1% | 0.4% | 1.1% | 2.9% | 2.7% | 2.1% | 3.1% |
| 4Q '12 | 2.4% | 2.5% | 0.9% | 0.6% | 3.4% | 3.5% | 1.9% | 3.2% |
| 1Q ''13 | 5.1% | 5.5% | 0.3% | 0.7% | 13.3% | 4.4% | 2.8% | 1.4% |
| 2Q '13 | 5.2% | 5.6% | 3.8% | 0.0% | 5.6% | 7.4% | 3.2% | 2.2% |
| 3Q '13 | 2.8% | 2.9% | 0.5% | 0.0% | 3.1% | 4.3% | 2.4% | 1.3% |
| 4Q '13 | 2.1% | 1.9% | 0.6% | 2.5% | 3.0% | 2.1% | 2.7% | 6.3% |
| 1Q '14 | 1.7% | 1.6% | 0.2% | 1.3% | 1.8% | 2.9% | 2.3% | 4.4% |
| 2Q '14 | 2.8% | 2.9% | 4.2% | 3.4% | 2.7% | 2.0% | 2.6% | 4.1% |
| 3Q'14 | 1.3% | 0.9% | 0.1% | 0.0% | 1.1% | 1.6% | 3.1% | 2.3% |
| 4Q'14 | 1.2% | 1.0% | 0.2% | 0.0% | 1.9% | 0.7% | 2.0% | 1.3% |
| 1Q '15 | 1.9% | 1.8% | 0.0% | 0.0% | 2.0% | 2.9% | 2.7% | 1.1% |
| 2Q '15 | 2.1% | 1.8% | 0.4% | 1.2% | 1.7% | 3.2% | 3.9% | 1.6% |
| 3Q'15 | 2.4% | 2.2% | 0.3% | 0.0% | 3.4% | 2.4% | 3.8% | 5.7% |
| 4Q'15 | 2.3% | 2.0% | 0.4% | 3.6% | 3.2% | 1.7% | 5.4% | 3.7% |
| 1Q '16 | 2.0% | 1.8% | 0.4% | 0.0% | 2.5% | 2.2% | 3.7% | 4.0% |
| 2Q '16 | 2.9% | 2.7% | 2.2% | 1.3% | 2.5% | 3.4% | 3.7% | 3.5% |
| 3Q '16 | 4.0% | 3.2% | 0.9% | 4.1% | 4.1% | 3.4% | 8.4% | 3.8% |
| 4Q '16 | 4.1% | 3.3% | 0.7% | 3.6% | 4.9% | 2.8% | 8.7% | 3.7% |
| 1Q '17 | 2.9% | 2.2% | 0.7% | 0.0% | 2.4% | 3.4% | 6.7% | 4.0% |
| 2Q '17 | 2.4% | 2.0% | 1.4% | 1.8% | 2.1% | 2.3% | 4.1% | 1.2% |
| 3Q '17 | 3.9% | 3.7% | 4.7% | 0.0% | 3.5% | 3.1% | 4.5% | 1.4% |
| **Average Last 12 Qtrs** | **2.7%** | **2.3%** | **1.0%** | **1.3%** | **2.9%** | **2.6%** | **4.8%** | **2.9%** |

Source: Colorado Division of Housing, Multi-Family Vacancy and Rental Survey Q3 2017

The subject is located in the Greeley MSA. The Greeley MSA submarket includes the lion's share of the University of Northern Colorado. Over the last 12 quarters this submarket has had an average vacancy of less than 3%.

The study by the Colorado Division of Housing also provides information about vacancy rates by the age of the property. The available information can be seen in the following table.

51

**CBRE**

**GFI's Exhibit 18, Page 61 of 221**

**Market Analysis**

| HISTORICAL VACANCY - GREELEY MSA (BY AGE) | | | | | |
|---|---|---|---|---|---|
| | 1960-1969 | 1970-1979 | 1980-1989 | 1990- 1999 | 2000-2009 | 2010+ |
| 1Q '00 | 5.6% | 3.3% | 3.1% | 4.0% | | |
| 1Q '01 | 6.5% | 1.3% | 2.1% | 1.4% | | |
| 1Q '02 | 2.4% | 11.6% | 4.3% | 4.7% | | |
| 1Q '03 | 12.4% | 9.9% | 9.2% | 22.9% | | |
| 1Q '04 | 15.5% | 9.9% | 12.4% | 0.3% | | |
| 1Q '05 | 25.9% | 9.7% | 10.9% | 0.1% | | |
| 1Q '06 | 3.2% | 6.9% | 8.7% | 11.3% | 9.6% | |
| 1Q '07 | 0.0% | 6.8% | 8.9% | 6.0% | 5.3% | |
| 1Q '08 | N/A | 7.8% | 6.3% | 15.1% | 10.4% | |
| 1Q '09 | 10.2% | 8.8% | 7.4% | 10.4% | 9.4% | |
| 1Q '10 | 9.2% | 6.7% | 5.4% | 8.5% | 12.9% | |
| 1Q '11 | 9.2% | 3.2% | 1.8% | 14.3% | 4.9% | |
| 1Q ''12 | 5.6% | 8.0% | 3.8% | 3.0% | 4.0% | |
| 2Q '12 | 2.0% | 8.2% | 0.3% | 1.3% | 4.0% | |
| 3Q '12 | 1.0% | 3.7% | 2.2% | 2.3% | 3.1% | |
| 4Q '12 | 5.1% | 2.2% | 8.6% | 0.3% | 3.1% | |
| 1Q '13 | 3.1% | 1.0% | 0.6% | 0.7% | 10.2% | |
| 2Q '13 | 6.0% | 1.3% | 2.5% | 0.3% | 2.2% | |
| 3Q '13 | 4.1% | 0.8% | 1.0% | 1.2% | 1.1% | |
| 4Q '13 | 2.0% | 1.5% | 0.2% | 0.9% | 44.6% | |
| 1Q '14 | 0.0% | 1.1% | 0.0% | 0.9% | 30.4% | |
| 2Q '14 | 4.1% | 2.2% | 7.7% | 0.9% | 10.5% | |
| 3Q'14 | 2.9% | 1.2% | 3.3% | 4.5% | 4.2% | |
| 4Q'14 | 1.0% | 1.4% | 0.4% | 0.6% | 3.1% | |
| 1Q '15 | 2.9% | 1.1% | 1.0% | 0.6% | 2.6% | 0.5% |
| 2Q '15 | 1.4% | 0.7% | 0.6% | 0.3% | 7.1% | 3.6% |
| 3Q'15 | 1.0% | 2.7% | 0.8% | 2.8% | 2.7% | 18.8% |
| 4Q'15 | 0.8% | 1.4% | 1.6% | 5.8% | N/A | 8.6% |
| 1Q '16 | 0.7% | 1.3% | 2.9% | 4.1% | 4.5% | 10.0% |
| 2Q '16 | 2.0% | 1.5% | 4.1% | 1.3% | 8.0% | 6.4% |
| 3Q'16 | 2.0% | 1.5% | 4.2% | 0.6% | 14.7% | 6.3% |
| 4Q'16 | 5.1% | 1.7% | 3.7% | 3.8% | 4.8% | 7.0% |
| 1Q '17 | 4.1% | 1.3% | 6.3% | 3.8% | 2.2% | 7.8% |
| 2Q '17 | 5.1% | 1.4% | 1.6% | 0.0% | 0.9% | 0.5% |
| 3Q '17 | 3.1% | 1.0% | 4.3% | 0.6% | 0.0% | 0.9% |

Source: Colorado Division of Housing, Multi-Family Vacancy and Rental Survey Q3 2017

The average vacancy of properties built since 2000 ranges between 0.0% and 0.9%.

52

**CBRE**

**GFI's Exhibit 18, Page 62 of 221**

### RENTAL RATES

Average rental rates in the Greeley multi-family housing market are reported based on unfurnished units with residents paying gas and electrical expenses. Average rents do not include the cost of rental discount/concessions, models, bad debt, and delinquencies. The average rental rates for the Greeley area can be seen in the following table. The Greeley MSA has an average rental rate of $1,080.12 per month.

| | Fort Collins/ Loveland MSA | Fort Collins | Northwest | Northeast | Southeast | Southwest | Loveland | Greeley MSA |
|---|---|---|---|---|---|---|---|---|
| HISTORICAL RENTAL RATES – FORT COLLINS/LOVELAND & GREELEY MSAs | | | | | | | | |
| 1Q '00 | $690.06 | N/A | $692.95 | $673.65 | $689.03 | $701.56 | $636.52 | $547.53 |
| 1Q '01 | $726.72 | N/A | $714.32 | $646.21 | $777.89 | $684.16 | $642.05 | $584.34 |
| 1Q '02 | $752.54 | N/A | $776.46 | $731.57 | $795.58 | $728.59 | $563.64 | $600.45 |
| 1Q '03 | $743.27 | N/A | $819.34 | $658.77 | $734.17 | $706.32 | $708.19 | $590.67 |
| 1Q '04 | $725.90 | N/A | $634.91 | $688.23 | $785.68 | $739.96 | $748.83 | $595.20 |
| 1Q '05 | $739.79 | N/A | $707.87 | $677.18 | $784.12 | $711.10 | $762.00 | $611.28 |
| 1Q '06 | $748.88 | N/A | $841.17 | $759.56 | $696.86 | $711.49 | $797.81 | $625.10 |
| 1Q '07 | $758.27 | N/A | $794.56 | $679.73 | $741.71 | $703.92 | $847.21 | $623.99 |
| 1Q '08 | $760.21 | N/A | $739.96 | $701.01 | $776.22 | $743.48 | $832.14 | $636.38 |
| 1Q '09 | $860.81 | N/A | $986.60 | $688.08 | $800.23 | $816.96 | $835.76 | $655.57 |
| 1Q '10 | $837.99 | $837.15 | $855.13 | $731.41 | $833.90 | $835.92 | $835.41 | $660.86 |
| 1Q '11 | $901.44 | $902.87 | $961.89 | $718.05 | $898.50 | $889.76 | $862.86 | $660.08 |
| 1Q '12 | $1,001.51 | $1,010.34 | $976.79 | $924.45 | $1,012.39 | $1,038.60 | $968.74 | $688.48 |
| 2Q '12 | $996.04 | $1,020.38 | $983.21 | $918.64 | $1,104.12 | $997.90 | $876.62 | $662.42 |
| 3Q '12 | $1,024.74 | $1,042.14 | $1,107.09 | $739.45 | $976.72 | $1,063.11 | $944.18 | $693.82 |
| 4Q '12 | $1,008.76 | $1,021.53 | $1,097.67 | $906.33 | $1,018.02 | $976.13 | $952.30 | $692.24 |
| 1Q '13 | $1,036.13 | $1,037.34 | $1,114.07 | $783.05 | $1,024.32 | $991.49 | $1,030.29 | $704.29 |
| 2Q '13 | $996.70 | $987.78 | $934.54 | $780.17 | $1,021.76 | $1,001.54 | $1,042.98 | $715.79 |
| 3Q '13 | $1,043.17 | $1,055.62 | $1,201.92 | $793.10 | $1,012.07 | $1,012.40 | $990.40 | $728.21 |
| 4Q '13 | $995.88 | $998.03 | $852.97 | $801.19 | $1,099.76 | $1,057.56 | $985.60 | $756.52 |
| 1Q '14 | $1,183.04 | $1,216.97 | $1,407.59 | $750.41 | $1,109.49 | $1,155.29 | $1,026.32 | $793.11 |
| 2Q '14 | $1,084.96 | $1,087.46 | $875.33 | $727.59 | $1,182.41 | $1,168.69 | $1,073.07 | $812.78 |
| 3Q '14 | $1,090.20 | $1,089.53 | $882.15 | $729.11 | $1,195.77 | $1,178.09 | $1,093.95 | $842.77 |
| 4Q '14 | $1,203.11 | $1,209.96 | $1,232.55 | $813.29 | $1,206.74 | $1,224.26 | $1,169.15 | $869.41 |
| 1Q '15 | $1,173.59 | $1,173.65 | $1,017.24 | $797.71 | $1,243.75 | $1,227.18 | $1,173.24 | $882.78 |
| 2Q '15 | $1,279.89 | $1,260.25 | $1,221.55 | $839.42 | $1,293.81 | $1,273.66 | $1,419.77 | $924.25 |
| 3Q '15 | $1,267.86 | $1,259.08 | $1,207.24 | $835.27 | $1,287.33 | $1,285.38 | $1,326.11 | $956.73 |
| 4Q '15 | $1,167.90 | $1,165.34 | $1,077.33 | $810.18 | $1,188.98 | $1,239.81 | $1,189.39 | $920.38 |
| 1Q '16 | $1,273.86 | $1,273.65 | $1,259.55 | $810.18 | $1,259.58 | $1,327.76 | $1,275.72 | $957.07 |
| 2Q '16 | $1,279.14 | $1,270.05 | $1,351.84 | $817.84 | $1,259.97 | $1,249.87 | $1,329.37 | $963.37 |
| 3Q '16 | $1,306.24 | $1,290.30 | $1,313.79 | $890.96 | $1,272.53 | $1,319.25 | $1,387.16 | $986.40 |
| 4Q '16 | $1,237.32 | $1,221.38 | $1,209.87 | $917.77 | $1,208.31 | $1,264.90 | $1,332.62 | $1,000.09 |
| 1Q '17 | $1,293.25 | $1,260.62 | $1,277.51 | $884.55 | $1,245.91 | $1,281.58 | $1,467.71 | $1,004.24 |
| 2Q '17 | $1,318.17 | $1,304.31 | $1,269.10 | $884.11 | $1,287.40 | $1,364.60 | $1,402.22 | $1,018.43 |
| 3Q '17 | $1,323.73 | $1,309.90 | $1,320.69 | $901.96 | $1,282.13 | $1,357.00 | $1,387.01 | $1,080.12 |
| Source: Colorado Division of Housing, Multi-Family Vacancy and Rental Survey Q3 2017 | | | | | | | | |

The study by the Colorado Division of Housing also provides information about rental rates by the age of the property. The available information can be seen in the following table.

CBRE

**GFI's Exhibit 18, Page 63 of 221**

| HISTORICAL RENTAL RATES – GREELEY MSA (BY AGE) | | | | | | |
|---|---|---|---|---|---|---|
| | Before 1960 | 1960-1969 | 1970-1979 | 1980-1989 | 1990 to 1999 | 2000-2009 | 2010+ |
| 1Q '00 | $454.58 | $468.19 | $546.59 | $592.23 | $775.71 | | |
| 1Q '01 | $454.99 | $473.71 | $549.15 | $633.41 | $702.29 | | |
| 1Q '02 | $525.89 | $517.74 | $557.43 | $664.90 | $715.29 | | |
| 1Q '03 | $509.10 | $458.20 | $565.77 | $590.83 | $813.56 | | |
| 1Q '04 | $333.93 | $433.27 | $608.96 | $583.77 | $738.47 | | |
| 1Q '05 | $775.00 | $498.71 | $558.76 | $620.54 | $712.77 | | |
| 1Q '06 | N/A | $639.34 | $597.44 | $630.00 | $581.45 | | |
| 1Q '07 | $426.56 | N/A | $567.05 | $636.11 | $652.90 | | |
| 1Q '08 | $524.04 | N/A | $625.87 | $651.56 | $580.48 | | |
| 1Q '09 | N/A | $584.23 | $643.96 | $706.76 | $762.14 | | |
| 1Q '10 | N/A | $584.23 | $767.18 | $701.55 | $646.67 | | |
| 1Q '11 | N/A | $760.96 | $635.08 | $703.91 | $515.76 | $890.64 | |
| 1Q '12 | N/A | $584.40 | $653.78 | $781.34 | $706.93 | $918.93 | |
| 2Q '12 | N/A | $603.72 | $652.01 | $695.93 | $685.42 | $922.14 | |
| 3Q '12 | N/A | $603.48 | $666.40 | $765.24 | $712.94 | $908.57 | |
| 4Q '12 | N/A | $610.46 | $671.58 | $765.34 | $683.44 | $919.42 | |
| 1Q '13 | N/A | $620.41 | $649.44 | $796.71 | $732.64 | $959.29 | |
| 2Q '13 | N/A | $565.73 | $676.50 | $796.72 | $687.72 | $1,023.57 | |
| 3Q '13 | N/A | $721.41 | $664.42 | $795.95 | $728.63 | $989.50 | |
| 4Q '13 | N/A | $730.41 | $672.14 | $807.77 | $739.48 | $1,023.54 | |
| 1Q '14 | N/A | $753.29 | $706.10 | $843.77 | $752.91 | $1,078.92 | |
| 2Q '14 | N/A | $790.00 | $733.63 | $844.11 | $767.78 | $1,133.28 | |
| 3Q '14 | $658.33 | $841.52 | $744.90 | $855.91 | $991.43 | $1,159.97 | |
| 4Q '14 | $628.33 | $813.73 | $758.57 | $893.94 | $935.06 | $1,212.51 | |
| 1Q '15 | N/A | $868.78 | $757.00 | $957.75 | $859.95 | $1,290.89 | $1,122.93 |
| 2Q '15 | N/A | $775.51 | $793.52 | $956.02 | $851.16 | $1,305.71 | $1,170.59 |
| 3Q '15 | N/A | $832.63 | $809.67 | $984.10 | $927.93 | $1,243.14 | $1,198.39 |
| 4Q '15 | N/A | $805.10 | $802.19 | $960.18 | $921.08 | N/A | $1,177.99 |
| 1Q '16 | N/A | $822.48 | $816.68 | $972.45 | $958.30 | $1,264.29 | $1,163.38 |
| 2Q '16 | N/A | $846.77 | $797.21 | $1,069.48 | $936.62 | $1,208.93 | $1,172.70 |
| 3Q '16 | N/A | $852.37 | $832.92 | $1,111.80 | $938.50 | $1,278.57 | $1,212.19 |
| 4Q '16 | N/A | $812.36 | $855.69 | $1,079.83 | $934.58 | $1,274.13 | $1,205.48 |
| 1Q '17 | N/A | $869.45 | $838.10 | $1,141.12 | $943.18 | $1,278.57 | $1,172.72 |
| 2Q '17 | N/A | $875.14 | $863.94 | $1,131.24 | $940.48 | $1,398.21 | $1,234.05 |
| 3Q '17 | N/A | $890.27 | $911.33 | $1,244.59 | $954.93 | $1,303.57 | $1,283.67 |

Source: Colorado Division of Housing, Multi-Family Vacancy and Rental Survey Q3 2017

The highest rental rates in the area are demonstrated by apartment properties that have been built in 2000-2009 and 2010+ which are currently averaging $1,303.57 and $1,283.67, respectively.

## CONCLUSION

Population growth and renewed job growth in the area continues to fuel demand for the local apartment market. The Greeley MSA has demonstrated a continued average vacancy of less than 3.0%. Supply and demand should be able to maintain a good balance with vacancy rates moderating in the range of 2% to 10% over the long term.

CBRE

GFI's Exhibit 18, Page 64 of 221

## ACQUISITION AND FINANCING

**Acquisition Terms.** The Trust purchased the Property from the Seller on April 6, 2018 for a purchase price of $21,907,000 plus acquisition, closing, and due diligence costs of approximately $635,000 (including tax and insurance deposits, but not including an acquisition fee to the Sponsor, Selling Expenses or the Trust Reserve). The Trust financed the purchase of the Property with the Offering Proceeds, the capital provided by the Preferred Equity Provider and the $13,301,000 Loan from the Lender. The Trust will offer the Interests with a maximum offering amount of $11,113,000, which when added to the Loan is $2,507,000 greater than the purchase price of the Property. This difference includes transaction costs, an acquisition fee to the Sponsor, Selling Expenses, and Offering Expenses and Reserves. See "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES", "ESTIMATED USE OF PROCEEDS" and "RISK FACTORS – REAL ESTATE RISKS – Determination of Purchase Price/Valuation."

Concurrently with the closing of the acquisition of the Property, the Seller transferred the Excess Land to an Affiliate of the Sponsor for no additional consideration, which property consists of approximately 1.227 acres of excess land located adjacent to the Property. The purchase price paid by the Trust for the Property was not discounted, nor did the Trust receive any direct consideration as a result of the transfer of the Excess Land to the Affiliate of the Sponsor. The Seller previously obtained conceptual approval from the city to construct additional multi-family units on the Excess Land, and the Sponsor is currently evaluating the feasibility of any such development. Except as set forth in the Supplemental Collateral Agreement, the Trust will not receive ownership or other rights in or to the Excess Land or any subsequent project or projects developed on such land. The Excess Land is not included in the appraised value of the Property. See "RISK FACTORS – REAL ESTATE RISKS – Determination of Purchase Price/Valuation." and "CONFLICTS OF INTEREST – Sponsor Ownership of the Excess Land."

The Offering Proceeds will be used to cover the reimbursement of closing, financing, and acquisition costs that the Trust or the Sponsor incurred in connection with the acquisition of the Property and the sale of the Interests and to pay any other deferred fees and expenses. See "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES" and "ESTIMATED USE OF PROCEEDS."

**Loan Terms.** The Loan is evidenced by the Loan Documents and secured by the Property. The Loan has a term of twelve years, maturing on the date that is twelve years from the acquisition of the Property. The interest rate on the Loan is fixed at a rate of 4.47%. The Loan Documents require monthly payments of interest only for the first 5 years of the Loan term, and monthly payments of principal and interest based on a 30-year amortization during years 6 to 12 of the Loan term. The Lender required an initial capital reserve of $163,625, which amount is included in the Trust Reserve. The Lender is also requiring annual capital reserve deposits in the initial annual amount of $39,300.

**Prepayment.** The Loan Documents allow prepayment, but if the Loan is prepaid within the first 138 months of the Loan term, a prepayment premium will be required in an amount equal to the greater of a yield maintenance payment or one percent (1%) of the outstanding principal balance of the Loan. Thereafter, a prepayment premium equal to one percent (1%) of the outstanding principal balance of the Loan will be due upon prepayment, except during the last three (3) months of the Loan term, when no prepayment premium will be due if the Loan is prepaid.

**Transfer Restrictions.** The Loan Documents allow the Property to be transferred subject to the Loan upon payment to Lender of a 1% assumption fee and reimbursement of Lender's costs. In addition, the Loan Documents are expect to permit, without Lender's consent or payment of any fees, the transfers of beneficial interests for estate-planning purposes and other transfers of beneficial interests subject to the satisfaction of certain criteria, including that there is no change of control of the Property or the Borrower, compliance with applicable notice and informational requirements in certain instances, satisfaction of the special purpose entity requirements in the Loan Documents, and payment of Lender's costs.

**Nonrecourse Loan.** The Loan is nonrecourse to the Investors, although Patrick Nelson and Brian Nelson (together in such capacity, the "**Guarantors**"), who own and control Nelson Brothers Professional Real Estate, LLC (the "**Original Sponsor**"), the Signatory Trustee and the Master Tenant, guaranteed certain non-recourse carve-outs under the Loan Documents. Accordingly, the Investors will have no personal liability in connection with the Loan.

**GFI's Exhibit 18, Page 65 of 221**

**Environmental Indemnity.** The Lender required the Borrower, the Guarantors and the Master Tenant to indemnify the Lender from any loss, cost, damage or expenses (including attorneys' fees) in connection with any environmental liability related to the Property. The Investors are not be required to provide the Lender an environmental indemnity due to the limited nature of the Investor's involvement with the Property as passive investors.

**Reserve Accounts.** In order to help the Trust defray the cost of certain immediate expenses and potential future Capital Expenses and to pay for the Master Tenant's obligations under the Master Lease, the Trust and the Master Tenant established the Reserves. The Reserves include the Trust Reserve, which is a $345,000 reserve funded by the Trust for the benefit of the Trust to be used by the Master Tenant to pay for any Capital Expenses incurred in connection with the Property. The Trust Reserve includes an initial capital reserve of $163,625 required by the Lender. The Trust Reserve will belong to the Trust and any funds remaining in such reserve when the Property is sold will be distributed to the Investors pro rata in accordance with their Interests. The Reserves also include annual capital reserve deposits required by the Lender in the initial annual amount of $39,300. Reserves funded by the Master Tenant not from the Offering or the Loan will be part of the Master Tenant Reserve. The Master Tenant Reserve will belong to the Master Tenant and any funds remaining in such reserve when the Loan is repaid will be returned to the Master Tenant. The Master Tenant may use the Reserves to pay for Capital Expenses, Operating Costs and Impositions to the extent permitted under the Loan Documents.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 66 of 221**

## PLAN OF DISTRIBUTION

**Capitalization**

The Offering is for a maximum of $11,113,000 of Interests. A minimum purchase of $50,000 is required, although the Trust may waive the minimum purchase requirements in its discretion. The Trust intends to continue the Offering until the earlier of (i) all the Interests have been sold, or (ii) 18 months from the date of this Memorandum.

**Qualifications of Investors**

The Interests may be purchased only by prospective Investors who are Accredited Investors and who satisfy certain suitability requirements. See "WHO MAY INVEST." In addition, the Lender may require additional information from, and special qualification of, Investors acquiring a certain percentage of the Interests, typically ranging from 10% to 20%.

**Sale of Interests**

Prospective Investors must adhere to the payment arrangements summarized in the section entitled "HOW TO PURCHASE" in this Memorandum and in the following paragraphs of this section and as set forth in full in the Purchase Agreement, attached as **Exhibit B** to this Memorandum. All proceeds for the purchase of Interests will be directly deposited into an account in the name of the Trust at a bank to be designated by the Trust, which funds will be kept in the account until the closing of the purchase of the Investor's Interests. There is no assurance that all of the Interests will be sold, and the Trust reserves the right to refuse to sell the Interests to any person, in its sole discretion, and may terminate this Offering at any time.

**THE BANK THAT HOLDS THE TRUST'S DEPOSIT ACCOUNT HAS NOT, AND WILL NOT, RECOMMEND OR PROVIDE ANY ADVICE IN CONNECTION WITH A PURCHASE OF THE INTERESTS.**

**Marketing of Interests**

Offers and sales of Interests will be made on a "best efforts" basis by Broker-Dealers ("Selling Group Members" or "Selling Group") who are members of Financial Industry Regulatory Authority, Inc. ("FINRA"). The Trust intends to continue the Offering until the earlier of (i) all of the Interests are sold, or (ii) 18 months from the date of this Memorandum.

The Selling Group Members will receive selling commissions in an amount up to nine percent (9%) of the purchase price of the Interest sold. The Trust and Patrick Capital Markets, LLC (the "Managing Broker-Dealer") entered into a Managing Broker-Dealer Agreement whereby the Trust agreed to pay the Managing Broker-Dealer as follows: (a) the Trust shall pay the Managing Broker-Dealer sales commissions equal to approximately six and one-quarter percent (6.25%) of the gross proceeds received by the Trust in the form of cash, notes or other assets from the sale of Interests ("Gross Proceeds") for sales made directly by the Managing Broker-Dealer or other registered broker-dealers, all or a portion thereof which may be re-allowed to the Selling Group; (b) the Trust shall pay Managing Broker-Dealer a marketing and due diligence fee equal to approximately one percent (1%) of the Gross Proceeds, all or a portion thereof which may be re-allowed to the Selling Group; (c) the Trust shall pay the Managing Broker-Dealer a managing broker-dealer fee equal to approximately three-quarters of one percent (0.75%) of the Gross Proceeds; and (d) the Trust shall pay the Managing Broker-Dealer a wholesale fee equal to one percent (1%) of the Gross Proceeds for the sale of the Interests which it then will pay to registered representatives of the Managing Broker-Dealer. Such registered representatives may also be employees or contractors of Nelson Partners.

The Trust, in its sole discretion, may accept purchases of Interest net (or partially net) of selling commissions and organization and offering expenses and other items of compensation due to the Trust or an affiliate of the Trust, in each instance under circumstances deemed appropriate by the Trust, and including, but not limited to, purchases of Interests that are directed by a registered investment advisor, purchases of Interests made by an investor through a bank or trustee, or purchases of Interests where the selling commissions or other fees are waived by the broker or other

**GFI's Exhibit 18, Page 67 of 221**

intermediary. If Interests are sold net of selling commissions and/or other expenses, then the Trust may issue additional Interests to the purchasing investor, or discount the price of the Interests, in the discretion of the Trust, to account for the savings of commissions and/or expenses.

Inquiries regarding purchases of Interests should be directed to the Sponsor at Greeley Flats, DST, 16B Journey, Suite 200, Aliso Viejo, CA 92656, Attn: Cindy Yearout, the telephone number: (949) 916-7300, fax number: (949) 916-7311, and email: cindyy@nelsonpartners.com.

THE INTERESTS ARE BEING OFFERED ONLY TO PERSONS WHO MEET THE INVESTOR SUITABILITY STANDARDS (SEE "WHO MAY INVEST").

## Limitation of Offering

This Offering is being made in reliance on Rule 506(b) of Regulation D promulgated under the Securities Act as well as state securities laws exemptions. Accordingly, distribution of this Memorandum has been strictly limited to persons satisfying the Investor Suitability Requirements described herein, and this Memorandum does not constitute an offer to sell or a solicitation of an offer to buy with respect to any person not satisfying those requirements.

Interests may be purchased using assets of various benefit plans, including employee benefit plans subject to Title I of ERISA, retirement plans subject to Section 4975 of the Code, such as plans intended to qualify under Code Section 401(a) (including plans covering only self-employed individuals) and individual retirement accounts (collectively "**Plans**"). Neither the Trust nor the Trustees make any representation with respect to whether Interests are a suitable investment for any such Plan. Additionally, the Sponsor and the Signatory Trustee will limit the availability of interests for purchase by or transfer to such Plans to less than 25% of all interests to prevent the assets of the Trust from characterization as "plan assets" (as defined in 29 Code of Federal Regulations § 2510.3-101) subject to the fiduciary standards of Part 4 of Subtitle B of Title I of ERISA and Code Section 4975.

## Ownership by the Sponsor, Original Sponsor or Affiliates

The Sponsor, the Original Sponsor or their Affiliates, including investment funds managed by the Sponsor, may acquire and hold Interests for investment purposes, to satisfy requirements of the Lender, or if the Trust does not sell all the Interests during the Offering period. The amount of Interests acquired and held by Sponsor, the Original Sponsor and their Affiliates is not limited, and ownership by these entities involves certain risks that potential Investors should consider. See "RISK FACTORS - Risks Relating to Private Offering and Lack of Liquidity."

## Ownership by the Preferred Equity Provider

In order to close the acquisition of the Property prior to sufficient Interests being sold to raise the minimum required closing equity, a preferred equity provider contributed $4,575,000 of capital to the Trust, through affiliates of the Trust, which capital was used to close the acquisition. Terra University Flats Pref, LLC, an affiliate of Terra Capital Partners, provided the preferred capital (the "**Preferred Equity Provider**"). The Trust has or will pay certain fees and interest to the Preferred Equity Provider for the contribution of such equity, some of which may have been or may be paid by the Sponsor or its Affiliates and reimbursed by the Trust to the Sponsor or its Affiliates.

Upon the sale of Interests, the net proceeds, less commissions and fees paid to broker-dealers and their representatives, will be used to repay capital contributed by the Preferred Equity Provider. Subject to limited exceptions, only after all capital contributed by the Preferred Equity Provider is repaid will net proceeds from the sale of Interests be used to pay the fees and other expense items that were not paid at the closing of the acquisition, including fees and commissions due to the Sponsor and its Affiliates.

The Organizational Chart attached as **Exhibit I** shows the Interests in the Trust held by the Preferred Equity Provider. An affiliate of the Original Sponsor (NB JV Partner, LLC) and the Preferred Equity Provider formed Greeley Flats JV, LLC, which is the owner of Greeley Flats IB, LLC, which in turn is the owner of all unsold Interests in the Trust. The $4,575,000 invested by the Preferred Equity Provider was contributed to Greeley Flats JV, LLC and then

**GFI's Exhibit 18, Page 68 of 221**

through Greeley Flats IB, LLC to the Trust. When Interests are sold, net proceeds are distributed to Greeley Flats JV, LLC and then to the Preferred Equity Provider until its entire investment is repaid.

**Acceptance of Investors**

The Trust may accept or reject the Purchase Agreement of any prospective Investor for any reason for a period of 30 days after receipt of the Purchase Agreement and Purchaser Questionnaire. Any proposed purchase of Interests not accepted within 30 days of receipt is deemed rejected.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 69 of 221**

## ESTIMATED USE OF PROCEEDS

**Estimated Uses of Offering Proceeds**

The following table sets forth certain information concerning the estimated uses of the Offering Proceeds:

| Uses of Offering Proceeds[1] | Amount | Percent of Offering Proceeds |
|---|---|---|
| Gross Offering Proceeds | $11,113,000 | 100.00% |
| Organization and Offering Costs[2] | $102,830 | 0.93% |
| Selling Commissions | $694,563 | 6.25% |
| Managing Broker-Dealer Fee | $83,347 | 0.75% |
| Broker-Dealer Marketing & Due Diligence | $111,130 | 1.00% |
| Managing Broker-Dealer Wholesale Fee | $111,130 | 1.00% |
| Available for Investment[3] | $10,010,000 | 90.07% |
| **Total Uses of Offering Proceeds** | **$11,113,000** | **100.00%** |

NOTE:

(1)     The Trust and Patrick Capital Markets, LLC (the "Managing Broker-Dealer") entered into a Managing Broker-Dealer Agreement whereby the Trust agreed to pay the Managing Broker-Dealer as follows: (a) the Trust shall pay the Managing Broker-Dealer sales commissions equal to approximately six and one-quarter percent (6.25%) of the gross proceeds received by the Trust in the form of cash, notes or other assets from the sale of Interests ("Gross Proceeds") for sales made directly by the Managing Broker-Dealer or other registered broker-dealers, all or a portion thereof which may be re-allowed to the Selling Group; (b) the Trust shall pay Managing Broker-Dealer a marketing and due diligence fee equal to approximately one percent (1%) of the Gross Proceeds, all or a portion thereof which may be re-allowed to the Selling Group; (c) the Trust shall pay the Managing Broker-Dealer a managing broker-dealer fee equal to approximately three-quarters of one percent (0.75%) of the Gross Proceeds; and (d) the Trust shall pay the Managing Broker-Dealer a wholesale fee equal to one percent (1%) of the Gross Proceeds for the sale of the Interests which it then will pay to registered representatives of the Managing Broker-Dealer. Such registered representatives may also be employees or contractors of Nelson Partners.

(2)     The Sponsor will be entitled to reimbursement for expenses incurred in connection with the Offering and organization of the Trust, including legal, accounting, printing and other costs and expenses directly related to the Offering. Reimbursements to Sponsor may include reasonable charges for services provided by Sponsor's internal legal staff and by Sponsor's staff working on organization and offering tasks. To the extent that these costs are less than the estimated amounts, the excess will be retained by the Trust.

(3)     Amounts available for investment will be used to acquire the Property, pay expenses and to establish the Trust Reserve.

**Estimated Sources and Uses of Offering and Loan Proceeds**

The following table sets forth the estimated sources and uses of Offering and Loan proceeds. The table reflects the present intentions of the Sponsor and an unforeseen change of circumstances may require the Sponsor to modify the information set forth below. The Sponsor will receive substantial compensation and fees in connection with the Offering and the Property, as described in this Memorandum. Certain of the uses described below are estimates by the Sponsor.

| Sources of All Funds | Amount | Percent of All Funds |
|---|---|---|
| Offering Proceeds | $11,113,000 | 45.52% |
| Loan | $13,301,000 | 54.48% |
| **Total Sources of All Funds** | **$24,414,000** | **100.00%** |

| Uses of All Funds | Amount | Percent of All Funds |
|---|---|---|
| Property Related Expenses | | |
| Purchase Price of Property[1] | $21,907,000 | 89.73% |

**GFI's Exhibit 18, Page 70 of 221**

| | | |
|---|---|---|
| Repairs & Maint. Reserve[2] | $195,000 | 0.80% |
| Lender Required Reserves[2] | $150,000 | 0.61% |
| Loan Origination[3] | $133,000 | 0.55% |
| Loan Costs | $133,000 | 0.55% |
| Property Insurance | $35,000 | 0.14% |
| Property Taxes | $110,000 | 0.45% |
| First Month's Interest | $51,000 | 0.21% |
| Utility Deposit Fees | $10,000 | 0.04% |
| Legal Fees (Acquisition)[4] | $25,000 | 0.10% |
| Legal Fees (Legal Opinion)[4] | $18,000 | 0.07% |
| Legal Fees (Loan)[4] | $75,000 | 0.31% |
| Third-Party Property Reports[5] | $17,000 | 0.07% |
| Closing Costs and Title Fees | $25,000 | 0.10% |
| Organization Formation Fees | $2,500 | 0.01% |
| Cash Account Set-Up Fees | $500 | 0.00% |
| **Total Property Acquisition Costs** | **$22,887,000** | **93.74%** |
| | | |
| Syndication/Offering Expenses[6] | | |
| Sponsor Acquisition Fee | $424,000 | 1.74% |
| Organization and Offering Costs | $102,830 | 0.42% |
| Broker-Dealer Commissions and Fees | $1,000,170 | 4.10% |
| **Total Syndication Load** | **$1,527,000** | **6.26%** |
| | | |
| **Total Uses of All Funds** | **$24,414,000** | **100.00%** |

NOTE:

(1) The Property Manager will receive a broker's commission of approximately 2.9% of the purchase price of the Property (or $638,000) for representing the Trust as its broker in the acquisition of the Property. See "COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES."

(2) Upon the sale of the Property, any amounts remaining in the Trust Reserve will be distributed to the Investors pro rata in accordance with their Interests. Upon repayment of the Loan, any amount remaining in the Master Tenant Reserve will be returned to the Master Tenant. The Reserves may also be used to make payments on the Loan and for other expenses.

(3) An Affiliate of the Sponsor will receive a loan fee for arranging the Loan, including identifying the Lender and negotiating the terms of the Loan Documents.

(4) Legal fees to acquire the Loan and to negotiate the Loan Documents. To the extent that these costs are less than the estimated amounts, the excess will be retained by the Trust.

(5) The appraisal fees, the fees for the survey, engineering and environmental reports and fees for other due diligence reports are payable to third parties not affiliated with the Sponsor or its Affiliates. To the extent that these costs are less than the estimated amounts, the excess will be retained by the Trust.

(6) The Trust and Patrick Capital Markets, LLC (the "Managing Broker-Dealer") entered into a Managing Broker-Dealer Agreement whereby the Trust agreed to pay the Managing Broker-Dealer as follows: (a) the Trust shall pay the Managing Broker-Dealer sales commissions equal to approximately six and one-quarter percent (6.25%) of the gross proceeds received by the Trust in the form of cash, notes or other assets from the sale of Interests ("Gross Proceeds") for sales made directly by the Managing Broker-Dealer or other registered broker-dealers, all or a portion thereof which may be re-allowed to the Selling Group; (b) the Trust shall pay Managing Broker-Dealer a marketing and due diligence fee equal to approximately one percent (1%) of the Gross Proceeds, all or a portion thereof which may be re-allowed to the Selling Group; (c) the Trust shall pay the Managing Broker-Dealer a managing broker-dealer fee equal to approximately three-quarters of one percent (0.75%) of the Gross Proceeds; and (d) the Trust shall pay the Managing Broker-Dealer a wholesale fee equal to one percent (1%) of the Gross Proceeds for the sale of the Interests which it then will pay to registered representatives of the Managing Broker-Dealer. Such registered representatives may also be employees or contractors of Nelson Partners.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 71 of 221**

## RISK FACTORS

The Interests are speculative and involve a high degree of risk.  A prospective Investor should be able to bear a complete loss of his or her investment.  If a prospective Investor intends to acquire the Interests to claim the Property as replacement property in a proposed Section 1031 Exchange, particular attention should be paid to the *"Federal Income Tax Consequences"* section of this Memorandum.  The prospective Investor will not receive a legal opinion providing that his or her particular investment in the Interests will qualify for tax-deferred exchange treatment under Section 1031.

Prospective Investors should carefully read this Memorandum and review the Financial Forecast attached as <u>Exhibit G</u> to this Memorandum (including the assumptions thereto), before purchasing an Interest. The Financial Forecast consists of "forward-looking" statements that are based on various assumptions regarding the Trust and future operation and management of the Property, such as lease occupancy, payment of rent and certain budgeted expenditures. Forward-looking statements can be identified by the use of words such as "may," "will," "plan," "potential," "projected," "should," "expect," "anticipate," "estimate," "continue" or comparable terminology. Forward-looking statements are inherently subject to risks and uncertainties, many of which cannot be predicted with accuracy and some of which the Trust might not even anticipate. Although the Trust believes that the expectations reflected in such forward-looking statements are based upon reasonable assumptions at the time made, there can be no assurance that such expectations will be achieved. Future events and actual results, financial and otherwise, may differ materially from the results discussed in the forward-looking statements. Investors are cautioned not to place undue reliance on these forward-looking statements. In addition, any projections and representations, written or oral, which do not conform to those contained in this Memorandum, must be disregarded.

Among the factors about which assumptions are made:

- risks and uncertainties affecting the general economic climate and conditions;

- changes in underlying enrollment rates or the availability of on-campus housing at the University of Northern Colorado;

- changes in interest rate levels and volatility in the capital markets;

- changes in operating costs;

- our ability to obtain adequate insurance, including coverage for terrorist acts;

- the availability of financing on attractive terms or at all;

- changes in governmental regulation, tax rates and similar matters; and

- other risks associated with the acquisition, ownership and maintenance of real estate set forth herein below.

A PROSPECTIVE INVESTOR SHOULD CONSIDER CAREFULLY, AMONG OTHER RISKS, THE FOLLOWING RISKS, AND SHOULD HAVE HIS OR HER OWN INDEPENDENT LEGAL, TAX, ACCOUNTING AND FINANCIAL ADVISORS CLOSELY REVIEW THIS MEMORANDUM AND ALL DOCUMENTS REFERENCED HEREIN AND ATTACHED HERETO BEFORE INVESTING IN THE INTERESTS.  THESE RISK FACTORS, OR OTHER EVENTS, COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE CONTAINED IN THIS MEMORANDUM.  FURTHERMORE, THESE RISK FACTORS RELATE TO A SOPHISTICATED TRANSACTION AND WHILE THE TRUST HAS ENDEAVORED TO ANALYZE THIS TRANSACTION AND THE RISKS ATTENDANT TO THIS TRANSACTION TO THE BEST OF ITS ABILITY, THE FOLLOWING RISKS MAY NOT ENCOMPASS EVERY POSSIBLE RISK WITH REGARD TO THIS TRANSACTION.  ONLY AFTER A PROSPECTIVE

GFI's Exhibit 18, Page 72 of 221

**INVESTOR AND HIS OR HER INDEPENDENT ADVISORS HAVE ANALYZED THE UNDERLYING DOCUMENTS CAN HE OR SHE FULLY UNDERSTAND THE TRANSACTION.**

## REAL ESTATE RISKS

**General Risk of Investment in the Property.**  Rent payments to the Trust, and thus cash flow paid by the Trust to the Investors, will be contingent on the successful operation of the Property; therefore, the economic success of an investment in the Interests will depend directly upon the Leases and the Property Tenants. The operation of the Property will be subject to those risks typically associated with real estate investments. Vacancies by Property Tenants that are not replaced or are replaced at less attractive terms can adversely affect operating results or render the sale or refinancing of the Property difficult or unattractive. No assurance can be given as to the accuracy of certain assumptions related to the future occupancy of the Property as these matters will depend on events and factors possibly beyond the control of the Trust. Such factors include continued validity and enforceability of the Leases, vacancies at the Property, rent levels in the market, adverse changes in local population trends, market conditions, neighborhood property values, local economic and social conditions, supply and demand for properties similar to the Property, competition from similar properties, environmental hazards and liabilities caused by a Property Tenant or by third parties, interest rates and real estate tax rates and assessments, governmental rules, regulations and fiscal policies, zoning restrictions and other easements, covenants and restrictions that affect title to the Property, the enactment of unfavorable environmental or hazardous material laws, labor and material costs, uninsured losses, effects of inflation and other risks. Further, given the total costs, expenses, and the acquisition fee the Trust incurred in relation to this Offering, if the Trust decides to sell the Property, it would have to sell the Property at a substantially higher price to recover the original investment.

**Resident turnover rates are high and difficult to predict.**  To maintain a stabilized occupancy level, the management of the Property must be constantly leasing to prospective residents. There is no assurance that the Master Tenant will be able to maintain occupancy rates sufficient to operate the Property profitably. Although units generally are rented on a 12-month basis, the Property is subject to certain additional risks because it is student housing, including that the Property Tenants are mainly students resulting in seasonality concerns regarding the collection of rent during the summer season when fall and spring semesters are not in session. With student housing, leasing cycles are based on the school year, and a substantial majority of leases will expire in August and September. Therefore, the impact of any occupancy losses may be greater after the August/September unit turn than those at a typical commercial apartment complex with leases expiring throughout the year which can moderate occupancy losses. Also, typically prospective tenants do not enter into leases until very close to the start of the leasing cycle.

**Occupancy levels may fluctuate significantly and are difficult to predict.**  As of July 12, 2018, the Property was approximately 75.57% occupied, and approximately 100% leased for the 2018-19 academic year. If a substantial portion of the Property Tenants do not renew or extend their Leases or if a substantial portion of the Property Tenants terminate their Leases, and the Property Manager is not able to re-let the units in a timely manner, the operating results of the Property would be substantially and adversely affected by the loss of revenue and possible increase in operating expenses not reimbursed by tenants. This Memorandum assumes in certain projections an average vacancy rate of approximately 4.0% for the Property for the projected holding period, but the Trust cannot provide any assurance to prospective Investors that the Property will achieve or maintain such an occupancy rate as contemplated in the assumptions to such projections. In addition, lease-up of any unoccupied space may be achievable only at rental rates less than those assumed in the Projections or with the provision of rental concessions, both of which would adversely affect operating cash flow.

**GFI's Exhibit 18, Page 73 of 221**

**The student housing industry is highly competitive.**  A number of other apartment communities and student dormitories are located within the vicinity of the Property and other residential options are available with profiles and amenities that might be more attractive to some potential tenants. In addition, future development of housing for students in the area of the Property might affect vacancy and rental rates. Competition from nearby apartment communities and dormitories and other residential options could make it more difficult to attract new tenants. The Property will also experience competition for real property investments from individuals, corporations and other entities engaged in real estate investment activities. Competition for investments may increase costs and reduce returns on the Property and thus reduce returns to the Trust and the Investors.

**Expiration or Termination of the Master Lease.**  The Property cash flow may be impacted and the Master Tenant and the Trust may not be able to pay the amounts owed under the Loan Documents or other expenses related to the Property if the Property Tenants fail to timely pay rent due pursuant to the terms of the Leases. Additionally, in certain circumstances, it is possible that Property Tenants might be able to abate rent such as if a casualty or condemnation occurs and abatement is required by statute. Any continuing default by a Property Tenant under its Lease, whether monetary or non-monetary, may force the Master Tenant to terminate the applicable Lease and the Master Tenant may not be able to find a new tenant or tenants at the same rental rate. If a material number of Property Tenants default and their Leases are terminated, the Trust may not be able to sell the Property without incurring a loss. Moreover, if a Property Tenant were to file for bankruptcy, the Master Tenant may not be able to regain possession of the applicable space in the Property quickly from the bankruptcy trustee. If that were to happen, it might delay re-letting the space in the Property, and, if a material number of Leases were so affected, the Master Tenant may not receive sufficient rent from the bankruptcy trustee to cover expenses. Consequently, the payments of rent by the Master Tenant to the Trust would be reduced, thus reducing the returns to the Investors.

If the Master Lease is terminated as a result of any of the foregoing events, the Trust would be forced to market the Property to be sold since it is prohibited from entering into new leases unless necessitated by the bankruptcy or insolvency of a tenant. However, if space cannot be re-leased after the expiration of one or more of the Leases, then the Signatory Trustee would likely determine that the Trust is in danger of losing the Property due to the bankruptcy or insolvency of the Master Tenant and/or a payment default under the Loan Documents. In the event the Master Tenant has not become bankrupt or insolvent, to avoid a payment default under the Loan Documents, the Signatory Trustee would terminate the Trust by converting it into (or effecting the contribution of the Property to) an LLC. This structure would allow the Signatory Trustee, which would then become the sole manager of the LLC, to enter into new leases on behalf of the Trust. In the event of the bankruptcy or insolvency of the Master Tenant, the Signatory Trustee would not terminate the Trust in order to re-lease the Property. In either case, the LLC or Trust will have to find replacement tenants, and it is possible that the rents paid under any replacement lease or leases will be less that the existing rents or that the Trust will not be able to find or agree upon terms with replacement tenants. Consequently, the returns to the Investors would be reduced.

**Agreements Affecting the Property.**  By purchasing the Property and subjecting it to the Master Lease, the Trust and the Master Tenant will each directly or indirectly become a party to various agreements, including easements, declarations, and restrictive covenants (collectively, the "**Agreements**") entered into by predecessors-in-interest which run with the land and continue to affect the Property after its acquisition. The Agreements contain obligations and restrictions with which the Trust and the Master Tenant must comply. Copies of the Agreements are available upon request.

**Key Personnel.**  The Sponsor is dependent upon Patrick Nelson, Paula Platt, Scott McKhann, Shane Stone and Sandy Simmons for strategic business direction and real estate experience, and loss of their services could adversely affect the future management of the Property.

**Risks Relating to Title.**  The Property is subject to various matters affecting title as set forth on the title policy and survey, copies of which are available upon request. In addition, other issues may arise that affect title to the Property, but that are not disclosed by the title policy or the survey. The Trust obtained title insurance when it acquired the Property. However, there is no guarantee that the title insurance will cover all title issues affecting the Property, that the title company will pay any claim, that the title insurance is sufficient to cover any damages, or that the Trust will not incur costs in making a title insurance claim.

**GFI's Exhibit 18, Page 74 of 221**

**Substantial Casualty or Condemnation.** If the Property is damaged or destroyed by fire or other casualty or subject to a condemnation, the Trust might be required under the Loan Documents to repair and restore the damage provided that the insurance proceeds received are sufficient to cover at least a certain portion of the costs of such restoration. If the Trust is unable or unwilling to restore following a casualty or condemnation, a default might occur under the Loan Documents, which would permit the Lender to exercise its remedies under the Loan Documents. The Property Tenants are not obligated to reimburse the Trust or the Master Tenant for the cost of insurance. In addition, the particular risks that are currently insurable may not continue to be insurable on an economical basis or the necessary levels of coverage may not continue to be available. If a loss occurs that is partially or completely uninsured, an Investor may lose his or her entire investment in the Property.

**Environmental Liability.** Federal, state and local laws may impose liability on a property owner for releases, or the otherwise improper presence on the premises of, hazardous substances (which, by definition, does not include petroleum) without regard to fault or knowledge of the presence of such substances. A property owner may be held liable for environmental releases of such substances that occurred before it acquired title and that are not discovered until after it sells the property. If any hazardous substances are found at any time on the Property, the Trust may be held liable for all cleanup costs, fines, penalties and other costs regardless of whether it owned the Property when the releases occurred or the hazardous substances were discovered.

The Trust has obtained a Phase I Environmental Site Assessment of the Property, dated January 29, 2018, from Partner Engineering and Science, Inc. (the "**Phase I Assessment**"). The Phase I Assessment was performed in compliance with the standards of ASTM Standard Practice E1527-13, which is recognized by the United States Environmental Protection Agency and many states as adequate to demonstrate compliance with "All Appropriate Inquiry." The objective of the Phase I Assessment was to identify any Recognized Environmental Conditions ("**RECs**"), Controlled Recognized Environmental Conditions ("**CRECs**"), Historical RECs ("**Historical RECs**"), and/or environmental issues ("**Environmental Issues**") in connection with the Property. The Phase I Assessment did not identify any RECs, CRECs, or Historical RECs, but did identify one potential Environmental Issue associated with the Property as discussed below. The Phase I Assessment will be provided to prospective Investors upon request.

Based on a review of the U.S. Environmental Protection Agency ("**EPA**") Map of Radon Zones, the Property is located in Radon Zone 1. A limited sampling was conducted in order to determine the general levels of radon concentrations at the Property. Seven charcoal canisters were placed throughout the buildings on the Property, and radon was not detected above EPA action levels. The Phase I Assessment concluded that no further investigation is recommended at this time.

The Phase I Assessment represents conditions at the Property and surrounding properties as of the effective dates of such assessment and may not represent current environmental risks, whether related to latent conditions unknown at the time of the Phase I Assessment or new conditions on the Property or surrounding properties. Furthermore, the Phase I Assessment will not involve any invasive testing and will be limited to a physical walk through or inspection of the Property and a review of the related governmental records. Consequently, there are no assurances that any actual environmental problems or conditions with the Property would be exposed by the Phase I Assessment. Prospective Investors may not rely on the Phase I Assessment, but instead should conduct any due diligence that they believe is necessary or appropriate to evaluate an investment in the Property.

The Seller makes limited representations in the Property Purchase Agreement regarding environmental matters. Accordingly, the Trust will be expected to assume the risk of adverse environmental conditions at the Property. It is possible that an environmental claim may be raised in such a manner that the claim could become enforceable against the Trust. It is also possible that the existence of any environmental issues with the Property may make it more difficult and more expensive, and perhaps impossible, to obtain financing for the Property, sell the Property or develop the Property for a different use. The Trust will make no representations in the Purchase Agreement regarding any environmental matters and has not agreed to indemnify the Investors for any environmental liabilities. If losses arise from hazardous substance contamination that cannot be recovered from a responsible party, the financial viability of the Property may be substantially affected.

**Earthquake, Tornado and Flood Exposure.** The Property is not located in an area with mandatory earthquake, tornado or flood insurance. The Trust has obtained a Property Condition Assessment for the Property, dated January 29, 2018, prepared by Partner Engineering and Science, Inc. (the "**Property Condition Assessment**"),

**GFI's Exhibit 18, Page 75 of 221**

which states that the Property is located in Wind Zone II, a special wind region with design wind speeds up to 160 miles per hour. The Property Condition Assessment also states that the Property is located in Flood Zone X (unshaded), which is defined as an area outside the 500-year flood plain.

Although no earthquake insurance is currently required, if earthquake or flood insurance is required in the future, and if the Master Tenant obtains such insurance, there can be no assurance that such insurance would be sufficient to cover any specific earthquake or flood loss. Accordingly, the Property may be damaged in the future by seismic activity, hurricanes or floods resulting in a partial or total loss of the Property. Even with insurance, there can be no assurances that the Trust would be fully reimbursed for any damage incurred in the event of a flood or earthquake at or near the Property.

**Climate Change.**  The Trust cannot predict with certainty whether climate change is occurring and, if so, at what rate. However, the physical effects of climate change could have a material adverse effect on the Property. To the extent climate change causes changes in weather patterns, the Property could experience increases in storm intensity, including increases in annual snowfall and rain levels, high winds and tornados. Climate change may also have indirect effects on our business by increasing the cost of or making property insurance unavailable on acceptable terms, increasing the cost of energy and increasing the cost of snow removal or related costs at the Property. Proposed legislation to address climate change could increase utility and other costs of operating the Property, which if not offset by rising rental income, would reduce cash flow. There can be no assurance that climate change will not have a material adverse effect on the Property.

**Property Not a Diversified Investment**.  Because an investment in the Interests represents an investment in one type of property in a geographically limited location, it is not a diversified investment. Accordingly, poor performance of the Property would adversely affect the profitability of the Interests.

**Speculative Investment.**  No assurance can be given that the Investors will satisfy their investment objectives.  No assurance can be given that the Investors will realize a substantial return (if any) on their investment or that they will not lose their entire investment in the Property. For this reason, prospective Investors should carefully read this Memorandum. **All such persons or entities should consult with their Advisors prior to making an investment.**

**Determination of Purchase Price/Valuation.**  The Trust purchased the Property from the Seller for a purchase price of $21,907,000 and incurred closing costs, financing costs, acquisition fees to the Sponsor and related transaction and Offering costs (see "SUMMARY OF THE OFFERING – Property – Acquisition"). The Seller also transferred the Excess Land to an Affiliate of the Sponsor for no additional consideration. The Excess Land consists of approximately 1.227 acres of excess land located adjacent to the Property. The purchase price paid by the Trust for the Property was not discounted, nor did the Trust receive any direct consideration in connection with the transfer of the Excess Land to the Affiliate of the Sponsor. The Seller previously obtained conceptual approval from the city to construct additional multi-family units on the Excess Land, and the Sponsor is currently evaluating the feasibility of any such development. Except as set forth in the Supplemental Collateral Agreement, the Trust will not receive ownership or other rights in or to the Excess Land, or any subsequent project or projects developed on such land. The Sponsor obtained the Appraisal, which appraised the value of the Property to be $20,500,000. The Excess Land is not included in the appraised value of the Property. Further, the appraiser stated that it reduced the value of the Property because a broker commission on the sale of the Property, in the amount of approximately $600,000, will be paid to an affiliate of the Sponsor. It is the Sponsor's position that the payment of such commission should not reduce the appraised value merely because the commission was paid to an affiliate of the Sponsor as opposed to a third-party broker.

The purchase price for the Interests is determined unilaterally by the Trust and is not based on an arm's-length negotiation. The combined total of the purchase price for the Interests and the Loan is significantly higher than the Trust's purchase price for the real estate. Therefore, Investors should not expect that the price paid for their investment is reflective of the fair market value of the Property on a stand-alone basis. Investors are, however, acquiring the Interests based on the existence of the financing, the Master Lease and the underlying Leases. Nevertheless, there is no evidence that such additional rights support the amounts invested over the purchase price of the Property.

**GFI's Exhibit 18, Page 76 of 221**

**Lack of Audited Financial Statements.** The Trust has not obtained audited financial statements, including without limitation income and expense statements, regarding the Property from the Seller.

**Physical Condition of the Property.** The Property Condition Assessment made the recommendations set forth below with respect to the Property.

| Immediate Repairs | Short Term Repairs | Long-Term Repairs* |
|---|---|---|
| $2,000 (repairs to pedestrian walkways to mitigate potential tripping hazards) | $300 (installation of placard signage for ADA accessible parking spaces) | $219,408 (inflated at 3.0% per year) (maintenance and replacement of improvements and equipment, including: exterior walls, unit appliances, water heaters, carpet and vinyl flooring, pool plaster and filtration equipment, and parking area seal coat) |

* Over a 12-year term.

The Reserves set forth in the Estimated Use of Proceeds (see "ESTIMATED USE OF PROCEEDS") are established to help defray the potential future costs of immediate and long-term repairs at the Property, but in the event that such costs exceed the Trust Reserve and the Master Tenant Reserve, if any, the Trust, and ultimately the Investors, would need to make up the difference. The Trust acquired the Property from the Seller with limited representations and warranties. The Trust will not guarantee the condition of the Property to the Investors, nor will it make any warranties or representations to the Investors regarding the condition of the Property, other than that it is aware of no breaches of the Seller's representations and warranties contained in the Property Purchase Agreement. Any prospective Investor is welcome to perform additional evaluations of the physical and structural condition of the Property.

## RISKS RELATING TO THE LOAN

**Loan Terms.** The Sponsor will make available to the Investors copies of the Loan Documents upon request.

**Prepayment Requirements**. The Loan Documents allow prepayment, but if the Loan is prepaid within the first 138 months of the Loan term, a prepayment premium will be required in an amount equal to the greater of a yield maintenance payment or one percent (1%) of the outstanding principal balance of the Loan. Thereafter, a prepayment premium equal to one percent (1%) of the outstanding principal balance of the Loan will be due upon prepayment, except during the last three (3) months of the Loan term, when no prepayment premium will be due if the Loan is prepaid.

**Leverage.** The Property has an initial debt to Offering price ratio in connection with the Loan of approximately 120% based on the total purchase price of the Interests. As a result of this level of leverage, a decrease in rental revenues from the Property may adversely affect the financial viability of the Property. If the revenue from the Property is insufficient to pay Rent under the Master Lease, it is possible that the Master Tenant will not be able to fully fund the Rent payments from other sources. If a Property Tenant defaults on its obligation to pay rent under its Lease or the Master Tenant defaults on its obligation to pay Rent under the Master Lease, the Trust would be unable to pay amounts due to the Lender under the Loan and the Lender could foreclose on the Property. In such event, the Investors could lose their entire investment in the Property and suffer adverse tax consequences.

**Restrictions on Transfer and Encumbrance.** The terms of the Loan materially restrict the common privileges that an owner of property has to exercise control over its property, including restrictions on the transfer and further encumbrance of the Property. See "ACQUISITION AND FINANCING." If the Trust violates the restrictions on transfer or encumbrance, the Lender may be permitted under Loan Documents to declare the entire amount of the loan, including principal, interest, prepayment premiums, and other charges, to be immediately due and payable. If the Lender declares the Loan to be immediately due and payable, the Trust will have the obligation to immediately

**GFI's Exhibit 18, Page 77 of 221**

repay the Loan in full. If the Trust fails to immediately repay the Loan in full, the Lender likely will be permitted to invoke its remedies under the Loan Documents, including proceeding with a foreclosure sale that is likely to result in the Investors losing their entire investment in the Property and suffering adverse tax consequences.

**Events of Default.**  Certain events outside of the control of the Trust constitute an event of default under the Loan Documents.

**Loan Representations, Covenants and Other Restrictions.**  The Loan Documents contain various representations, covenants (affirmative and negative) and other provisions. Such restrictions, while relatively common in today's real estate financing market, increase the risks of an investment in the Trust beyond those of a cash purchaser of the Property. In addition, these restrictions may also make the Property less attractive as an acquisition target for third-party investors who desire to acquire the Property subject to the Loan. If the Trust fails to satisfy such representations, covenants and agreements, the Lender may declare the Loan in default. If the Trust fails to cure the default, the Lender could foreclose on the Property. In such a case, the Investors could suffer material adverse tax consequences because the foreclosure would be treated as a taxable sale for federal income tax purposes.

## RISKS RELATING TO THE TRUST STRUCTURE

**Investors Have Limited Control over the Trust.**  The Trustees (and in particular the Signatory Trustee) are solely responsible for the operation and management of the Trust. The Investors have no right to participate in the management of the Trust, or in the decisions made by the Trustees. Even though the Investors will be canvassed prior to the Signatory Trustee entering into a binding contract to sell the Property, and even though such Signatory Trustee will take the opinions of the Investors concerning such prospective sale into account in good faith, the Signatory Trustee is under no obligation to make its decision with respect to such prospective sale in accordance with the wishes of the Investors. The Trustees may only be removed by Investors holding a majority of the Interests, and only if the Trustees have engaged in willful misconduct, fraud or gross negligence.

**Limited Duties of Trustees.**  The Trustees do not owe any fiduciary or other duties to the Investors other than those provided for in the Trust Agreement. The Trust Agreement provides that the Trustees are individually answerable for their actions to the Investors only if, among other things, the Trustees engage in willful misconduct or gross negligence or any Prohibited Action, or they fail to use ordinary care in disbursing monies to Investors pursuant to the terms of the Trust Agreement. In addition, the Trustees may only be removed by Investors holding a majority of the Interests, and only if the Trustees have engaged in willful misconduct, fraud or gross negligence as determined pursuant to a final, non-appealable judgment of a court of competent jurisdiction.

**Limited Powers of Trustees; Risk of Termination of Trust.**  To comply with Revenue Ruling 2004-86 regarding Section 1031 Exchanges, the Trust Agreement prevents the Trustees from engaging in numerous actions, including (a) reinvesting the proceeds from the sale of the Property in other property, (b) renegotiating the terms of the Loan or taking advantage of favorable market conditions by entering into new financing, renegotiating the Master Lease or entering into new leases except in the event of the bankruptcy or insolvency of the Master Tenant, (c) making other than minor non-structural modifications of the Property other than as required by law, (d) after the formation and capitalization of the Trust, accepting any additional capital contributions from any Investor, or any contributions from any prospective new investor, or (e) taking any other action that would in the opinion of tax counsel cause the Trust to be treated as a "business entity" for federal income tax purposes. These restrictions severely limit the actions the Trustees can take on behalf of the Investors with respect to the Property. Accordingly, in order to be able to take the actions necessary to avoid a default on a Loan and loss of the Property, the Trust may need to be terminated. Since the Lender will not permit tenant in common interests in the Property to be distributed to the Investors, the Trust would be terminated by being converted into an LLC. See "SUMMARY OF THE TRUST AGREEMENT." Although the Property would remain subject to the applicable Loan and Master Lease after such transaction, and the direct and indirect ownership interest of each Investor in the LLC would be identical to such Investor's Interest in the Trust, the Investor would at such time no longer be considered to own, for federal income tax purposes, a direct ownership interest in the Property. Since an LLC that is directly owned by the Investors would be treated as a partnership for tax purposes, it may be difficult or impossible to do a tax-free exchange when the LLC disposes of the Property.

**GFI's Exhibit 18, Page 78 of 221**

**No Right of Partition/Limited Liquidity.**  Unlike the tenant-in-common structure, there is no right of partition. There is no ability, other than the sale of the beneficial interests in the Trust to a third party, to withdraw or otherwise terminate the relationship with the Trust.

## RISKS RELATING TO PRIVATE OFFERING AND LACK OF LIQUIDITY

**Limited Transferability of Interests.**  Each Investor will be required to represent that he or she is acquiring an Interest for investment and not with a view to distribution or resale, that such Investor understands that an Interest is not freely transferable and that such Investor must bear the economic risk of investment in the Property for an indefinite period of time because: (i) the Interest has not been registered under the Act or applicable state "Blue Sky" or securities laws; and (ii) the Interest cannot be sold unless it is subsequently registered or an exemption from such registration is available. There currently is no market for an Interest nor is one expected in the future and Investors may not be able to liquidate their investment in case of an emergency. Further, the sale of an Interest may have adverse federal income tax consequences.

**Offering Not Registered with SEC or State Securities Authorities.**  The Offering of an Interest will not be registered with the SEC under the Securities Act or the securities agency of any state and is being offered in reliance upon an exemption from the registration provisions of the Securities Act and state securities laws applicable only to offers and sales to investors meeting the suitability requirements set forth herein. Since this is a nonpublic offering, prospective Investors will not have the benefit of review by the SEC or any state securities regulatory authority. The terms and conditions of the Offering may not comply with the guidelines and regulations established for real estate programs that are required to be registered and qualified with those agencies.

**Private Offering Exemption - Compliance with Requirements.**  The Interests are being offered, and will be sold, to persons or entities in reliance upon a private offering exemption from registration or qualification provided in the Securities Act and securities or "Blue Sky" laws and regulations in the states in which the Interests are being offered. If the Trust fails to comply with the requirements of such exemptions, Investors may have the right to rescind their purchase of the Interests. If such were the case and a number of Investors were successful in seeking rescission, the Trust would face severe financial demands that would adversely affect the Investors as a whole and, thus, the investment in the Interests by the remaining Investors.

**Ownership of Interests by Sponsor or Affiliates**.  The Sponsor, the Original Sponsor or their Affiliates, including investment funds managed by the Sponsor, may acquire Interests for investment purposes, to satisfy requirements of the Lender, or if the Trust does not sell all the Interests during the Offering period. The amount of Interests acquired and held by the Sponsor, the Original Sponsor and their Affiliates is not limited. Ownership by the Sponsor, the Original Sponsor and their Affiliates involves certain risks that potential Investors should consider, including, but not limited to, the following:

(1)      there may be conflicts of interest between the objectives of the Investors and those of the Sponsor, the Original Sponsor and their Affiliates - for example, the Sponsor, the Original Sponsor and their Affiliates may have an interest in disposing of the Property at an earlier date than other Investors so as to recover their investments in the Interests; and

(2)      if the Offering is not fully subscribed, a significant amount of the Interests will not have been acquired by disinterested investors after an assessment of the merits of the Offering.

**Forward-Looking Statements.**  Some of the information you will find in this Memorandum may contain forward-looking statements, which are based on various assumptions that may not prove to be correct.  For example, such assumptions include, but are not limited to, the continued growth and expansion of the local and regional economies, anticipated leasing schedules and budgeted capital improvement expenditures. The assumptions form the basis for various projections set forth in this Memorandum and, if incorrect, would make the projections incorrect. Since the assumptions are beyond the control of the Sponsor, the Trust or the Investors, there can be no assurance that such assumptions, such projections or other forward-looking statements will accurately predict future events or the actual performance of the Property. Any projections included in this Memorandum or any other material or documents supplied by the Sponsor or their Affiliates or in connection with this Offering, including projections regarding future cash flow and financial performance, should be considered speculative and are qualified in their entirety by the

**GFI's Exhibit 18, Page 79 of 221**

assumptions, information and risks disclosed in this Memorandum. In addition, any projections and statements, written or oral, which do not conform to those contained in this Memorandum should be disregarded, and their use is a violation of law. No representation or warranty can be given that the estimates, opinions or assumptions made herein or therein will prove to be accurate. Prospective Investors should closely review the assumptions set forth in the projections.

The Sponsor intends to identify forward-looking statements in this Memorandum by using words or phrases such as "anticipates," "believes," "estimates," "expects," "intends," "maybe," "objective," "plan," "predict," "project" and "will be" and similar words or phrases, or the negative thereof or other variations thereof or comparable terminology. These types of statements discuss future expectations or contain projections or estimates. When considering such forward-looking statements, you should keep in mind the risk factors outlined herein. These risk factors, or other events, could cause actual results to differ materially from those contained in any forward-looking statement.

**Privacy Concerns.** In the ordinary course of business, the Trust may collect and store sensitive data, including investor qualification data, intellectual property, proprietary business information of tenants and business partners, including personally identifiable information of tenants and employees, in data centers and networks. Despite security measures, information technology and infrastructure may be vulnerable to attacks by hackers or breached due to employee error, malfeasance or other disruptions. Any such breach could compromise the information systems utilized by the Trust, Sponsor or the Property, and the information stored there could be accessed, publicly disclosed, lost or stolen. Any such access, disclosure or other loss of information could result in legal claims or proceedings, liability under laws that protect the privacy of personal information, damage the reputation of the Trust or Sponsor, which could adversely affect cash flows.

## RISKS RELATING TO THE PREFERRED EQUITY

The contribution of capital by the Preferred Equity Provider allowed the acquisition of the Property to close prior to the sale of sufficient Interests to raise the minimum required closing equity. Subject to limited exceptions, all net sales proceeds from the sale of Interests must be used to repay to the Preferred Equity Provider the capital it invested. If insufficient Interests are sold, the Preferred Equity Provider may not be fully repaid and there may be insufficient funds to pay the expenses, fees and commissions set forth in the Estimated Use of Proceeds (See "ESTIMATED USE OF PROCEEDS") that were not paid at the closing of the acquisition. If proceeds from the sale of Interests are not available to pay such expenses, fees and commissions, then the Trust may be required to use income from the Property to pay such items, reducing cash flow available to operate the Property and to pay distributions to the Investors.

## RISKS RELATING TO THE MASTER LEASE AND THE MANAGEMENT OF THE PROPERTY

**Operating History and Capital of the Master Tenant.** The Master Tenant had limited capital upon the inception of the Master Lease, and the Master Tenant is not involved in other business activities and is dependent solely on the Property for its income. However, the Master Tenant Capitalization will consist of a demand note issued by the Original Sponsor in the amount of $150,000, the retention of a portion of any net after-tax profits the Master Tenant determines in its sole discretion is necessary to perform its obligations under the Master Lease, and any amounts contributed pursuant to the Supplemental Collateral Agreement. The Master Tenant Capitalization will be available for use by the Master Tenant in its discretion to satisfy its obligations under the Master Lease. The Master Tenant will have no obligation to replenish any portion of the Master Tenant Capitalization once it has been used, and if the Master Tenant's net cash flow from the Master Lease is not sufficient to allow the Master Tenant Capitalization to be fully funded, the Master Tenant is under no obligation to any person to fully fund the Master Tenant Capitalization from other sources. Any funds remaining in the Master Tenant Capitalization upon a sale of the Property by the Trust will be retained by the Master Tenant. There can be no assurance that the Master Tenant will be able to fund the Master Tenant Capitalization, or that such funds will be sufficient for the Master Tenant to satisfy its obligations under the Master Lease in the event the Property experiences a cash flow shortfall. Prospective Investors must carefully evaluate the personal experience and business performance of the principals of the Master Tenant. See "MANAGEMENT."

**GFI's Exhibit 18, Page 80 of 221**

The Master Tenant has no operating history as a Master Tenant. No assurances can be given that the Property will be operated properly or successfully. In addition, no person or entity has guaranteed payment of the Rent or the performance of the obligations of the Master Tenant under the Master Lease. A significant financial problem with the Property, such as the loss of a majority of the Property Tenants, could substantially reduce the amounts paid as Rent under the Master Lease and could also adversely affect the Master Tenant's ability to satisfy its financial obligations under the Master Lease. Under the Master Lease, the Master Tenant will be obligated to pay the Base Rent, Operating Expenses and Impositions of the Property regardless of whether the Property is profitable. If the Property is performing poorly, for whatever reason, the Master Tenant may not be able to pay the Rent. If the Master Tenant is unable to pay the Rent required under the Master Lease or otherwise satisfy its obligations under the Master Lease, the Trust will have the right to terminate the Master Lease but will then be subject to all of the risks associated with the ownership, management, operation and leasing of the Property. These risks are substantially greater than the risks of solely being the lessor under the Master Lease wherein the Master Tenant is obligated to operate, manage, lease and maintain the Property. Furthermore, if the Master Tenant is unable to pay the operating expenditures with respect to the Property, the Property may fall into disrepair, or in the event of a failure to pay property or real estate taxes or assessments, may be subject to foreclosure or seizure by the taxing authority.

**No Assurance of Stated Rent or Annual Supplemental Payments.**  The Master Lease provides that, if there is a loss of income from the Property, that as long as the Master Tenant continues to pay Base Rent, Operating Costs and Impositions, it can defer the payment of Stated Rent to the Trust (and thus to the Investors), which deferrals would accrue and bear interest at a rate of 2% per annum. In addition, upon a sale of the Property, so long as the Master Tenant is not in default under the Master Lease, the Master Tenant's obligation to pay accrued but unpaid Stated Rent (including interest thereon) would be extinguished. Accordingly, there can be no assurance that payments of Stated Rent or Annual Supplemental Payments will be made.

**Bankruptcy of the Master Tenant.**  The Trust would be adversely affected if a bankruptcy or similar insolvency proceeding was initiated with respect to the Master Tenant. For example, a bankruptcy trustee appointed for the Master Tenant might attempt to reject one or more Property Leases. Further, as a result of the automatic stay provided for under the applicable bankruptcy laws, the Trust might not be able to enforce the Master Tenant's obligations under the Master Lease or the Supplemental Payment Agreement, or reach rental payments being made by Property Tenants to the Master Tenant, which could negatively impact the Trust's ability to receive rent with respect to the Property. In the event of the bankruptcy or insolvency of the Master Tenant, the Trust will be able to terminate the Master Lease and either succeed to the Master Tenant's interest in the Property Leases or negotiate new leases with the Property Tenants.  Nevertheless, there is no guarantee that the Trust will be successful in succeeding to the Master Tenant's interest in any lease on the Property or in re-leasing the Property to one or more new tenants.

**Variance from Financial Forecast (Exhibit G).**  There may be a variance from the financial forecast (**Exhibit G**) due to a variety of factors, including, without limitation, any of the following:

(1)      Actual expenses could be in excess of projected expenses;

(2)      Collection of rent may occur in a subsequent year than the year projected due to the requirement or the failure of a Property Tenant to make rent payments to the Master Tenant when due;

(3)      A Property Tenant may terminate a Lease early; and

(4)      A Property Tenant may not renew a Lease.

**Sale of the Property.**  The proceeds realized from the sale of the Property will be distributed to the Trust and then by the Trust among the Investors in accordance with their respective Interests, but only after payment of the Loan (and any other loans) and satisfaction of the claims of other third-party creditors. The ability of any Investor to recover all or any portion of its investment will, accordingly, depend on the amount of net proceeds realized from such sale and the amount of claims to be satisfied therefrom. There can be no assurance that the Investors will receive any proceeds from the sale of the Property.

**GFI's Exhibit 18, Page 81 of 221**

**Lack of Audited Financial Reports.**  There will not be any audited financial reports available to the Investors with respect to the Property. Thus, it may be costly and difficult to verify the accuracy of any financial reports detailing the operations of the Property.

## INCOME TAX RISKS

**Acquisition of the Interests May Not Qualify as a Section 1031 Exchange.**  An Interest may not qualify under Section 1031 for tax-deferred exchange treatment and a portion of the proceeds from an Investor's sale of his or her property to be relinquished (the "**Relinquished Property**") could constitute taxable boot (as hereinafter defined). Whether any particular acquisition of an Interest will qualify as a Section 1031 Exchange depends on the specific facts involved, including, without limitation, the nature and use of the Relinquished Property and the method of its disposition, the use of a qualified intermediary and a qualified exchange escrow and the lapse of time between the sale of the Relinquished Property and the identification and acquisition of the replacement property (the "**Replacement Property**"). Neither the Sponsor nor its Affiliates or agents are examining or analyzing any prospective Investor's particular circumstances to determine whether such Investor's acquisition of the Replacement Property qualifies as a Section 1031 Exchange. Moreover, no opinion or assurance is being provided to the effect that any individual prospective Investor's transaction will qualify under Section 1031. Such examinations or analyses are the sole responsibility of each prospective Investor, who must consult with his or her own independent legal, tax, accounting and financial advisors before purchasing an Interest. If the factors surrounding a prospective Investor's disposition of the Relinquished Property and his or her acquisition of the Interests do not meet the requirements of Section 1031, the disposition of the Relinquished Property will be taxed as a sale and the IRS will assess interest and possibly penalties for failure to timely pay such taxes.

With respect to issues of availability and timing, prospective Investors should be aware that merely designating an Interest in connection with an Investor's Section 1031 Exchange does not assure the Investor that there will be Interests available to purchase when the Investor executes the Purchase Agreement and causes his or her qualified intermediary to transfer funds to complete the purchase of the Interest. In addition, no guarantee can be given to any particular prospective Investor that the acquisition of an Interest by an Investor will occur within a time frame that will permit such Investor to satisfy the requirements under Section 1031 regarding the time frame within which Replacement Property must be acquired.

Revenue Ruling 2004-86, 2004-2 C.B. 191, holds that, assuming the other requirements of Section 1031 are satisfied, a taxpayer's exchange of real property for an interest in the Delaware statutory trust described in the ruling (the "**DST**") satisfies the requirements of Section 1031. The IRS based its holding on the following conclusions: (a) the DST is treated as an entity separate from its owners (and not as a co-ownership or agency arrangement), (b) the DST is an "investment" trust and not a "business entity" for federal income tax purposes, (c) the DST is a "grantor trust" for federal income tax purposes, with the holders of interest in the DST treated as the grantors of the DST, and (d) the holders of an interest in the DST are treated as directly owning an interest in real property held by the DST. Because the holding of Revenue Ruling 2004-86 is based on numerous factual assumptions regarding the DST, not all of which apply to the Trust, there can be no guarantee that an Interest will satisfy the requirements of Section 1031. However, the Trust Agreement has been drafted such that it is consistent with the material factual assumptions regarding the DST. In addition, Special Tax Counsel to the Trust has rendered a Tax Opinion that a holder of an Interest should be treated as holding a direct interest in the Property for purposes of Section 1031. See "FEDERAL INCOME TAX CONSEQUENCES" and the Tax Opinion attached as **Exhibit I** to this Memorandum.

**A Delayed Closing on the Acquisition of an Interest Could Adversely Affect the Qualification of a Section 1031 Exchange**.  Investors who are completing Section 1031 Exchanges should be aware that closing on their replacement property must occur before the earlier of: (a) the day which is 180 days after the date on which the taxpayer transferred the property relinquished in the exchange; or (b) the due date (determined with regard to extension) for the transferor's return for the taxable year in which the transfer of the relinquished property occurs. No extensions will be granted or other relief afforded to taxpayers who do not satisfy this requirement. Therefore, a delayed closing on the acquisition of an Interest could adversely affect the qualification of a Section 1031 Exchange.

**State Laws May Differ.** Some states adopt Section 1031 in whole, other states adopt it in part and still other states impose their own requirements to qualify for deferral of gain under state law.  In addition, while many states follow federal tax law by treating the owner of an interest in a fixed investment trust as owning an interest in the assets

**GFI's Exhibit 18, Page 82 of 221**

held by the Trust, other state laws may differ and could result in the imposition of income or other taxes on such entities. Therefore, each Investor must consult his or her own tax advisor as to the qualification of a transaction for deferral of gain under state law.

By way of illustration but not limitation, the State of California has historically taken the position that any capital gains deferred under Section 1031 with respect to California property remain California-source income ultimately subject to taxation in California when the deferred gain is ultimately recognized. In order to track compliance with this rule, for years beginning on and after January 1, 2014, the State of California has imposed a reporting rule which requires any person who engages in a Section 1031 Exchange of non-California property for California property to file an annual information return until the deferred gain is ultimately recognized.

**The Conversion of the Trust to an LLC may have adverse Tax Consequences to Investors.** If the Trust is converted to an LLC, the Property will be transferred from the Trust to the LLC and the membership interests in the LLC will be held by the Investors. It is anticipated that the Signatory Trustee will serve as the manager of the LLC. Under current law, such a transfer generally should not be subject to federal income tax pursuant to Section 721 of the Code. The transfer could be subject, however, to state or local income, transfer or other taxes. In addition, there can be no assurances that the transfer will not be taxable under the federal income or other tax laws in effect at the time the transfer occurs. Because the conversion of the Trust to an LLC could occur in several situations, it is not possible to determine all of the potential tax consequences to the Investors.

**If the Trust is Converted into an LLC, the Investors' Ownership Interests in the LLC will not Qualify for Tax-Deferred Exchange Treatment under Section 1031.** As indicated in "SUMMARY OF THE TRUST AGREEMENT," in order to avoid a default on a Loan and loss of the Property, the Signatory Trustee may be required to terminate the Trust by converting it into an LLC. As a result of such conversion, the Interests will be converted into membership interests in an LLC, which cannot be transferred in an exchange that qualifies for tax-deferred exchange treatment under Section 1031. If, after the conversion of the Trust into an LLC, the Investors wish to engage in tax-deferred exchange of their interests in the Property, the manager of the LLC will attempt to convert the Investors' interests in the LLC into (or exchange them for) direct interests in the Property or adopt some other tax strategy to accomplish the tax-deferred exchange. However, there can be no guarantee that this will be accomplished.

**Losses from Passive Activities are Subject to Limitations.** Losses from passive trade or business activities generally may not be used to offset "portfolio income," such as interest, dividends and royalties, or salary or other active business income. Deductions from passive activities, including interest deductions attributable to passive activities, generally may only be used to offset passive income. Passive activities include (i) most trade or business activities in which the taxpayer does not "materially participate" (a statutorily-defined test) and (ii) rental activities (subject to an exception for taxpayers who qualify as real property operators under certain statutory tests). Subject to satisfaction of the real property operator test and the material participation test, an Investor's income and loss from an investment in an Interest, if any, will constitute income and loss from passive activities. However, the rules regarding the deductibility of passive losses (whether from an investment in an Interest, or from another passive activity that potentially could be used to offset income from an investment in an Interest) are complex and vary with the facts and circumstances particular to each Investor. Prospective Investors should consult their tax advisors with respect to the tax consequences to them of the rules described above.

In addition, an Investor that is an individual or closely held corporation will be unable to deduct losses from the Trust, if any, to the extent such losses exceed the amount the Investor is considered "at risk" under the Code. Losses not allowed under the at-risk provisions may be carried forward to subsequent tax years and used when the Investor's amount "at risk" increases or when the Investor generates gain on the disposition of the activity. However, the rules regarding the applicability of the at risk rules to a particular Investor are complex and vary with the facts and circumstances particular to each Investor. Prospective Investors should consult their tax advisors with respect to the tax consequences to them of the rules described above.

**Income and Gain from Passive Activities May be Subject to the Medicare Contributions Tax.** For taxable years beginning after December 31, 2012, the Code imposes a 3.8% tax on the "net investment income" of certain U.S. individuals and on the undistributed "net investment income" of certain estates and trusts. Among other items, "net investment income" generally includes passive investment income, including rent and net gain from the

**GFI's Exhibit 18, Page 83 of 221**

disposition of investment property, less certain deductions. Prospective Investors should consult their tax advisors with respect to the tax consequences to them of the legislation described above.

**An Investor may need to use Funds from other Sources to Satisfy Tax Liabilities.** It is possible that an Investor's taxable income resulting from its Interest will exceed any distribution of cash attributable thereto. This may occur because cash flow from the Property may be used to fund nondeductible operating or capital expenses of the Property, including reserves and payments of principal on the Loan. Thus, there may be years in which an Investor's tax liability exceeds its share of cash from the Property. In addition, a sale or exchange of the Property at an economic loss without a Section 1031 Exchange could result in ordinary income, depreciation recapture or capital gain to an Investor without any concomitant net cash proceeds from the sale or disposition of the Property to pay income taxes on such items. This is a particular risk for certain Investors, such as persons acquiring an Interest in a Section 1031 Exchange, whose income tax basis in an Interest may be substantially lower than his or her cash investment in the Property. If this were to occur, an Investor would have to use funds from other sources to satisfy its tax liability.

**Future Legislative or Regulatory Action could Significantly Change the Tax Aspects of an Investment in an Interest.** The discussion of tax aspects contained in this Memorandum is based on law presently in effect and certain proposed Treasury Regulations. Nonetheless, Investors should be aware that new administrative, legislative or judicial action could significantly change the tax aspects of an investment in an Interest. Any such change may be retroactive with respect to transactions entered into or contemplated before the effective date of such change and could have a material adverse effect on the tax consequences of an investment in an Interest.

**Property Valuation Could Adversely Affect the Qualification of a Section 1031 Exchange**. If the IRS were to successfully challenge the appraised value of the Property to be less than the purchase price paid by the Trust, there is substantial risk that a portion of the amount an Investor pays for an Interest would not be eligible for treatment as a replacement property for purposes of Code Section 1031. The Lender has obtained an appraisal by CBRE Inc. that concludes that the fair market value of the Property is $20,500,000, a value somewhat less than the Trust's actual purchase price of $21,907,000 for the Property.

## ERISA RISKS

ERISA and Code Section 4975 impose certain fiduciary restrictions, including prohibited transaction restrictions, on funds that hold "plan assets."

The DOL Plan Asset Rules provide that, subject to certain exceptions outlined in the rules, the assets of an entity (such as the Trust) in which a Benefit Plan Investor holds an ownership interest may be treated as assets of an investing plan, in which event the assets of the Trust (and transactions involving such assets, such as a sale of the Property) would be subject to ERISA's fiduciary provisions, including any prohibited transaction provisions under ERISA or Code Section 4975. One of the exceptions in the Plan Asset Rules will apply if ownership in the Trust is limited so that at all times less than 25% of the outstanding Interests may be owned by Benefit Plan Investors. The Sponsor and the Signatory Trustee will use reasonable best efforts to qualify the Trust for this exception to the Plan Asset Rules. If, nevertheless, Benefit Plan Investors acquire 25% or more of the Interests and the Plan Asset Rules apply to the Trust, ERISA's fiduciary standards and prohibited transaction rules would apply to the operation of the Trust, which would likely impose substantial additional compliance expenses upon the Trust, thereby potentially reducing amounts distributable by the Trust to the Investors. Finally, if the Trust is subject to the Plan Asset Rules and is not able to comply with ERISA or Code Section 4975, Benefit Plan Investors may be at risk of breaching fiduciary duties owed to their sponsoring plan.

Employee benefit plans such as governmental and non-United States plans, while not subject to ERISA, may be subject to laws regulating employee benefit plans that contain rules substantially similar to ERISA and may contain other rules relating to permissible investments. Such plans should conclude that an investment in the Interests would satisfy all such laws before making such an investment (and, as indicated above, may be required to make certain assurances to the Trust).

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 84 of 221**

## COMPENSATION OF THE SPONSOR, THE MASTER TENANT AND AFFILIATES

The following table describes compensation and other amounts payable to the Sponsor and Affiliates. The determination of the type and amount of the compensation to be received by the Sponsor and Affiliates was not the result of arm's length negotiations. See "CONFLICTS OF INTEREST."

| TYPE OF PAYMENT | DETERMINATION OF AMOUNT | AMOUNT |
|---|---|---|
| | **Acquisition Stage** | |
| Broker's Commission | The Property Manager will receive a broker's commission of approximately 2.9% of the purchase price of the Property for representing the Trust as its broker in the acquisition of the Property. | $638,000 |
| Acquisition Fee | The Sponsor will receive approximately 1.95% of the purchase price of the Property as an acquisition fee. | $424,000 |
| Loan Fee | An affiliate of the Sponsor will receive a loan fee for arranging the Loan, including identifying the Lender and negotiating the terms of the Loan Documents. | $133,000 |
| Excess Land | The Seller transferred the Excess Land to an Affiliate of the Sponsor for no additional consideration. The Excess Land consists of approximately 1.227 acres of excess property located adjacent to the Property. The purchase price paid by the Trust for the Property was not be discounted, nor did the Trust receive any direct consideration as a result of the transfer of the Excess Land to the Affiliate of the Sponsor. The Seller previously obtained conceptual approval from the city to construct additional multi-family units on the Excess Land, and the Sponsor is currently evaluating the feasibility of any such development. Except as set forth in the Supplemental Collateral Agreement, The Trust and Investors will not receive ownership or other rights in or to the Excess Land or any project or projects developed on such land. | Value of the Excess Land has not been appraised. |
| Legal Fees and Due Diligence Costs | The Sponsor will be entitled to reimbursement of reasonable charges for services provided by Sponsor's internal legal staff. | Not determinable at this time. |
| Organizational and Offering Costs | The Sponsor will be entitled to reimbursement of reasonable charges for services provided by Sponsor's staff working on organization and offering tasks. | Not determinable at this time. |
| Sales Commissions | Certain employees of the Sponsor are registered representatives of the Managing Broker-Dealer and receive commissions in connection with the sale of | Not determinable at this time. |

**GFI's Exhibit 18, Page 85 of 221**

| TYPE OF PAYMENT | DETERMINATION OF AMOUNT | AMOUNT |
|---|---|---|
| | Interests to Investors for whom such employees are the registered representatives. | |
| | **Operational Stage** | |
| Master Tenant Profit | The Master Tenant will be entitled to the net income equal to the difference, after taxes owed by the Master Tenant, between (a) the gross revenues the Master Tenant receives from the Property, and (b) the expenses it incurs in maintaining the Property, its payment and other financial obligations under the Master Lease, including its obligations to pay Rent, Impositions and Operating Costs, and its payment obligations under the Supplemental Payment Agreement. | Not determinable at this time. |
| Property and Asset Management Fees | The Property Manager will receive an annual fee of 3% of gross income from the Property for providing property management services, and an annual fee of 1% of gross income from the Property for providing asset management services. These fees will be paid by the Master Tenant. | Not determinable at this time. |
| | **Property Disposition Stage** | |
| Sales Commission | The Master Tenant or another Affiliate of the Sponsor will be entitled to a sales commission when the Property is marketed and sold. Such commission will be based upon market commission rates and will not exceed 3% of the gross sales price of the Property. A third-party broker may also be retained to provide services in connection with the marketing and sale of the Property and may receive a separate fee or commission for such services. | Not determinable at this time. |
| Disposition Fee | If the Property is sold or exchanged during the term of the Master Lease, the Trust will pay the Master Tenant the Disposition Fee equal to 1% of the gross sales price of the Property. | Not determinable at this time. |

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 86 of 221**

## FIDUCIARY DUTIES OF THE SPONSOR, THE TRUSTEES AND THE MASTER TENANT

The Trustees and the Sponsor do not have any fiduciary duty to the Investors and the Trust Agreement provides that the Trustees are liable to the Investors for their actions only if, among other things, the Trustees engage in willful misconduct or gross negligence or any Prohibited Action, or they fail to use ordinary care in disbursing monies to Investors pursuant to the terms of the Trust Agreement. The duties of the Master Tenant to the Trust are limited by the terms of the Master Lease.

## CONFLICTS OF INTEREST

In this Offering, Affiliates of the Sponsor and the Original Sponsor will also serve as the Signatory Trustee, the Master Tenant and the Property Manager. Such parties and their Affiliates will control, manage and/or advise other entities and participate in other business arrangements in the future, including the ownership of properties that compete with the Property. The Investors will not have any interests in any such future entities or properties. The Property could be adversely affected by these conflicts of interest. The principal areas in which conflicts may be anticipated to occur are as follows:

**Competition for Tenants**

The Sponsor, the Master Tenant, the Property Manager and their Affiliates may acquire other properties similar to the Property in the same market.  See "RISK FACTORS – Real Estate Risks – Competition."

**Obligations to Other Entities**

The Sponsor, the Original Sponsor, the Master Tenant, the Property Manager, their Affiliates and their respect principals, owners and executive officers will (1) have conflicts of interest in allocating management time, services and functions among the various entities with which they are engaged and others that may be organized in the future, and (2) will devote only so much time as they, in their sole discretion, deem to be reasonably required for the proper management of the Trust and the Property. Such parties believe they have the capacity to discharge their responsibilities, notwithstanding participation in other present and future investment programs and projects.

**Interest in Other Activities**

The Sponsor, the Original Sponsor, the Master Tenant, the Property Manager, their Affiliates and their respect principals, owners and executive officers may engage for their own account, or for the account of others, in other business ventures.  Investors will not be entitled to any interests in such other activities.

**Resolution of Conflicts of Interest**

None of the Sponsor, the Original Sponsor, the Master Tenant or the Property Manager has developed, and none expects to develop, any formal process for resolving conflicts of interest.

**Sponsor May Retain or Acquire Interest in Trust**

The Sponsor, the Original Sponsor or an Affiliate of such entities may retain or acquire an Interest in the Trust. The financial obligations and interests of the Sponsor may not always be consistent with those of the other Investors. See "RISK FACTORS - Risks Relating to Private Offering and Lack of Liquidity - Ownership of Interests by Sponsor or Affiliates."

**Ownership of the Excess Land by Affiliate of Sponsor**

The Seller transferred the Excess Land to an Affiliate of the Sponsor for no additional consideration. The Excess Land consists of approximately 1.227 acres of excess land located adjacent to the Property. The purchase price paid by the Trust for the Property was not discounted, nor did the Trust receive any direct consideration as a result of the transfer of the Excess Land to the Affiliate of the Sponsor. The Seller previously obtained conceptual approval

**GFI's Exhibit 18, Page 87 of 221**

from the city to construct additional multi-family units on the Excess Land, and the Sponsor is currently evaluating the feasibility of any such development. The Sponsor or its Affiliate may develop or operate the Excess Land in such a way as to compete or otherwise interfere with the operation of the Property. Alternatively, the Excess Land may be sold or otherwise transferred to a third party that develops or operates the property in such a way as to compete or otherwise interfere with the operation of the Property. Except as set forth in the Supplemental Collateral Agreement, the Trust and Investors will not receive ownership or other rights in or to the Excess Land or any subsequent project or projects developed on such land. See "ACQUISITION AND FINANCING" and "RISK FACTORS – REAL ESTATE RISKS – Determination of Purchase Price/Valuation."

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 88 of 221**

# MANAGEMENT

## Original Sponsor

At the time the Property was acquired, Nelson Brothers Professional Real Estate, LLC ("**NBPRE**") was the Original Sponsor of the Offering. Following the purchase of the Property, Patrick Nelson and Brian Nelson agreed to separate their business interests and to operate independent of each other. Both Patrick and Brian intend to remain active in the market place, and both intend to identify, acquire, manage, develop and operate new projects. Patrick and Brian will generally invest separately in future real estate projects, and although they may collaborate from time to time on some projects, they may also compete with each other in some markets.

The Sponsor believes that the agreement between Patrick and Brian will not have a material impact on the Property as historically Patrick has had responsibility for management of properties post acquisition. For the Property, Patrick and Brian have agreed that Patrick will take the primary role in overseeing the leasing and operation of the project.

As the separation of Patrick's and Brian's business interests is implemented, it is expected that Brian will relinquish his interest in the Trust. As the result thereof, he will be relinquishing his indirect interest in the Property and Brian will no longer play a role in the leasing, operation or sale of the Property by the Trust. The Sponsor believes that this too should not have a material impact on the Property as Patrick has historically taken the lead in leasing, operation and disposition of properties. It is possible that, because they will no longer be working together, Patrick and Brian will not be as successful operating independently as they were operating together. Because both Patrick and Brian are guarantors of the existing Loan on the Property, if either or both encounter financial troubles, then those financial troubles could reduce their ability to assist the Trust should the Loan go into default.

## Sponsor

In accordance with the restructuring discussed above, Nelson Partners, LLC, a Utah limited liability company wholly-owned and controlled by Patrick Nelson ("**Nelson Partners**" or the "**Sponsor**") shall sponsor the Offering instead of NBPRE. In connection with sponsoring the Offering, Nelson Partners will assume all obligations and responsibilities of the Original Sponsor, and the Original Sponsor shall no longer promote the sale of the Interests. However, the Original Sponsor will continue to own and manage its interests in NB JV Partner, LLC and related entities, as set forth on the Organizational Chart, and will continue to satisfy its legal obligations under the Loan and the Preferred Equity, to the extent such obligations may not be assumed by Nelson Partners.

Nelson Partners was founded in 2018 by Patrick Nelson to focus on acquiring, managing, operating and developing student housing real estate investments. Prior to forming the Sponsor, Patrick Nelson was co-founder and co-owner of NBPRE, a real estate investment company which acquired, managed, operated and developed student housing and assisted living real estate investments. Patrick Nelson is the sole owner and manager of the Nelson Partners. The biographies of key management of the Sponsor and its construction management affiliate, Nelson Partners Construction Management, are below.

## Management of the Sponsor

**Patrick Nelson (President and Chief Executive Officer) Nelson Partners, LLC**.  Following years of individual prosperous experience in the investment arena, brothers Patrick and Brian Nelson founded NBPRE, a company formed in 2007 to focus on acquiring, managing, operating and developing student housing and assisted living real estate investments. During its successful years of operation, NBPRE was involved in 37 syndicated real estate programs. NBPRE's programs raised approximately $250,000,000 from over 1,000 investors, purchasing roughly $645,000,000 in real property, including four assisted-living and thirty-one university student-housing properties, including one ground-up student housing development project. Mr. Nelson, as CEO, was instrumental in creating and implementing new marketing strategies and overseeing millions of dollars in rehab and improvements from inception to completion.  In addition, he developed the strategies to allocate the highest and best use of these funds in relation to leasing and occupancy rates, creating long-term value for investors. He has worked extensively on

**GFI's Exhibit 18, Page 89 of 221**

site with property managers, contractors, architects, investors and directly with residents to develop and identify prudent renovation plans that create value to investors by achieving increased rental rates with a measurable "bang for your buck" focused strategy.

In April 2018, the brothers made a business decision to go their separate ways dividing their investment properties equally, with Patrick Nelson re-establishing his real estate holdings as Nelson Partners, LLC. Recently Nelson Partners added to its student-housing portfolio with properties in Greeley, CO as well as Bellingham, WA.

Mr. Nelson brings a practical knowledge and understanding of real estate acquisition, property management, underwriting, rehabilitation underwriting, 1031 strategy and investor expectations. He has experience in property due diligence, research and suitability analysis. Mr. Nelson has secured over $380,000,000 in debt and refinancing for investments from a variety of lenders, including local and national banks, Fannie Mae, HUD, credit unions, and seller carry back financing.

Mr. Nelson holds a B.S. degree in finance from Brigham Young University and an M.B.A from Utah State University.  He and his wife are the proud parents of five adorable daughters and reside in South Orange County, CA.

**Paula Platt (Executive Vice President of Operations)**.  Paula brings over 19 years of student housing experience, and in her position as Executive Vice President of Operations she is responsible for the overall operating functions of Nelson Partners and corporate support services for the portfolio. Before joining Nelson Partners, she was Vice President of Asset Management for Fountain Residential Partners, a merchant developer of Class A student housing properties. She has also served as Vice President of Client Services, overseeing the 20,000-bed client-managed division of Campus Apartments and held a similar role as Vice President with Campus Advantage, supervising a large portfolio of student properties. As Regional Vice President of GMH Communities Trust, Paula supervised a 14,000-bed student housing portfolio of 22 properties located throughout the western half of the US.

**Scott McKhann (Vice President of Forward Planning)**.  Scott is Vice President of Forward Planning of Nelson Partners. In that capacity he is responsible for development, project planning, budgeting, construction oversight and governmental relations for all capital improvement projects. Mr. McKhann brings over 25 years of experience in civil engineering, real estate, and construction to Nelson Partners, and has previously worked for Fortune 500 real estate developers.  Mr. McKhann has a BS in Civil Engineering from Brigham Young University, an MPA from Cal State Fullerton and is a Registered Civil Engineer.

**Shane Stone (Chief Financial Officer)**.  Shane has over fifteen years of experience in accounting, financial management and investment analysis in entrepreneurial, high-growth environments. Prior to becoming Chief Financial Officer of Nelson Partners, he served as the Vice President of Asset Management of NBPRE to ensure the maximum returns for investors in the portfolio. Shane was part of the acquisitions process providing an integral role in the growth of the NBPRE portfolio from approximately 2,000 to over 8,000 beds. Prior to joining NBPRE, Shane led finance and operations teams in several start-up and growth businesses, including completing multiple business acquisitions, divestitures and investment rounds. Shane has a BA in Political Science from Utah State University and an MBA from Brigham Young University.

**Sanford (Sandy) Simmons (Director of National Sales)**.  Sandy has extensive financial industry experience in sales, marketing and management. His background includes executive and sales management positions in the financial services industry with several leading national sponsors and brokerage firms. He has a proven track record of success in his previous roles as National and Divisional Sales Manager, Wholesaler, Key Accounts Manager and Due Diligence Officer. His experience includes sales in real estate, 1031 offerings, equipment leasing, mutual funds, private placements and other asset classes and structures.

Sandy joins Nelson Partners as Director of National Sales, leading company efforts to build a first-rate distribution team and investor communications resource group. He works hand-in-hand with Warren Posner, Director of National Accounts, to grow Nelson Partners' reach and expand the investment opportunity within student housing. Sandy graduated from Dickinson College in Carlisle, PA with a Bachelor of Science and a Bachelor of Arts degree. Sandy holds Series 7, 24, 26, 39, 63, 65 and 66 licenses.

**Warren Posner (Director of National Accounts)**.  Warren is a 30+ year veteran of the financial services industry. He has worked on the sell side with asset management and distribution companies in national accounts and managing sales support departments, as well as on the buy side for a number of wire houses, banks and with the largest independent financial services firm leading product management and relationship management efforts. This broad experience has provided him with a unique perspective and the ability to anticipate needs and envision solutions.

Warren joins Nelson Partners as Director of National Accounts, leading our efforts to engage home offices and expand the scope of distribution. He works hand-in-hand with Sandy Simmons, Director of Sales, to grow Nelson Partners' reach and expand the investment opportunity within student housing.

**Paris Watson (Vice President of Leasing and Marketing)**.  As Vice President of Leasing and Marketing at Nelson Partners, Paris is responsible for the overall leasing success of the student-housing portfolio through strategic planning, development and the execution of portfolio-wide marketing and leasing campaigns. In her previous position as Regional Manager with Nelson Brothers Property Management, her duties included the operations and management of properties in the states of Texas, Mississippi, West Virginia and Colorado.

Paris began her student housing career working with GMH as a Community Assistant in Lubbock, Texas, while attending Texas Tech University. Prior to joining Nelson Brothers Property Management in 2015, Paris was involved in a variety of property and corporate positions with companies such as Asset Campus Housing and Campus Living Villages. Throughout her years in student housing, Paris has helped build student housing markets in over 20 different states and three countries, including Australia, New Zealand and the United States.

**Joseph (Joe) Harding (Principal & Project Executive – Nelson Partners Construction Management)**. After graduating with an engineering degree from a PAC-12 University in 2005, Joseph Harding's next conquest was construction. As an industry expert with more than 12 years of successful involvement in the construction world, Joe has experience as a Concrete Foreman, Project Engineer, Assistant Project Manager, Project Manager and Project Executive; there are very few situations that Joe hasn't seen and dealt with. Joe's work portfolio contains over $140 million of projects built and a wide variety of development types; private high-end hospitality, public works, tenant improvements and multi-family/student housing. He has collaborated with such recognized companies as Amazon, The Irvine Company, Louis Vuitton, the City of Newport Beach, Corona Del Mar, Rio Hondo College and Huntington Beach High School.

Joe, along with a partner, has started two different construction companies with licenses in Utah, Arizona, Washington State and soon to be California. As the Principal/Project Executive for Nelson Partners Construction Management, Joe's responsibilities are companywide project supervision and project yield.

Knowing that a company is only as good as its team, Joe has shepherded an outstanding group of dedicated and loyal team members. Helping people to grow professionally is a key goal. His vision and ability to nurture relationships leads to long-term solutions and lasting success.

**Ryan Beck (Director of Development – Nelson Partners Construction Management)**.  As Director of Development for Nelson Partners, Ryan is responsible for carrying out the day-to-day activities of ground-up design and construction. Mr. Beck brings with him over ten years of experience as a construction and real estate professional working with mid-size construction and development firms, where he established his skills in construction, estimating and financial forecasting and a keen sense of construction and development costs. Mr. Beck has an undergraduate degree in Construction Management from Weber State University and a Masters in Real Estate Development from the University of Utah.

**Master Tenant Management**

Patrick Nelson is the manager of the Master Tenant. The Patrick Nelson is also co-owner and manager of the Original Sponsor, which is an owner of the Master Tenant through a joint venture with the Preferred Equity Provider.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 91 of 221**

## PRIOR INVESTMENT PERFORMANCE

Nelson Partners has been established to acquire, manage, rehabilitate, develop and construct strategically-located student housing properties to generate income with tax benefits, preserve principal and provide the potential for long-term growth. Prior to founding the Nelson Partners, Patrick Nelson was President and Chief Executive officer and a founder of Nelson Brothers Professional Real Estate, LLC ("**NBPRE**").  In the spring of 2018, Patrick Nelson and Brian Nelson agreed to separate their business interests and to operate independent of each other. Following the restructuring of NBPRE, Nelson Partners has taken primary responsibility for operation of the properties previously operated by NBPRE and described on **Exhibit J** (the "**Managed Properties**"). Information on the investment performance of the Managed Properties is included on **Exhibit J**. The past operating results of the Managed Properties are not necessarily indicative of future operating results.

Nelson Partners has not taken primary responsibility for leasing and operation of the properties previously operated by NBPRE and described on **Exhibit K** (the "**Non-Managed Properties**"). Information on the investment performance of the Non-Managed Properties is included on **Exhibit K**. The past operating results of the Non-Managed Properties are not necessarily indicative of future operating results.

## RESTRICTIONS ON TRANSFERABILITY

There are restrictions on the transferability of the Interests imposed by state and federal securities laws. The Interests offered hereby have not been registered under the Securities Act or by the securities regulatory authority of any state. The Interests may not be resold unless they are registered under the Securities Act and registered or qualified under applicable state securities laws or unless exemptions from such registration and qualification are available. There currently is no market for the Interests and none is expected to develop. Prospective Investors should view the Interests as being a long-term investment. In addition, a sale of the Interests must be consummated in accordance with the Trust Agreement and the Loan Documents.

### [BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

**GFI's Exhibit 18, Page 92 of 221**

## FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain federal income tax consequences to the Investors that prospective Investors should consider. A complete discussion of the federal tax consequences of acquiring Interests is beyond the scope of this summary. Prospective Investors should be aware that the income tax consequences of acquiring an Interest are uncertain and complex and the consequences may not be the same for all taxpayers. Neither the Trust nor any of the Trust's Affiliates are providing any assurances or legal opinions to the effect that the acquisition of Interests by any prospective Investor will meet the requirements under Section 1031. The following summary is based on the Code, regulations enacted under the Code (the "**Regulations**"), court decisions and published IRS rulings that are in effect on the date of this Memorandum. Future legislative or administrative changes or court decisions may significantly change the conclusions expressed below, and these changes or decisions may have a retroactive effect.

### Classification for Purposes of Section 1031

The Sponsor has structured the Trust Agreement with the intent that an Investor will be treated as acquiring an undivided interest in real estate, as opposed to a security or interest in a partnership, joint venture or corporation (collectively, a "**business entity**"), for federal income tax purposes. An Investor who is acquiring an Interest pursuant to a Section 1031 Exchange must be aware that the Interest must be treated as an interest in real property and not as an interest in a business entity or in personal property in order for an Investor to be eligible to use the Interest as part of a Section 1031 Exchange. In that connection, we note that the appraised value that CBRE – Valuation and Advisory Services provided for the Lender for the Property is $20,500,000, about 93% of the purchase price of the Property. There is therefore a risk that a portion of the purchase price may be attributable to personal property or intangible assets not eligible for like kind exchange. The Trust has not obtained its own appraisal of the Property's value. However, no ruling will be requested from the IRS that the Interests will be treated as undivided interests in real estate as opposed to an interest in a business entity for federal income tax purposes. In the absence of a ruling, there can be no assurance that the IRS will treat the Interests as interests in real estate for federal income tax purposes. Consequently, an Investor acquiring an Interest as part of a Section 1031 Exchange must, and is required to represent in the Purchase Agreement, that such Investor has consulted his or her own independent tax advisor about the tax consequences of any Section 1031 Exchange and its potential risks.

An Interest must constitute an interest in real estate to qualify for exchange treatment under Section 1031. The determination of whether an Interest will be treated for federal income tax purposes as ownership in real estate and not as a security or an interest in a business entity is dependent upon all of the surrounding facts and circumstances. Revenue Ruling 2004-86, 2004-2 C.B. 191, holds that, assuming the other requirements of Section 1031 are satisfied, a taxpayer's exchange of real property for an interest in the DST satisfies the requirements of Section 1031. The IRS based its holding on the following conclusions: (a) the DST is treated as an entity separate from its owners (and not as a co-ownership or agency arrangement), (b) the DST is an "investment" trust and not a "business entity" for federal income tax purposes, (c) the DST is a "grantor trust" for federal income tax purposes, with the holders of interest in the DST treated as the grantors of the DST, and (d) the holders of interests in the DST are treated as directly owning interests in real property held by the DST. Revenue Ruling 2004-86 lists certain specific matters and trust provisions that would, in the IRS's view, cause an interest in the DST to not qualify for a Section 1031 Exchange. It also contains numerous facts regarding the DST and the transactions, and did not indicate which facts were key factors in the Ruling. In addition, the Ruling did not describe many other features of the trust agreement or factual matters that would have been present. As a result, there are some aspects of the Trust that differ from Revenue Ruling 2004-86 or are not addressed therein. For example, Investors will not acquire an Interest in a trust that directly holds the Property; rather, Investors will acquire an Interest in the Trust, and the Trust will hold all of the beneficial interests in the Trust. In addition, the Trust may be converted in certain circumstances into an LLC. Notwithstanding these differences from the facts described in Revenue Ruling 2004-86, the Trust Agreement has been drafted such that it is consistent with the material factual matters and assumptions regarding the DST and with the existing body of law applicable to fixed investment trusts under Treasury Regulation Section 301.7701-4(c).

**Special Tax Counsel to the Trust has rendered a Tax Opinion that the acquisition of an Interest by an Investor should be treated as a direct acquisition of the Property for purposes of Section 1031. This opinion relies upon the accuracy and completeness of certain documents, facts, representations and assumptions that may not be applicable to a particular prospective Investor. In addition, qualification of the transaction under Section 1031 requires meeting numerous statutory, regulatory and other conditions and also involves issues**

GFI's Exhibit 18, Page 93 of 221

based on facts and situations that are not and cannot be known to Special Tax Counsel. Therefore, each prospective Investor's tax situation with respect to an exchange will be different and a prospective Investor must consult with his or her own tax advisor regarding his or her ability to effectuate an acquisition of Replacement Property under Section 1031. The Tax Opinion addresses only one aspect in qualifying under Section 1031, which is whether an acquisition of an Interest can be treated as a direct acquisition of the Property for purposes of Section 1031.

Other issues relevant to qualification under Section 1031 that will not be addressed include, but are not limited to:

- whether a prospective Investor has properly identified an interest in the Trust as the Replacement Property within the 45-day time period;

- whether a prospective Investor has closed on the acquisition of an interest in the Trust within the 180 day time period;

- whether the Relinquished Property qualified as being held for investment purposes or in a trade or business;

- whether a prospective Investor will fall within the deferred exchange safe harbor rules by properly using a "qualified intermediary" and a "qualified exchange escrow";

- whether a prospective Investor acquiring the Property and attempting to do a reverse exchange meets all the qualifications spelled out in Revenue Procedure 2000-37, 2000-2 C.B. 308;

- whether some portion of the Property is not "real property" as opposed to "personal property"; and

- whether any amounts paid by, or deemed paid by, the prospective Investors with respect to certain costs and expenses of the Offering, financing costs and funding of the Reserves will be deemed to constitute other consideration received in the exchange.

**Therefore, a prospective Investor must consult his or her own tax advisor regarding an acquisition of an Interest and the qualification of his or her transaction under Section 1031. A prospective Investor may not rely on the Trust's Special Tax Counsel or on the Trust, its Affiliates or its agents, including its accountants, for any tax advice regarding the treatment of his or her transaction under Section 1031. For the same reason, except as provided in the Tax Opinion (subject to the limitations described therein), a prospective Investor may not rely on any statement made in this Memorandum regarding the qualification of his or her purchase of an Interest under Section 1031. No representation or warranty of any kind is made with respect to the IRS's acceptance of the qualification of a proposed Section 1031 Exchange.**

## Receipt of Boot

If, in a Section 1031 Exchange, money is received or deemed received in addition to the like-kind property (referred to as "**boot**"), then gain on the Relinquished Property is recognized up to the amount of boot. Although there is no direct authority on point, prospective Investors should be aware that the IRS may take the position that certain costs paid or deemed paid from money received from the sale of the Relinquished Property are boot and, therefore, income to the Investors. For example, the IRS may conclude that some amounts, including but not limited to fees to Affiliates of the Sponsor, paid in connection with the Offering of the Interests constitute boot received by the Investors and not a reinvestment in real estate. Special Tax Counsel to the Trust is not opining as to whether any such amounts paid by or deemed paid by the Trust or the Investors will be considered an acquisition of real estate or boot to the Investors.

**GFI's Exhibit 18, Page 94 of 221**

**Tax Deficiency, Penalties and Interest**

If an IRS audit disqualifies an Investor's proposed Section 1031 Exchange, the Investor will be taxed on his or her gain on the sale of the Relinquished Property, and the IRS will assess interest and could assess penalties and interest on the tax deficiencies associated with any failed Section 1031 Exchange. The Code provides for penalties relating to the accuracy of a tax return equal to 20 percent of the portion of the underpayment to which the penalty applies. The penalty applies to any portion of any understatement that is attributable to (i) negligence, (ii) any substantial understatement of income tax or (iii) any substantial valuation misstatement. Additional interest may be imposed on underpayments relating to tax shelters. As indicated above, Special Tax Counsel issued an opinion that an acquisition of an Interest should be treated as a direct acquisition of an interest in the Property for purposes of Section 1031. However, the Tax Opinion does not address whether an Investor's specific transaction qualifies as a Section 1031 Exchange or whether any amounts paid by or deemed paid by the Trust or the Investors with respect to certain expenses of the Offering or financing will be deemed to constitute an acquisition of real estate. While Special Tax Counsel believes that its opinion is supported by substantial authority and that an Investor should not be subject to the accuracy-related penalties described above with respect to whether the purchase of an Interest qualifies as a direct acquisition of real estate, the Tax Opinion is not binding on the IRS and does not provide a guarantee against an adverse tax result.

**Taxable Income**

It is possible that an Investor's Interest will generate annual taxable income in excess of the cash distributable to such Investor. Although such taxable income can be offset by depreciation deductions, the amounts of such depreciation deductions may be limited because the tax basis of such property received in a Section 1031 Exchange is generally the same as the tax basis of the property exchanged. Therefore, if an Investor has a low tax basis in the Relinquished Property exchanged in a proposed Section 1031 Exchange, such Investor will have a low tax basis in his or her Interest, and his or her depreciation deductions will be lower than the depreciation deductions of an Investor whose purchase was not structured as a Section 1031 Exchange.

**Net Income and Loss of Each Investor**

Each Investor will be required to determine his or her own net income or loss from the Property for income tax purposes. Certain expenses of the Property, such as depreciation and any interest expense attributable to refinancing proceeds that are distributed to the Investors, will be different for different Investors. The Signatory Trustee will keep records and provide information about expenses and income for each Investor. An Investor, however, will be required to keep separate records and to separately report his or her income.

In addition to other income tax imposed by the Code, Section 1411 imposes a 3.8% Medicare Contribution Tax on the "net investment income" of certain U.S. individuals and on the undistributed "net investment income" of certain estates and trusts. Among other items, "net investment income" generally includes rent and net gain from the disposition of investment property, less certain deductions.

**Taxation of Tax-Exempt Investors**

Tax-exempt entities, including qualified employee pension and profit sharing trusts, individual retirement accounts, Simple 401k plans, Keogh plans, annuities, and charitable remainder trusts, are subject to taxation on their unrelated business taxable income ("**UBTI**"). Generally, a tax-exempt entity that incurs UBTI is taxed on such income at the regular trust, or in the case of some entities, corporate federal income tax rates. Because Interests in the Trust are treated for tax purposes as direct interests in the Property, tax-exempt investors will be deemed to be carrying on the activities of the Trust for purposes of determining whether the tax-exempt investors' income is UBTI.

UBTI is income that is derived by a tax-exempt entity from an unrelated trade or business that it regularly carries on, less the deductions directly connected with that trade or business. UBTI generally includes a percentage of rental income (less applicable deductions) and gains from the sale or other disposition of real property if the property is debt-financed.

**GFI's Exhibit 18, Page 95 of 221**

The percentage of rental income that will be UBTI (less the same percentage of applicable deductions) for debt-financed property is the ratio of the investor's pro-rata share of the average outstanding principal balance of the debt to the investor's individual **average** tax basis in the property. Depreciation with respect to a tax-exempt investor's interest in debt-financed property must be computed using the straight-line method.

The following is an example calculating the percentage of income that will be treated as UBTI. This example is for illustration purposes only and investors should contact their tax advisor regarding their unique situation.

FOR ILLUSTRATION PURPOSES ONLY

Assumptions:
- $1,000,000 cash investment in the property (i.e. funds not related to a §1031 transaction).

- The property is 50% leveraged with an interest only loan.  Therefore, the $1,000,000 equity investor is responsible for $1,000,000 of the first mortgage.

- 10% of the property's value is attributed to land.

Projected Average Tax Basis Calculation (Year One):
- Beginning Tax Basis in the property for the First Year:

  $1,000,000 - Equity
  +$1,000,000 - Debt
  $2,000,000 - Beginning Basis for First Year

- Annual Depreciation

  $2,000,000 - Beginning Basis for First Year
  - $200,000 - Land Value (10% of $2,000,000)
  $1,800,000 - Depreciable Value
  ÷      39.5 - Depreciable Years
  $45,600 - Approximate Annual Depreciation

- Net Tax Basis in the property at the End of the First Year:

  $2,000,000 - Basis at the beginning of the year
  - $45,600 - Approximate Annual Depreciation (calculated above)
  $1,954,400 - Net Tax Basis at End of First Year

- Average Tax Basis in the property for the First Year

  $2,000,000 - Beginning Basis for First Year
  +$1,954,400 - Net Tax Basis at End of First Year
  $3,954,400
  ÷            2
  $1,977,200 - Average Tax Basis for the First Year

- Percentage of Income that will be UBTI in First Year:

  $1,000,000 - Pro-Rata share of Debt
  ÷ $1,977,200 - Average tax basis (calculated above)

  = **50.58%** of rental income that will be UBTI in the first year.

89

**GFI's Exhibit 18, Page 96 of 221**

Projected Average Tax Basis Calculation (Year Two):
- Net Tax Basis in the property at the End of the Second Year:

$1,954,400 - Net Tax Basis at End of First Year
 - $45,600 - Approximate Annual Depreciation (calculated above)
$1,908,800 - Net Tax Basis at End of Second Year


- Average Tax Basis in the property for the Second Year:

 $2,000,000 - Beginning Basis for First Year
+$1,908,800 - Net Tax Basis at End of Second Year
 $3,908,800
÷          2
 $1,954,400 - Average Tax Basis for the Second Year


- Percentage of Income that will be UBTI in Second Year:

 $1,000,000 - Pro-Rata share of Debt
÷$1,954,400 - Average tax basis (calculated above)

= **51.17%** of rental income that will be UBTI in the second year.

Upon the sale or other disposition of debt-financed property, the percentage of the gain that will be UBTI is the ratio of the of the investor's individual average outstanding principal balance of the debt during the 12-month period ending with the sale to the investor's pro-rata share of the **average** tax basis in the Property during the applicable sale year.

Because the Property is debt-financed, a portion of certain tax-exempt investors' rental income and gains from the sale of the Property will generate UBTI. However, it is anticipated that depreciation deductions will offset a portion of the UBTI from rental income. If such a tax-exempt investor incurs additional debt in connection with its investment in the Trust, it may give rise to UBTI. Therefore, each prospective investor should consult its own advisors regarding the use of debt to invest in the Trust.

**TAX-EXEMPT ENTITIES SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE TAX CONSEQUENCES OF AN INVESTMENT IN THE TRUST. TAX-EXEMPT INVESTORS MAY INCUR SIGNIFICANT AMOUNTS OF UBTI AS A RESULT OF INVESTING IN THE TRUST.**

**Tax Impact of Sale of Property**

If the Property is sold or otherwise disposed of (such as by foreclosure by the Lender), the Investors will likely recognize taxable income. The amount realized by the Investors will include the amount of any debt assumed by the Investor or eliminated in such disposition of the Property. An Investor will have taxable income to the extent that the amount realized by such Investor exceeds his or her tax basis in his or her Interest. In addition, as noted above in "Net Income and Loss of Each Investor," the 3.8% Medicare Contribution Tax is likely to apply to any net gain realized on a taxable disposition of the Property.

**Tax Legislation**

Congress passed and the President signed comprehensive tax reform legislation in December 2017. Under that Act, like kind exchange treatment is available only for real property. While that provision leaves the exchange of the real property unaffected, an investor would not be able to exchange on a tax deferred basis any portion of its

90

relinquished property allocable to personal property. The tax reform act also contains provisions that reduced the marginal income tax rates on individuals, making the deferral of tax through an investment in the Trust less valuable.

**State and Local Laws**

Prospective Investors may be affected in different ways by state and local taxes that are not discussed in this Memorandum, such as income taxes, franchise taxes, privilege and use taxes, and other taxes and fees. Therefore, each prospective Investor is urged and expected to consult with his or her personal tax advisor regarding the state and local tax consequences resulting to such Investor from a potential purchase of an Interest.

By way of illustration but not limitation, the State of California has historically taken the position that any capital gains deferred under Section 1031 with respect to California property remain California-source income ultimately subject to taxation in California when the deferred gain is ultimately recognized. In order to track compliance with this rule, for years beginning on and after January 1, 2014, the State of California has imposed a reporting rule which requires any person who engages in a Section 1031 Exchange of non-California property for California property to file an annual information return until the deferred gain is ultimately recognized.

In addition, while many states follow federal tax law by treating the owner of an interest in a fixed investment trust as owning an interest in the assets held by the Trust, other state laws may differ and could result in the imposition of income or other taxes on such entities. Therefore, each Investor must consult his, her or its own tax advisor as to the qualification of a transaction for deferral of gain under state law.

**Tax Opinion**

Irvine Venture Law Firm, LLP, Special Tax Counsel to the Trust, rendered the Tax Opinion concerning certain issues related to the Interests as set forth in this Memorandum. A copy of the Tax Opinion of Special Tax Counsel is attached as **Exhibit H** to this Memorandum. Except as to matters stated in the Tax Opinion, which are based upon the law in effect as of the date of the opinion, the issuance of the opinion should not in any way be construed as implying that counsel has approved or passed upon any other matter for the Trust.

<div align="center">

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

</div>

**GFI's Exhibit 18, Page 98 of 221**

## ERISA CONSIDERATIONS

The following is a summary of certain considerations associated with an investment in us by Benefit Plan Investors.  The following is merely a summary of such considerations. A complete discussion of the considerations associated is beyond the scope of this summary.

Each Benefit Plan Investor considering investing the assets of an IRA, or a pension, profit sharing, 401(k), Keogh or other employee benefit plan in the Trust should satisfy himself that such investment is consistent with his fiduciary obligations under ERISA and other applicable law, is made in accordance with the documents and instruments governing the plan or IRA, including the plan's investment policy, and satisfies the prudence and diversifications requirements of Sections 404(a)(1)(B) and 404(a)(1)(C) of ERISA. Each Benefit Plan Investor should also determine that an investment in the Trust will not impair the liquidity of the plan or IRA and that, even though it is expected that the Interests will produce unrelated business taxable income for the Benefit Plan Investor, the purchase and holding of an Interest is still consistent with the fiduciary obligations of the Benefit Plan Investor.  See "FEDERAL INCOME TAX CONSEQUENCES" for a discussion of the unrelated business taxable income issues applicable to tax exempt investors such as Benefit Plan Investors. The fiduciary for each Benefit Plan Investor should also satisfy himself that he will be able to value the assets of the plan annually in accordance with ERISA requirements.

**Treatment of the Trust under ERISA**

ERISA and the Code do not define "plan assets."  However, the Department of Labor has issued the Plan Asset Rules concerning the definition of what constitutes the assets of an employee benefit plan.  The Plan Asset Rules provide that, as a general rule, the underlying assets and properties of corporations, partnerships, trusts and certain other entities in which a plan purchases an "equity interest" will be deemed, for purposes of ERISA, to be assets of the investing plan unless certain exceptions apply. The Plan Asset Rules define an "equity interest" as any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features. Interests in the Trust offered hereby should be treated as "equity interests" for purposes of the Plan Asset Rules.

One exception to the look-through rule under the Plan Asset Rules provides that an investing plan's assets will not include any of the underlying assets of an entity if at all times less than 25% of each class of "equity" interests in the entity are held by Benefit Plan Investors. The Trust and the Signatory Trustee intend to take such steps as may be necessary to limit the ownership of Interests in the Trust by Benefit Plan Investors to less than 25% of the total amount of Interests, and thereby qualify for the 25% exemption.  If, however, neither this nor any other exemption under the Plan Asset Rules were available and the Trust were deemed to hold plan assets by reason of a Benefit Plan Investor's investment in the Interests, such investor's indirect interest in the Property would be considered a plan asset. In such event, the Property, transactions involving the Property and the persons with authority or control over and otherwise providing services with respect to the Property would be subject to the fiduciary responsibility provisions of Title I of ERISA and the prohibited transaction provisions of ERISA and Code Section 4975. See "RISK FACTORS – ERISA Risks" for a discussion of certain consequences if the prohibited transaction provisions of ERISA and Code Section 4975 apply to the Trust.

Each Benefit Plan Investor that is a prospective Investor in an Interest in the Trust should consult with its counsel with respect to the potential applicability of ERISA and Code Section 4975 to such investment and determine on its own whether any exceptions or exemptions are applicable and whether all conditions of any such exceptions or exemptions have been satisfied. Moreover, each Benefit Plan Investor should determine whether, under the general fiduciary standards of investment prudence and diversification, an investment in an Interest is appropriate for the Benefit Plan Investor, taking into account the overall investment policy of such investor and the composition of such investor's investment portfolio. The sale of Interests in the Trust is in no respect a representation by the Sponsor, the Trust, their Affiliates or any other person that such an investment meets all relevant legal requirements with respect to investments by plans generally or that such an investment is appropriate for any particular plan.

GFI's Exhibit 18, Page 99 of 221

## REPORTS

It is the practice of the Sponsor to provide regular reports to all Investors, typically on a quarterly basis.

During the term of the Master Lease, the Master Tenant will keep proper and complete records and books of accounts for the Property, which will not be audited. These books and records will be kept at the Master Tenant's principal place of business and will be available to the Investors during reasonable business hours.

## LITIGATION

**Pending Matters**

There are no material legal actions pending against the Sponsor, the Master Tenant or the Trust nor, to the knowledge of the Sponsor, the Master Tenant or the Trust, are any such proceedings threatened or contemplated.

**Material Regulatory Matters**

One prior claim resulted in a judgment against the respondents, including Patrick Nelson, which judgment was ultimately paid in full by White Pacific Securities, Inc. On August 2, 2010, a FINRA arbitration panel made an award in the approximate amount of $1 million plus interest in favor of three investors, Ame Wauters, Camilla Rogers and Suzanne Rogers Special Needs Trust, in certain real estate investment programs sold in 2005 and 2006 by Mr. Nelson, White Pacific Securities, Inc., Robert T. Angle and Arthur M. Quintero.  Mr. Nelson was named in the award in his capacity as a registered representative employed by White Pacific Securities, Inc. and not as an agent, owner, executive officer or control person of any securities issuer. There was no specified basis for the award made against the respondents, nor did the award make any findings of fact with respect to any conduct by the individual respondents. The respondents were all jointly and severally liable for the award but were not enjoined from the conduct of any future activities nor subject to any bar from FINRA membership. The award was paid by White Pacific Securities, Inc.

Patrick Nelson has been a party to five arbitration proceedings before FINRA regarding client claims. In a separate proceeding, Mr. Nelson was suspended from FINRA on January 29, 2016 and the suspension was lifted on July 6, 2016. The allegations regarding this proceeding as reported on FINRA's broker check website are that Mr. Nelson "failed to comply with an arbitration award or settlement agreement or to satisfactorily respond to a FINRA request to provide information concerning the status of his compliance." Additional information regarding the five arbitration proceedings and his suspension by FINRA can be found at https://files.brokercheck.finra.org/individual/individual_3059819.pdf.

## ADDITIONAL INFORMATION

The Sponsor will answer inquiries from Investors concerning the Interests and other matters relating to the offer and sale of the Interests, and they will afford prospective Investors the opportunity to obtain any additional information to the extent they possess such information or can acquire such information without unreasonable effort or expense that is necessary to verify the information in this Memorandum.

Prospective Investors are entitled to review copies of other material contracts relating to the Interests, the Trust or the Property described in this Memorandum and copies of the various entities' organizational documents. Copies of all reports and financial statements prepared by third parties in connection with this Offering are available upon request to the Sponsor.

## [BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

**GFI's Exhibit 18, Page 100 of 221**

**EXHBIT A**

**Form of Purchaser Questionnaire**

**PUCHASER QUESTIONNAIRE**

**BENEFICIAL INTERESTS**
**IN**
**GREELEY FLATS, DST**

**Legal Name of Investor:** _____

**Name of Registered Representative:** _____

Please read carefully the Amended and Restated Confidential Private Placement Memorandum of Greeley Flats, DST (the "Trust") dated July 24, 2018, and all exhibits thereto (collectively, the "Memorandum") relating to the beneficial interests in the Trust (each, an "Interest" and collectively the "Interests") before deciding to invest. Defined terms used herein and not otherwise defined shall have the meaning ascribed to them in the Memorandum.

EACH PROSPECTIVE PURCHASER SHOULD EXAMINE THE SUITABILITY OF THIS TYPE OF INVESTMENT IN THE CONTEXT OF HIS/HER OWN NEEDS, PURCHASE OBJECTIVES AND FINANCIAL CAPABILITIES AND SHOULD MAKE HIS/HER INDEPENDENT INVESTIGATION AND DECISION AS TO SUITABILITY AND AS TO THE RISK AND POTENTIAL GAIN INVOLVED. ALSO, EACH PROSPECTIVE PURCHASER MUST CONSULT WITH HIS/HER ATTORNEY, ACCOUNTANT, FINANCIAL CONSULTANT OR OTHER BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF THE PROPOSED PURCHASE.

This Offering is limited to a purchaser who certifies that he/she meets all of the suitability requirements set forth in the Memorandum and the Purchase Agreement for the purchase of the Interest.

If the undersigned meets these qualifications and desires to purchase the Interest, please complete, execute and deliver this Purchaser Questionnaire and the accompanying Purchase Agreement.

Upon receipt of the signed Purchaser Questionnaire, the Purchase Agreement and the Cash Deposit, the Trust will notify the undersigned accordingly. The Trust reserves the right, in its sole discretion, to accept or reject a prospective Purchaser for any reason whatsoever. If a prospective Purchaser is not accepted, such Purchaser's original documents and payments will be returned without interest.

**GFI's Exhibit 18, Page 101 of 221**

**EXHBIT A**

**BENEFICIAL INTEREST**
**IN**
**GREELEY FLATS, DST**

**PURCHASER QUESTIONNAIRE**

This Purchaser Questionnaire relates to the undersigned's intention to purchase an Interest in the Trust for a purchase price of $_____.  PLEASE NOTE: the minimum purchase for Investors is $50,000, subject to the terms, conditions, acknowledgments, representations and warranties stated herein and in the Memorandum.

In order to induce the Trust to accept the Purchase Agreement, and as further consideration for such acceptance, the undersigned hereby makes the following acknowledgments, representations and warranties, with the full knowledge that the Trust will expressly rely thereon in making a decision to accept or reject the undersigned's Purchase Agreement:

1.      The undersigned's primary state of residence is: _____

2.      The undersigned's date of birth is: _____

3.      The following information is required in order that the Trust may accurately determine if the undersigned prospective investor is an "Accredited Investor," as defined in Rule 501(a) of Regulation D under the Securities Act of 1933 and, if applicable, whether the undersigned prospective investor is a Benefit Plan Investor (defined below).

The undersigned represents that the undersigned meets the requirements of the initialed categories: **(PLEASE INITIAL ALL CATEGORIES THAT APPLY)**

(a)  _____   The undersigned is a natural person whose net worth, or joint net worth with the undersigned's spouse, at this time is in excess of $1,000,000, provided that for purposes of calculating such net worth (A) the undersigned's primary residence shall not be included as an asset; (B) indebtedness that is secured by the undersigned's primary residence, up to the estimated fair market value of the primary residence at the time of the closing of the undersigned's acquisition of an Interest, shall not be included as a liability, *provided, however,* that if the amount of such indebtedness outstanding at the time of the closing of the undersigned's acquisition of an Interest exceeds the amount of indebtedness outstanding sixty days before such time, other than as a result of the acquisition of the primary residence (such as, for example, if the undersigned takes out a home equity loan that is not used to acquire a primary residence during such sixty-day time frame), the amount of such new indebtedness shall be included as a liability; and (C) indebtedness that is secured by the undersigned's primary residence is in excess of the estimated fair market value of the primary residence shall be included as a liability.

(b)  _____   The undersigned is a natural person whose individual income was in excess of $200,000 in each of the two most recent years, or whose joint income with the undersigned's spouse was in excess of $300,000 for each of those years, and the undersigned has a reasonable expectation of reaching an equal or greater income level in the current year.

(c)  _____   The undersigned is an entity owned entirely by Accredited Investors.

(d)  _____   The undersigned is a bank as defined in Section 3(a)(2) of the Securities Act of 1933 (the "Act"), savings and loan association, or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; insurance company as defined in Section 2(13) of the Act; investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Small Business Investment Act of 1958; or a plan established and maintained

A-2

EXHBIT A

by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

(e) _____  The undersigned is a "Private Business Development Company" as defined in Section 202(a)(22) of the Investment Advisors Act of 1940.

(f) _____  The undersigned is a corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered hereby, with total assets in excess of $5,000,000.

(g) _____  The undersigned is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered hereby, whose purchase is directed by a "sophisticated person," as defined in Rule 506(b)(2)(ii) of Regulation D under the Securities Act.

Furthermore, the undersigned represents that the undersigned meets the requirements of the initialed category:  **(INITIAL AND COMPLETE THE APPLICABLE CATEGORY)**

(a) _____  The undersigned is purchasing the Interest with funds that constitute, directly or indirectly, the assets of a Benefit Plan Investor (defined below).  The undersigned hereby represents and warrants that its investment in the Trust: (i) does not violate and is not otherwise inconsistent with the terms of any legal document constituting or governing the employee benefit plan; (ii) has been duly authorized and approved by all necessary parties; and (iii) is in compliance with all applicable laws.

(b) _____  The undersigned is not purchasing the Interest with funds that constitute, directly or indirectly, the assets of a Benefit Plan Investor (defined below).

The term Benefit Plan Investor means a benefit plan investor within the meaning of U.S. Department of Labor Regulation 29 C.F.R. Section 2510.3-101, which includes (i) any employee benefit plan (as defined in Section 3(3) of ERISA), whether or not such plan is subject to Title I of ERISA (which includes both U.S. and Non-U.S. plans, plans of governmental entities as well as private employers, church plans and certain assets held in connection with nonqualified deferred compensation plans); (ii) any plan described in Code Section 4975(e)(1) (which includes a trust described in Code Section 401(a) which forms a part of a plan, which trust or plan is exempt from tax under Code Section 501(a), a plan described in Code Section 403(a), an individual retirement account described in Code Sections 408(a) or 408A, an individual retirement annuity described in Code Section 408(b), a medical savings account described in Code Section 220(d), and an education individual retirement account described in Code Section 530); and (iii) any entity whose underlying assets include plan assets by reason of a plan's investment in the entity (generally because 25 percent or more of a class of interests in the entity is owned by plans).  Benefit Plan Investors also include that portion of any insurance company's general account assets that are considered "plan assets" and the assets of any insurance company separate account or bank common or collective trust in which plans invest. 100% of an Investor's Interest whose underlying assets include "plan assets," such as a fund investor, shall be treated as "plan assets" by the Trustees for purposes of meeting an exemption under the Department of Labor regulation.

4. The undersigned acknowledges that the undersigned has consulted with a qualified attorney or other knowledgeable professional as to the tax and real estate issues associated with the purchase of the Interest.

5. The undersigned represents and warrants that, he or she has a reasonable expectation of reaching the income level necessary to qualify as an accredited investor during the current year.

6. THE INTEREST HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND IS BEING OFFERED AND SOLD IN

**GFI's Exhibit 18, Page 103 of 221**

EXHBIT A

RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE INTEREST IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE INTEREST HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION, OR ANY OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

7. The undersigned hereby agrees to indemnify, defend and hold harmless the Trust, the Sponsor, the Trustees and their Affiliates and all of their members, managers, shareholders, officers, employees, affiliates and advisors from any and all damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) that they may incur by reason of the undersigned's failure to fulfill all of the terms and conditions of the associated Purchase Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein, in the Purchase Agreement or in any other documents the undersigned has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs or expenses (including reasonable attorneys' fees and costs) incurred by the Trust, the Sponsor, the Trustees and their Affiliates or any of their members, managers, shareholders, officers, employees, affiliates or advisors defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein, in the Purchase Agreement or in any other documents the undersigned has furnished to any of the foregoing in connection with this transaction.

GFI's Exhibit 18, Page 104 of 221

**EXHBIT A**

PURCHASER
REGISTRATION
INFORMATION

Please print the exact title (registration) and address the undersigned desires on the account. In the case of a corporation, trust or other entity, the undersigned should use the full name of such entity and include the name and title of the signatory for such entity (*i.e.,* Trustee, President, Manager, etc.)  **Please also complete the appropriate EXECUTION section below for the registered entity type, *e.g.*, Spouses or Limited Liability Company. Organizational documents of any investor that is an entity must be included with the Purchaser Questionnaire:**

Name: _____

Purchaser Address:_____

_____

Work (____) _____   Home (____) _____

Fax (____) _____   Cell (____) _____

Primary State of Residence:_____

Federal Tax ID Number/Social Security Number:_____

E-Mail Address:_____

\* Please **do not** use a P.O. Box address.  A street address is required to send documents via overnight delivery.

DISTRIBUTIONS

Please indicate to whom distributions should be sent, if not to the address set forth above.  **The Trust requires that distributions be made via direct deposit; please complete the attached Authorization Agreement for Direct Deposit (ACH Credits).**

Name:_____

Address:_____

_____

_____

A-5

**EXHBIT A**

| | |
|---|---|
| **EXECUTION SECTION** | **Please sign this Purchaser Questionnaire by completing the appropriate EXECUTION section below:** |

SPOUSES    If the prospective Purchasers are SPOUSES, complete the following:

_____
Signature of Spouse

_____
Name of Spouse (please print or type)

_____
Social Security Number

_____
Signature of Spouse

_____
Name of Spouse (please print or type)

_____
Social Security Number

_____
State of Residence

INDIVIDUAL AND/OR JOINT OWNER    If the prospective Purchaser is an INDIVIDUAL and/or JOINT OWNER, please complete the following:

_____    _____  (if applicable)
Signature of Investor                              Signature of Joint Owner

_____    _____  (if applicable)
Name (please print or type)                     Name of Joint Owner

_____    _____  (if applicable)
Social Security Number                          Social Security Number of
                                                             Joint Owner

_____
State of Legal Residence

**GFI's Exhibit 18, Page 106 of 221**

**EXHBIT A**

TRUST | If the prospective Purchaser is a TRUST (excluding trusts that are Benefit Plan Investors), complete the following:

The undersigned hereby represents, warrants and agrees that: (i) the undersigned trustee(s) is duly authorized by the terms of the trust instrument (the "Trust Instrument") for the trust ("trust") set forth below to acquire the Interest; (ii) the undersigned, as trustee(s), has all requisite power and authority to acquire the Interest for the trust; and (iii) the undersigned trustee(s) is authorized by the trust to execute this Purchaser Questionnaire and the Purchase Agreement. **The undersigned trustee(s) encloses a true copy of the Instrument of said trust, as amended to date, and, as necessary, the resolutions of the trustees authorizing the purchase of the Interest.**

_____
Name of trust (please type or print)

By:_____     By: _____

Print Name:_____     Print Name: _____

Title (check one):  ☐ Trustee(s)   ☐ Co-Trustee(s)

_____
Federal Employer ID Number

_____
State of Formation

LIMITED LIABILITY COMPANY | If the prospective Purchaser is a LIMITED LIABILITY COMPANY, complete the following:

The undersigned hereby represents, warrants, and agrees that: (i) the undersigned is either the authorized manager or all of the members of the limited liability company named below (the "LLC"); (ii) the undersigned has been duly authorized by the LLC to acquire the Interest and has all requisite power and authority to acquire the Interest; and (iii) the undersigned is authorized by the LLC to execute this Purchaser Questionnaire and the Purchase Agreement. **The undersigned encloses a true copy of the Operating Agreement of the LLC, as amended to date, together with a current and complete list of all members and managers and, as necessary, the resolutions of the LLC authorizing the purchase of the Interest.**

_____
Name of LLC (please type or print)

By:_____

Print Name:_____

Title (check one):  ☐ Member   ☐ Manager   ☐ Managing Member

_____
Federal Employer ID Number

_____
State of Formation

**GFI's Exhibit 18, Page 107 of 221**

**EXHBIT A**

PARTNERSHIP    If the prospective Purchaser is a PARTNERSHIP, complete the following:

The undersigned hereby represents, warrants, and agrees that: (i) the undersigned is a general partner of the partnership named below (the "Partnership"); (ii) the undersigned general partner has been duly authorized by the Partnership to acquire the Interest and the general partner has all requisite power and authority to acquire the Interest; and (iii) the undersigned general partner is authorized by the Partnership to execute this Purchaser Questionnaire and the Purchase Agreement. **The undersigned general partner encloses a true copy of the Partnership Agreement of the Partnership, as amended to date, together with a current and complete list of all partners and, as necessary, the resolutions of the Partnership authorizing the purchase of the Interest.**

_____
Name of Partnership (please print or type)

By:_____

Print Name:_____

Title:  General Partner

_____
Federal Employer ID Number

_____
State of Formation

CORPORATION    If the prospective Purchaser is a CORPORATION, complete the following:

The undersigned hereby represents, warrants and agrees that: (i) the undersigned has been duly authorized by all requisite action on the part of the corporation listed below (the "Corporation") to acquire the Interest; (ii) the Corporation has all requisite power and authority to acquire the Interest; and (iii) the undersigned officer of the Corporation has authority under the Articles of Incorporation, Bylaws, and resolutions of the Board of Directors of the Corporation to execute this Purchaser Questionnaire and the Purchase Agreement. **The undersigned officer encloses a true copy of the Articles of Incorporation, the Bylaws and, as necessary, the resolutions of the Board of Directors authorizing a purchase of the Interest, in each case as amended to date.**

_____
Name of Corporation (please type or print)

By:_____

Print Name:_____

Title:_____

_____
Federal Employer ID Number

_____
State of Formation

**GFI's Exhibit 18, Page 108 of 221**

**EXHBIT A**

BENEFIT PLAN INVESTOR

If the prospective Purchaser is a BENEFIT PLAN INVESTOR (as defined in question 3, above), complete the following:

The undersigned hereby represents, warrants and agrees that: (i) the undersigned is duly authorized by the terms of the investor's governing instrument trust instrument (the "Governing Instrument") for the entity ("entity") set forth below to acquire the Interest; (ii) the entity has all requisite power and authority to acquire the Interest; and (iii) the undersigned has authority under the Governing Instrument to execute this Purchaser Questionnaire and the Purchase Agreement. **The undersigned encloses a true copy of the Governing Instrument of the entity, as amended to date, and, as necessary, any resolutions authorizing the purchase of the Interest.**

_____
Name of entity (please type or print)

By:_____          By: _____

Print Name:_____          Print Name: _____

Title:_____          Title:_____

_____
Federal Employer ID Number

_____
State of Formation

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**GFI's Exhibit 18, Page 109 of 221**

**EXHBIT A**

**1031 EXCHANGE INFORMATION AND AUTHORIZATION AGREEMENT**

**Prospective Purchaser's Intent to Exchange**

  **If the undersigned is an Exchange Investor completing a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code in connection with an investment in the Trust, please complete the this page.** The minimum investment for an Investor is $50,000 which equals a 0.4499% Interest. In addition, for purposes of determining liabilities assumed in connection with an Exchange Investor's Section 1031 Exchange, each 0.4499% Interest will have a pro rata percentage of the Loan made to the Trust, estimated at $59,841.

  The undersigned's exchange information is as follows:

  45-day identification period expires on: _____

  180-day exchange period expires on: _____

  Cash to complete this investment will be available on: _____

The undersigned hereby confirms that the acquisition of the Interest is part of a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code, pursuant to an Exchange Agreement between Buyer and _____ (the "Accommodator") whose address, telephone number and contact person are as follows (**Please complete in full**):

_____
Street Address

_____
City      State      Zip Code

_____
Telephone No.   Fax No.    E-mail

_____
Contact Person

**Authorization of Inquiry**

  Signing this form authorizes the Trust and its authorized representatives to contact the Accommodator to obtain and confirm the following information:

- Funds available for exchange;
- Expiration date of 45-day identification period; and
- Expiration date of 180-day exchange period.

  The Trust will use this information solely for the purpose of approving the undersigned's investment in the Interest and establishing the required time period for completing the exchange.

Please indicate the undersigned's approval by printing the undersigned's name and signing below.

Print Name:_____  Date:_____

Signature:_____

**GFI's Exhibit 18, Page 110 of 221**

**EXHBIT A**

FINANCIAL STATEMENT

Statement Date:                                    Account Registration:

| Assets | | Liabilities | |
|---|---|---|---|
| **Current Address** | | **Current Liabilities (due within 12 months)** | |
| Cash & Cash Equivalents | | Credit Card Debt | |
| Checking/Savings | $ | Notes / Accounts Payable (within 12 months) | |
| Money Market | $ | | |
| ODs | $ | | |
| Marketable Securities Stocks, Bonds, Mutual Funds | $ | | |
| Notes / Accounts Receivable (within 12 months) | $ | | |
| Other Retirement Assets IRA 401k, Pension, PSPs | $ | | |
| | | | |
| | | | |
| | | | |
| **Total Current Assets** | $ | **Total Current Liabilities** | $ |
| | | | |
| Market Value of Primary Residence | $ | Mortgage Payable on Primary Residence | $ |
| Market Value of Investments and Real Estate Owned | $ | Mortgage Payable on Investments Real Estate Owned | |
| Net Worth of Business Interest | | Debt Secured by Personal Property | |
| Personal Property | | Debt Secured by Business Interest | |
| Vehicles | | Debt Secured by Vehicles | |
| Furniture Fixtures & Equipment | | | |
| Notes / Accounts Receivable | $ | | |
| | | | |
| | | | |
| | | **Total Long-Term Liabilities** | $ |
| **Total Long-Term or Liquid Assets** | $ | **TOTAL LIABILITIES** | $ |
| **TOTAL ASSETS** | $ | **NET WORTH** | $ |

_____                    _____
Client Name (please print)                         Client Signature            Date

_____                    _____
Client Name (please print)                         Client Signature            Date

A-11

**EXHBIT A**

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSITS (ACH CREDITS)**

Individual/Trust/Company Name:_____

Individual/Trust/Company Tax ID Number:_____

The undersigned hereby authorizes the Greeley Flats, DST, or its designee, hereinafter called the "Trust," to initiate credit entries to the undersigned's ___ Checking Account / ___ Savings Account (select one) at the depository financial institution named below, hereinafter called the "Depository," and to credit the undersigned's distributions to such account. The undersigned acknowledges that the origination of ACH transactions to the undersigned's account must comply with the provisions of U.S. law.

Depository
Name:_____   Branch:_____

City:_____   State:_____   Zip:_____

Bank Account Name:_____

Routing                                              Account
Number:_____   Number:_____

This authorization is to remain in full force and effect until the Trust has received written notification from the undersigned (or either of the undersigned) of its termination in such time and in such manner as to afford the Trust and the Depository a reasonable opportunity to act on it.

Name(s):_____   Tax ID Number:_____

Date:_____   Signature:_____

  **If the undersigned authorizing a direct ACH credit, please attach a voided check for the account listed above.**

**EXHBIT A**

**BROKER/DEALER REPRESENTATIONS AND WARRANTIES**

Standards of suitability have been established by Greeley Flats, DST (the "Trust") and fully disclosed in the section of the private placement memorandum for the Trust entitled "WHO MAY INVEST."  Prior to recommending purchase of a beneficial interest in the Trust (the "Interest"), we have reasonable grounds to believe, on the basis of information supplied by the investor named below (the "Investor") concerning his, her or its investment objectives, other investments, financial situation and needs, and other pertinent information that: (i) the Investor is an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act; (ii) the Investor meets any additional standards established by the Trust; (iii) the Investor has a net worth and income sufficient to sustain the risks inherent in an investment in the Interest, including loss of the entire investment and lack of liquidity; and (iv) the Interest is otherwise a suitable investment for the Investor.  We will maintain in our files documents disclosing the basis upon which the suitability of the Investor was determined.

We verify that the above subscription either does not involve a discretionary account or, if so, that we have made the Investor aware, prior to subscribing for the Interest, of the risks entailed in investing in the Interest.

Investor Name: _____

Broker/Dealer Firm Name: _____

Registered Representative: _____
(Please Print)

_____
Registered Representative's BRANCH ADDRESS, City, State, Zip

Branch Phone Number: (_____) _____

E-mail address: _____

I hereby certify that I am registered in _____, the state of sale.

_____
Signature of Registered Representative

_____
Signature of Principal

**GFI's Exhibit 18, Page 113 of 221**

**EXHBIT B**

**Form of Purchase Agreement**

**PURCHASE AGREEMENT**
**GREELEY FLATS, DST**

THIS PURCHASE AGREEMENT ("Agreement") is made and effective as of the date Seller executes this Agreement ("Effective Date") by and between Greeley Flats, DST, a Delaware statutory trust ("Seller"), and _____ (Please enter complete legal name of buyer) ("Buyer"), with reference to the facts set forth below. All terms with initial capital letters not otherwise defined herein shall have the meanings set forth in the Defined Terms attached hereto as Schedule 1 and incorporated herein.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as set forth below.

1.      Agreement of Purchase and Sale.

1.1      Purchase and Sale. Seller hereby agrees to sell, and Buyer hereby agrees to purchase, a beneficial interest (the "Interest") of _____% in the Seller at a purchase price ("Purchase Price") equal to $_____. In addition, for purposes of any exchange being entered into by the Buyer under Section 1031 of the Internal Revenue Code, the Buyer shall have a pro rata portion (_____%) of the debt, equal to $_____. Investment Equity will be $_____.

1.2      Payment. Buyer shall pay the Purchase Price at least five (5) Business Days prior to the Close of Escrow in accordance with instructions from Seller. If the purchase of the Interest is to take place after the Close of Escrow, then Buyer shall pay the Purchase Price promptly following receipt of instructions from Seller.

1.3      Buyer's Deliveries. Prior to the Close of Escrow, Buyer shall execute, acknowledge (where appropriate) and deliver to Seller: (i) the Purchaser Questionnaire (including documentary evidence of Accredited Investor status specified therein), (ii) an executed signature page for the Trust Agreement and (iii) such other documents as may reasonably be requested by Seller; provided, however, the effectiveness of any such documentation shall remain subject to the satisfaction of the closing condition set forth in Section 3 hereof.

1.4      Buyer's Intent to Exchange. If Buyer's acquisition of the Interest is part of a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code, pursuant to an Exchange Agreement between Buyer and Buyer's Accommodator set forth on the Purchaser Questionnaire, then Seller agrees to execute such documents or instruments as may be necessary or appropriate to evidence such exchange, provided Seller's cooperation in such regard shall be at no additional cost, expense, or liability whatsoever to Seller and that no additional delays in the scheduled closing date of this Agreement are incurred unless mutually agreed upon by all parties to this Agreement.

1.5      Advisors. Buyer has consulted with a qualified attorney or other knowledgeable professional as to the tax and real estate issues associated with a purchase of the Interest.

2.      Close of Sale.

2.1      Close of Sale. This sale of the Interest shall close on or before _____, 2018 (the "Closing Date"), by delivering funds and documents IF AND ONLY IF: (a) all funds and instruments required pursuant to Sections 1 have been delivered to Seller; and (b) the condition precedent set forth in Section 3 has been, or upon such closing shall be, satisfied or waived.

2.2      Latest Closing. If the transfer of the Interest has not closed by 5:00 p.m. on the Business Day after the Closing Date, for any reason other than the default of either Buyer or Seller under this Agreement, either party may terminate this Agreement by written notice to the other party. If this Agreement is so terminated for any reason other than the default of Buyer or Seller hereunder, Buyer and Seller shall be released from their obligations

**GFI's Exhibit 18, Page 114 of 221**

EXHBIT B

under this Agreement, other than any obligations of Buyer that survive termination of this Agreement.  If all conditions to the Close of Escrow have been satisfied or waived by the Closing Date and Buyer fails to acquire the Interest by satisfying all of its obligations under this Agreement, then in addition to any other rights or remedies that Seller may have, Seller shall be entitled to terminate this Agreement and, upon such termination, Seller shall be released from all obligations under this Agreement.

3.      Conditions to Closing.

3.1      Closing Condition.  This Agreement and the obligations of the parties hereunder are subject to Seller simultaneously acquiring the Property.

4.      Representations and Warranties.

4.1      Seller Representations and Warranties.

4.1.1      Seller Representations and Warranties.  Seller hereby represents and warrants, as of the date of this Agreement and the closing of the sale of the Interest, that:

(a)      the execution, delivery, and performance of this Agreement and all other agreements contemplated hereby or otherwise in connection with the purchase, lease, and operation of the Property to which Seller is a party have been duly and validly authorized by Seller;

(b)      this Agreement and each such other agreements constitutes a valid and binding obligation of Seller, enforceable in accordance with its terms;

(c)      the execution and delivery by Seller of this Agreement and all such other agreements, and the sale of the Interests hereunder, and the fulfillment of and compliance with the respective terms hereof and thereof by Seller, do not and shall not (1) conflict with or result in a breach of the terms, conditions, or provisions of, (2) constitute a material default under, (3) result in the creation of any lien or encumbrance upon Seller's assets pursuant to, (4) give any third party the right to modify, terminate, or accelerate any obligation under, (5) result in a violation of, or (6) require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with any court or administrative or governmental body or agency pursuant to, the organizational documents of Seller, or any law, statute, rule or regulation, order, judgment or decree to which Seller is subject, or any material agreement or instrument to which Seller is subject;

(d)      there are no actions, suits, proceedings, orders, investigations, or claims pending or, to the best of Seller's knowledge, threatened against or, to Seller's knowledge, affecting Seller, or pending or threatened by Seller against any third party, at law or in equity, or before or by any governmental department, commission, board, bureau, agency, or instrumentality (including, without limitation, any actions, suit, proceedings, or investigations with respect to the transactions contemplated by this Agreement); nor have there been any such actions, suits, proceedings, orders, investigations or claims pending against or affecting Seller during the past three years;

(e)      Seller is not subject to any judgment, order, or decree of any court or governmental body, agency, or official of any country or political subdivision of any country, including, but not limited to, federal, state, county, and local governments, administrative agencies, and courts (a "Governmental Authority'), which could have any change or effect (or aggregation of changes and effects) that is or could reasonably be expected to be materially adverse to the business, assets, condition (financial or otherwise), or operations of Seller;

(f)      no permit, consent, approval, or authorization of, or declaration to or filing with, any Governmental Authority or any other person or entity is required in connection with the execution, delivery, and performance by Seller of this Agreement or the other agreements contemplated hereby, or the consummation by Seller of any other transactions contemplated hereby or thereby, except those that have already been obtained or made;

GFI's Exhibit 18, Page 115 of 221

EXHBIT B

(g)     to the best of Seller's knowledge, there are no current, outstanding breaches of any representations, warranties, or covenants made to Seller by the prior owners of the Property pursuant to the acquisition agreement between Seller and the prior owners;

(h)     all documents, instruments, and other materials provided to Buyer, by Seller, in conjunction with this transaction, including, but not limited to the Memorandum, are true and correct in all material respects, and do not contain any material misstatement of a material fact or fail to state any material fact required to be stated therein or necessary to make any statements contained therein, in light of the circumstances in which they are made, not misleading;

(i)     assuming the representations by Buyer made in this Agreement and in the Purchaser Questionnaire related hereto are true and correct in all material respects, the offer and sale of the Interest pursuant to this Agreement will be exempt from the registration requirements of the Securities Act of 1933, as amended; and

(j)     Seller has not made, and will not make prior to closing of the sale of the Interest, directly or indirectly, any offer or sale of the Interests or of other securities of the same or similar class as the Interests if, as a result thereof, the offer and sale contemplated hereunder of the Interests could fail to be entitled to exemption from the registration requirements of the Securities Act of 1933, as amended.

For purposes of the foregoing, the terms "offer" and "sale" have the meanings specified in Section 2(3) of the Securities Act of 1933, as amended.  Further, as used herein, the term "knowledge" shall mean the actual knowledge of such person or party, following due and reasonable inquiry.

4.1.2   NO TAX REPRESENTATIONS.  BUYER REPRESENTS AND WARRANTS THAT EXCEPT AS EXPRESSLY PROVIDED IN THE TAX OPINION PROVIDED BY SELLER'S SPECIAL TAX COUNSEL, WHICH OPINION IS QUALIFIED AND BASED ON NUMEROUS ASSUMPTIONS THAT MAY NOT BE APPLICABLE TO BUYER, IT IS NOT RELYING UPON ANY ADVICE OR ANY INFORMATION OR MATERIAL FURNISHED BY SELLER, THE SPONSOR OR THEIR REPRESENTATIVES, WHETHER ORAL OR WRITTEN, EXPRESSED OR IMPLIED, OF ANY NATURE WHATSOEVER, REGARDING ANY TAX MATTERS, INCLUDING WITHOUT LIMITATION, A DECISION BY BUYER TO EFFECT A TAX-DEFERRED EXCHANGE UNDER INTERNAL REVENUE CODE SECTION 1031, AS AMENDED.  BUYER FURTHER REPRESENTS AND WARRANTS THAT IT HAS INDEPENDENTLY OBTAINED ADVICE FROM ITS OWN INDEPENDENT LEGAL COUNSEL AND/OR TAX ACCOUNTANT REGARDING ANY SUCH TAX-DEFERRED EXCHANGE, INCLUDING, WITHOUT LIMITATION, WHETHER THE ACQUISITION OF THE INTEREST PURSUANT TO THIS AGREEMENT MAY QUALIFY AS PART OF A TAX-DEFERRED EXCHANGE, AND BUYER IS RELYING SOLELY ON SUCH ADVICE.

4.2     Commissions.  The parties mutually warrant and covenant that, other than commissions and fees described in the Memorandum or this Agreement, no brokerage commissions, finder's fees, or similar commissions or fees shall be due or payable by the Buyer on account of this transaction. Each party shall indemnify, protect, defend (with legal counsel acceptable to the other), and hold the other harmless from the claims for such commission or finder's fees or similar commissions or fees arising out of the actions of the indemnifying party, including, without limitation, attorneys' fees and costs, incurred in connection therewith or to enforce this indemnity, which indemnities shall survive the closing of the sale of the Interest.

4.3     Additional Buyer Representations and Warranties.  Buyer hereby represents and warrants to Seller that the following are true and correct on the date of this Agreement and shall be true and correct as of the Closing Date.

4.3.1   Buyer acknowledges that it has received, read, and fully understands the Memorandum.  Buyer acknowledges that it is basing its decision to invest in the Interest on the Memorandum and Buyer has relied only on the information contained in said materials and has not relied upon any representations made by any other person.  Buyer recognizes that an investment in the Interest involves substantial risk and Buyer is fully cognizant of and understands all of the risk factors related to the purchase of the Interest, including, but not limited to, those risks set forth in the section of the Memorandum entitled "RISK FACTORS."

GFI's Exhibit 18, Page 116 of 221

**EXHBIT B**

4.3.2    Buyer's overall commitment to investments that are not readily marketable is not disproportionate to its individual net worth, and its investment in the Interest will not cause such overall commitment to become excessive.  Buyer has adequate means of providing for its financial requirements, both current and anticipated, and has no need for liquidity in this investment.  Buyer can bear and is willing to accept the economic risk of losing its entire investment in the Interest.  Buyer has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment in the Interests.

4.3.3    All information and documentary evidence that Buyer has provided to Seller concerning its suitability to invest in the Interest is complete, accurate, and correct as of the date of its signature on the last page of this Agreement.  Buyer hereby agrees to notify Seller immediately of any material change in any such information occurring prior to the Closing Date, including any information about changes concerning its net worth and financial position.

4.3.4    Buyer has had the opportunity to ask questions of, and receive answers from, Seller, the Sponsor, the property manager and their owners, officers, members, managers, employees, and affiliates, concerning the Property and the terms and conditions of the offering of the Interest and to obtain any additional information deemed necessary to verify the accuracy of the information contained in the Memorandum.  Buyer has been provided with all materials and information requested by either Buyer or others representing Buyer, including any information requested to verify any information furnished Buyer.

4.3.5    Buyer is purchasing the Interest for Buyer's own account and for investment purposes only and has no present intention, agreement, or arrangement for the distribution, transfer, assignment, resale, or subdivision of the Interest.  Buyer understands that, due to the restrictions referred to in Subsection 4.3.6, and the lack of any market existing or to exist for the Interest, Buyer's investment in the Interest will be highly illiquid and may have to be held indefinitely.

4.3.6    Buyer understands that there may be restrictions on the transfer, resale, assignment, or subdivision of the Interest imposed by applicable federal and state securities laws.  Buyer is fully aware that the Interest has not been registered with the Securities and Exchange Commission in reliance on the exemptions specified in Regulation D issued by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended, which reliance is based in part upon Buyer's representations set forth herein.  Buyer understands that the Interest has not been registered under applicable state securities laws and is being offered and sold pursuant to the exemptions specified in said laws, and unless it is registered, it may not be re-offered for sale or resold except in a transaction or as a security exempt under those laws.  Buyer understands that because the Trustees will operate in a manner such that the assets of the Trust will not be "plan assets" subject to the provisions of Part 4 of Subtitle B of Title I of ERISA, if the Buyer is purchasing the Interest with "plan assets" it must disclose as much to the Trust in order for the Trustees to determine whether the Trust might be subject to the provisions of ERISA and Section 4975 of the Internal Revenue Code.  Buyer further understands that the specific approval of such resales by a state securities administrator or official may be required in some states.

4.3.7    BUYER UNDERSTANDS THAT SELLER HAS NOT OBTAINED A RULING FROM THE INTERNAL REVENUE SERVICE THAT THE INTEREST WILL BE TREATED AS AN INTEREST IN REAL ESTATE AS OPPOSED TO A BUSINESS ENTITY.  BUYER UNDERSTANDS THAT THE TAX CONSEQUENCES OF AN INVESTMENT IN THE INTEREST, ESPECIALLY THE TREATMENT OF THE TRANSACTION UNDER SECTION 1031 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED ("IRC"), AND THE RELATED "1031 EXCHANGE" RULES AND REGULATIONS, ARE COMPLEX AND VARY WITH THE FACTS AND CIRCUMSTANCES OF EACH INDIVIDUAL PURCHASER.  BUYER SPECIFICALLY REPRESENTS AND WARRANTS THAT BUYER (I) HAS CONSULTED ITS OWN TAX ADVISOR REGARDING AN INVESTMENT IN THE INTEREST AND THE TREATMENT OF THE TRANSACTION UNDER IRC SECTION 1031; (II) EXCEPT AS EXPRESSLY PROVIDED IN THE TAX OPINION FROM SELLER'S SPECIAL TAX COUNSEL, WHICH IS QUALIFIED AND BASED ON NUMEROUS ASSUMPTIONS AND QUALIFICATIONS THAT MAY NOT BE APPLICABLE TO THE BUYER, IS NOT RELYING AND WILL NOT RELY ON SELLER OR ANY OF ITS AFFILIATES OR ANY BROKER-DEALER THROUGH WHOM THE INTEREST IS PURCHASED, FOR ANY TAX ADVICE REGARDING THE TREATMENT OF BUYER'S TRANSACTION UNDER IRC SECTION 1031; AND (III) IS NOT RELYING AND

GFI's Exhibit 18, Page 117 of 221

**EXHBIT B**

WILL NOT RELY ON ANY STATEMENTS MADE IN THE MEMORANDUM REGARDING THE TREATMENT OF ITS PURCHASE OF THE INTEREST UNDER IRC SECTION 1031.

4.3.8    Buyer understands that none of Seller, the Sponsor, the Manager or their owners, officers, members, managers, employees or affiliates, legal counsel, or advisors represent Buyer in any way in connection with the purchase of the Interest and the entering into any of the related agreements associated with the purchase.  Buyer also understands that legal counsel to Seller, the Sponsor, the Manager and their affiliates does not represent, and shall not be deemed under the applicable codes of professional responsibility to have represented or to be representing, Buyer.

4.3.9    THE INTEREST OFFERED HEREBY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATES AND IS BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS.  THE INTEREST IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE INTEREST HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION, OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

4.3.10    Buyer hereby agrees to indemnify, defend, and hold harmless Seller, the Sponsor, the Manager and each of their owners, officers, members, managers, affiliates, and advisors of and from any and all damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Buyer's failure to fulfill all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties, covenants, or agreements contained herein or in any other documents Buyer has furnished to any of the foregoing in connection with this transaction.  This indemnification includes, but is not limited to, any damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) incurred by Seller, the Sponsor, the Manager or any of their owners, officers, members, managers, affiliates, or advisors defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents Buyer has furnished to any of the foregoing in connection with this transaction.

4.3.11    Within five (5) days after receipt of a written request from Seller, Buyer agrees to provide such information and to execute and deliver such documents as may be reasonably necessary to comply with any and all laws and regulations to which Seller or Buyer is subject.

4.3.12    The representations, warranties and other information set forth in the Purchaser Questionnaire are, and shall continue to be, true, correct and complete in all respects.

4.4    The representations and warranties of Buyer and Seller set forth herein above shall survive the closing of the sale of the Interest or termination of this Agreement.

5.    <u>General Provisions</u>.

5.1    <u>Interpretation</u>.  The use herein of (i) the neuter gender includes the masculine and the feminine, (ii) the singular number includes the plural, whenever the context so requires and (iii) the words "I" and "me" include "we" and "us" if Buyer is more than one person.  Captions in this Agreement are inserted for convenience of reference only and do not define, describe, or limit the scope or the intent of this Agreement or any of the terms hereof.  All exhibits referred to herein and attached hereto are incorporated by reference.  This Agreement, together with the other Transaction Documents, contain the entire agreement between the parties relating to the transactions contemplated hereby, and all prior or contemporaneous agreements, understandings, representations and statements, whether oral or written, are merged herein.

**EXHBIT B**

5.2    Modification.  No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless the same is in writing and signed by the party against which the enforcement thereof is or may be sought.

5.3    Cooperation.  Buyer and Seller acknowledge that it may be necessary to execute documents other than those specifically referred to herein to complete the acquisition of the Interest as provided herein.  Buyer and Seller agree to cooperate with each other in good faith by executing such other documents or taking such other action as may be reasonably necessary to complete this transaction in accordance with the parties' intent evidenced in this Agreement.

5.4    Assignment.  Neither party may assign its rights under this Agreement, except, in the case of Buyer, to (a) a "Qualified Intermediary" as required by the IRC Section 1031, and/or (b) to a limited liability company in which Buyer is the sole member, without first obtaining the other party's prior written consent, which consent may be withheld in such party's sole and absolute discretion.  No such assignment shall operate to release the assignor from the obligation to perform all of its obligations hereunder.

5.5    Notices.  Unless otherwise specifically provided herein, all notices, demands, or other communications given hereunder shall be in writing and shall be addressed as follows:

<div style="margin-left:3em">

If to Seller, to:    Greeley Flats, DST
16B Journey, Suite 200
Aliso Viejo, CA  92656
Attn:  Patrick Nelson
Phone: (949) 916-7300
Fax: (949) 916-7311

</div>

If to Buyer, to Buyer's address as provided to Seller. Either party may change such address by written notice to the other party.  Unless otherwise specifically provided for herein, all notices, payments, demands or other communications given hereunder shall be deemed to have been duly given and received:  (i) upon personal delivery, or (ii) as of the third business day after mailing by United States registered or certified mail, return receipt requested, postage prepaid, addressed as set forth above, or (iii) the immediately succeeding Business Day after deposit with Federal Express or other similar overnight delivery system that maintains tracking and evidence of delivery.

5.6    Periods of Time.  All time periods referred to in this Agreement include all Saturdays, Sundays, and state or United States holidays, unless Business Days are specified, provided that if the date or last date to perform any act or give any notice with respect to this Agreement falls on a Saturday, Sunday, or state or national holiday, such act or notice may be timely performed or given on the next succeeding Business Day.

5.7    Counterparts.  This Agreement may be executed in counterparts, all of which when taken together shall be deemed fully executed originals.

5.8    Attorneys' Fees.  If either party commences litigation for the judicial interpretation, enforcement, termination, cancellation, or rescission hereof, or for damages (including liquidated damages) for the breach hereof against the other party, then, in addition to any or all other relief awarded in such litigation, the substantially prevailing party therein shall be entitled to a judgment against the other for an amount equal to reasonable attorneys' fees and court and other costs incurred.

5.9    Joint and Several Liability.  If any party consists of more than one person or entity, the liability of each such person or entity signing this Agreement shall be joint and several.

5.10    Choice of Law.  This Agreement shall be construed and enforced in accordance with the internal laws of the State of Delaware, without regard to its conflicts of laws principles.  All actions arising out of or relating to this Agreement shall be heard and determined exclusively by a court of competent jurisdiction located in Orange County, California, and each party hereto expressly and irrevocably consents and submits to personal

**GFI's Exhibit 18, Page 119 of 221**

EXHBIT B

jurisdiction therein.  The parties hereby knowingly, voluntarily, and intentionally waive any right to a trial by jury with respect to any litigation arising out of or relating to this Agreement.

      5.11    <u>Time</u>.  Time is of the essence with respect to all dates set forth in this Agreement.

      5.12    <u>Third-Party Beneficiaries</u>.  Buyer and Seller do not intend to benefit any party that is not a party to this Agreement and no such party shall be deemed to be a third party beneficiary of this Agreement or any provision hereof.

      5.13    <u>Severability</u>.  If any term, covenant, condition, provision, or agreement herein contained is held to be invalid, void or otherwise unenforceable by any court of competent jurisdiction, such fact shall in no way affect the validity or enforceability of the other portions of this Agreement.

      5.14    <u>Election to Effect an Internal Revenue Code Section 1031 Exchange</u>.  In the event Buyer so elects, Seller agrees to cooperate with Buyer, at no cost or expense to Seller, in effecting a tax-deferred exchange under IRC Section 1031.  Buyer shall have the right to elect a tax-deferred exchange at any time prior to the Closing Date.  If Buyer elects to effect a tax-deferred exchange, Seller agrees to execute escrow instructions, documents, agreements, or instruments to effect the exchange, provided that Seller shall incur no additional costs, expenses, fees, or liabilities, nor shall the closing be delayed as a result of the exchange.  Buyer may assign this Agreement to an accommodator in order to effect such exchange and, thereafter, such assignee will perform Buyer's obligations under this Agreement.

      5.15    <u>Binding Agreement</u>.  Subject to any limitation on assignment set forth herein, all terms of this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, successors and assigns.

      5.16    <u>ACCEPTANCE OR REJECTION OF BUYER'S OFFER</u>.  THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER OF ANY KIND BY SELLER AND SHALL NOT BIND SELLER UNLESS DULY EXECUTED AND DELIVERED BY SELLER.  TO SUBMIT AN OFFER, BUYER SHALL DELIVER TO SELLER: (I) ONE COMPLETED AND EXECUTED ORIGINAL OF THIS AGREEMENT (OR AS MANY COMPLETED AND EXECUTED ORIGINALS AS SELLER MAY REQUEST); AND (II) THE PURCHASER QUESTIONNAIRE. SELLER SHALL HAVE TEN DAYS TO EITHER ACCEPT OR REJECT BUYER'S OFFER. IF SELLER DOES NOT ACCEPT BUYER'S OFFER WITHIN SUCH TEN-DAY PERIOD, THE OFFER SHALL BE DEEMED REJECTED.

      5.17    <u>BINDING ARBITRATION</u>.  ANY DISPUTE OR CONTROVERSY ARISING OUT OF, OR RELATING TO, THIS AGREEMENT SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION BROUGHT IN IRVINE, CALIFORNIA, UNDER THE AUSPICES AND RULES OF JAMS, INC., AND THE PARTIES HERETO SUBMIT TO THE IN PERSONAM JURISDICTION OF SUCH TRIBUNAL AND WAIVE ANY OBJECTION THAT SUCH FORUM IS INCONVENIENT OR OTHERWISE IMPROPER. THE SUBSTANTIALLY PREVAILING PARTY OR PARTIES IN ANY SUCH ARBITRATION (AS DETERMINED BY THE ARBITRATOR) SHALL RECEIVE FROM THE OTHER PARTY OR PARTIES TO THE ARBITRATION SUCH PREVAILING PARTY'S (OR PARTIES') FEES AND COSTS OF ARBITRATION, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS, IN ADDITION TO ANY OTHER RELIEF TO WHICH SUCH PREVAILING PARTY OR PARTIES MAY BE ENTITLED.

      5.18    <u>WAIVER OF LEGAL RIGHTS</u>.  BY INITIALING IN THE SPACE BELOW, THE PARTIES ACKNOWLEDGE AND AGREE TO HAVE ANY DISPUTE ARISING OUT THE MATTERS INCLUDED IN THIS ARTICLE DECIDED BY NEUTRAL ARBITRATION AS PROVIDED UNDER APPLICABLE LAW AND THAT THEY ARE KNOWINGLY WAIVING ANY RIGHTS THEY MAY POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR BY JURY TRIAL. THE PARTIES FURTHER ACKNOWLEDGE AND AGREE THAT THEY ARE WAIVING THEIR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL EXCEPT TO THE EXTENT SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THIS ARTICLE.  IF EITHER PARTY REFUSES TO SUBMIT TO ARBITRATION AFTER EXECUTION OF THIS AGREEMENT AND INITIALING BELOW, SUCH PARTY MAY BE COMPELLED TO ARBITRATE UNDER APPLICABLE LAW. EACH PARTY'S AGREEMENT TO THIS ARTICLE IS VOLUNTARY. THE PARTIES

GFI's Exhibit 18, Page 120 of 221

**EXHBIT B**

HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES OUT OF THE MATTERS INCLUDED IN THIS ARTICLE TO BINDING ARBITRATION.


_____      _____
Seller's Initials            Buyer's Initials


**[SIGNATURE PAGE FOLLOWS]**

**EXHBIT B**

IN WITNESS WHEREOF, this Agreement has been executed as of the Effective Date.

**SELLER:**

GREELEY FLATS, DST, a Delaware statutory
trust

By:      _____
Name:  _____
Its:      Authorized Signatory
Dated:  _____


**BUYER:**

_____
Printed Name: _____
Title (if applicable): _____
Dated:  _____

B-9

**EXHBIT B**

**SCHEDULE 1 OF EXHIBIT B**

**DEFINED TERMS**

This list of Defined Terms is attached to and forms a part of the Purchase Agreement between Buyer and Seller.

"Business Day" means any day other than a Saturday or Sunday or legal holiday in the State of Delaware.

"Cash" means (i) currency of the United States of America, (ii) cashier's check(s) currently dated and payable to Seller, as required under this Agreement, drawn and paid through a duly organized and operating bank or savings and loan institution, tendered to Seller, as required under this Agreement at least two (2) Business Days before funds are otherwise required to be delivered under this Agreement, or (iii) an amount credited by wire transfer to Seller's bank account, as required under this Agreement.

"Close of Escrow" means the date and time when the Deed is recorded in the official records of the county or counties in which the Property is located or in such other appropriate office.

"Interest" shall have the meaning set forth in Subsection 1.1.

"Memorandum" means the Amended and Restated Confidential Private Placement Memorandum for the sale of Interests in Greeley Flats, DST, dated July 24, 2018, as the same may from time to time be supplemented.

"Property" means the real estate and improvements commonly known as University Flats, located at 1758 6th Avenue, Greeley, Colorado, as more particularly described in the Memorandum.

"Purchase Price" shall have the meaning set forth in Subsection 1.1.

"Purchaser Questionnaire" means the Purchaser's Questionnaire described in the Memorandum.

"Seller" shall have the meaning set forth in the preamble.

"Sponsor" means Nelson Partners, LLC, a Utah limited liability company.

"Transaction Documents" means this Agreement, the Purchaser Questionnaire and the Trust Agreement.

"Trust Agreement" shall mean the Delaware Statutory Trust Agreement of Greeley Flats, DST in the form attached to the Memorandum executed or to be executed by Buyer as of the Close of Escrow.

**GFI's Exhibit 18, Page 123 of 221**

**EXHBIT C**

**Form of Trust Agreement**

**TRUST AGREEMENT**
**OF**
**GREELEY FLATS, DST**
**A DELAWARE STATUTORY TRUST**

This TRUST AGREEMENT of Greeley Flats DST, a Delaware statutory trust (the "**Trust**"), dated as of January    , 2018 is made between Greeley Flats IB, LLC, a Delaware limited liability company (the "**Initial Beneficiary**"), Corporation Service Company, a Delaware corporation, as co-trustee (the "**Delaware Trustee**"), and Greeley Flats ST, LLC, a Delaware limited liability company, as co-trustee (the "**Signatory Trustee**," and together with the Delaware Trustee, the "**Trustees**"), and any other person who subsequently signs this agreement (the "**Trust Agreement**") and becomes a party to it.

**WHEREAS**, the Trustees formed the Trust as a "statutory trust" pursuant to and in accordance with the Delaware Statutory Trust Act (Title 12, Chapter 38 §3801 et. seq.), as amended from time to time (the "Act") by filing the Certificate of Trust with the Delaware Secretary of State on January 10, 2018, and intend that this Trust Agreement constitute the "governing instrument" of the Trust (as such term is defined in Section 3801(c) of the Act);

**WHEREAS**, the Initial Beneficiary initially owns one hundred percent (100%) of the Interests in the Trust;

**WHEREAS**, the Trust will acquire the student housing apartment complex commonly known as the University Flats Apartments located at 1758 6th Avenue, Greeley, Colorado, 80631 (the "**Real Estate**");

**WHEREAS**, the Real Estate will be subject to the Loan and the Master Lease as hereinafter defined;

**WHEREAS**, it is anticipated that certain Persons will purchase Interests in exchange for payment of money and become Investors as such terms are defined herein pursuant to a private placement of Interests, and such proceeds shall be used by the Signatory Trustee to replace certain interest of the Initial Beneficiary and for payment of expenses and fees as set forth in the Private Placement Memorandum.

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

For all purposes of this Trust Agreement, the capitalized terms set forth below shall have the following meanings:

"**Affiliate**" shall mean, with respect to any specified Person, any other Person owning beneficially, directly or indirectly, any ownership interest in such specified Person or directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Control**" shall mean (whether capitalized or not), with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, more than fifty percent (50%) of the ownership interests.

"**Delaware Trustee**" shall have the meaning set forth in the Preamble to this Trust Agreement.

GFI's Exhibit 18, Page 124 of 221

**EXHBIT C**

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Interest" shall mean, with respect to an Investor, such Investor's beneficial ownership interest in the Trust Property, which is reflected on Exhibit A attached hereto and made a part hereof.  All Interests shall be of a single class.

"Investor(s)" shall mean the Initial Beneficiary to the extent it retains an Interest, each holder of an Interest and each of their successors in interest as beneficiaries of the Trust pursuant to Article III.

"Lender" shall mean Arbor Commercial Funding I, LLC, and its successors and assigns with respect to the Loan.

"Loan" shall mean the loan from Lender in the approximate amount of Thirteen Million Three Hundred One Thousand and No/100 Dollars ($13,301,000), as evidenced and secured by the Loan Documents.

"Loan Documents" shall mean any and all documents evidencing or securing the Loan or any assumptions thereof including, without limitation, any promissory note, mortgage, assignment of leases and rents, indemnity agreement, guaranty certificate, escrow agreement, consent or subordination agreement or the functional equivalent of any of the aforementioned, and any and all other documents related to the Loan.

"Majority" shall mean at least fifty-one percent (51%).

"Master Lease" shall mean that certain Master Lease between the Trust, as landlord, and the Master Tenant, as tenant, with respect to the Real Estate.

"Master Tenant' shall mean Greeley Flats LeaseCo, LLC, a Delaware limited liability company.

"Percentage" shall mean, with respect to a particular Investor, the percentage beneficial ownership interest of such Investor in the Trust Property as reflected on Exhibit A attached hereto and made a part hereof (including any updates to Exhibit A to reflect transfers of Interests that satisfy the provisions of Article III) and the rights, obligations, benefits and burdens associated with such beneficial ownership interest.

"Person" shall mean a natural person, corporation, limited partnership, general partnership, limited liability company, joint stock company, joint venture, association, company, trust, bank trust company, land trust, business trust, statutory trust or other organization, whether or not a legal entity, and a government or agency or political subdivision thereof.

"Plan Asset Rules" shall mean 29 Code of Federal Regulations Section 2510.3-101, as amended from time to time.

"Private Placement Memorandum" shall mean the memorandum and related documents distributed to the prospective Investors that provides such persons with information relating to an investment in the Interests.

"Real Estate" shall have the meaning set forth in the recitals of this Trust Agreement.

"Real Estate Agreement" shall mean, collectively, the Purchase Agreement between the Trust, as buyer and the successor to Nelson Brothers Professional Real Estate, LLC and Greeley Realty Investors, LLC , together, as seller, and all amendments and supplements thereto.

"Regulations" shall mean U.S. Treasury Regulations promulgated under the Code.

"Section" shall mean a section in this Trust Agreement, unless otherwise modified.

GFI's Exhibit 18, Page 125 of 221

**EXHBIT C**

"Special Purpose Entity" shall mean an entity, whose organizational documents contain restrictions on its activities and impose requirements intended to preserve such entity's separateness that are substantially similar to the special purpose provisions set forth in Section 2.05 of this Trust Agreement.

"Special Purpose Provisions" shall have the meaning set forth in Section 2.05(d) of this Trust Agreement.

"Transaction Documents" shall mean the Trust Agreement, Real Estate Agreement and the Master Lease and the Loan Documents.

"Trustees" shall have the meaning set forth in the Preamble to this Trust Agreement.

"Trust Agreement" shall have the meaning set forth in the Preamble to this Trust Agreement.

"Trust Property" shall mean all right, title and interest of the Trust in and to any property contributed to the Trust, the Signatory Trustee on behalf of the Trust, by the Investors or otherwise owned by the Trust, including the Real Estate.

**ARTICLE II**
**FORMATION OF TRUST**

2.01    <u>Name</u>.  The Trust created hereby shall be known as Greeley Flats, DST.

2.02    <u>Registered Office and Agent; Principal Place of Business</u>.  The principal place of business of the Trust shall be at such place as the Signatory Trustee shall designate from time to time by notice to the Investors, which need not be in the State of Delaware.  The initial principal place of business of the Trust shall be 16B Journey, Aliso Viejo, California 92656.

2.03    <u>Purposes</u>.  The purposes of the Trust are to engage in the following activities:  (i) to acquire and own the Real Estate and any related personal property; (ii) to enter into or assume and comply with the terms of the Master Lease, the Loan Documents and the other Transaction Documents; (iii) to conserve, protect, manage and dispose of the Real Estate; and (iv) to take such other actions as the Trustees deem necessary or advisable to carry out the foregoing.  The Trust shall hold the Trust Property solely for investment purposes (and not for the active conduct of a trade or business) and only engage in activities that are customary services in connection with the maintenance and repair of the Real Estate.  Neither the Trustees, Investors, nor their agents shall provide services: (a) that are not "customary services" within the meaning of Revenue Ruling 75-374, 1975-2 C.B. 261; (b) the payment for which would not qualify as "rents from real property" within the meaning of Code Section 512(b)(3)(A)(i) and the Regulations thereunder; (c) the payment for which would not qualify as "rents from real property" within the meaning of Code Sections 856(c)(2)(C) and 856(c)(3)(A) and the Regulations thereunder or (d) other than as specifically provided in this Section 2.03.  The Trust shall conduct no business other than as specifically set forth in this Section 2.03.

2.04    <u>Declaration of Trust by Trustees</u>.  The Trustees hereby declare that they will hold the Trust Property upon the terms and conditions herein for the benefit of the Investors, subject to the obligations of the Trust under the Loan Documents, the Master Lease and other relevant agreements.  It is the intention of the parties hereto that the Trust constitute a "statutory trust" under Chapter 38 of Title 12 of the Delaware Code.  Not later than the date hereof, the Trustees shall have caused the filing of a Certificate of Trust (the "**Certificate of Trust**") with the Secretary of State of the State of Delaware (the "**Secretary of State**") pursuant to Section 3810 of Title 12 of the Act.  It is the intention of the parties hereto that the Trust shall not constitute an agency, partnership, corporation, association or a business trust for federal income tax purposes.  Instead, each Investor shall be treated for federal income tax purposes as if it holds a direct ownership interest in the Trust Property.  Each Investor agrees to report its interest in the Trust in a manner consistent with the foregoing and otherwise not to take any action that would be inconsistent with the foregoing.

2.05    <u>Limitation on Certain Activities</u>.  This Section 2.05 is being adopted in order to, among other things, comply with certain provisions of the Loan Documents necessary to qualify the Trust as a "special purpose entity."

**GFI's Exhibit 18, Page 126 of 221**

## EXHBIT C

(a)      Notwithstanding any provisions of this Trust Agreement and any provision of law that otherwise so empowers the Trustees or the Investors, so long as any obligation evidenced or secured by any of the Loan Documents remains outstanding and not discharged in full and the lien of the mortgage has not been released, neither the Trust, the Trustees nor any other Person on behalf of the Trust shall have any authority to do any of the following without Lender's prior written consent:

(i)      perform any act in contravention of or constituting an event of default under the Loan Documents;

(ii)      borrow money or incur indebtedness other than the Loan, normal trade accounts payable and lease obligations in the normal course of business (subject to the limitations contained in the Loan Documents), or grant consensual liens on the Trust's property other than in connection with the Loan;

(iii)      to the fullest extent permitted by law, dissolve, wind-up or liquidate except as provided in Sections 9.02 and 9.03 of this Trust Agreement;

(iv)      sell or lease, or otherwise dispose of, either the Real Estate or all or substantially all of its assets except simultaneously with a permitted repayment of the Loan;

(v)      engage in any business activity other than those set forth in Section 2.03;

(vi)      issue or distribute (in termination of the Trust or otherwise) tenancy in common interests or other partial interests in the Real Estate to the Investors or to any other persons; and

(vii)      override any provision of this Trust Agreement unless the Lender consents in writing.

(b)      Notwithstanding any other provision of this Trust Agreement, so long as any obligation evidenced or secured by any of the Loan Documents remains outstanding and not discharged in full and the lien of the mortgage has not been released, the Trustees shall and shall cause the Trust at all times to:

(i)      observe statutory formalities with respect to the administration of the Trust and in the conduct of the Trust's activities; and

(ii)      prepare separate financial statements and, if the Trust is not treated for federal, state or local income tax purposes as a disregarded entity, file its tax returns, if any, separate from those of any other Person, and not file consolidated tax returns with any other Person.

(c)      Notwithstanding any other provision of this Trust Agreement, the Trustees shall maintain the separateness of the Trust by maintaining separate books, records, and bank accounts for the Trust, and shall hold the Trust out to third parties as a distinct legal entity, in order to prevent a substantive consolidation of the Trust with the bankruptcy of any other person, including any Investor or any affiliate of the Trust.

(d)      Notwithstanding any other provision of this Trust Agreement and any provision of law that otherwise so empowers the Trust, so long as any obligation evidenced or secured by any of the Loan Documents remains outstanding, neither the Trust, the Trustees nor any other Person shall be authorized or empowered to, nor shall they permit the Trust, without the unanimous prior written consent of the Signatory Trustee and the Delaware Trustee. take any action that might cause the Trust to become insolvent, or file a voluntary petition or otherwise initiate proceedings to be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Trust, or file a petition seeking or consenting to reorganization or relief of the Trust as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Trust; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Trust or of all or any substantial part of the properties and assets of the Trust, or make any general assignment for the benefit of creditors of the Trust, or admit in writing the inability of the

GFI's Exhibit 18, Page 127 of 221

EXHBIT C

Trust to pay its debts generally as they become due or declare or effect a moratorium on the Trust debt or take any action in furtherance of any such action.

(e)     Notwithstanding any other provision of this Trust Agreement, so long as any obligation evidenced or secured by any of the Loan Documents remains outstanding and not discharged in full, the Signatory Trustee shall cause the Trust to, and the Trust shall, comply with the covenants set forth in Exhibit C.

2.06    Operative Timing Related to Certain Provisions of this Trust Agreement.  Notwithstanding anything else in this Trust Agreement to the contrary, the following sections of this Trust Agreement shall be of no force or effect until the admission of the first Investor (other than the Initial Beneficiary) to the Trust pursuant to the Private Placement Memorandum, at which time they shall become fully operative:  (i) Section 2.05(a)(iv) (solely to the extent it refers to Sections 9.02 and 9.03); (ii) Section 6.02(b); (iii) Section 7.03; (iv) Section 7.05 (solely to the extent it refers to Section 7.03); (v) Section 9.02; (vi) Section 9.03; and (vii) Section 11.09 (solely with respect to the clause limiting amendments that would "vary the investment" of the Investors).

ARTICLE III
TRANSFER AND ENCUMBRANCE OF INTERESTS

3.01    No Interest, or any portion thereof, may be assigned or transferred without the prior consent of the Signatory Trustee (each a "**Proposed Interest Transfer**").  The Signatory Trustee's consent to each Proposed Interest Transfer is subject to sole discretion of the Signatory Trustee, including, but not limited to, the satisfaction of the following as determined in the sole discretion of the Signatory Trustee:

(a)     That such Proposed Interest Transfer complies with all applicable securities laws;

(b)     That such Proposed Interest Transfer complies with all transfer restrictions and requirements set forth in the Loan Documents and does not itself or in combination with any other prior Interest transfer or Proposed Interest Transfer constitute an event of default under the Loan Documents;

(c)     That such Proposed Interest Transfer would not result in the Trust having to register as an investment company or require the Trust or any Trustee to register as an investment advisor under the Investment Company Act of 1940, as amended;

(d)     That such Proposed Interest Transfer does not cause the Trust Property to become "plan assets" (as defined in the Plan Asset Rules) subject to the fiduciary standards of Part 4 of Subtitle B of Tile I of ERISA and Code Section 4975;

(e)     That the transferor and transferee(s) in such Proposed Interest Transfer shall have executed documents to effectuate such transfer that are satisfactory to the Signatory Trustee, including that the Transferee(s) shall have executed a written acceptance and adoption of this Trust Agreement; and

(f)     That all expenses of such Proposed Interest Transfer shall have been paid by the transferor or the transferee in such proportion as they shall agree.

ARTICLE IV
DISTRIBUTIONS

4.01    Payments From Trust Property Only.  Except as determined by the Signatory Trustee in its sole discretion and as is consistent with the status of the Trust described in Section 5.01, all payments to be made by the Trustees under this Trust Agreement shall be from the Trust Property.

4.02    Distributions in General.  The Signatory Trustee shall distribute all available cash as determined pursuant to Section 4.01 to the Investors in accordance with their Percentages on a monthly basis, after paying or reimbursing the Trustees for any fees or expenses paid by the Trustees on behalf of the Trust, paying debt service and related expenses and retaining such additional amounts as are necessary to pay anticipated ordinary current and future Trust expenses ("**Reserves**").  Amounts of cash retained pursuant to this paragraph shall only be invested in short-

GFI's Exhibit 18, Page 128 of 221

**EXHBIT C**

term obligations of (or guaranteed by) the United States, or any agency or instrumentality thereof and in certificates of deposit or interest-bearing bank accounts of any bank or trust company having a minimum stated capital and surplus of Fifty Million and no/100 Dollars ($50,000,000.00). All such obligations must mature prior to the next distribution date, and be held to maturity. All amounts distributable to the Investors pursuant to this Trust Agreement shall be paid by check or in immediately available funds by transfer to a banking institution with bank wire transfer facilities for the account of such Investor, as instructed from time to time by such Investor.

**ARTICLE V**
**RIGHTS AND OBLIGATIONS OF INVESTORS**

5.01    Status of Relationship.

(a)    This Trust Agreement shall not be interpreted to impose a partnership or joint venture relationship on the Investors either in law or in equity. Accordingly, no Investor shall have any liability for the debts or obligations incurred by any other Investor, with respect to the Trust Property, or otherwise, and no Investor shall have any authority, other than as specifically provided herein, to act on behalf of any other Investor or to impose any obligation with respect to the Trust Property.

(b)    For so long as there is only one (1) Investor that is an owner of Interests in the Trust, the rights of such Investor with respect to any Trust Property held at such time will be such that the Trust will be characterized at such time as a "business entity" within the meaning of Regulation Section 301.7701-3. Because the sole Investor will be the sole beneficial owner of the Trust, the Trust will be characterized as a disregarded entity and any Trust Property held at such time will be treated for federal income tax purposes as the property of the sole Investor.

(c)    At such time as there is more than one (1) Investor that is an owner of the Trust, it shall not constitute a business entity for federal income tax purposes, but shall instead constitute an investment trust pursuant to Regulation Section 301.7701-4(c); and a Grantor Trust under Subpart E of Part 1, Subchapter J of the Code (Code Sections 671 and following).

5.02    No Legal Title to Trust Property in the Investors, Etc. Legal title to the Trust Property, including the Real Estate, shall be held by the Trust and the Investors shall not have legal title to the Trust Property. Neither the bankruptcy, death or other incapacity of any Investor nor the transfer, by operation of law or otherwise, of any right, title or interest of the Investors in and to the Trust Property or hereunder shall terminate this Trust Agreement. Except as expressly set forth herein, Investors shall not be liable for any liabilities or obligations of the Trust or the Trustees or for the performance of the Trust Agreement.

5.03    Sale of Trust Property by Trustees Is Binding. Any sale or other conveyance of the Trust Property or any part thereof by the Signatory Trustee made pursuant to the terms of this Trust Agreement shall bind the Investors and be effective to transfer or convey all rights, title and interest of the Trustees and the Investors in and to the Trust Property. Nevertheless, prior to the Signatory Trustee entering into a binding contract to sell or convey the Real Estate, the Signatory Trustee shall notify the Investors of such potential transaction and solicit their views on the transaction. The Signatory Trustee shall consider the Investors' views and opinions in good faith, but not be bound by such opinions and the decision to do the transaction or not rests solely with the Signatory Trustee.

5.04    No In-Kind Distributions; Waiver of Partition; Nature of Interest. To the fullest extent permitted by law, and consistent with Section 3805 of the Act, each Investor and any additional Investor admitted to the Trust shall not have, and hereby completely and irrevocably waives, any and all power or right: (a) to cause the Trust or any of its assets to be partitioned or divided or to demand or receive an in-kind distribution of the Trust Property; (b) to cause the appointment of a receiver for all or any portion of the assets of the Trust; (c) to compel any sale of all or any portion of the assets of the Trust pursuant to any applicable law; or (d) to file a complaint or to institute any proceeding at law or in equity to cause the bankruptcy, dissolution, liquidation, winding up or termination of the Trust. No Investor shall have any interest in any specific assets of the Trust, and no Investor shall have the status of a creditor with respect to any distribution pursuant to Section 4.02 hereof. An Investor's sole right with respect to the Trust shall be limited to the right to receive distributions as provided under Section 4.02. Each Investor's Interest in the Trust is personal property.

GFI's Exhibit 18, Page 129 of 221

EXHBIT C

5.05     Role of Investors.  For the avoidance of doubt, except solely as provided in Article X with respect to the appointment of a successor trustee, Investors shall have no right to make decisions for or to operate or manage the Trust, it being understood and agreed that all authority with respect to the Trust, other than as expressly set forth in this Section 5.05, shall be vested in the Trustees as provided in this Trust Agreement.

5.06     Subordination to Loan Documents.  While the Loan Documents remain in effect, any and all rights of the Investors pursuant to the terms of this Trust Agreement are subordinate to the rights of the Lender under the Loan Documents.

**ARTICLE VI**
**TRUSTEES IN GENERAL**

6.01     Acceptance of Trust and Duties.  The Trustees accept the Trust hereby created and agree to perform their duties as so provided, including receiving and disbursing all money received by them constituting part of the Trust Property, subject to the Loan Documents, Master Lease and other relevant agreements.

6.02     Limitation on Fiduciary Duties of Trustees.  Consistent with Sections 3803(b) and 3806(c)(2) of the Act, the duties and liabilities of the Trustees to the Trust and the Investors pursuant to this Trust Agreement are expressly limited as follows:

(a)     The Trustees shall not be individually answerable or accountable for their omissions or actions on behalf of the Trust, except: (i) for their own willful misconduct or gross negligence, (ii) for the inaccuracy of any of their representations or warranties contained in Section 6.05 hereof, (iii) for their failure to comply with Section 7.03, (iv) for their own income taxes based on fees, commissions or compensation received as a trustee, or (v) for the failure to use ordinary care to disburse money received by them in accordance with the terms hereof.

(b)     The Investors hereby acknowledge and agree that the Trustees and their Affiliates engage in business activities other than acting as Trustees hereunder, and each Investor hereby waives any claim or cause of action against any Trustee as result of any potential or actual conflict of interest arising as a result of any such business activity on the part of the Trustees or their Affiliates.  Such business activities include, but are not limited to, the Trustees or their Affiliates:  (i) receiving fees related to the acquisition of the Trust Property, (ii) acting as Master Tenant with respect to the Trust Property; (iii) owning an interest in and receiving distributions of income from the Trust Property, (iv) engaging directly or indirectly in business activities that may relate to the Trust Property, (v) acquiring, or sponsoring the acquisition of interests by investors in, parcels of real property that may compete with the Trust Property, and (vi) undertaking obligations (including obligations as trustees) to entities other than the Trust.

6.03     Not Acting in Individual Capacity.  Except as otherwise provided in this Article VI and pursuant to Section 3803(b) of the Act, the Trustees act solely as Trustees hereunder and not in their individual capacity, and all Persons other than the Investors having any claim against the Trustees by reason of the transactions contemplated hereby shall look only to the Trust Property for payment or satisfaction thereof, but subject to the liens and other obligations created pursuant to the Loan Documents.

6.04     Authority of Trustees.  The Trustees shall manage, control, dispose of or otherwise deal with the Trust Property consistent with their duties to conserve and protect the Trust Property, subject to any restrictions required by the Loan Documents, or otherwise provided in this Trust Agreement.

6.05     Representations or Warranties as to Trust Property or Documents.  The Trustees make no representation or warranty as to (i) the title, value, condition or operation of the Trust Property, and (ii) the validity or enforceability of any Transaction Document or as to the correctness of any statement contained in any thereof, except as expressly made by the Trustees in their individual capacities.  The Trustees represent and warrant to the Investors that this Trust Agreement has been authorized, executed and delivered by each Trustee respectively.

6.06     Reliance.  The Trustees shall not be liable to anyone for relying on any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper believed by them to be genuine and signed by the proper parties.  The Trustees may accept a copy of a resolution of the board of directors or other governing body of any corporate party, certified by the secretary or a senior officer thereof, as conclusive

**GFI's Exhibit 18, Page 130 of 221**

EXHBIT C

evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter, the manner of ascertainment of which is not specifically prescribed herein, the Trustees may for all purposes hereof rely on an officer's certificate of the relevant Person (if not an individual) as to such fact or matter, and such certificate shall constitute full protection to the Trustees for any action taken, suffered or omitted by it in good faith in reliance thereon.

6.07   Advice of Counsel. In the administration and interpretation of the Trust, the Trustees may perform any of their powers and duties, directly or through agents or attorneys and may consult with counsel, accountants and other skilled Persons selected and employed by them. The Trustees shall not be liable for anything done or omitted in good faith in accordance with the advice or opinion within the scope of competence of any such counsel, accountant or other skilled Persons selected with due care.

6.08   Compensation. The Delaware Trustee shall receive as compensation for its services an initial fee, monthly fees and document execution fees as agreed to by the Trustees in a separate agreement. The Signatory Trustee shall serve without compensation for services solely as the Signatory Trustee.

**ARTICLE VII**
**DUTIES OF TRUSTEES**

7.01   Duties of the Trustees in General.

(a)   The Trustees shall only have the duties and obligations expressly provided in this Trust Agreement. Except to the extent specifically provided in Section 7.01(b) or Section 7.01(c), to the effect that specific duties and obligations are those of the Delaware Trustee, and notwithstanding any other provision of this Trust Agreement, all the duties and obligations of the Trustees or of any of them under this Agreement shall be solely the duties and obligations of the Signatory Trustee.

(b)   The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the purpose of satisfying the requirement of Section 3807(a) of the Act that the Trust have at least one trustee with a principal place of business in Delaware. It is understood and agreed by the parties hereto that the Delaware Trustee shall have none of the duties or liabilities of the Signatory Trustee. The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware, (ii) executing any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Act, and (iii) any other duties specifically allocated to the Delaware Trustee in the Trust Agreement. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Investors, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)   Except as provided in Section 7.01(b) and Section 7.01(c) above, the Signatory Trustee is hereby authorized and directed to enter into any agreement permitted or directed by this Trust Agreement without the consent or signature of the Delaware Trustee including, without limitation, the Loan Documents and other Transaction Documents. The Delaware Trustee is authorized and directed to enter into such other documents and take such other actions as the Signatory Trustee shall specifically direct in written instructions delivered to the Delaware Trustee; *provided*, *however*, that the Delaware Trustee will take such action merely in a ministerial nondiscretionary capacity, as directed by the Signatory Trustee, and any such action shall not subject the Delaware Trustee to any liability, and *provided further, however*, that no Trustee shall be required to take any action if such Trustee shall determine, or shall be advised by counsel, that such action is likely to result in personal liability to such Trustee or is contrary to applicable law or any agreement to which such Trustee is a party. For the avoidance of doubt, this Section 7.01(d) does not limit or condition the separate duties of the Delaware Trustee set forth in this Trust Agreement.

(d)   The Signatory Trustee has also been appointed hereunder to satisfy such legal or administrative requirements as may be necessary or prudent to carry out the duties of the Trust with respect to the Loan Documents and other Transaction Documents or any Trust Property to the extent that the Delaware Trustee is not required to do so under applicable law. Notwithstanding anything to the contrary in this Trust Agreement, so long as any obligation under the Loan Documents remains outstanding (subject, however, in all respects to Section 2.05),

GFI's Exhibit 18, Page 131 of 221

**EXHBIT C**

Signatory Trustee shall be required to comply with the special purpose entity requirements set forth in the Loan Documents.

7.02   <u>Actions of Signatory Trustee</u>.  The Signatory Trustee has a duty to conserve and protect the Trust Property for the benefit of the Investors and is hereby authorized and directed to take any and all necessary actions on behalf of the Trust, or to cause the Trust to take the same, to conserve and protect the Trust Property for the benefit of the Investors, including, but not limited to:

(a)   receiving the contribution of the Real Estate Agreement and acquiring, owning, conserving, protecting and selling the Real Estate;

(b)   entering into or assuming and complying with the terms of the Master Lease, the Loan Documents and any other Transaction Documents;

(c)   conserving and maintaining the Real Estate in a manner consistent with the Trust's obligations under the Master Lease;

(d)   collecting rents and making distributions in accordance with Article IV;

(e)   entering into any agreement for purposes of completing tax-free exchanges of real property with a Qualified Intermediary as defined in Section 1031 of the Code;

(f)   notifying the relevant parties of any default by them under the Transaction Documents;

(g)   subject to the terms and conditions of the Loan Documents, entering into an asset management agreement with a third party or an affiliate of the Signatory Trustee for a fee not to exceed 1% of gross income per year;

(h)   solely to the extent necessitated by the bankruptcy or insolvency of the Master Tenant, renegotiating any existing leases or entering into a new lease(s) with respect to the Real Estate or negotiating or financing any debt secured by the Real Estate;

(i)   notifying the Lender of any default under this Trust Agreement;

(j)   taking all actions required under Section 9.02 of this Trust Agreement; and

(k)   taking any action, which in the reasoned opinion of tax counsel to the Trust, should not have an adverse effect on either the treatment of the Trust as an "investment trust" within the meaning of Regulations Section 301.7701-4(c) or the Beneficiary as a "grantor" within the meaning of Code Section 671.

7.03   <u>Prohibited Actions</u>.  Notwithstanding any other provision in this Trust Agreement, the Trustees shall not take any of the following actions, provided, however, that such prohibition shall only apply if the effect of taking such action or actions would be that such action or actions would constitute the exercise of a power under the Trust Agreement to "vary the investment of the certificate holders" as defined by Regulation Section 301.7701-4(c)(1). Such actions which may constitute prohibited actions are: (a) reinvesting any monies of the Trust, except in accordance with Section 4.02; (b) renegotiating the terms of the Loan, entering into new mortgage financing, renegotiating the Master Lease or entering into new leases, except in the case of the Master Tenant's bankruptcy or insolvency, (c) making other than minor non-structural modifications to the Real Estate, other than as required by law, (d) accepting any capital from the Investors or new investors except as provided for in the Private Placement Memorandum, or (e) taking any other action that, in the reasoned opinion of tax counsel to the Trust, should cause the Trust to be treated as a "business entity" for federal income tax purposes.

7.04   <u>Books and Records</u>.  The Signatory Trustee shall keep customary and appropriate books and records relating to the Trust and the Trust Property and shall certify reports regarding same to the Lender, if required by the Loan Documents.  The Signatory Trustee shall maintain separate books and records for each Investor's Interest and

C-9

EXHBIT C

shall provide reports of income and expenses to each Investor as necessary for such Investor to prepare his/her income tax returns regarding the Trust Property.

      7.05    Duty to Act.

      (a)    The Trustees shall not be required to act or refrain from acting under this Trust Agreement or the Loan Documents (other than the actions prohibited in Section 7.03) if the Trustees reasonably determine, or have been advised by legal counsel, that such actions may result in personal liability, unless the Trustees are indemnified by the Investors, in a manner and form reasonably satisfactory to the Trustees (subject to the final sentence of Article VIII hereof), against any liability and costs (including reasonable legal fees and expenses) which may result from such actions. However, the Investors shall not be required to indemnify the Trustees with respect to any of the matters described in Section 6.02(a) (i) through 6.02(a) (v).

      (b)    The Delaware Trustee shall have no duty (i) except as provided in Section 7.01(b) with respect to the Delaware Trustee, to file, record or deposit any document or to maintain any such filing, recording or deposit or to refile, rerecord or redeposit any such document, (ii) to obtain or maintain any insurance on the Real Estate, (iii) to maintain the Real Estate, (iv) to pay or discharge any tax levied against any part of the Trust Property, (v) to confirm, verify, investigate or inquire into the failure to receive any reports or financial statements from any person obligated to provide such reports or financial statements, or (vi) to inspect the Real Estate at any time.

      Section 7.06. Furnishing of Documents. The Signatory Trustee will promptly furnish to the Lender those documents as required by the Loan Documents.

### ARTICLE VIII
### INDEMNIFICATION AND PAYMENT OF THE TRUSTEES

      The Trust agrees: (a) to reimburse the Trustees for all reasonable expenses (including reasonable fees and expenses of counsel and other professionals) incurred in connection with the performance of their duties under this Trust Agreement: (b) to the fullest extent permitted by law, to indemnify the Trustees, their owners, officers, directors, members, employees, agents and other Affiliates (collectively the "Trustee Indemnified Parties" and each a "Trustee Indemnified Party") and hold the Trustee Indemnified Parties harmless, in their individual capacities, from and against, any and all liabilities, obligations, losses, damages, taxes, claims, actions, suits, costs, expenses and disbursements including reasonable legal fees and expenses which may be imposed on, incurred by or asserted at any time against them, in their individual capacities (and not indemnified against by other Persons) which relate to or arise out of the operation of the Trust (including the Trust Agreement and all transactions and documents contemplated thereby), the Trust Property, or the Loan Documents (all such items collectively the "Indemnified Costs"), provided, however, that the Trust shall not be required to indemnify any Trustee Indemnified Party with respect to any of the matters described in Sections 6.02(a)(i) through 6.02(a)(v) to the extent any such section is adjudged (as provided in subsection (c) below) to apply to such Trustee Indemnified Party; and (c) to the fullest extent permitted by law, to advance to each such Trustee Indemnified Party the Indemnified Costs incurred by such Trustee Indemnified Party in defending any claim, demand, action, suit or proceeding arising out of the operation of the Trust (including the Trust Agreement and all transactions and documents contemplated thereby), the Trust Property or the Loan Documents, prior to the final disposition of such claim, demand, action, suit or proceeding, upon receipt by the Trust of an undertaking by or on behalf of such Trustee Indemnified Party, to repay such amount if a court of competent jurisdiction renders a final, non-appealable judgment that includes a specific finding of fact that such Trustee Indemnified Party is not entitled to indemnification pursuant to this Article VIII (*i.e.*, because such court of competent jurisdiction specifically finds that any of Sections 6.02(a)(i) through 6.02(a)(v) apply to such Trustee Indemnified Party). The obligations of the Trust pursuant to this Article VIII shall survive the resignation or removal of any Trustee, the disposition of the Trust Property, the termination of the Trust (whether in accordance with Article IX or otherwise), or the amendment, supplement or restatement of this Trust Agreement. So long as any obligation evidenced or secured by the Loan Documents is outstanding, no indemnity payment from funds of the Trust (as distinct from funds from other sources, such as insurance) of any indemnity pursuant to this Article VIII shall be payable from amounts allocable to the Lender pursuant to the Loan Documents. Any indemnification set forth in this Trust Agreement shall be fully subordinate to the Loan and shall not constitute a claim against the Trust in the event its cash flow is insufficient to pay its obligations, nor shall it constitute a claim against any beneficial owner of an interest in the Trust.

GFI's Exhibit 18, Page 133 of 221

EXHBIT C

## ARTICLE IX
## TERMINATION OF TRUST AGREEMENT

9.01    Termination in General.  The Trust shall dissolve and wind up in accordance with Section 3808 of the Act and each Investor's share of the Trust Property shall, subject to Article IV hereof, be distributed to the Investors, at the earlier of (a) December 31, 2067, or (b) the sale or other disposition of the Trust Property; provided, however, that no such dissolution or winding up will occur so long as any obligation evidenced or secured by any of the Loan Documents remains outstanding and not discharged in full.

9.02    Termination in Certain Circumstances.  Notwithstanding Section 9.01, if (i) the Trust Property is in jeopardy of being foreclosed upon due to a default on the Loan or if there is otherwise an event of default under the Loan Documents beyond any applicable notice and cure period, (ii) the Trust Property or any portion thereof is subject to a casualty, condemnation or similar event, and upon any such event that is not adequately compensated for through insurance or otherwise, (iii) the Signatory Trustee determines that the Investors are at risk of losing all or a substantial portion of their investment in the Interests, (iv) so long as any portion of the Loan remains outstanding, any event occurs that causes the Signatory Trustee to cease to be the Signatory Trustee of the Trust unless a replacement acceptable to Lender has been appointed, or (v) so long as any portion of the Loan remains outstanding, any event resulting in the dissolution, liquidation, winding up or termination of the Trust occurs other than in accordance with the terms and conditions of the Loan Documents, and the Signatory Trustee is prohibited from taking actions to cure or mitigate the events described in clauses (i), (ii), (iii), (iv) or (v) above by reason of the restrictions set forth in Section 7.03 hereof, the Signatory Trustee shall, in compliance with such conditions precedent and other requirements as may be set forth in the Loan Documents (if still in force), terminate the Trust and distribute the Trust Property to the Investors in the manner provided in Section 9.03.

9.03    Distribution of Trust Property to Investors.

(a)    If any obligation evidenced or secured by the Loan Documents remains outstanding and has not been satisfied in full at the time the Trust is to be terminated pursuant to Section 9.02, and if the Loan Documents prohibit a direct distribution of the Trust Property to the Investors as provided in Section 9.03(b)(ii), the Signatory Trustee shall, subject to the requirements set forth in the Loan Documents:  (i) terminate the Trust in accordance with Section 9.02 by converting it pursuant to Section 3821 of the Act into a Delaware limited liability company (an "LLC"), the operating agreement for which will be substantially similar in form to the LLC operating agreement set forth as Exhibit B attached hereto and made a part hereof, with such changes thereto as may be reasonably acceptable to Lender or may be required to cause the LLC to comply with the requirements of the Loan Documents (the "LLC Agreement") (or in lieu of such conversion, as determined in the sole discretion of the Signatory Trustee, by transferring or contributing the Trust Property to, or by merging the Trust into, such LLC), which LLC shall acquire, by operation of law, contract, or otherwise, the Trust Property subject to the then-outstanding obligations of the Trust under the Loan Documents and the Master Lease, and which LLC shall assume, by operation of law, contract, or otherwise, the Trust's obligations under the Loan Documents and the Master Lease, which assumption shall be evidenced by documents approved in writing by the Lender; (ii) effect the conversion or exchange of the Investors' ownership interests in the Trust into equivalent membership interests in the LLC; (iii) cause the Signatory Trustee to be designated as the Manager (as such term is defined in the LLC Agreement) of the LLC and to execute all necessary documents, including the LLC Agreement on behalf of the members of the LLC; and (iv) take all other actions necessary to complete the termination and winding up of the Trust and the formation of the LLC in accordance with the Act and the Delaware Limited Liability Company Act.

(b)    If no obligation evidenced or secured by the Loan Documents remains outstanding and all such obligations have been satisfied in full at the time the Trust is to be terminated pursuant to Section 9.02, or if the Loan Documents do not prohibit a direct distribution of the Trust Property to the Investors, the Signatory Trustee may in its sole discretion terminate the Trust in accordance with Section 9.02 by either (i) following the procedure described in Section 9.03(a), i.e., converting the Trust to an LLC or (ii) dissolving and winding up the Trust in accordance with Section 3808 of the Act and distributing to the Investors, subject to Article IV hereof, each Investor's share of the Trust Property.

(c)    For federal income tax purposes, a conversion of the Trust to an LLC effectuated pursuant to the procedure described in Section 9.03(a) (including such procedure if effectuated pursuant to Section 9.03(b))

GFI's Exhibit 18, Page 134 of 221

EXHBIT C

shall be characterized as: (1) a distribution of the Trust Property by the Trust to the Investors in termination of the Trust, followed by (2) a contribution by the Investors of the Trust Property to the LLC in exchange for membership interests in the LLC.

9.04    Certificate of Cancellation.  Upon the completion of winding up of the Trust, the Trustees shall cause a Certificate of Cancellation to be filed with the Delaware Secretary of State and thereupon the Trust and this Trust Agreement shall terminate.

ARTICLE X
SUCCESSOR TRUSTEES

10.01    Resignation or Removal.  A Trustee or any successor trustee may resign at any time by giving at least 60 days' prior written to the Investors.  Investors holding a Majority of the Interests may remove a Trustee for "Cause" (as defined in the following sentence) by written notice to such Trustee.  Cause shall mean the willful misconduct, fraud or gross negligence of the Trustee as determined by a final, non-appealable judgment of a court of competent jurisdiction.  Notwithstanding the foregoing, (a) until the date on which all obligations of the Trust under the Loan Documents are indefeasibly and fully satisfied, the prior written consent of the Lender shall be required for the removal of the Signatory Trustee and the appointment of a replacement for the Signatory Trustee, and (b) the removal of the Signatory Trustee shall not be effective without the prior written consent of the Signatory Trustee until the Signatory Trustee and each of its Affiliates have been fully removed from any guarantee and indemnity obligations they may have with respect to any Loan. The terms of this Section 10.1 are subject to the terms and conditions of the Loan Documents.

10.02    Appointment of Successor Signatory Trustee.  Notwithstanding anything herein to the contrary (but subject to the terms and conditions of the Loan Documents), no resignation or removal of a Trustee shall be effective until a successor trustee has been appointed and such successor trustee has accepted its responsibilities, all as hereinafter provided.  In case of the resignation, death, liquidation or removal of a Trustee, the Investors holding a Majority in Interests may appoint a successor by written instrument.  The Trust shall not be terminated solely due to the death, liquidation, resignation or removal of any Trustee.  If a successor trustee shall not have been appointed within 60 days after the giving of such notice, a trustee or the Investors may apply to any court of competent jurisdiction in the United States to appoint a successor trustee to act until such time, if any, as a successor shall have been appointed as above provided. Any successor so appointed by such court shall immediately and without further act be superseded by any successor appointed as provided above within one year from the date of the appointment by such court.  Any successor, however appointed, shall execute and deliver to its predecessor trustee (the Delaware Trustee, Signatory Trustee or a successor trustee, as the case may be) an instrument accepting such appointment, and thereupon such successor, without further act, shall become vested with all the estates, properties, rights, powers, duties and trusts of the predecessor trustee with like effect as if originally named a Delaware Trustee or Signatory Trustee herein; but upon the written request of such successor, such predecessor shall execute and deliver an instrument transferring to such successor all the estates, properties, rights, powers, duties and trusts of such predecessor, and such predecessor shall duly assign, transfer, deliver and pay over to such successor all monies or other property then held by such predecessor upon the trusts herein expressed.  Any right of the Investors against the predecessor trustee, in its, his or her individual capacity, shall not be prejudiced by the appointment of any successor trustee and shall survive the termination of the trusts created hereby.

10.03    Successor Delaware Trustee.  Any successor Delaware Trustee, however appointed, shall be a bank or trust company with its principal place of business in the State of Delaware and either (a) having a combined capital and surplus of at least Fifty Million and no/100 Dollars ($50,000,000.00), or (b) having the performance of its obligations hereunder guaranteed by such a bank or trust company having a combined capital and surplus of at least Fifty Million and no/100 Dollars ($50,000,000.00), if there is such an institution willing, able and legally qualified to perform the duties of trustee hereunder upon reasonable or customary terms.  Any corporation into which the Delaware Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which such Delaware Trustee shall be a party, or any corporation to which substantially all the corporate trust business of the Delaware Trustee may be transferred, shall, subject to the preceding sentence, be the Delaware Trustee under this Trust Agreement without further act.  Any successor Delaware Trustee, however appointed, shall be competent and qualified to (i) serve as a trustee of a statutory trust formed pursuant to Chapter 38 of Title 12 of the Delaware Code, (ii) own, buy, sell, lease and mortgage land in the state where the Real

**GFI's Exhibit 18, Page 135 of 221**

EXHBIT C

Estate is located, and (iii) take all actions required by the Delaware Trustee pursuant to the Trust in the State of Delaware. The terms of Section 10.03 are subject to the terms and conditions of the Loan Documents.

## ARTICLE XI
## MISCELLANEOUS

11.01   Limitations on Rights of Others.  Nothing in this Trust Agreement, whether express or implied, shall give to any Person other than the Trustees and the Investors any legal or equitable right, remedy or claim hereunder, *provided, however*, that the Lender shall be an intended third-party beneficiary of Section 2.05 of this Trust Agreement.

11.02   Notices, Etc.  All notices, requests, demands, consents and other communications ("**Notices**") required or contemplated by the provisions hereof shall refer on their face to this Trust Agreement (although failure to do so shall not make such Notice ineffective), shall, unless otherwise stated herein, be in writing and shall be (i) personally delivered, (ii) sent by reputable overnight courier service, (iii) sent by certified or registered mail, postage prepaid and return receipt requested, or (iv) transmitted by telephone facsimile with electronic confirmation of receipt, in each case, as follows:

| | |
|---|---|
| if to the Delaware Trustee: | Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, Delaware 19808 |
| if to the Signatory Trustee: | Greeley Flats ST, LLC<br>16B Journey<br>Aliso Viejo, CA  92656<br>Attn:  Patrick Nelson |
| if  to the Initial Beneficiary: | Greeley Flats IB, LLC<br>16B Journey<br>Aliso Viejo, CA  92656<br>Attn:  Patrick Nelson |
| if to the Investors: | at the address and/or fax set forth in Exhibit A attached hereto and made a part hereof. |

or at such other address and telephone facsimile number as shall be designated, respectively, by the Trustees, the Initial Beneficiary or the Investors in a written notice to the other Persons receiving Notices pursuant to this Section. Notices given pursuant to this Section shall be deemed received upon the earliest of the following to occur: (i) upon personal delivery, (ii) on the fifth day following the day sent, if sent by registered or certified mail, (iii) on the next business day following the day sent, if sent by reputable overnight courier, and (iv) if transmitted by telephone facsimile, on the day sent if such day is a business day of the addressee and the telephone facsimile is received by the addressee by 5:00 p.m. local time of the addressee on such day and otherwise on the first business day of the addressee after the day that the telephone facsimile is sent.

11.03   Severability.  Any provision of this Trust Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.04   Separate Counterparts.  This Trust Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

11.05   Successors and Assigns.  All covenants and agreements contained herein shall be binding upon and inure to the benefit of the Trustees and their successors and assigns and the Investors and their respective successors

**GFI's Exhibit 18, Page 136 of 221**

EXHBIT C

and assigns, all as herein provided.  Any request, notice, direction, consent, waiver or other writing or action by the Investors shall bind their respective successors and assigns.

11.06    Usage of Terms.  With respect to all terms in this Trust Agreement, the singular includes the plural and the plural includes the singular; words importing any gender include the other gender; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all subsequent amendments thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Trust Agreement; references to Persons include their successors and permitted assigns; and the term "including" means including without limitation.

11.07    Headings. The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.08    Governing Law.  This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts to be performed entirely within such state, including all matters of construction, validity and performance. Each party to this Trust Agreement acknowledges and agrees that, except solely for the Act, the laws of the State of Delaware or of any other state or authority having jurisdiction over the Trust which pertain to trusts shall not apply to this Trust Agreement, and that the Act is the sole law pertaining to trusts that applies to this Trust Agreement. Each party to this Trust Agreement agrees to only bring suit in a court located in Orange County, California, and consents to personal jurisdiction therein.

11.09    Amendments.  Subject to Section 2.05 of this Agreement and any restrictions set forth in the Loan Documents, this Trust Agreement may be supplemented or amended by agreement of the Signatory Trustee and the Delaware Trustee to correct scrivener's errors, to clarify any ambiguities in the Trust Agreement or to reflect any changes to or otherwise comply with securities and tax law, *provided, however*, that no amendment or supplement shall be made if its effect would be that it would constitute a power under the Trust Agreement to "vary the investment" of the Investors within the meaning of Treasury Regulation Section 301.7701-4(c)(1).

11.10    Power of Attorney.  Each Investor hereby constitutes and appoints the Signatory Trustee, with full power of substitution and resubstitution, as his, her or its true and lawful agent and attorney in fact, with full power and authority in his, her or its name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (a) this Trust Agreement, all certificates, documents and other instruments, and all amendments thereof and hereof in accordance with the terms hereof which the Signatory Trustee deems appropriate or necessary to form, qualify or continue the qualification of the Trust as a Delaware statutory trust in the State of Delaware and in all other jurisdictions in which the Trust may conduct business or own property, or to effect the termination and dissolution of the Trust pursuant to the terms of this Trust Agreement, (b) in the event the circumstances described in Sections 9.02 and 9.03 of this Trust Agreement arise, the limited liability company agreement of the LLC into which the Trust is converted,  and all amendments thereof and hereof in accordance with the terms hereof which the Signatory Trustee (as Manager of such LLC) deems appropriate or necessary to form, qualify or continue the qualification of the LLC as a limited liability company in the State of Delaware and in all other jurisdictions in which the LLC may conduct business or own property, or to effect the termination and dissolution of the LLC pursuant to the terms of the operating agreement for the LLC; (c) all documents and instruments which the Signatory Trustee deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Trust Agreement in accordance with its terms and of the documents and instruments described in clause (a); (d) all conveyances, documents and other instruments which the Signatory Trustee deems appropriate or necessary to reflect the dissolution and liquidation of the Trust pursuant to the terms of this Agreement or a transfer of Interests pursuant to the terms of this Trust Agreement; and (e) all instruments relating to the admission, withdrawal or substitution of any Investor pursuant to the terms of this Trust Agreement. Each Investor authorizes the Signatory Trustee to take any further action that the Signatory Trustee shall consider necessary in connection with any of the foregoing, hereby giving the Signatory Trustee full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as fully as such Investor might or could do personally, and hereby ratifies and confirms all that the Signatory Trustee shall lawfully do, or cause to be done, by virtue thereof or hereof.  The foregoing power of attorney is irrevocable and coupled with an interest and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Investor and the transfer of all or any portion of his, her or its Interest and shall extend to such Investor's heirs, successors, assigns and personal representatives.

GFI's Exhibit 18, Page 137 of 221

**EXHBIT C**

11.11    <u>Waiver of Conflicts.</u>   The Investors acknowledge and agree that:  (i) this Trust Agreement was prepared by Mosley LLP ("Mosley") as legal counsel to the Trust, the Signatory Trustee and their Affiliates, and not to any Investor; (ii) the Investors are advised that the interests of the Investors may be opposed to each other and may be opposed to the interests of the Trust, the Signatory Trustee and their Affiliates and, accordingly, Mosley's limited representation as aforesaid may not be in the best interests of any particular Investor; (iii) each Investor is advised to retain separate legal counsel to review this Trust Agreement prior to its execution; and (iv) Mosley has in the past and will continue to represent the Trust, the Signatory Trustee and their respective Affiliates.  By signing this Trust Agreement, the Investors acknowledge that they (w) understand the terms of this Trust Agreement, (x) are entering into this Trust Agreement voluntarily and after having been afforded an opportunity to review this Trust Agreement with an attorney of their own selection, (y) have been advised to retain separate counsel and have either retained separate counsel or waived their right to do so at this time, and (z) jointly and severally forever waive any claim that Mosley's representation of the Trust, the Signatory Trustee and its Affiliates hereunder, and of the Trust, the Signatory Trustee and/or their respective Affiliates now and in the future on matters for which Mosley is retained as counsel by the Trust, the Signatory Trustee and/or their respective Affiliates constitutes a conflict of interest.

11.12    <u>Benefits of Agreement; No Third-Party Rights.</u>   None of the provisions of this Trust Agreement shall be for the benefit of or enforceable by any creditor of the Trust or by any creditor of the Initial Beneficiary; and nothing in this Trust Agreement shall be deemed to create any right in any Person not a party hereto.  Notwithstanding the foregoing, Lender and its successors or assigns are intended third-party beneficiaries of this Trust Agreement and may enforce this Trust Agreement against the Trustees or the Investors.

<div align="center">

**[SIGNATURE PAGE TO FOLLOW]**

</div>

**GFI's Exhibit 18, Page 138 of 221**

**EXHBIT C**

      **WHEREFORE**, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers as of the day and year first above written.

**INITIAL BENEFICIARY:**

Greeley Flats IB, LLC, a Delaware limited liability company

By: _____
Name: _____
Its:    Authorized Signatory

**DELAWARE TRUSTEE:**

Corporation Service Company, a Delaware corporation

By: _____
Name: _____
Its:    Authorized Signatory

**SIGNATORY TRUSTEE:**

Greeley Flats ST, LLC, a Delaware limited liability company

By: _____
Name: _____
Its:    Authorized Signatory

**GFI's Exhibit 18, Page 139 of 221**

APPENDIX A TO EXHBIT C


EXHIBIT A

SIGNATURE OF INVESTORS

INVESTOR SIGNATURE PAGE
TO THE TRUST AGREEMENT


The undersigned hereby covenants and agrees to be bound by the terms and conditions of the Trust Agreement.

ON BEHALF OF OR BY INDIVIDUAL INVESTOR(S):


_____          _____
Signature Investor #1                                        Signature Investor #2

_____          _____
Print Name                                                        Print Name



ON BEHALF OF OR BY AN ENTITY INVESTOR (trust, corporation, partnership, limited liability company):

NAME OF TRUST/ENTITY: _____



_____          _____
Signature of Authorized Person                          Signature of Authorized Person

_____          _____
Print Name / Title                                                Print Name / Title

**GFI's Exhibit 18, Page 140 of 221**

APPENDIX B TO EXHBIT C

EXHIBIT B

**FORM OPERATING AGREEMENT FOR LLC CREATED
PURSUANT TO SECTION 9.03(a) OF THIS AGREEMENT**

**OPERATING AGREEMENT
OF
GREELEY FLATS 2, L.L.C.**

THIS OPERATING AGREEMENT (this "**Agreement**") of Greeley Flats 2, L.L.C., a Delaware limited liability company (the "**Company**"), is made and entered into as of _____ (the "**Effective Date**"), by and among Greeley Flats, DST, a Delaware statutory trust (the "**DST**" or the "**Trust**"), Greeley Flats ST, LLC, a Delaware limited liability company (the "**Signatory Trustee**" or "**Manager**"), and the persons whose names are set forth on Exhibit A of this Agreement (the "**Members**").

**RECITALS:**

WHEREAS, pursuant to the Trust Agreement of the DST dated January _____ (the "**Trust Agreement**"), Greeley Flats ST, LLC, a Delaware limited liability company, is the signatory trustee of the DST, and the Members collectively own all of the beneficial interests in the DST (the Members in such capacity the "**Owners**");

WHEREAS, the DST owns the real estate comprised of the student housing apartment complex commonly known as the University Flats Apartments located at 1758 6th Avenue, Greeley Colorado, 8031 (the "**Real Estate**"), and certain incidental additional assets associated with the Real Estate (the Real Estate and all such additional assets collectively the "**Trust Property**"), which property is subject to the Loan Documents and the Master Lease;

WHEREAS, the Signatory Trustee has determined that, to conserve and protect the Trust Property, the DST must be converted to a limited liability company as provided in Sections 9.02 and 9.03 of the Trust Agreement; and

WHEREAS, pursuant to Section 9.03(a) of the Trust Agreement, the Company shall become the owner of the Trust Property (such property in the hands of the Company the "**Company Property**") which shall remain subject to the Loan Documents and the Master Lease, the Signatory Trustee shall become the manager of the Company, the Owners shall become Members of the Company, and the Trust shall be converted to a limited liability company, and that such transaction shall be characterized pursuant to Section 3821 of the Delaware Statutory Trust Act and Section 18-214 of the Delaware Limited Liability Company Act (the "**Act**") as a conversion of the Trust into the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein, the parties agree as follows:

**ARTICLE I
FORMATION OF COMPANY**

1.1     Authority.  The Company has been formed in accordance with the requirements of the Act and Greeley Flats ST, LLC, a Delaware limited liability company, has been designated the manager of the Company (the "**Manager**").  The Manager shall have the authority to perform such other filings, recordings and actions and will comply with all formation requirements under the Act and the laws of such other states in which the Company elects to do business.

1.2     Membership; Rights and Obligations.  Upon the consummation of the transactions described in the Recitals, the Members will be members of the Company.  Except as otherwise provided herein, the rights and obligations of the Company and the Members will be governed by the Act.

1.3     Name.  The name of the Company is "**Greeley Flats 2, L.L.C.**" and its affairs will be conducted under the Company name or such other name(s) as the Manager may select.  The Manager will execute and file with the proper offices any and all certificates required by the fictitious name or assumed name statutes of the states in

GFI's Exhibit 18, Page 141 of 221

**APPENDIX B TO EXHBIT C**

which the Company elects to do business.  The Company will have the exclusive ownership of and right to use the Company name.

1.4     Purposes of the Company.  The purposes of the Company are: (i) to manage and dispose of, finance and refinance the Company Property; (ii) to assume and to satisfy the obligations of the DST and the Signatory Trustee as set forth in the Loan Documents and the Master Lease; and (iii) to engage in such other activities, enterprises, ventures and undertakings permitted under this Agreement and/or the Act that are necessary or appropriate to the foregoing purposes.

1.5     Characterization.  It is the intention of the Manager and the Members that the Company constitutes a partnership for federal, state and local income tax purposes.  Each Member will report its Membership Interest in a manner consistent with the foregoing, and neither the Manager nor any Member will take any action inconsistent with the foregoing.

1.6     Principal Office of the Company.  The principal office of the Company shall be 16B Journey, Aliso Viejo, California 92656, or at such other place as the Manager may designate.  The Company may have other offices in such place or places as selected by the Manager.

1.7     Registered Office and Registered Agent.  The name and address of the registered agent of the Company in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Wilmington, Delaware 19808.  The Manager may from time to time in accordance with the Act change any of the Company's registered agents and/or registered offices and designate a registered agent and registered office in each state the Company is required to maintain or appoint one.

1.8     Term of Existence of the Company.  The term of the Company commenced upon the filing of its Certificate of Formation with the Secretary of State of Delaware and will be perpetual unless sooner terminated as provided in Article VIII.

**ARTICLE II**
**MEMBERSHIP INTERESTS; CAPITAL CONTRIBUTIONS**

2.1     Membership Interest.  Each Member's percentage ownership interest in the Company shall be equal to such Member's beneficial ownership interest in the DST immediately prior to the transactions described in the Recitals.  The amount of each Member's percentage ownership interest in the Company ("**Membership Interest**") is set forth opposite such Member's name on Exhibit A hereto.

2.2     Capital Contributions.

(a)     Each Member will be credited with an initial capital contribution ("**Capital Contribution**") in the amount set forth opposite such Member's name on Exhibit A hereto.

(b)     The Manager may request at any time that the Members make additional Capital Contributions to the Company on a pro rata basis in proportion to each Member's Membership Interest.  The Members are not required to comply with any such request.  The Manager shall adjust the Members' Capital Contributions and Membership Interests set forth on Exhibit A hereto to equitably reflect any additional capital contributions made by Members.

2.3     Subordination to Loan Documents. While the Loan Documents remain in effect, any and all rights of Members pursuant to the terms of this Agreement are subordinated to the rights of the Lender under the Loan Documents.

**GFI's Exhibit 18, Page 142 of 221**

APPENDIX B TO EXHBIT C

**ARTICLE III**
**ACCOUNTING, ALLOCATIONS AND DISTRIBUTIONS**

3.1     <u>Books of Account</u>.

(a)     The Manager shall maintain the books of account of the Company.

(b)     The books of account will be closed promptly after the end of each calendar year, which will be the Company's fiscal year ("**Fiscal Year**").  Promptly after the close of the Fiscal Year, the Company will cause to be prepared such partnership income tax and other returns required under applicable law and regulation, including any and all statements necessary to advise all Members promptly about their investment in the Company for federal income tax reporting purposes.  The Manager will be responsible for the prompt filing and delivery of all such returns and statements.  All elections and options available to the Company for tax purposes will be taken or rejected by the Company in the sole discretion of the Manager.

3.2     <u>Capital Accounts</u>. A separate capital account ("**Capital Account**") will be maintained for each Member. Each Member's initial Capital Account shall be equal to the amount set forth opposite such Member's name on <u>Exhibit A</u> hereto.  Thereafter, each Member's Capital Account will, *inter alia*, be increased by (i) any amount of money contributed by such Member to the Company, (ii) the fair market value of any property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752) and (iii) allocations to such Member of Company income and gain (or items thereof), including income and gain exempt from tax; and decreased by (iv) the amount of money distributed to such Member (as a Member) by the Company, (v) the fair market value of property distributed to such Member (as a Member) by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752), (vi) allocations to such Member of expenditures of the Company described in Code Section 705(a)(2)(B) and (vii) allocations to such Member of Company loss and deduction (or items thereof).

3.3     <u>Profit and Loss Allocations</u>.  Except as otherwise required by Code Section 704 and the Treasury Regulations thereunder, net profit or net loss of the Company, determined for income tax purposes, will be allocated to the Members pro rata with their Membership Interests.

3.4     <u>Special Tax Allocations</u>.  In accordance with Code Sections 704(b) and 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any asset contributed to the capital of the Company will, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution to the Company.

3.5     <u>Distributions</u>.

(a)     Company "Cash Flow" for any Fiscal Year will consist of all cash received by the Company (other than as a capital contribution) <u>less</u> cash expenditures for Company debts, expenses, capital expenditures and reasonable reserves as determined by the Manager in its sole discretion.

(b)     Company Cash Flow for any Fiscal Year will be distributed to the Members in proportion to their Membership Interests.

(c)     No Member has the right to partition, or otherwise demand an in-kind distribution of, the Company Property.  If the Company distributes Company Property to the Members, the fair market value of such property at the time of such distribution will be determined by the Manager in its sole discretion, and any such distribution will be made to the Members in proportion to their Membership Interests.

(d)     No distribution shall be made to any Members, if such distribution would violate applicable law or constitute a default under the Loan Documents.

C-20

APPENDIX B TO EXHBIT C

**ARTICLE IV**
**RIGHTS, DUTIES, LIABILITIES AND RESTRICTIONS OF THE MANAGER**

4.1     <u>The Manager</u>.

(a)     Except solely as provided in Section 4.1(b) with respect to Major Decisions (as defined below), the Manager will have the sole and exclusive right to manage, control and conduct the affairs of the Company and to manage the Company Property.

(b)     Notwithstanding the foregoing, after satisfaction of all of the Company's obligations with respect to the Loan or arising pursuant to the terms and conditions of the Loan Documents, the following actions (the "**Major Decisions**") will require the consent of Members holding a Majority of the Membership Interests:  (i) entering into any agreement for the sale, transfer, or exchange of all or any substantial portion of the Trust Property; (ii) entering into, modifying, extending, renewing or canceling any lease with respect to the Trust Property or any portion thereof; (iii) entering into, modifying, extending, renewing or canceling any agreement pertaining to any indebtedness to be secured in whole or in part by any mortgage, pledge, lien or other encumbrance upon the Trust Property (other than the assumption by the Company the obligations of DST under the Loan Documents, consent to which is deemed to have been given); (iv) admitting new Members to the Company in exchange for Capital Contributions by such persons to the Company; (v) dissolving and winding up the Company; or (vi) amending this Agreement; *provided, however,* subject to Section 4.3, this Agreement may be supplemented or amended by the Manager in its sole discretion to correct scrivener's errors, to clarify any ambiguities in this Agreement, to reflect transfers or issuances of Membership Interests or changes in the Capital Contributions of the Members, or to reflect any changes to or otherwise comply with securities and tax law.  The consent of the Members to any Major Decision shall be determined as provided in Section 5.1.

4.2     <u>Intentionally Omitted</u>.

4.3     <u>Limitation on Authority; Separateness</u>.  This Section 4.3 is being adopted in order to, among other things, comply with certain provisions of the Loan documents necessary to qualify the Company as a "special purpose entity."

(a)     Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, the Manager or the Members, so long as any obligation evidenced or secured by any of the Loan Documents remains outstanding and not discharged in full and the lien of the mortgage has not been released, neither the Manager, the Members nor any other Person on behalf of the Company shall have any authority to do any of the following without the Lender's prior written consent:

(i)     perform any act in contravention of or constituting an event of default under the Loan Documents;

(ii)     borrow money or incur indebtedness other than normal trade accounts payable and lease obligations in the normal course of business, or grant consensual liens on the Company's property other than in connection with the Loan;

(iii)     to the fullest extent permitted by law, dissolve, wind-up or liquidate under Section 18-801 of the Act;

(iv)     sell, distribute in partition, lease, or otherwise dispose of, all or substantially all of its assets except simultaneously with a permitted repayment of the Loan;

(v)     engage in any business or activity other than those set forth in Section 1.4; and

(vi)     amending any provision of this Agreement unless the Lender consents in writing.

GFI's Exhibit 18, Page 144 of 221

### APPENDIX B TO EXHBIT C

(b)     Notwithstanding any other provision of this Agreement, so long as any obligation evidenced or secured by any of the Loan Documents remains outstanding and not discharged in full and the lien of the mortgage has not been released, the Company shall (and the Manager and the Members shall cause the Company at all times to):

(i)     observe statutory formalities with respect to the administration of the Company and in the conduct of the Company's activities; and

(ii)     prepare separate financial statements and file its tax returns, if any, separate from those of any other Person, and not file consolidated tax returns with any other Person;

(c)     Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Members or the Managers, so long as any obligation evidenced or secured by the Loan Document remains outstanding, neither the Members nor the Managers nor any other Person on behalf of the Company shall be authorized or empowered to, nor shall they permit the Company, without the unanimous prior written consent of the Manager, to the fullest extent permitted by law, to take any action that might cause the Company to become insolvent, or to file a voluntary petition or otherwise initiate proceedings to be adjudicated bankrupt or insolvent, or to consent to the institution of bankruptcy or insolvency proceedings against the Company, or to file a petition seeking or consenting to reorganization or relief of the Company as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Company; or to seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or of all or any substantial part of the properties and assets of the Company, or to make any general assignment for the benefit of creditors of the Company, or to admit in writing the inability of the Company to pay its debts generally as they become due or to declare or effect a moratorium on the Company debt or to take any action in furtherance of any such action.

(d)     Failure of the Company, or the Members or the Manager on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Company as a separate legal entity or the limited liability of the Member or the Manager.

(e)     Notwithstanding any provisions of this Agreement, so long as the Loan remains outstanding, the Manager also shall cause the Company to and the Company shall comply with the provisions set forth on Exhibit B.

4.4     <u>Duties and Responsibilities of the Manager</u>.  The business and affairs of the Company shall be managed by or under the direction of the Manager and in connection therewith the Manager shall have and exercise all powers necessary or convenient to effect any or all of the purposes for which the Company is organized. The Manager need not devote full time to the Company's business, but shall devote such timed as the Manager, in its discretion, deems necessary to fulfill the management responsibilities of the Manager.

4.5     <u>Officers of the Company</u>.  The Manager may appoint one or more persons to serve as officers of the Company, in such capacities and with such delegated rights and powers as the Manager may approve; provided, however, that no such officer will have any different or greater rights and powers than the Manager.  The Manager may provide that compensation be paid to persons who provide services to the Company as officers.

4.6     <u>Expenditures by Manager</u>.  Subject to the terms and conditions of the Loan Documents, the Company will reimburse the Manager and its Affiliates for any costs and expenses reasonably incurred by them on behalf of the Company.  Specifically, the Manager is authorized to enter into an asset management agreement with a third party or an affiliate of the Manager for a fee not to exceed 1% of gross income per year (prorated for any partial year).

4.7     <u>Potential Conflicts</u>.  The Company may purchase goods or services from the Manager or its Affiliates, provided that all such transactions will be conducted on commercially reasonable terms.  The Manager may engage in business ventures of any nature and description independently or with others, including, but not limited to,

**GFI's Exhibit 18, Page 145 of 221**

## APPENDIX B TO EXHBIT C

the business or businesses engaged in by the Company, and neither the Company nor any of the other Members will have any rights in or to such independent ventures or the profits derived therefrom.

4.8    Liability of Manager.  The Manager will not be liable to any Member or the Company for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith for a purpose that was reasonably believed to be in the best interests of the Company, or for losses due to such mistakes, action or inaction, or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Company.  The Manager may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, provided that they will have been selected with reasonable care.  The Members will look solely to the Company Property for the return of their capital and, if the assets of the Company remaining after payment or discharge of the debts and liabilities of the Company are insufficient to return such capital, they will have no recourse against the Manager for such purpose.  Notwithstanding any of the foregoing to the contrary, the provisions of this Section will not relieve the Manager of any liability by reason of the gross negligence, willful misconduct or intentional wrongdoing or to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but will be construed so as to effectuate the provisions of this Section to the fullest extent permitted by law.

4.9    Indemnification.  The Company agrees: (a) to reimburse the Manager for all reasonable expenses (including reasonable fees and expenses of counsel and other professionals) incurred in connection with the performance of their duties under this Agreement: (b) to the fullest extent permitted by law, to indemnify the Manager, its owners, officers, directors, members, employees, agents and other Affiliates (collectively the "**Manager Indemnified Parties**" and each a "**Manager Indemnified Party**") and hold the Manager Indemnified Parties harmless, in their individual capacities, from and against, any and all liabilities, obligations, losses, damages, taxes, claims, actions, suits, costs, expenses and disbursements including reasonable legal fees and expenses which may be imposed on, incurred by or asserted at any time against them, in their individual capacities (and not indemnified against by other Persons) which relate to or arise out of the operation of the Company (including this Agreement and all transactions and documents contemplated thereby) (all such items collectively the "**Indemnified Costs**"), provided, however, that the Company shall not be required to indemnify any Company Indemnified Party with respect to any willful misconduct or gross negligence with respect to the Company on the part of such Manager Indemnified Party to the extent such Manager Indemnified Party is adjudged (as provided in subsection (c) below) to have engaged in such willful misconduct or gross negligence with respect to the Company; and (c) to the fullest extent permitted by law, to advance to each such Manager Indemnified Party the Indemnified Costs incurred by such Manager Indemnified Party in defending any claim, demand, action, suit or proceeding arising out of the operation of the Company (including this Agreement and all transactions and documents contemplated thereby) prior to the final disposition of such claim, demand, action, suit or proceeding, upon receipt by the Company of an undertaking by or on behalf of such Manager Indemnified Party, to repay such amount if a court of competent jurisdiction renders a final, non-appealable judgment that includes a specific finding of fact that such Manager Indemnified Party is not entitled to indemnification pursuant to this Section 4.9 (i.e., because such court of competent jurisdiction specifically finds that such Manager Indemnified Party engaged in willful misconduct or gross negligence with respect to the Company). The obligations of the Company pursuant to this Article VIII shall survive the resignation or removal of any Manager, the disposition of the Company Property, the termination of the Company, or the amendment, supplement or restatement of this Agreement.  So long as any obligation evidenced or secured by the Loan Documents is outstanding, no indemnity payment from funds of the Company (as distinct from funds from other sources, such as insurance) of any indemnity pursuant to this Section 4.9 shall be payable from amounts allocable to the Lender pursuant to the Loan Documents.  Any indemnification set forth in this Agreement shall be fully subordinate to the Loan and shall not constitute a claim against the Company in the event its cash flow is insufficient to pay its obligations, nor shall it constitute a claim against any owner of an interest in the Company.

4.10    Successor to Manager.  If the Manager resigns, a successor manager will be selected by Members holding a Majority of the Membership Interests.

4.11    Tax Matters Member.  The Manager will be the Company's Tax Matters Partner as defined in Code Section 6231(a)(7) (the "**TMP**").  The TMP will have the right to resign as such by giving 30 days written notice to the Members.  Upon the resignation of the TMP, a successor TMP will be selected by the Manager.  The TMP will employ experienced tax counsel to represent the Company in connection with any audit or investigation of the Company by the Internal Revenue Service (the "**Service**") and in connection with all subsequent administrative and

GFI's Exhibit 18, Page 146 of 221

APPENDIX B TO EXHBIT C

judicial proceedings arising out of such audit. The Company will not be obligated to pay any compensation to the TMP in its capacity as such; provided, however, that all reasonable expenses incurred by the TMP in serving as the TMP will be Company expenses and the TMP will be reimbursed by the Company in accordance with Section 4.6 above. The TMP will keep the Members informed of all administrative and judicial proceedings, as required by Code Section 6223(g), and will furnish to each Member who so requests in writing a copy of each notice or other communication received by the TMP from the Service, except such notices or communications as are sent directly to such Member by the Service.

## ARTICLE V
## MEMBERS

5.1     <u>Powers of the Members</u>.  Except as otherwise provided in the Agreement, as to any matters on which the Members have a right to vote such vote shall require an affirmative vote of a Majority in Interests of the Members voting.

5.2     <u>Liability</u>.  No Member will be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount of such Member's Capital Contribution to the Company.

5.3     <u>Meetings of the Members</u>.  A meeting of the Members may be called at any time by the Manager or by Members holding more than twenty five percent (25%) of the Membership Interests.  The meetings will be held at the Company's principal place of business or any other place designated by the Manager.  The Manager will give the Members at least ten (10) days prior written notice stating the time, place and purpose of the meeting.  At a meeting of the Members, the presence of Members holding more than fifty percent (50%) of the Membership Interests, in person or by proxy, will constitute a quorum.  A Member may vote either in person or by written proxy signed by the Member or by his, her or its duly authorized attorney in fact.  Persons present by telephone will be deemed to be present "in person" for purposes hereof.

5.4     <u>Removal of Manager</u>.  Notwithstanding any other provision of this Agreement (but subject to the terms and conditions of the Loan Documents), a Manager can be removed and its successor chosen by Members holding at least seventy five percent (75%) of the Membership Interests for cause by giving written notice to the Manager.  As used in the preceding sentence, "Cause" shall mean the willful misconduct, fraud or gross negligence of the Manager, as determined by a final, nonappealable judgment of a court of competent jurisdiction. Notwithstanding the foregoing, (a) so long as any obligation evidenced or secured by the Loan Documents remains outstanding and not discharged in full, the consent of the Lender shall also be required for removal of a Manager and appointment of a successor Manager, and (b) the removal of the Manager shall not be effective without the prior written consent of the Manager until the Manager and each of its Affiliates have been fully removed from any guarantee and indemnity obligations they may have with respect to the Loan.

## ARTICLE VI
## ASSIGNMENT PROVISIONS

6.1     <u>Transfers by Members</u>.

(a)     Subject to Section 6.1 (b) and Section 6.2, a Member may Transfer some or all of its Membership Interests in the Company.  For purposes hereof, "Transfer" means, when used as a noun, any sale, hypothecation, pledge, assignment, gift, and other transfer, be it voluntary or involuntary, to any person, inter vivo, testamentary, by operation of laws of devise and descent or other laws, and, when used as a verb, to sell, hypothecate, pledge, assign, gift, or otherwise transfer to any person, be it voluntarily or involuntarily, inter vivo, testamentary, by operation of the laws of devise or descent or any other laws.

(b)     Notwithstanding anything contained herein to the contrary, no Transfer of any Membership Interest will be permitted if such Transfer would: (i) be in contravention of or constitute an event of default under the Loan Documents; (ii) result in a termination of the Company for federal income tax purposes that would have a material adverse effect on the Company or any of the Members; (iii) result in the Company not qualifying for an exemption from the registration requirements of any applicable federal or state securities laws; (iv) result in any

GFI's Exhibit 18, Page 147 of 221

violation of any applicable federal or state securities laws; (v) result in the Company having to register as an investment company under the Investment Company Act of 1940, as amended; (vi) require the Company, the Manager or any Affiliate of the Manager to register as an investment advisor under the Investment Advisers Act of 1940, as amended, or (vii) cause the Company Property to become "plan assets" (as defined in the Plan Asset Rules) subject to the fiduciary standards of Part 4 of Subtitle B of Tile I of ERISA and Code Section 4975.

6.2     <u>General Provisions</u>.  The following rules will apply to the Transfer of membership interests in the Company:

(a)     no person will be admitted as a substitute member hereunder unless and until: (i) the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by the Manager; (ii) the prospective assignee executes and delivers to the Company a written agreement, in form and substance satisfactory to the Manager, pursuant to which said person agrees to be bound by this Agreement; and (iii) an appropriate amendment hereto is executed and, if required, filed of record;

(b)     the effective date of admission of a substitute member will be no earlier than the date that the documents specified in subsection (a) above are delivered to and accepted by the Manager;

(c)     the Company and the Manager will treat the assignor of the assigned interest as the absolute owner thereof and will incur no liability for distributions made in good faith to such assignor prior to such time as the documents specified in subsection (a) above have been delivered to and accepted by the Manager;

(d)     unless admitted as a substitute member to the Company by the Manager, the assignee or transferee of an interest in the Company hereunder will not be entitled to become or exercise any rights of a Member, but will, to the extent of the interest acquired, be entitled only to the predecessor Member's share of distributions from the Company. No person, including the legal representatives, heirs or legatees of a deceased Member, will have any rights or obligations greater than those set forth herein and no person will acquire an interest in the Company or become a Member except as permitted hereby. Substitute Members admitted pursuant to Section 6.2 (a) will be entitled to all of the rights and privileges of the original Members hereunder and will be subject to all of the obligations and restrictions hereunder, and in all other respects their admission will be subject to all of the terms and provisions hereof;

(e)     the costs incurred by the Company in processing an assignment (including attorney's fees) will be borne by the assignee, and will be payable prior to and as a condition of any distribution of cash or property; and

(f)     upon the Transfer of a Membership Interest which satisfies Section 6.2, <u>Exhibit A</u> to this Agreement will be revised to reflect such Transfer.

### ARTICLE VII
### ADMISSION OF ADDITIONAL MEMBERS; RESIGNATIONS AND WITHDRAWALS

7.1     <u>Admission of Additional Members</u>.

(a)     Subject to compliance with applicable securities laws, the Loan Documents and this Agreement, the Manager, in its sole discretion, may admit new Members in exchange for Capital Contributions by such persons to the Company in an amount as determined by the Manager in its sole discretion.  The Members hereby grant the Manager the power of attorney to amend the Company's Articles of Organization and this Agreement to effect any issuance of Membership Interests pursuant this subsection.  Upon the admission of any new Members to the Company, the Manager shall adjust the Members' Membership Interests set forth on <u>Exhibit A</u> hereto to equitably reflect the Capital Contributions made by new Members.

GFI's Exhibit 18, Page 148 of 221

APPENDIX B TO EXHBIT C

(b)     Additional Members admitted pursuant to Section 7.1(a) will be entitled to all of the rights and privileges of the original Members hereunder and will be subject to all of the obligations and restrictions hereunder, and in all other respects their admission will be subject to all of the terms and provisions hereof.

(c)     No Member shall have any preemptive or similar rights to increase or maintain such Member's Membership Interest in the Company.

7.2     <u>Resignations and Withdrawals</u>.  A Member who withdraws from the Company will forfeit all Membership Interests and rights as a Member, including its right to receive any distributions from the Company and the right to vote.  Upon the withdrawal of a Member, the Company will not have any obligation to purchase such Member's Membership Interests or any part thereof.  The Manager shall adjust the Members' Membership Interests set forth on Exhibit A hereto to equitably reflect the withdrawal of a Member.

<div align="center">

**ARTICLE VIII**
**TERMINATION AND WINDING UP**

</div>

8.1     <u>Termination</u>.

(a)     The Company will terminate upon the earliest to occur of the following:

(i)     The Manager and Members holding a Majority of the Membership Interests vote to terminate the Company or convert it into a different legal entity pursuant to Delaware Law; or

(ii)     The Company's sale, exchange or other disposition of all of the Company Property.

(b)     Notwithstanding the foregoing, or any other provision of this Agreement to the contrary, for so long as the Company's obligations under the Loan Documents remain outstanding, the Company may not be terminated without the prior written consent of the Lender.

(c)     This Agreement generally and Article VIII in particular will govern the conduct of the parties during the winding up of the Company.

8.2     <u>Liquidation Procedures</u>.  Upon termination of the Company, the Company's affairs will be wound up and the Company will be dissolved.  A proper accounting will be made of the profit or loss of the Company from the date of the last previous accounting to the date of termination.

8.3     <u>Liquidating Trustee</u>.  Upon the winding up of the Company, the Manager will act as the liquidating trustee or will appoint a liquidating trustee.  The liquidating trustee will have full power to sell, assign and encumber the Company Property.  All certificates or notices thereof required by law will be filed on behalf of the Company by the liquidating trustee.

8.4     <u>Distribution on Winding Up</u>.  The proceeds of liquidation will be applied by the end of the taxable year in which the liquidation occurs or, if later, within ninety (90) days after the date of such liquidation, in the following order:

(a)     first, to the creditors of the Company, in the priority and to the extent provided by law; and

(b)     thereafter, to the Members in proportion to their Membership Interests.

8.5     <u>No Dissolutions</u>.  The bankruptcy, death, dissolution, liquidation, termination or adjudication of incompetency of a Member shall not cause the termination or dissolution of the Company and the business of the Company shall continue.  Upon any such occurrence, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member (an "**assignee**") shall have all the rights of such Member for the purpose of settling or managing its estate or property, subject to satisfying conditions precedent to the admission of such assignee

**GFI's Exhibit 18, Page 149 of 221**

APPENDIX B TO EXHBIT C

as a substitute Member.  The Transfer by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Membership Interest shall be subject to all of the restrictions, hereunder to which such transfer would have been subject if such transfer had been made by such bankrupt, deceased, dissolved, liquidated, terminated or incompetent Member.

## ARTICLE IX
## GENERAL PROVISIONS

9.1     <u>Definitions</u>.  The following terms not otherwise defined herein will have the meanings ascribed to them below:

(a)     "Affiliate" (whether or not such term is capitalized) shall mean, with respect to any specified Person any other Person owning beneficially, directly or indirectly, any ownership interest in such specified Person or directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.

(b)     "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(c)     "Control" (whether or not such term is capitalized) when used with respect to any specified Person, shall mean the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.  Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, forty nine percent (49%) or more of the ownership interests.

(d)     "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

(e)     [Intentionally omitted].

(f)      "Lender" or "Lenders" shall mean Arbor Commercial Funding I, LLC, and its successors and assigns with respect to the Loan.

(g)     "Loan" or "Loans" shall mean the loan from Lender in the approximate amount of Thirteen Million Three Hundred One Thousand Dollars and No/100 Dollars ($13,301,000), as evidenced and secured by the Loan Documents.

(h)     "Loan Documents" shall mean any and all documents evidencing or securing the Loan or any assumptions thereof including, without limitation, any promissory note, mortgage, assignment of leases and rents, indemnity agreement, guaranty certificate, escrow agreement, consent or subordination agreement or the functional equivalent of any of the aforementioned, and any and all other documents related to the Loan.

(i)     "Majority" shall mean at least fifty-one percent (51%).

(j)     "Master Lease" shall mean that certain Master Lease between the Trust, as landlord, and the Master Tenant, as tenant, with respect to the Real Estate.

(k)     "Master Tenant" shall mean Greeley Flats LeaseCo, LLC, a Delaware limited liability company.

(l)     "Person" (whether or not such term is capitalized) shall mean a natural person, corporation, limited partnership, general partnership, limited liability company, joint stock company, joint venture, association,

**GFI's Exhibit 18, Page 150 of 221**

**APPENDIX B TO EXHBIT C**

company, trust, bank trust company, land trust, business trust, statutory trust or other organization, whether or not a legal entity, and a government or agency or political subdivision thereof.

(m)     "Plan Asset Rules" shall mean 29 Code of Federal Regulations Section 2510.3-101, as amended from time to time.

(n)     "Section" shall mean a section in this Agreement unless the context clearly indicates otherwise.

(o)     "Treasury Regulations" shall mean U.S.  Treasury Regulations promulgated under the Code.

9.2     Notices.  All notices, offers or other communications required or permitted to be given pursuant to this Agreement will be in writing and will be considered as properly given or made upon personal delivery or on the third business day following mailing from within the United States by first class United States mail, postage prepaid, certified mail return receipt requested, and addressed to the address of the Company set forth in Section 1.6, if to the Company, and to the address beneath a Member's name on the signature pages hereto, if to a Member.  Any Member may change its address by giving fifteen (15) days advance written notice stating its new address to the Manager. Commencing with the giving of such notice, such newly designated address will be such Member's address for purposes of all notices or other communications required or permitted to be given pursuant to this Agreement.

9.3     Third Party Reliance.  Third parties dealing with the Company shall be entitled to conclusively rely on the signature of the Manager and/or any officer of the Company to bind the Company.

9.4     Successors.  This Agreement and all the terms and provisions hereof will be binding upon and will inure to the benefit of all Members and their legal representatives, heirs, successors and permitted assigns, except as expressly herein otherwise provided.

9.5     Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts to be performed entirely within such state, including all matters of construction, validity and performance. Each party to this Agreement acknowledges and agrees that, except solely for the Act, the laws of the State of Delaware or of any other state or authority having jurisdiction over the Company which pertain to limited liability companies shall not apply to this Agreement, and that the Act is the sole law pertaining to limited liability companies that applies to this Agreement.  Each party to this Agreement agrees to only bring suit in a court located in Orange County, California, and consents to personal jurisdiction therein**.**

9.6     Counterparts.  This Agreement may be executed in counterparts, each of which will be an original, but all of which will constitute one and the same instrument.

9.7     Pronouns and Headings.  As used herein, all pronouns will include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction. The headings, titles and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

9.8     Members Not Agents.  Nothing contained herein will be construed to constitute any Member as the agent of another Member or in any manner to limit the Members in the carrying on of their own respective businesses or activities.

9.9     Entire Understanding.  This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.

9.10     Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstance, is held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid by such court, will not be affected thereby.

## APPENDIX B TO EXHBIT C

9.11    Further Assurances.   Each of the Members will hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.  Recognizing that the Company may find it necessary from time to time to establish to third parties, such as accountants, banks, mortgagees or the like, the then current status of performance hereunder, each Member agrees, upon the written request of the Manager to furnish promptly a written statement of the status of any matter pertaining to this Agreement or the Company to the best of the knowledge and belief of the Member making such statements.

9.12    Benefits of Agreement.  No Third-Party Rights.   None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of any Member and nothing in this Agreement shall be deemed to create any right in any Person (other than the Manager with respect to indemnity under Section 4.9) not a party hereto.  This Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person, except as provided in this Section 9.12.  Notwithstanding anything to the contrary contained herein, the Lender and its successors or assigns are intended third-party beneficiaries of Section 4.3 of this Agreement and may enforce this Agreement against the Manager or the Members.

9.13    Waiver of Partition; Nature of Interest.  To the fullest extent permitted by law, and not withstanding any provision in this Agreement to the contrary, each of the Members, and any additional and substitute members admitted to the Company hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.  No Member shall have any interest in any specific assets of the Company, and no Member shall have the status of a creditor with respect to any distribution pursuant to Section 3.5 hereof.  The interest of each Member in the Company is personal property.

9.14    Power of Attorney.   Each Member hereby constitutes and appoints the Manager, with full power of substitution and resubstitution, as his true and lawful agent and attorney in fact, with full power and authority in his name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (a) this Agreement, all certificates, documents and other instruments (including the Certificate of Formation of the Company), and all amendments thereof and hereof in accordance with the terms hereof which the Manager deems appropriate or necessary to form, qualify or continue the qualification of the Company as a limited liability company in the State of Delaware and in all other jurisdictions in which the Company may conduct business or own property, or to effect the termination and dissolution of the Company pursuant to the terms of this Agreement; (b) all documents and instruments which the Manager deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement in accordance with its terms and of the documents and instruments described in clause (a); (c) all conveyances, documents and other instruments which the Manager deems appropriate or necessary to reflect the dissolution and liquidation of the Company pursuant to the terms of this Agreement or a transfer of Membership Interests pursuant to the terms of this Agreement; and (d) all instruments relating to the admission, withdrawal or substitution of any Member pursuant to the terms of this Agreement.  Each Member authorizes the Manager to take any further action that the Manager shall consider necessary in connection with any of the foregoing, hereby giving the Manager full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as fully as such Member might or could do personally, and hereby ratifies and confirms all that the Manager shall lawfully do, or cause to be done, by virtue thereof or hereof.  The foregoing power of attorney is irrevocable and coupled with an interest and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Member and the transfer of all or any portion of his Membership Interest and shall extend to such Member's heirs, successors, assigns and personal representatives.

### [SIGNATURE PAGE TO FOLLOW.]

**APPENDIX B TO EXHBIT C**

**COUNTERPART SIGNATURE PAGE**
**OPERATING AGREEMENT**
**OF**
**GREELEY FLATS 2, L.L.C.**

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement this _____ day of _____, _____.

MANAGER:

Greeley Flats ST, LLC, a Delaware limited liability company

By: _____
Name: _____
Its:     Authorized Signatory

MEMBER:

_____
Signature

_____
Print Name

_____
Address

_____
City, State & Zip Code

C-30

**GFI's Exhibit 18, Page 153 of 221**

**ANNEX A TO APPENDIX B TO EXHBIT C**

**EXHIBIT A OF OPERATING AGREEMENT**
**OF GEELEY FLATS 2, L.L.C.**

| NAME AND ADDRESS OF MEMBER | CAPITAL CONTRIBUTION | INITIAL CAPITAL ACCOUNT | MEMBERSHIP INTEREST |
|---|---|---|---|
| _____ _____ _____ | | | |
| _____ _____ _____ | | | |
| _____ _____ _____ | | | |
| _____ _____ _____ | | | |
| _____ _____ _____ | | | |
| _____ _____ _____ | | | |
| _____ _____ _____ | | | |
| _____ _____ _____ | | | |

C-31

ANNEX B TO APPENDIX B TO EXHBIT C

EXHIBIT B OF OPERATING AGREEMENT
OF GREELEY FLATS 2, L.L.C.

SPE Provisions

During the term of the Loan, the Company (hereinafter referred to as Borrower and Special Purpose Entity) shall comply with the provisions listed below.  For purposes of this Exhibit, all capitalized terms shall have the meanings ascribed to them in the Loan Agreement:

(a)      is organized solely for the purpose of (i) in the case of Borrower, acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, obtaining the Loan from Lender and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing; (ii) in the case of Master Lessee, owning, managing and operating the leasehold interest in the Property and the tenant's interest in the Master Lease; or (iii) in the case of Signatory Manager, acting as signatory Manager of Borrower;

(b)      has not engaged, does not engage, and will not engage in any business other than (i) in the case of Borrower, the ownership, management and operation of the Property, (ii) in the case of Master Lessee, the ownership, management and operation of the leasehold interest in the Property and the tenant's interest in the Master Lease, and (iii) in the case of Signatory Manager, acting as signatory Manager of Borrower;

(c)      has not owned, does not own and will not own any asset or property other than (i) in the case of Borrower, (A) the Property and (B) incidental personal property necessary for the ownership, management or operation of the Property, (ii) in the case of Master Lessee, (A) the leasehold interest in the Property and tenant's interest in the Master Lease and (B) incidental personal property necessary therefor, and (iii) in the case of Signatory Manager, (A) the rights as signatory Manager of Borrower and (B) incidental personal property necessary therefor;

(d)      has not engaged in, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, or transfer of its partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company);

(e)      has preserved and will preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation and will not without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its Organizational Documents, or consent to or suffer the amendment, modification, termination or breach of any of the Organizational Documents, or amend, modify, terminate or fail to comply with, or consent or suffer the amendment, modification, termination or breach of any Organizational Documents of any entity in which it owns an interest;

(f)      has not owned and will not own any subsidiary or make any investment in, any person or entity;

(g)      has not commingled and will not commingle its assets with the assets of any of its general partners, managing members, Managers, shareholders, Affiliates, principals or of any other person or entity;

(h)      has not incurred and will not incur any Indebtedness, other than, (i) with respect to Borrower (A) the Debt and (B) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding five percent (5%) of the original principal amount of the Loan at any one time; provided that any Indebtedness incurred pursuant to clause (B) shall be (1) outstanding not more than sixty (60) days and (2) incurred in the ordinary course of business (ii) in the case of Master Lessee unsecured trade payables incurred in the ordinary course of business related to the Master Lease that (A) do not exceed at any one time $100,000.00, and (B) are paid within thirty (30) days after the date incurred, and (iii) in the case of Signatory Manager, unsecured trade payables incurred in the ordinary course of business related to the ownership of an interest in Borrower that (A) do not exceed at any one time $100,000.00, and (B) are paid within thirty (30) days after the date incurred.  No Indebtedness, other than the Debt, may be secured (senior, subordinate or pari passu) by the Property;

**GFI's Exhibit 18, Page 155 of 221**

ANNEX B TO APPENDIX B TO EXHBIT C

(i)        has maintained and will maintain its financial statements, accounting records, bank accounts and other entity documents separate and apart from those of the partners, members, shareholders, principals and Affiliates of such entity, and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except that such entity's financial position, assets, results of operations and cash flows may be included in the consolidated financial statements of an Affiliate of such entity in accordance with GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(j)        has not entered into or been a party to and will not enter into or be a party to any contract or agreement with any general partner, managing member, shareholder, principal or Affiliate of such entity, or any general partner, managing member, shareholder, principal or Affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties;

(k)        has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(l)        has not made and will not make any loans to any third party;

(m)        has held itself out and identified itself and will hold itself out and identify itself to the public as a legal entity separate and distinct from any other Person;

(n)        has conducted and will conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that such entity is responsible for the debts of any third party (including any general partner, managing member, shareholder, principal or Affiliate of such entity, but not including any Single Purpose Entity limited partnership of which such entity is expressly permitted to be a general partner in accordance with the terms hereof);

(o)        is and will endeavor to remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, in each case to the extent sufficient Gross Revenue exists to do so and provided that compliance with this clause (o) shall not require any member or beneficial interest holder of such Single Purpose Entity to make any capital contributions to such Single Purpose Entity;

(p)        has maintained and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(q)        has filed and will file its own tax returns, if any, as may be required under applicable law, to the extent such entity is (1) not part of a consolidated group filing a consolidated return or returns or (2) not treated as a division solely for tax purposes of another taxpayer, and has paid and will pay any taxes so required to be paid under applicable law;

(r)        has allocated and will allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate, if any;

(s)        has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations and pay the salaries of its own employees from its own funds;

(t)        has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(u)        has held and will hold its assets in its own name and has conducted and will conduct its business in its own name;

(v)        has paid and will pay its own liabilities and expenses;

GFI's Exhibit 18, Page 156 of 221

ANNEX B TO APPENDIX B TO EXHBIT C

(w)     has observed and will observe all corporate, trust, limited liability company or limited partnership formalities, as applicable;

(x)     has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(y)     has not and will not acquire obligations or securities of its partners, Managers, members or shareholders or any other Affiliate;

(z)     maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name;

(aa)     has not pledged and will not pledge its assets for the benefit of any other Person;

(bb)     has not and will not have any obligation to, and will not, indemnify its partners, officers, Managers, directors or members, as the case may be, unless such an obligation is fully subordinated to the Debt and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(cc)     does not and will not have any of its obligations guaranteed by any Affiliate of such entity;

(dd)     has complied and will comply with all of the terms and provisions contained in its Organizational Documents;

(ee)     has acted and will continue to act in a manner to make the statement of facts contained in its Organizational Documents true and correct;

(ff)     has considered and will continue to consider the interests of its creditors in connection with all actions;

(gg)     [intentionally omitted];

(hh)     if such entity is a limited partnership, does not and will not have any general partner that is not a Single Purpose Entity that owns at least one-half of one percent (0.5%) of the partnership interests in such limited partnership;

(ii)     if such entity is a limited liability company, has and will continue to have at least one (1) managing member that is a Single Purpose Entity that owns at least one-half of one percent (0.5%) of the membership interests of the limited liability company ("SPC Party") or, if such entity does not have a SPC Party, is as of the date hereof, and will continue to be, a Delaware limited liability company that has Organizational Documents that provide that, as long as any portion of the Debt remains outstanding, upon the occurrence of any event that causes the last remaining member of such entity or the sole member of such entity if such entity is a single member limited liability company (such last remaining member or single member shall be referred to herein as "Sole Member") to cease to be a member of such entity (other than (i) upon an assignment by Sole Member of all of its limited liability company interests in such entity and the admission of the transferee, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents, or (ii) the resignation of Sole Member and the admission of an additional member of such entity, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents), a Person that has signed the operating agreement of such limited liability company, without any action of any Person and simultaneously with Sole Member ceasing to be a member of such entity, automatically be admitted as a member of such entity (a "Special Member") and shall preserve and continue the existence of such entity without dissolution. The Organizational Documents of such entity shall further provide that for so long as any portion of the Debt is outstanding, no Special Member may resign or transfer its rights as a Special Member unless a successor Special Member has been admitted to such entity as a Special Member;

GFI's Exhibit 18, Page 157 of 221

ANNEX B TO APPENDIX B TO EXHBIT C

(jj)     if such entity is a limited liability company that does not have a SPC Party, is as of the date hereof, and will continue to be, a Delaware limited liability company that has Organizational Documents that provide that, as long as any portion of the Debt remains outstanding: (i) such entity shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining member of such entity or the occurrence of any other event which terminates the continued membership of the last remaining member of such entity in such entity unless the business of such entity is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "Act"), or (B) the entry of a decree of judicial dissolution under Section 18-802 of the Act; (ii) except as expressly permitted pursuant to the terms of the Loan Documents, (y) Sole Member may not resign (in the case of a single member limited liability company), and (z) no additional member shall be admitted to such entity; and (iii) upon the occurrence of any event that causes the last remaining member of such entity to cease to be a member of such entity or that causes Sole Member to cease to be a member of such entity (other than (A) upon an assignment by Sole Member of all of its limited liability company interests in such entity and the admission of the transferee, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents, or (B) the resignation of Sole Member and the admission of an additional member of such entity, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing (1) to continue the existence of such entity, and (2) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such entity, effective as of the occurrence of the event that terminated the continued membership of such member in such entity; (iv) the bankruptcy of Sole Member or a Special Member shall not cause such Sole Member or Special Member to cease to be a member of such entity and upon the occurrence of such event, the business of such entity shall continue without dissolution; (v) in the event of the dissolution of such entity, such entity shall conduct only such activities as are necessary to wind up its affairs (including the sale of its assets and properties in an orderly manner), and its assets and properties shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and (vi) to the fullest extent permitted by applicable law, each member and Special Members shall irrevocably waive any right or power that they might have to cause such entity or any of its assets or properties to be partitioned, to cause the appointment of a receiver for all or any portion of the assets or properties of such entity, to compel any sale of all or any portion of the assets or properties of such entity pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of such entity;

(kk)     [intentionally omitted];

(ll)     [intentionally omitted];

(mm)     the Organizational Documents of such entity shall from and after the date hereof provide that such entity will not (and such entity agrees that it will not), without (i) in the case of Borrower, the unanimous consent of its Managers, (ii) the unanimous consent of its board of directors or managers, or (iii) if such entity is a limited liability company with a SPC Party or a limited partnership, the unanimous consent of the board of directors or managers, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (B) seek or consent to the appointment of a receiver, liquidator or any similar official for such entity or a substantial portion of its assets or properties, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors, (E) admit in writing such entity's inability to pay its debts generally as they become due, (F) declare or effectuate a moratorium on the payment of any obligations, or (G) take any action in furtherance of any of the foregoing;

(nn)     the Organizational Documents of such entity shall provide an express acknowledgment that Lender is an intended third-party beneficiary of the "special purpose" and "separateness" provisions of such Organizational Documents;

(oo)     in the case of Borrower, has one (1) Manager that is a Single Purpose Entity that complies with the requirements of this Schedule I.

GFI's Exhibit 18, Page 158 of 221

ANNEXC TO APPENDIX B TO EXHBIT C

EXHIBIT C

SPE Provisions

During the term of the Loan, the Trust (hereinafter referred to as Borrower and Special Purpose Entity) shall comply with the provisions listed below.  For purposes of this Exhibit, all capitalized terms shall have the meanings ascribed to them in the Loan Agreement:

(a)      is organized solely for the purpose of (i) in the case of Borrower, acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, obtaining the Loan from Lender and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing; (ii) in the case of Master Lessee, owning, managing and operating the leasehold interest in the Property and the tenant's interest in the Master Lease; or (iii) in the case of Signatory Trustee, acting as signatory trustee of Borrower;

(b)      has not engaged, does not engage, and will not engage in any business other than (i) in the case of Borrower, the ownership, management and operation of the Property, (ii) in the case of Master Lessee, the ownership, management and operation of the leasehold interest in the Property and the tenant's interest in the Master Lease, and (iii) in the case of Signatory Trustee, acting as signatory trustee of Borrower;

(c)      has not owned, does not own and will not own any asset or property other than (i) in the case of Borrower, (A) the Property and (B) incidental personal property necessary for the ownership, management or operation of the Property, (ii) in the case of Master Lessee, (A) the leasehold interest in the Property and tenant's interest in the Master Lease and (B) incidental personal property necessary therefor, and (iii) in the case of Signatory Trustee, (A) the rights as signatory trustee of Borrower and (B) incidental personal property necessary therefor;

(d)      has not engaged in, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, or transfer of its partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company);

(e)      has preserved and will preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation and will not without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its Organizational Documents, or consent to or suffer the amendment, modification, termination or breach of any of the Organizational Documents, or amend, modify, terminate or fail to comply with, or consent to or suffer the amendment, modification, termination or breach of any Organizational Documents of any entity in which it owns an interest;

(f)      has not owned and will not own any subsidiary or make any investment in, any person or entity;

(g)      has not commingled and will not commingle its assets with the assets of any of its general partners, managing members, trustees, shareholders, Affiliates, principals or of any other person or entity;

(h)      has not incurred and will not incur any Indebtedness, other than, (i) with respect to Borrower (A) the Debt and (B) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding five percent (5%) of the original principal amount of the Loan at any one time; provided that any Indebtedness incurred pursuant to clause (B) shall be (1) outstanding not more than sixty (60) days and (2) incurred in the ordinary course of business (ii) in the case of Master Lessee unsecured trade payables incurred in the ordinary course of business related to the Master Lease that (A) do not exceed at any one time $100,000.00, and (B) are paid within thirty (30) days after the date incurred, and (iii) in the case of Signatory Trustee, unsecured trade payables incurred in the ordinary course of business related to the ownership of an interest in Borrower that (A) do not exceed at any one time $100,000.00, and (B) are paid within thirty (30) days after the date incurred.  No Indebtedness, other than the Debt, may be secured (senior, subordinate or pari passu) by the Property;

(i)      has maintained and will maintain its financial statements, accounting records, bank accounts and other entity documents separate and apart from those of the partners, members, shareholders, principals and Affiliates

GFI's Exhibit 18, Page 159 of 221

of such entity, and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except that such entity's financial position, assets, results of operations and cash flows may be included in the consolidated financial statements of an Affiliate of such entity in accordance with GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(j)      has not entered into or been a party to and will not enter into or be a party to any contract or agreement with any general partner, managing member, shareholder, principal or Affiliate of such entity, or any general partner, managing member, shareholder, principal or Affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties;

(k)      has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(l)      has not made and will not make any loans to any third party;

(m)      has held itself out and identified itself and will hold itself out and identify itself to the public as a legal entity separate and distinct from any other Person;

(n)      has conducted and will conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that such entity is responsible for the debts of any third party (including any general partner, managing member, shareholder, principal or Affiliate of such entity, but not including any Single Purpose Entity limited partnership of which such entity is expressly permitted to be a general partner in accordance with the terms hereof);

(o)      is and will endeavor to remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, in each case to the extent sufficient Gross Revenue exists to do so and provided that compliance with this clause (o) shall not require any member or beneficial interest holder of such Single Purpose Entity to make any capital contributions to such Single Purpose Entity;

(p)      has maintained and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(q)      has filed and will file its own tax returns, if any, as may be required under applicable law, to the extent such entity is (1) not part of a consolidated group filing a consolidated return or returns or (2) not treated as a division solely for tax purposes of another taxpayer, and has paid and will pay any taxes so required to be paid under applicable law;

(r)      has allocated and will allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate, if any;

(s)      has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations and pay the salaries of its own employees from its own funds;

(t)      has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(u)      has held and will hold its assets in its own name and has conducted and will conduct its business in its own name;

(v)      has paid and will pay its own liabilities and expenses;

GFI's Exhibit 18, Page 160 of 221

ANNEXC TO APPENDIX B TO EXHBIT C

(w)      has observed and will observe all corporate, trust, limited liability company or limited partnership formalities, as applicable;

(x)      has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(y)      has not and will not acquire obligations or securities of its partners, trustees, members or shareholders or any other Affiliate;

(z)      maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name;

(aa)     has not pledged and will not pledge its assets for the benefit of any other Person;

(bb)     has not and will not have any obligation to, and will not, indemnify its partners, officers, trustees, directors or members, as the case may be, unless such an obligation is fully subordinated to the Debt and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(cc)     does not and will not have any of its obligations guaranteed by any Affiliate of such entity;

(dd)     has complied and will comply with all of the terms and provisions contained in its Organizational Documents;

(ee)     has acted and will continue to act in a manner to make the statement of facts contained in its Organizational Documents true and correct;

(ff)     has considered and will continue to consider the interests of its creditors in connection with all actions;

(gg)     [intentionally omitted];

(hh)     if such entity is a limited partnership, does not and will not have any general partner that is not a Single Purpose Entity that owns at least one-half of one percent (0.5%) of the partnership interests in such limited partnership;

(ii)     if such entity is a limited liability company, has and will continue to have at least one (1) managing member that is a Single Purpose Entity that owns at least one-half of one percent (0.5%) of the membership interests of the limited liability company ("SPC Party") or, if such entity does not have a SPC Party, is as of the date hereof, and will continue to be, a Delaware limited liability company that has Organizational Documents that provide that, as long as any portion of the Debt remains outstanding, upon the occurrence of any event that causes the last remaining member of such entity or the sole member of such entity if such entity is a single member limited liability company (such last remaining member or single member shall be referred to herein as "Sole Member") to cease to be a member of such entity (other than (i) upon an assignment by Sole Member of all of its limited liability company interests in such entity and the admission of the transferee, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents, or (ii) the resignation of Sole Member and the admission of an additional member of such entity, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents), a Person that has signed the operating agreement of such limited liability company, without any action of any Person and simultaneously with Sole Member ceasing to be a member of such entity, automatically be admitted as a member of such entity (a "Special Member") and shall preserve and continue the existence of such entity without dissolution. The Organizational Documents of such entity shall further provide that for so long as any portion of the Debt is outstanding, no Special Member may resign or transfer its rights as a Special Member unless a successor Special Member has been admitted to such entity as a Special Member;

GFI's Exhibit 18, Page 161 of 221

ANNEXC TO APPENDIX B TO EXHBIT C

(jj)     if such entity is a limited liability company that does not have a SPC Party, is as of the date hereof, and will continue to be, a Delaware limited liability company that has Organizational Documents that provide that, as long as any portion of the Debt remains outstanding: (i) such entity shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining member of such entity or the occurrence of any other event which terminates the continued membership of the last remaining member of such entity in such entity unless the business of such entity is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "Act"), or (B) the entry of a decree of judicial dissolution under Section 18-802 of the Act; (ii) except as expressly permitted pursuant to the terms of the Loan Documents, (y) Sole Member may not resign (in the case of a single member limited liability company), and (z) no additional member shall be admitted to such entity; and (iii) upon the occurrence of any event that causes the last remaining member of such entity to cease to be a member of such entity or that causes Sole Member to cease to be a member of such entity (other than (A) upon an assignment by Sole Member of all of its limited liability company interests in such entity and the admission of the transferee, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents, or (B) the resignation of Sole Member and the admission of an additional member of such entity, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing (1) to continue the existence of such entity, and (2) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such entity, effective as of the occurrence of the event that terminated the continued membership of such member in such entity; (iv) the bankruptcy of Sole Member or a Special Member shall not cause such Sole Member or Special Member to cease to be a member of such entity and upon the occurrence of such event, the business of such entity shall continue without dissolution; (v) in the event of the dissolution of such entity, such entity shall conduct only such activities as are necessary to wind up its affairs (including the sale of its assets and properties in an orderly manner), and its assets and properties shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and (vi) to the fullest extent permitted by applicable law, each member and Special Members shall irrevocably waive any right or power that they might have to cause such entity or any of its assets or properties to be partitioned, to cause the appointment of a receiver for all or any portion of the assets or properties of such entity, to compel any sale of all or any portion of the assets or properties of such entity pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of such entity;

(kk)     [intentionally omitted];

(ll)     [intentionally omitted];

(mm)     the Organizational Documents of such entity shall from and after the date hereof provide that such entity will not (and such entity agrees that it will not), without (i) in the case of Borrower, the unanimous consent of its trustees, (ii) the unanimous consent of its board of directors or managers, or (iii) if such entity is a limited liability company with a SPC Party or a limited partnership, the unanimous consent of the board of directors or managers, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (B) seek or consent to the appointment of a receiver, liquidator or any similar official for such entity or a substantial portion of its assets or properties, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors, (E) admit in writing such entity's inability to pay its debts generally as they become due, (F) declare or effectuate a moratorium on the payment of any obligations, or (G) take any action in furtherance of any of the foregoing;

(nn)     the Organizational Documents of such entity shall provide an express acknowledgment that Lender is an intended third-party beneficiary of the "special purpose" and "separateness" provisions of such Organizational Documents;

(oo)     in the case of Borrower, has one (1) signatory trustee that is a Single Purpose Entity that complies with the requirements of this Schedule I.

GFI's Exhibit 18, Page 162 of 221

**EXHBIT D**

Form of Master Lease

**MASTER LEASE**
**FOR**
**GREELEY FLATS APARTMENTS**

THIS MASTER LEASE (this "Lease") is entered into to be effective as of April 6, 2018, between Greeley Flats DST, a Delaware statutory trust (hereinafter called "Landlord"), and Greeley Flats LeaseCo, LLC, a Delaware limited liability company (hereinafter called "Tenant").

W I T N E S S E T H:

ARTICLE 1

Demise of Premises

Landlord, for and in consideration of the rents to be paid and the covenants and agreements hereinafter contained to be kept and performed by Tenant, hereby demises and leases to Tenant and Tenant hereby lets and takes from Landlord, for the term hereinafter set forth, Landlord's interest in the real estate commonly known as the Greeley Flats Apartments, located at 6730 4th Avenue, Sacramento, CA 95817, as more particularly described in Exhibit "A" attached hereto and made a part hereof, together with the easements, rights and appurtenances thereunto belonging or appertaining, together with (i) the improvements, buildings, equipment and personal property located thereon and associated therewith and owned by Landlord, (ii) the leases and other agreements to occupy such improved real property, and (iii) all other rights and property (real, personal and intangible) associated with such improved real property (hereinafter sometimes called the "Demised Premises" or the "Property").

ARTICLE 2

Term of Lease

Section 2.01.  The term of this Lease shall commence on the date hereof, and shall expire, unless sooner terminated as hereinafter provided, on the date that is the ten (10) year and three (3) month anniversary of the date hereof (hereinafter called the "Original Term").  Provided that the Tenant is not in default hereunder as of the expiration of the Original Term or the renewal term, as applicable, this Lease shall automatically be renewed for three (3) successive five (5) year terms upon expiration of the Original Term or the renewal term, as applicable, on the same terms and conditions contained herein, provided that Tenant may elect not to renew by providing Landlord sixty (60) days' prior written notice prior to the expiration of the Original Term or renewal term (the Original Term, including all applicable extensions, is referred to herein as the "Term").  Each year during the Term is herein called a "Lease Year", with the first Lease Year commencing on the date hereof.  The term of this Lease shall automatically terminate upon the sale of the Property.  For the avoidance of doubt, for so long as any obligation remains outstanding under any of the Loan Documents (as hereinafter defined), the Term of this Lease shall automatically extend beyond the Original Term or review term, as applicable, and shall continue in full force and effect thereafter until all such obligations have been fully performed and satisfied.

Section 2.02.  This Lease constitutes the absolute and unconditional obligation of Tenant.  Tenant waives all rights which are not expressly stated in this Lease but which may now or otherwise be conferred by law (i) to quit, terminate or surrender this Lease or the Demised Premises, (ii) to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to  "Monthly Rent" (as defined below) or any other sums payable under this Lease, except as otherwise expressly provided in this Lease, and (iii) for any statutory lien or offset right against Landlord or its property.  Notwithstanding Section 2.02(i) above, if a person not affiliated with the Tenant is the Signatory Trustee (or otherwise in control) of the Landlord, Tenant shall have the right to terminate this Lease in the event of a default by the Landlord hereunder.

**GFI's Exhibit 18, Page 163 of 221**

**EXHBIT D**

ARTICLE 3

Rent

Section 3.01.

(a)      Tenant shall pay to Landlord during the Term, in currency of the United States of America, at the office of Landlord, or at such other address as shall be specified, in writing, from time to time by Landlord, the rentals hereinafter provided.  Tenant shall pay an annual rental (hereinafter called the "Annual Rent") in equal monthly installments (the "Monthly Rent") throughout the Term, which shall accrue from and after the commencement of the Term, and be payable monthly in arrears.  Each such monthly installment shall be payable on or before the fifteenth (15th) day of each month during the Term and shall relate to the immediately preceding month, with the first installment being due and payable on May 15, 2018.  All such payments shall be made in accordance with Exhibit "C" attached hereto, with Annual Rent being the sum of Base Rent and Stated Rent, as set forth on Exhibit "C".  If the Term commences or expires on other than the first day of a calendar month, the Monthly Rent for such partial calendar month shall be pro-rated on a per diem basis based upon the number of days elapsed in such month that falls within the Term. Notwithstanding the foregoing, until further written notice from Landlord to Tenant, Landlord hereby directs, and Tenant hereby agrees, to pay "Base Rent", in the amounts set forth on Exhibit "C" hereto, directly to Arbor Commercial Funding I, LLC  (including its successors and assigns, the "Lender") on Landlord's behalf, in satisfaction of Landlord's payment obligations to Lender under that certain loan from Lender to Landlord in the approximate original principal amount of $13,301,000 (the "Loan") (for the avoidance of doubt, the parties acknowledge and agree that Lender is a first lienholder of the Property and is the holder of a first mortgage loan secured by the Demised Premises).  The document evidencing and securing the Loan are hereinafter referred to as the "Loan Documents." The foregoing direction is merely for the convenience of, and as an accommodation to, Landlord, and in no manner constitutes an assumption by Tenant of any of Landlord's obligations under the Loan.  For the avoidance of doubt, and notwithstanding anything in this Lease to the contrary, Monthly Rent does not include any balloon payments of principal required to be paid in respect of the Loan at the end of the term of the Loan or otherwise pursuant to the terms of the Loan Documents.

(b)      (i)      Tenant shall pay (A) all costs and expenses (and taxes, if any, thereon) paid or incurred in respect of the operation, maintenance, management and security of the Property which, in accordance with generally accepted accounting principles are properly chargeable to the operation, maintenance, management and security of the Property, including the "Cost of Utilities" (which for purposes of this Lease shall mean the cost of electricity, gas, oil, steam, water, air conditioning and other fuel and utilities used or consumed in connection with the Property), property management fees, reasonable attorneys' fees and disbursements and auditing, management and other professional fees and expenses (hereinafter collectively called "Operating Costs"), and (B) before any fine, penalty or cost may be added thereto for the nonpayment thereof, all taxes, assessments, water and sewer rents, rates and charges, charges for public utilities, excises, levies, license and permit fees and other similar charges associated with the Demised Premises and the transactions contemplated in this Lease (hereinafter collectively called "Impositions" and any of the same is hereinafter called an "Imposition" as the context may require).

(ii)      Nothing herein shall obligate Tenant to pay, and the term "Impositions" shall exclude, federal, state or local (A) transfer taxes as the result of a conveyance by (or suffered by) Landlord, (B) franchise, capital stock or similar taxes if any, of Landlord, (C) income, excess profits or other taxes, if any, of Landlord, determined on the basis of or measured by its net income, or (D) any estate, inheritance, succession, gift, capital levy or similar taxes, unless the taxes referred to in clauses (B) and (C) above are in lieu of or a substitute for any other tax or assessment upon or with respect to any of the Demised Premises which, if such other tax or assessment were in effect at the commencement of the Term, would be payable by Tenant.  In the event that any assessment against any of the Demised Premises may be paid in installments, Tenant shall have the option to pay such assessment in installments; and in such event, Tenant shall be liable only for those installments that become due and payable during the Term.  Tenant shall prepare and file all tax reports required by governmental authorities that relate to the Impositions.

(iii)      After prior written notice to, and consent from Landlord, which consent shall not be unreasonably withheld, Tenant shall not be required to pay any Imposition so long as Tenant shall contest, with Landlord's consent and in good faith and at its expense, the amount thereof by appropriate proceedings which shall

D-2

## EXHBIT D

operate during the pendency thereof to prevent the collection of, or other realization upon any property securing, the Imposition.  No proceeding to contest any Imposition shall be settled without Landlord's consent.

In no event shall Tenant pursue any contest with respect to any Imposition in such manner that exposes Landlord to (A) criminal liability, penalty or sanction, (B) any civil liability, penalty or sanction for which Tenant has not made provisions reasonably acceptable to Landlord and its lender or (C) defeasance of its interest in the Demised Premises.

Tenant agrees that each such contest shall be promptly and diligently prosecuted to final conclusion, except that Tenant shall have the right to attempt to settle or compromise such contest through negotiations.  Tenant shall pay and save Landlord's lender and Landlord harmless against any and all losses, judgments, decrees and costs (including all reasonable attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof.

(c)	Provided such monthly escrows are required by the first lienholder of the Property, Tenant shall deposit monthly with Landlord (or Landlord's designee), simultaneously with its payment of Monthly Rent, as additional rent, one-twelfth (1/12) of the Impositions and premiums for insurance required under Article 4 hereof, which amounts may be adjusted from time to time depending on such Impositions and insurance premiums from time to time, in amounts sufficient to pay the same when due.

(d)	Provided such monthly escrows are required by the first lienholder of the Property, Tenant shall deposit monthly with Landlord (or Landlord's designee), simultaneously with its payment of Monthly Rent, as additional rent, the amount required by such lienholder for any capital expenditures reserve (the "Working Capital Account"), which reserve Tenant may use to pay for Capital Expenses, subject to the terms of the Loan Documents notwithstanding anything to the contrary contained herein.

(e)	This Section 3.01 is subject to the terms and conditions of the Loan Documents.

(f)	For the avoidance of doubt, to the extent the Loan Documents require that cash flow from the Real Estate be directed to, held in and distributed from accounts designated by the Lender (including, without limitation, any of the reserves described in this Section 3.01), the denomination of ownership of such accounts shall not be construed as altering the economic entitlements to the funds held in such accounts created pursuant to this Lease, and any amounts held in any such account denominated as owned by a person that is not entitled to such amounts pursuant to the terms and conditions of this Lease shall be treated as held for the benefit of the person that is entitled to such amounts pursuant to this Lease, subject to the rights of the Lender pursuant to the terms and conditions of the Loan Documents relating thereto.

Section 3.02.  Landlord shall promptly send to Tenant all bills that it may receive for Impositions and Operating Costs referred to in Section 3.01 above.  Tenant shall make payment of all Impositions directly to the appropriate Governmental Authority (as hereinafter defined) and all Operating Costs to the parties to whom such amounts are due and payable.  Within fifteen (15) days after receipt thereof, Tenant shall make available to Landlord for its inspection official receipts of the appropriate taxing authority, or other proof satisfactory to Landlord, evidencing the payment of any Imposition payable directly by Tenant to a Governmental Authority as in this Article provided.  To the extent available, Tenant shall be entitled to use amounts deposited pursuant to Section 3.01(c) above to fund the payment of Impositions and premiums for insurance.

Section 3.03.  Landlord shall inform Tenant in writing, within five (5) business days following receipt of notice thereof, of any audit, threatened audit, or other administrative or judicial proceeding or action by any Governmental Authority which could give rise to an obligation by Tenant to pay, or indemnify Landlord for, Impositions.

GFI's Exhibit 18, Page 165 of 221

EXHBIT D

Section 3.04. Notwithstanding any other terms of this Article 3, Tenant shall not be required to pay, nor to indemnify or hold harmless Landlord to the extent (and only to the extent) that any Imposition or Operating Cost arises or is increased directly as a result of the breach by Landlord of any of its obligations under this Lease.

Section 3.05. To the extent that any portion of the Operating Costs or Impositions relate to any period not included within the Term, Tenant's obligation to pay the same shall be prorated.

Section 3.06. Tenant shall pay the Monthly Rent, Operating Costs, Impositions and all other amounts due and payable hereunder without notice, demand, setoff, counterclaim, deduction, defense, abatement, suspension, deferment, diminution or reduction during the Term.

Section 3.07.

(a)      If any installment of Monthly Rent is not paid within three (3) days after written notice is given by Landlord to Tenant that the same is overdue, Tenant shall pay to Landlord, as additional rent, a late charge equal to the late charge assessed by Landlord's lender with respect to the mortgage payment which would have been funded by Landlord utilizing such overdue installment of Monthly Rent, had it been paid to Landlord in a timely fashion.

(b)      Notwithstanding the foregoing, the Tenant may defer payment of all or any portion of Stated Rent (defined as "Annual Gross Stated Rent" on Exhibit "C" attached hereto) as long as Base Rent and all Operating Costs and Impositions and all escrow amounts required pursuant to Section 3.01 are timely paid by the Tenant, and all other "Net Cash Flow" (as defined below) is paid to the Landlord, it being understood and agreed that in such event, any payment of Net Cash Flow to the Landlord shall be treated as a partial payment of Stated Rent. Any unpaid portion of Stated Rent shall accrue and be payable out of future Net Cash Flow and shall accrue interest at the rate of 2% per annum until repaid. "Net Cash Flow" means, for each month of the Term, the positive difference between (a) gross revenue from the Property, reduced by (b)(i) Base Rent and (ii) all Operating Costs and Impositions for such month. For the avoidance of doubt, the Tenant is obligated to pay all Base Rent, Operating Costs and Impositions regardless of Net Cash Flow. If the Tenant is in default of the Lease, any accrued and unpaid Stated Rent shall become immediately due and payable without regard to any Net Cash Flow limitation. Any deferred Stated Rent that is not paid prior to the expiration or earlier termination of this Lease shall be payable in full (subject to the terms of the Loan Documents) no later than 91 days after (a) the applicable Loan is repaid in full, or (b) the Property is sold or exchanged by the Trust.

Section 3.08. Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement, partnership, joint venture, management or other arrangement. Each party shall reflect the transactions represented by this Lease in all applicable books, records and reports (including, without limitation, income tax filings) in a manner consistent with "true lease" treatment rather than "financing," "partnership" or "management" treatment.

Section 3.09 For avoidance of doubt, and subject to the terms and conditions of the Loan Documents, Tenant's obligation to pay rent and any other amounts to Landlord shall be limited to the Rent and Tenant shall be entitled to retain any other revenues generated by the Premises after payment of Rent and any other amounts Tenant is expressly required to pay under this Lease.

Section 3.10. While the Loan is outstanding the Tenant shall, as an accommodation to Landlord, provide all financial information and other reporting information required under the Loan Documents to Lender on behalf of Landlord.

ARTICLE 4

Insurance

Section 4.01. Throughout the Term, Landlord may, at Landlord's sole cost and expense, obtain and maintain insurance in amounts and against risks consistent with insurance coverages obtained and maintained by owners of improved real property similar to the Demised Premises.

GFI's Exhibit 18, Page 166 of 221

EXHBIT D

Section 4.02.  Throughout the Term, Tenant shall, at Tenant's sole cost and expense (subject to Section 3.01(e)), obtain and maintain insurance, in the amounts and against the risks, described in Exhibit "B" attached hereto and made a part hereof, or, if different, such insurance, in the amounts and against the risks, as may be required by any lender that has made a loan to Landlord secured by the Property.  Landlord shall be named as an additional insured on all such policies of insurance. To the extent any lender that has made a loan to Landlord secured by the Property requires a change to the insurance coverages described on Exhibit B, Landlord shall notify Tenant, in writing, not less than thirty (30) days prior to the date upon which any such change in insurance coverage is required to become effective hereunder.  Any lender shall be named as an insured and loss payee on the property/casualty insurance policy and as an additional insured on the liability policy, as may be required by such lender.  All costs incurred by Tenant in maintaining the insurance required by this Section 4.02 are herein collectively called the "Insurance Costs."

Section 4.03.  Landlord shall be furnished with evidence reasonably satisfactory to Landlord of Tenant's payment of the premiums for the insurance coverage required by this Lease.  Tenant shall renew all such insurance and deliver to Landlord certificates evidencing such renewals at least thirty (30) days before any such insurance is set to expire (except to the extent that provision for payment of the premiums therefor is actually made pursuant to Section 3.01(c) of this Lease).

Section 4.04.  Landlord shall not be required to incur any expense under any policy of insurance maintained by Tenant or to prosecute any claim against any insurer or to contest any settlement proposed by any insurer.  Tenant may, at its cost and expense, prosecute any such claim or contest any such settlement.

ARTICLE 5

Casualty and Restoration

Section 5.01.  If during the Term all or any part of the Demised Premises shall be damaged or destroyed by fire or other casualty, Tenant shall promptly give notice thereof to Landlord.

Section 5.02.

(a)   If during the Term all or any part of the Demised Premises shall be damaged or destroyed by any fire or other casualty, this Lease shall continue in full force and effect.  Subject in all respects to the terms of the documents evidencing and/or securing a first mortgage loan secured by the Demised Premises, any insurance proceeds received by Landlord on account of such damage or destruction, less the actual cost, fees and expenses, if any, incurred in connection with adjustment of the loss, shall, provided no default by Tenant or Event of Default shall have occurred and be continuing hereunder, be used by Landlord to cause the repair, restoration or replacement of any portion of the Demised Premises so damaged or destroyed as nearly as possible to its value, condition and character immediately prior to such damage or destruction and to pay contractors, subcontractors, materialmen, engineers, architects or other persons who have rendered services or furnished materials for said repairs, restorations or replacements (hereinafter collectively, the "Casualty Restoration"), and shall be paid out from time to time as the Casualty Restoration progresses upon the written request of Tenant.

(b)   If the insurance proceeds received by Landlord are applied to the cost of the Casualty Restoration and the insurance proceeds shall, at any time, be insufficient to pay the cost of the Casualty Restoration, Landlord shall use the Reserve Accounts (as hereinafter defined in Article 7) to make up the deficiency, subject to any required approvals of the first lienholder of the Property.  In the event the Reserve Accounts are insufficient to make up the deficiency, Landlord shall be required to make up any remaining deficiency.  If such net insurance proceeds shall exceed the cost of the Casualty Restoration, then, in such event, Landlord, shall retain the excess.

Section 5.03.  If Landlord fails to diligently pursue to completion the Casualty Restoration of any portion of the Demised Premises damaged or destroyed by fire or other casualty as provided in Section 5.02(a) above, then, in such event, Tenant shall have the right to perform such Casualty Restoration on behalf of Landlord and at Landlord's expense.  Subject to any required approval of the first lienholder of the Property, Tenant shall have the right to use the Reserve Accounts in connection with any such Casualty Restoration performed by Tenant on behalf of Landlord.

GFI's Exhibit 18, Page 167 of 221

EXHBIT D

Section 5.04.  Landlord shall have the right to satisfy its obligations under this Article 5 by requiring the property manager of the Demised Premises to perform the Casualty Restoration.

Section 5.05.  Notwithstanding the foregoing provisions of this Article 5, but subject to the terms and conditions of the Loan Documents, in the event all or a material portion of the Demised Premises is damaged or destroyed by fire or other casualty, following which (i) Landlord's lender elects not to make the insurance proceeds available to Landlord for restoration, and (ii) Landlord then elects not to reconstruct the Demised Premises, then this Lease automatically shall terminate and neither party shall have any further obligations hereunder.

Section 5.05.  This Article 5 is subject to the terms and conditions of the Loan Documents.

ARTICLE 6

Condemnation

Section 6.01.

(a)     If during the Term all or any part of the Demised Premises shall be subject to a "Taking", which shall mean any taking of the Demised Premises or a part thereof, in or by condemnation or other eminent domain proceeding, this Lease shall continue in full force and effect.  Tenant hereby assigns to Landlord any award, payment or compensation to which it may be or become entitled during the Term by reason of a Taking whether the same shall be paid or payable in respect of Tenant's leasehold interest hereunder or otherwise.  Subject in all respects to the terms of the documents evidencing and/or securing a first lien mortgage loan secured by the Demised Premises, and provided no default by Tenant or Event of Default shall have occurred and be continuing hereunder, Landlord shall be obligated to cause the repair, restoration or rebuilding of any part of the Demised Premises remaining after such Taking, including payment of all contractors, subcontractors, materialmen, engineers, architects or other persons who render services or furnish materials for said repairs, restorations or rebuilding (hereinafter collectively, the "Condemnation Restoration").  The Condemnation Restoration shall be performed by Landlord so as to restore the Demised Premises, as nearly as possible, to its value, condition and character immediately prior to such Taking.  Any award, payment or compensation paid or assigned to Landlord on account of said Taking, less the actual costs, fees and expenses, if any, incurred in connection with obtaining the award, shall be used by Landlord to perform the Condemnation Restoration.

(b)     If the award, payment or compensation received by Landlord as the result of a Taking are applied to the cost of the Condemnation Restoration and said award, payment or compensation shall, at any time, be insufficient to pay the cost of the Condemnation Restoration, Landlord shall use the Reserve Accounts (as hereinafter defined in Section 7.03) to make up the deficiency, subject to any required approvals of the first lienholder of the Property.  Should the award, payment or compensation, together with the Reserve Accounts, be insufficient to pay the cost of the Condemnation Restoration, then Landlord shall be required to make up any remaining deficiency.  If such award, payment or compensation shall exceed the cost of the Condemnation Restoration, then, in such event, Landlord shall retain the excess.

(c)     If Landlord fails to diligently pursue to completion the Condemnation Restoration of any portion of the Demised Premises affected by any Taking as provided in Section 6.01(a) hereof,  then, in such event, Tenant shall have the right to perform such Condemnation Restoration on behalf of Landlord and at Landlord's expense.  Subject to any required approval of the first lienholder of the Property, Tenant shall have the right to use the Reserve Accounts in connection with any such Condemnation Restoration performed by Tenant on behalf of Landlord.

(d)     Landlord shall be entitled to participate in any Taking proceeding at Landlord's cost and expense.

Section 6.02.

(a)     If during the Term (i) there is a permanent Taking of all of the Demised Premises, or (ii) there is a permanent taking of less than all of the Demised Premises but it is impractical to rebuild the Demised Premises and/or continue to operate the Demised Premises as a multi-family apartment project, then this Lease

**GFI's Exhibit 18, Page 168 of 221**

EXHBIT D

automatically shall terminate upon payment in full of the Loan, and neither party shall have any further obligations hereunder.

(b)    If during the Term (i) there is a permanent Taking of less than all of the Demised Premises and it is economically feasible to rebuild the Demised Premises and/or continue to operate the Demised Premises as a multi-family apartment project, or (ii) the use or occupancy of any part, or all, of the Demised Premises shall be temporarily requisitioned by any federal government, or any state or other political subdivision thereof, or any agency, court or body of the federal government, any state or other political subdivision thereof, exercising executive, legislative, judicial, regulatory or administrative functions (hereinafter collectively called "Governmental Authority"), then this Lease shall continue in full force and effect, however, (A) Landlord shall proceed to perform any necessary repairs, restoration or replacement, and (B) Landlord and Tenant shall adjust the Monthly Rent in an equitable fashion to reflect the economic effect of any such Taking or temporary requisition.

Section 6.03.  Landlord shall have the right to satisfy its obligations under this Article 6 by requiring the property manager of the Demised Premises to perform the Condemnation Restoration.

Section 6.04.  This Article 6 is subject to the terms and conditions of the Loan Documents.

ARTICLE 7

Maintenance and Repairs

Section 7.01.  Tenant shall be responsible for all Operating Costs.  Tenant shall take good care (or cause good care to be taken) of the Demised Premises, alleyways and passageways and the sidewalks, curbs and vaults adjoining the Demised Premises, and keep the same (or cause the same to be kept) in good order and condition, ordinary wear and tear and obsolescence excepted, and make necessary nonstructural repairs thereto, interior and exterior.  Tenant also shall be responsible for all personal property replacements and repairs, including, but not limited to, (i) water heater replacements, (ii) floor covering replacements, (iii) replacement of window coverings, (iv) replacement of appliances, (v) HVAC compressor and condenser replacements, (vi) plumbing fixture replacements, (vii) electrical fixture replacements, and (viii) interior painting.  Tenant also shall make (or cause to be made) all repairs necessary to avoid any structural damage or injury to the Demised Premises.  All repairs and replacements shall be equal in quality and class to the original work.

Section 7.02.  Landlord shall be responsible for all "Capital Expenses," which shall mean any and all costs and expenses incurred in connection with major repairs, replacements, and improvements relating to the structural elements of the Property which are not Operating Costs and thus would be capitalized under generally accepted accounting principles, including, but not limited to, (i) the replacement of roofs, chimneys, gutters, downspouts, paving, curbs, ramps, driveways, balconies, porches, patios, foundations, exterior walls and all load bearing walls, exterior doors and doorways, windows, elevators,  fences and gates, and (ii) exterior painting.  Other than as set forth in this Section 7.02, Landlord shall not be required to furnish any services or facilities or make any repairs, replacements or alterations in or to the Demised Premises, Tenant hereby assuming the full and sole responsibility for the operation, repair, replacement, maintenance and management of the Demised Premises.

Section 7.03.  Upon the execution of this Lease, if required by the Lender, Landlord shall deposit funds in an amount required by the Lender (the "Required Repair Funds") into a special account (the "Required Repair Account") at a depository mutually acceptable to Landlord, Tenant and the Lender (the "Depository").  The Required Repair Funds shall be available to Tenant as further described in Section 7.05 below.  Upon the expiration or earlier termination of this Lease, any funds remaining in the Required Repair Account shall be disbursed to Landlord or its designee.

Section 7.04.   Upon the execution of this Lease, Landlord shall deposit an additional sum required by the Lender (the "Trust Reserve Deposit," and together with the Required Repairs Funds, the "Reserve Funds") into a special account (the "Trust Reserve Account") at the Depository.  The Trust Reserve Deposit shall be funded out of the proceeds of the loan from Lender to Landlord in connection with the acquisition of the Property by the Landlord.  The Trust Reserve Deposit shall be made available for the uses described in Section 7.05 below.  Upon the expiration

GFI's Exhibit 18, Page 169 of 221

EXHBIT D

or earlier termination of this Lease, any funds remaining in the Trust Reserve Account shall be disbursed to Landlord or its designee.

Section 7.05.  Subject to any required approvals of the Lender and, if applicable, to the terms of the Loan Documents, the Reserve Funds shall be available to and may be withdrawn by Tenant to pay for: (i) Operating Costs and Capital Expenses described in Sections 7.01 and 7.02 above, as determined by the Tenant in its sole discretion, (ii) any Restoration, (iii) any Condemnation Restoration, and (iv) unanticipated operating expenses.  If the Reserve Funds are not available for any reason and funds of Tenant are used to pay for expenses for which Landlord is responsible hereunder, such amount shall be treated as a non-interest-bearing loan from Tenant to Landlord, which Tenant may recover by set off against Stated Rent and, if not previously repaid, out of the gross sales proceeds of the Property if such amounts are not repaid prior to the sale or exchange of the Property (or the expiration or earlier termination of this Lease if sooner).  If Reserve Funds are used to pay for expenses for which the Tenant is responsible hereunder, such amount shall be treated as a non-interest-bearing loan from Landlord to Tenant, which Tenant will reimburse to the applicable Reserve Account as soon as practicable thereafter, and in no event later than the expiration or earlier termination of this Lease.

Section 7.06.  Tenant shall have the right to satisfy its obligations under this Article 7 (other than 7.03 above) by requiring the property manager to cause the performance of such obligations.

Section 7.07.  The necessity for and adequacy of replacements, maintenance and repairs to the Demised Premises pursuant to this Article 7 shall be measured by the standard which is appropriate for properties of similar construction, class and use in the area in which the Demised Premises are situated, provided that if the representations, warranties and covenants of Landlord in the Loan Documents requires the maintenance and repair of the Demised Premises to a higher or greater standard, then such higher or greater standard shall apply under this Lease. Notwithstanding any other provisions of this Lease, the requirements for Replacement/Repair Escrows under this Lease shall not be inconsistent with the requirements set forth in the Loan Documents.

ARTICLE 8

Alterations and Additions

Section 8.01.  Subject to the terms and conditions of the Loan Documents, Tenant may make alterations to (but not additions to, removals of, and substitutions for) the buildings or any portion thereof situated on the Demised Premises, provided that (a) no such alterations shall be undertaken without Landlord's prior written consent; (b) the fair market value of the Demised Premises shall not be lessened by reason thereof; (c) all such alterations shall be completed in compliance with any and all valid laws, rules, regulations, ordinances, orders, codes, judgments, decrees, injunctions, permits or similar norms or decisions of any Governmental Authority having jurisdiction over the Demised Premises or the use, manner of use or occupancy thereof (hereinafter collectively called "Law"); and (d) any such additions shall become the property of Landlord when completed.  Tenant shall discharge any and all liens filed against the Demised Premises arising out of any alteration thereof and, upon the written request of Landlord, shall deliver to Landlord a surety bond or other security satisfactory to Landlord to assure the completion thereof.

Section 8.02.  Tenant shall not construct or place upon the Demised Premises any additional buildings, structures, facilities or other improvements without the prior written consent of Landlord.  Notwithstanding anything else in this Lease, at any time that the Landlord is a Delaware statutory trust, Landlord shall not have the right, power or ability to make more than minor non-structural modifications to the Property (in accordance with Revenue Ruling 2004-86).

Section 8.03.  Tenant shall have the right, from time to time, to purchase personal property to be used for the benefit of the Demised Premises.  Upon the expiration of the Term, all such personal property shall belong to the Landlord.

Section 8.04.  Tenant shall not remove, sell or transfer any portion of the Demised Premises, including personal property purchased by Tenant for the benefit of the Demised Premises that is to belong to the Landlord upon the expiration of the Term, except that personal property that is obsolete or worn out may be removed provided it is replaced contemporaneously by unencumbered personal property of equal or better function and quality.

GFI's Exhibit 18, Page 170 of 221

EXHBIT D

ARTICLE 9

Compliance with Law; Zoning

Section 9.01.  Tenant shall during the Term, at its sole cost and expense, except for noncompliances which may have existed prior to the commencement of the Term, promptly comply (or cause compliance) with all Laws which may be applicable to the Demised Premises or to the use, manner of use or occupancy thereof, and shall take all actions reasonably necessary to comply with any and all orders or requirements affecting the Property by any federal, state, county or municipal authority having jurisdiction over the Property.  Tenant shall likewise observe and comply (or cause observance and compliance) with the requirements of all policies of public liability, fire and other insurance at any time in force with respect to the Demised Premises.  In addition, Tenant shall cause all tenants, subtenants or other occupants of the Demised Premises to comply with all Laws which may be applicable to the Demised Premises or to the use, manner of use or occupancy thereof.

Section 9.02.  Tenant shall not cause or maintain any nuisance in or upon the Demised Premises.  Tenant shall not suffer or permit the Demised Premises, or any portion thereof, to be used by the public, as such, in any way as might tend to impair Landlord's title thereto.

Section 9.03.  If Tenant fails to timely take (or cause to be taken), or to diligently and expeditiously proceed to complete (or cause completion) in a timely fashion, any such action described in Section 9.01 or 9.02 hereof, Landlord may, in its sole and absolute discretion, upon prior written notice to Tenant, make payments toward the performance or satisfaction of the same, but shall in no event be under any obligation to do so.  All sums so advanced or paid by Landlord (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, and fines or other penalty payments) and all sums paid in connection with any judicial or administrative investigation or proceeding relating thereto, will immediately, upon demand, become due and payable from Tenant.

Section 9.04.  Without Landlord's prior written consent, Tenant shall not (a) change, consent or apply for the change of the zoning or any land use regulation affecting the Demised Premises or any part thereof, or (b) combine the Demised Premises with any other parcel to create an enlarged zoning or tax lot.

ARTICLE 10

Discharge of Liens

In the event that the Demised Premises or any part thereof or Tenant's leasehold interest therein shall, at any time during the Term, become subject to any vendor's, mechanic's, laborer's, materialman's or other lien, encumbrance or charge other than any such lien based upon the furnishing of materials or labor to Landlord and contracted for by Landlord, Tenant shall cause the same, at its sole cost and expense, to be discharged or bonded promptly after notice thereof.

ARTICLE 11

Right of Landlord to Perform Tenant's Covenants

Landlord shall have the right at any time, after ten (10) days' notice to Tenant (or without notice in case of emergency or in case any fine, penalty or cost may otherwise be imposed or incurred), or upon such lesser period of notice as is otherwise herein provided for, to make any payment or perform any act required of Tenant under this Lease, and in exercising such right, to incur necessary and incidental costs and expenses, including, without limitation, reasonable counsel fees and expenses.  Nothing herein shall imply any obligation on the part of Landlord to make any payment or perform any act required of Tenant, and the exercise of the right so to do shall not constitute a release of any obligation or a waiver of any default.  All payments made by Landlord and all costs and expenses incurred by Landlord in connection with any exercise of such right, shall be payable to Landlord by Tenant within ten (10) days after written demand.

GFI's Exhibit 18, Page 171 of 221

**EXHBIT D**

ARTICLE 12

Entry on Demised Premises by Landlord

At any time, Landlord, through its agents or employees, at all reasonable times and upon prior notice to Tenant, shall have the right to enter the Demised Premises to inspect same.

ARTICLE 13

Assignment and Subletting

Section 13.01.  Tenant shall not assign this Lease or its interest under this Lease, directly or indirectly, unless it first obtains the prior written consent of Landlord and its lender, which may be withheld in either's sole discretion, whether reasonable or unreasonable.  Notwithstanding the foregoing, but subject to the terms and conditions of the Loan Documents, Tenant shall have the right to enter into individual space tenant leases at the Demised Premises ("Space Leases") or modify, amend, cancel, terminate, extend or renew any Space Leases.  In addition, Tenant shall not grant easements, licenses, rights-of-way or any other rights or privileges in the nature of easements with respect to the Demised Premises without the prior written consent of Landlord in each instance.

Section 13.02.  During the Term, neither this Lease nor the Term hereby demised shall be mortgaged by Tenant, nor shall Tenant mortgage or pledge the interest of Tenant in and to any Space Lease or the rentals payable thereunder, except as required by the Lender in connection with a first mortgage loan secured by the Demised Premises.  Any such mortgage or pledge and any Space Lease, easement, license, right-of-way or other right or privilege made or granted in violation of or without compliance with Section 13.01 of this Lease shall be null and void.

Section 13.03.  Tenant may not otherwise sell, assign, transfer, mortgage, pledge or otherwise dispose of any interest in, including personal property (other than obsolete or worn out personalty that are contemporaneously replaced by unencumbered items of equal or better function and quality), of the Demised Premises without Landlord's prior written consent, which Landlord may grant or withhold in its sole discretion.

Section 13.04.  Any assignment, transfer or other disposition of Landlord's interest in and to this Lease shall include a corresponding assignment of Landlord's rights under all supplemental agreements between Landlord and Tenant relating to the Demised Premises or this Lease as well as all of Landlord's rights under the Loan Documents associated with this Lease.

ARTICLE 14

Use of Demised Premises; Quiet Enjoyment

Section 14.01.    Tenant shall use the Demised Premises solely as a multifamily residential rental property and other uses, in compliance with the Loan Documents, incidental thereto.

Section 14.02.    Tenant, upon paying amounts payable under this Lease provided for and observing and keeping the covenants, agreements, terms and conditions of this Lease on its part to be observed and performed, shall, subject to the covenants, agreements, terms and conditions of this Lease, lawfully and quietly hold, occupy and enjoy the Demised Premises during the Term, without hindrance or molestation by Landlord or by any other party claiming under Landlord.

ARTICLE 15

Indemnification of Landlord; Limitation of Liability

Section 15.01.  In addition to Tenant's obligations to indemnify Landlord as set forth in other Sections of this Lease, Tenant will indemnify and save harmless Landlord, its beneficiaries, trustees, partners, members, shareholders, officers, directors and employees (each individually an "Indemnified Party" and collectively, the "Indemnified

**GFI's Exhibit 18, Page 172 of 221**

EXHBIT D

Parties") from and against any and all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including, without limitation, reasonable attorneys' fees and expenses, which may be imposed upon or incurred by or asserted against such persons (except to the extent the same are caused by the negligence or willful misconduct of Landlord, its agents, employees, licensees, invitees, contractors and/or subcontractors) by reason of any of the following occurring during the Term:

(a)     any work or thing done by anyone other than Landlord in, on or about the Demised Premises or any part thereof;

(b)     any use, non-use, possession, occupation, condition, operation, maintenance or management of the Demised Premises or any part thereof or any street, alley, sidewalk, curb, passageway or space adjacent thereto;

(c)     any negligence of Tenant or any agent, contractor, employee, licensee or invitee of Tenant;

(d)     any accident or injury to any person (including death) or damage to property occurring in, on or about the Demised Premises or any part thereof or any street, alley, sidewalk, curb, passageway, or space adjacent thereto;

(e)     any failure on the part of Tenant to perform or comply with any of the agreements, terms or conditions contained in this Lease on its part to be performed or complied with; and

(f)     any indemnification or reimbursement owed by Landlord to Lender (i) as a result of any failure or default by Tenant of its obligations under this Lease, or (ii) arising from any other obligation, loss, liability, damage or expense for which Tenant must indemnify or reimburse Landlord pursuant to the terms of this Lease.

In the event that any action or proceeding shall be brought against an Indemnified Party by reason of any matter covered by this Section, Tenant, upon notice from the Indemnified Party, will at Tenant's sole cost and expense resist or defend the same. To the extent of the proceeds received by Landlord under any insurance policy furnished or supplied to Landlord by Tenant, Tenant's obligation to indemnify and save harmless an Indemnified Party against the hazard which is the subject of such insurance shall be deemed to be satisfied.

Section 15.02.

(a)     Tenant is fully familiar with the physical condition of the Demised Premises and takes the same hereunder "as is" and "where is."

(b)     TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) HAS NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE DEMISED PREMISES, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO ITS FITNESS FOR USE OR PURPOSE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, LATENT OR PATENT, AS TO LANDLORD'S TITLE THERETO, OR AS TO VALUE, COMPLIANCE WITH SPECIFICATIONS, LOCATION, USE, CONDITION, MERCHANTABILITY, QUALITY, DESCRIPTION, DURABILITY OR OPERATION, IT BEING AGREED THAT ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY TENANT. In the event of any defect or deficiency in the Demised Premises of any nature, whether patent or latent, Landlord shall not have any responsibility or liability with respect thereto or for any incidental or consequential damages (including strict liability in tort). The provisions of this Section 15.02 have been negotiated, and the foregoing provisions are intended to be a complete exclusion and negation of any warranties by Landlord, express or implied, with respect to the Demised Premises, arising pursuant to the uniform commercial code or any other Law now or hereafter in effect or otherwise.

(c)     Tenant acknowledges and agrees that Tenant has examined the title to the Demised Premises prior to the execution and delivery of this Lease and has found such title to be satisfactory for the purposes contemplated by this Lease.

GFI's Exhibit 18, Page 173 of 221

EXHBIT D

(d)     Landlord hereby assigns to Tenant, to the extent assignable and without recourse or warranty whatsoever, all warranties, guaranties and indemnities, express or implied, and similar rights which Landlord may have against any third party in respect of the Demised Premises, including, without limitation, any manufacturer, seller, engineer, contractor or builder, including, but not limited to, any rights and remedies existing under contract or pursuant to the uniform commercial code (collectively, the "Guaranties") except those which relate to the structural components of the Demised Premises.  Such assignment shall remain in effect until the expiration or earlier termination of this Lease.  Landlord shall also retain the right to enforce any Guaranties assigned in the name of Tenant upon the occurrence of an Event of Default.  Landlord hereby agrees to execute and deliver at Tenant's expense such further documents, including powers of attorney, as Tenant may reasonably request in order that Tenant may have the full benefit of the assignment effected or intended to be effected by this Section 15.02(d).  Upon the termination of this Lease, the Guaranties shall automatically revert to Landlord.  The foregoing provision of reversion shall be self-operative and no further instrument of reassignment shall be required.  In confirmation of such reassignment Tenant shall execute and deliver promptly any certificate or other instrument which Landlord may request.  Any monies collected by Tenant under any of the Guaranties after the occurrence of and during the continuation of an Event of Default shall be held in trust by Tenant and promptly paid over to Landlord.  To the extent any of the Guaranties are not assignable by Landlord, Landlord shall, upon request by Tenant, enforce same for the benefit of Tenant, at Tenant's sole cost and expense.

Section 15.03.  Tenant shall indemnify Landlord against all legal costs and charges incurred in obtaining possession of the Demised Premises after default by Tenant or after Tenant's default in surrendering possession upon expiration or earlier termination of this Lease or enforcing any covenant or agreement of Tenant herein contained.  In addition, Tenant shall indemnify Landlord for the Landlord's indemnification, reimbursement and other similar obligations to the Lender.

Section 15.04.  Notwithstanding anything to the contrary provided in this Lease, there shall be absolutely no personal liability on the part of Landlord, its beneficiaries, trustees, members, partners, officers, directors, agents, employees, and/or disclosed or undisclosed principals with respect to any of the terms, covenants and conditions of this Lease, and Tenant shall look solely to the equity of Landlord in the Property for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease, such exculpation of personal liability to be absolute and without any exception whatsoever.

Section 15.05.  The obligations of Tenant under this Article 15 and under Section 26.02 shall survive the expiration or earlier termination of this Lease, by which is meant that a claim relating to any matter occurring, arising, accruing or otherwise happening during the term of this Lease as to which Tenant has obligations under this Article 15 or under Section 26.02, may be asserted against Tenant after (and notwithstanding) the expiration or earlier termination of this Lease.

Section 15.06.  Tenant hereby waives any right to claim that this Agreement creates a de facto guaranty relationship between the parties or entitles the Tenant to guarantor protections.

ARTICLE 16

Default and Remedies

Section 16.01.  If during the Term any one or more of the following acts or events (any one of such events or acts being herein called an "Event of Default") shall occur:

(a)     Tenant (i) shall, subject to Section 3.07(b), default in making the payment of any installment of the Monthly Rent, or any component thereof, or any Operating Costs or Impositions as and when the same shall become due and payable hereunder, which default continues for a period of ten (10) days following written notice thereof from Landlord, or (ii) shall fail to pay any other amounts payable under this Lease as and when the same shall become due and payable or shall default in any other manner curable by the payment of money; or

(b)     Tenant shall default in the performance of or compliance with any of the other covenants, agreements, terms or conditions of this Lease to be performed by or complied with by Tenant (other than any default

GFI's Exhibit 18, Page 174 of 221

## EXHBIT D

curable by payment of money), and such default shall continue for a period of thirty (30) days after receipt of written notice thereof from Landlord to Tenant, or, in the case of a default which cannot, with due diligence, be cured within thirty (30) days, Tenant shall fail to proceed promptly (except for unavoidable delays) after the giving of such notice and with all due diligence to cure such default and thereafter to prosecute the curing thereof with all due diligence (it being intended that as to a default not susceptible of being cured with due diligence within thirty (30) days, the time within which such default may be cured shall be extended for such period as may be reasonably necessary to permit the same to be cured with all due diligence; provided, however that in no event shall the extension of any such cure period exceed any applicable cure periods under the Loan Documents or otherwise result in a cure period exceeding one hundred eighty (180) days); or

(c)        Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, composition, readjustment or similar relief under any present or future bankruptcy or other applicable Law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, or liquidator of Tenant or of all or any substantial part of its properties or of all or any part of the Demised Premises; or

(d)        if within ninety (90) days after the filing of an involuntary petition in bankruptcy against Tenant or the commencement of any proceeding against Tenant seeking any reorganization, composition, readjustment or similar relief under any Law, such proceeding shall not have been dismissed, or if, within ninety (90) days after the appointment, without the consent or acquiescence of Tenant, of any trustee, receiver or liquidator of Tenant or of all or any substantial part of the properties of Tenant or of all or any part of the Demised Premises, such appointment shall not have been vacated or stayed on appeal or otherwise, or if, within ninety (90) days after the expiration of any such stay, such appointment shall not have been vacated, or if, within ninety (90) days after the taking of possession, without the consent or acquiescence of Tenant, of the property of Tenant by any Governmental Authority pursuant to statutory authority for the dissolution or liquidation of Tenant, such taking shall not have been vacated or stayed on appeal or otherwise; or

(e)        if Tenant shall assign, pledge or encumber any of the rentals or other sums payable from time to time under the Space Leases, other than to Landlord's lender, as may be requested by Landlord; or

(f)        if, without the consent of Landlord (or as otherwise permitted herein), Tenant's interest in this Lease or the Term hereby demised shall be mortgaged, encumbered or pledged; or

(g)        if any representation, warranty or statement made or deemed to be made by Tenant hereunder or in connection herewith is or proves to have been incorrect or misleading in any material respect when made; or

(h)        if it becomes unlawful for Tenant to perform any material obligation hereunder or under any other document executed in connection herewith; or

(i)        Tenant ceases to do business or terminates its business as presently conducted for any reason whatsoever or institutes any proceeding for its dissolution or termination; or

(j)        if Tenant fails to deliver possession of the Demised Premises at the end of the Term; or

(k)        if any act or omission of Tenant results in the breach of any indenture, deed of trust, mortgage or other instrument (beyond any applicable notice and cure periods contained therein) to which Landlord or Tenant is a party or to which the Demised Premises is bound or may be affected;

then, and in any such event, and during the continuance thereof, Landlord may at its option, then or thereafter while any such Event of Default shall continue and notwithstanding the fact that Landlord may have any other remedy hereunder or at law or in equity, and without prejudice to any of the same, pursue one or more of the following remedies:  (1) by notice to Tenant, designate a date, not less than ten (10) days after the giving of such notice, on which this Lease shall terminate; and thereupon, on such date the Term of this Lease and the estate hereby granted shall expire and terminate upon the date specified in such notice with the same force and effect as if the date specified in such notice were the date herein fixed for the expiration of the Term of this Lease, and all rights of Tenant hereunder

GFI's Exhibit 18, Page 175 of 221

## EXHBIT D

shall expire and terminate, but Tenant shall remain liable as hereinafter provided and/or (2) pursue any other remedies available to Landlord at law or in equity; so long as the foregoing actions are not prohibited by documents evidencing and/or securing a first mortgage loan secured by the Property.  In the event of any Default by Tenant as hereinabove provided, Landlord shall have the option to enter the Property and do whatever Tenant is obligated to do under the terms of this Agreement and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in effecting compliance with Tenant's obligations under this Agreement, and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such Action.

Section 16.02.  If this Lease is terminated as provided in Section 16.01, or as permitted by Law, Tenant shall peaceably quit and surrender the Demised Premises to Landlord, and Landlord may, without further notice, enter upon, re-enter, possess and repossess the same by summary proceedings, ejectment or other legal proceeding, and again have, repossess and enjoy the same as if this Lease had not been made, and in any such event neither Tenant nor any person claiming through or under Tenant by virtue of any Law or an order of any court shall be entitled to possession or to remain in possession of the Demised Premises but shall forthwith quit and surrender the Demised Premises. After any termination of this Lease, Landlord will be entitled to recover all unpaid rent that has accrued through the date of termination plus the costs of performing any of Tenant's obligations (other than the payment of rent) that should have been but were not satisfied as of the date of such termination.

Section 16.03.  Notwithstanding the provisions of 16.01(a)(i) above (but only with respect to failure to fully and timely pay Stated Rent), it shall not be a default so long as any amounts remain owing under the Loan and so long as, after providing for Base Rent, Operating Costs, Impositions and all other obligations hereunder except Stated Rent (collectively, the "Expenses"), and after providing for an amount equal to one-half of the amounts owning hereunder as Stated Rent (the "Minimum Current Stated Rent"), all Tenant's revenues after Expenses and Minimum Current Stated Rent ("Cash Flow") shall be allocated and paid toward Stated Rent.  The shortfall if any shall be accrued (the "Accrued Stated Rent") and paid as follows:

(a)   The Accrued Stated Rent shall bear interest at the rate of Prime plus 3% until paid;

(b)   Accrued Stated Rent plus interest thereon shall be paid on the next succeeding due date of Stated Rent hereunder, to the extent of available Cash Flow;

(c)   All Accrued Stated Rent plus interest thereon shall be due and payable in full on the earlier of 91 days after (x) the date the Lender's Loan is indefeasibly paid in full or (y) the end of the Term, provided however, all such payment rights hereunder shall be at all times fully subordinated to the Loan Documents.

Section 16.04.  Upon the occurrence and during the continuance of an Event of Default, in addition to any other remedies available to Landlord under this Lease, at law or in equity, Landlord shall have the right to continue this Lease in full force and effect, whether or not Tenant shall have abandoned the Demised Premises.  If Landlord elects to continue this Lease in full force and effect pursuant to this Section 16.04, then Landlord shall be entitled to enforce all of its rights and remedies under this Lease, including the right to recover rent as it becomes due.  Landlord's election not to terminate this Lease pursuant to this Section 16.04 or pursuant to any other provision of this Lease, at law or in equity, shall not preclude Landlord from subsequently electing to terminate this Lease or pursuing any of its other remedies.

Section 16.05.  The exercise, or beginning of the exercise, by Landlord of any one or more of the rights or remedies provided for in this Lease or otherwise existing at law or in equity, or otherwise, shall not preclude the simultaneous or later exercise by Landlord of any or all other rights or remedies so provided for or so existing.  The obligations of Tenant under this Article 16 shall survive the expiration or any earlier termination of this Lease.

## ARTICLE 17

### Additional Rights of Landlord

Section 17.01.  No right or remedy conferred upon or reserved to Landlord shall be exclusive of any other right or remedy, and any right and remedy shall be cumulative and in addition to every other right or remedy given hereunder or now or hereafter existing at law or in equity.  The failure of Landlord to insist at any time upon the strict

GFI's Exhibit 18, Page 176 of 221

EXHBIT D

performance of any covenant or agreement or to exercise any right, power or remedy contained in this Lease shall not be construed as a waiver or relinquishment thereof for the future.  A receipt by Landlord of any installment of Monthly Rent (or any component thereof) or any other amount hereunder with knowledge of the breach of any covenant or agreement contained in this Lease shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. Landlord shall be entitled, to the extent permitted by Law, to injunctive relief in case of the violation, or attempted or threatened violation, of any covenant, agreement, condition or provision of this Lease or to a decree compelling performance of any covenant, agreement, condition or provision of this Lease, or to any other remedy allowed Landlord by Law.

Section 17.02.  If an Event of Default occurs and is continuing during the Term, Tenant hereby waives and surrenders for itself and all those claiming under it (a) any right and privilege which it or any of them may have under any Law to redeem the Demised Premises or to have a continuance of this Lease for the Term after termination of Tenant's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease, or after the termination of the Term of this Lease as herein provided, and (b) the benefits of any Law which exempts property from liability for debt or for distress for rent.

Section 17.03.  If Tenant shall be in default in the observance or performance of any of its obligations under this Lease and an action shall be brought for the enforcement thereof in which it shall be determined that Tenant was in default, Tenant shall pay to Landlord the expenses incurred in connection therewith, including reasonable attorneys' fees.

Section 17.04.  Landlord May inspect and audit Tenant's books and records to the extent Landlord is required to do so in order to comply with the terms of the Loan Documents.

ARTICLE 18

Estoppel Certificates

Tenant will, from time to time upon not less than ten (10) days' prior written request by Landlord, deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, and setting forth such modifications) and the dates to which the Monthly Rent and other amounts due hereunder have been paid, and either stating that to the knowledge of Tenant no default exists in the performance of any covenant, agreement or condition contained in this Lease or specifying each default of which Tenant may have knowledge.

ARTICLE 19

No Merger

There shall be no merger of this Lease or of the leasehold estate hereby created with the fee estate in the Demised Premises or any part thereof by reason of the fact that the same person may acquire or hold, directly or indirectly, this Lease or the leasehold estate hereby created, or any interest in this Lease or in such leasehold estate, as well as the fee estate in the Demised Premises.

ARTICLE 20

Surrender and Holding Over

Section 20.01.  Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Demised Premises (except as to any portion thereof with respect to which this Lease has previously terminated) to Landlord or, if applicable, to the Lender or other party to whom possession is due under the terms of the Loan Documents, including any agent of the Lender or a receiver.  Tenant shall remove from the Demised Premises on or prior to such expiration or earlier termination the trade fixtures and personal property that are owned by Tenant, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal.  Trade fixtures and personal property not so removed at the end of the Term or within thirty (30) days after

GFI's Exhibit 18, Page 177 of 221

## EXHBIT D

the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Demised Premises.  The cost of removing and disposing of such property and repairing any damage to any of the Demised Premises caused by such removal shall be borne by Tenant.  Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property that becomes the property of Landlord as a result of such expiration or earlier termination.

Section 20.02  Any holding over by Tenant of the Demised Premises after the expiration or earlier termination of the Term of this Lease or any extensions thereof, with the consent of Landlord, shall operate and be construed as a tenancy from month to month only, at the Monthly Rent reserved herein and otherwise upon the same terms and conditions as contained in this Lease.  Notwithstanding the foregoing, any holding over without Landlord's consent shall entitle Landlord, in addition to collecting Monthly Rent at a rate of one hundred fifty percent (150%) thereof from and after the date of such holding over, to exercise all rights and remedies provided by law or in equity, including the remedies of Section 16.01.

## ARTICLE 21

### Space Leases

Tenant covenants and agrees to observe and perform all of the duties and obligations of the landlord/lessor to be observed and performed under Space Leases and to use Tenant's best efforts to enforce the conditions and obligations imposed on the tenants under the Space Leases to the extent prudent in the then current market.  Subject to the terms of this Lease, during the Term, Tenant shall be entitled to all of the benefits of the "Landlord" under the Space Leases (whether the Space Leases are entered into by Landlord or Tenant), including, without limitation, the right to collect and use the rents under the Space Leases.  Tenant shall not assign the right to receive any rental or other sums payable under the Space Leases or any other rights under the Space Leases, without the prior written consent of Landlord in each instance.

## ARTICLE 22
### [Intentionally Omitted]

## ARTICLE 23

### Sales Commission

Section 23.01.  Coterminous with the term of this Lease, Landlord hereby appoints Tenant to act as Landlord's agent with respect to the marketing and sale of the Property (the Tenant in such capacity the "Marketing Agent").  Notwithstanding anything in this Lease to the contrary, including, but not limited to, Section 3.08, Landlord and Tenant acknowledge and agree that any fees payable to Tenant pursuant to this Article 23 shall be paid to Tenant in its capacity as Marketing Agent of Landlord.  Each party shall reflect the transactions represented by this Article 23 in all applicable books, records and reports (including, without limitation, income tax filings) in a manner consistent with the characterization set forth in this Article 23.

Section 23.02.  Tenant will be entitled to a reasonable sales commission, based upon market rates not to exceed 3% of the gross sales price, from the gross proceeds from the sale of the Property.

Section 23.03.  Upon the sale or exchange of the Demised Premises, Tenant will also be entitled to receive a disposition fee equal to one percent (1%) of the gross sales price of the Demised Premises (the "Disposition Fee").  The Disposition Fee will be paid to Tenant at the closing of the sale or exchange of the Demised Premises.  In its sole discretion, Tenant may choose to waive any or all of the Disposition Fee to which it is otherwise entitled pursuant to this Article 23.  Notwithstanding anything to the contrary contained herein, the Disposition Fee (a) is fully subject and subordinate to any mortgage or deed of trust encumbering Landlord's estate in the Property ("Security Instrument") and all of the lender's rights and benefits under any Security Instrument, and (b) does not apply to any sale of the Property by any lender or its designee in connection with a foreclosure (and Tenant hereby waives the Disposition Fee with respect thereto).  The Disposition Fee is also fully subject and subordinate to any amounts due or owed to Terra University Flats Pref LLC under that certain Operating Agreement of Greeley Flats,

GFI's Exhibit 18, Page 178 of 221

## EXHBIT D

JV, LLC, a Delaware limited liability company, and the Disposition Fee shall not be paid unless and until all amounts due to be paid under such Operating Agreement, now or in the future, have been paid, which payments under the Operating Agreement are also fully subject and subordinate to the Security Instrument.

## ARTICLE 24

### Fee Mortgages

Tenant shall not mortgage, pledge or otherwise finance its interest in this Lease or the Demised Premises. Both Tenant and Landlord agree that, for federal and applicable state tax purposes, Tenant and Landlord shall characterize this Lease in a manner consistent with applicable tax laws as Tenant and Landlord jointly shall determine. Tenant acknowledges that Landlord may have entered into (or may in the future enter into) mortgage financings related to its ownership of the Property (and as part of such financings, Landlord may pledge its interests in this Lease and execute and/or deliver such other documents and instruments Landlord deems necessary and/or appropriate to consummate such transactions). This Lease is and shall be subject and subordinate to any and all fee mortgages now or hereafter in effect entered into by Landlord, it being understood and agreed that Tenant shall have no responsibility whatsoever under such financing arrangements and/or fee mortgages or to the holder of any such fee mortgages, except as may be otherwise agreed by Tenant in writing. Except as provided in Section 3.01(a), Tenant shall not be required to make any payments nor shall Tenant be deemed to be either a borrower or guarantor under any financing transaction entered into by Landlord. Tenant acknowledges that, pursuant to the Loan Documents, Lender has the right to terminate this Lease. In the event the Lease is not terminated in connection with a foreclosure or deed-in-lieu transaction, then Tenant shall attorn to the purchaser at any foreclosure sale or sale pursuant to the exercise of any power of sale under the Loan Documents, in which event Tenant shall automatically be and become the master tenant of such purchaser.

## ARTICLE 25

### Property Manager

Subject to the terms of the Loan Documents, Tenant may appoint an affiliate or other third-party manager from time to time as the property manager or asset manager for the Property.

## ARTICLE 26

### Hazardous Substances

Section 26.01. Tenant agrees that it will not on, about, or under the Demised Premises, make, release, treat or dispose of any "hazardous substances" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, and the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 *et seq.* (the "Act"); but the foregoing shall not prevent the use of any hazardous substances in accordance with applicable Laws and regulations. Tenant represents and warrants that it will at all times comply with the Act and any other federal, state or local Laws, rules or regulations governing "Hazardous Materials". "Hazardous Materials" as used herein shall mean all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Act; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901 *et seq.;* air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq.;* pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 125 1, *et seq.,* any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, *et seq.,* any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et Seq., any substance listed in the United States Department of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes; any explosives, radioactive material, and any chemical or other substance regulated by federal, state or local statutes similar to the federal statutes listed above and regulations promulgated under such federal, state or local statutes.

GFI's Exhibit 18, Page 179 of 221

EXHBIT D

Section 26.02.  To the extent required by the Act and/or any federal, state or local Laws, rules or regulations governing Hazardous Materials, Tenant shall remove any hazardous substances (as defined in the Act) and Hazardous Materials (as defined above) whether now or hereafter existing on the Demised Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Demised Premises during the Term.  In addition to, and without limiting Article 15 of this Lease, Tenant shall and hereby does agree to defend, indemnify and hold the Indemnified Parties harmless from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including response and remedial costs), and liabilities, including, but not limited to, reasonable attorneys' fees and costs of litigation, arising out of or in any manner connected with (i) the violation of any applicable federal, state or local environmental Law with respect to the Demised Premises or Tenant's or any other person's or entity's prior ownership of the Demised Premises; (ii) the "release" or "threatened release" of or failure to remove, as required by this Article 26, "hazardous substances" (as defined in the Act) and Hazardous Materials (as defined above) at or from the Demised Premises or any portion or portions thereof, including any past or current release and any release or threatened release during the Term whether or not arising out of or in any manner connected with Tenant's occupancy of the Demised Premises during the Term.  The provisions of this Section 26.02 shall survive the expiration or earlier termination of this Lease as provided in Section 15.05.

Section 26.03.  Tenant agrees that it will not install any underground storage tanks at the Demised Premises without specific, prior written approval from the Landlord.  Tenant agrees that it will not store combustible or flammable materials on the Demised Premises in violation of the Act or any other federal, state or local laws, rules or regulations governing Hazardous Materials.

ARTICLE 27
Miscellaneous

Section 27.01.  Each covenant and agreement contained in this Lease shall be construed to be a separate and independent covenant and agreement, and the breach of any such covenant or agreement by Landlord shall not discharge or relieve Tenant from Tenant's obligation to observe and perform each and every covenant and agreement of this Lease to be observed and performed by Tenant.  If any term or provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected, and each term and provision of this Lease shall be valid and enforceable to the maximum extent permitted by Law.

Section 27.02.  This Lease shall be construed and enforced in accordance with the internal laws of the State in which the Demised Premises is located without regard to principles of conflicts of laws.

Section 27.03.  This Lease has been executed and delivered, for the convenience of the Landlord and Tenant, in several counterparts, but it is intended that all counterparts shall constitute only one Lease.  Facsimile signature pages shall be effective for purposes of this paragraph.

Section 27.04.  This Lease (including the attached Exhibits) contains the entire agreement between the parties regarding the subject matter hereof, and any agreement hereafter made shall not operate to change, modify or discharge this Lease in whole or in part unless such agreement is in writing and signed by the party sought to be charged therewith.

Section 27.05.    All covenants, conditions and obligations contained in this Lease shall be binding upon and inure to the benefit of the respective permitted successors and assigns of Landlord and Tenant to the same extent as if such permitted successor and assign were named as a party to this Lease.

Section 27.06.  All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be deemed to have been given for all purposes (i) three (3) days after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, or (ii) one (1) day after having been sent by Federal Express, United Parcel or other nationally recognized air courier service.

GFI's Exhibit 18, Page 180 of 221

## EXHBIT D

To the Addresses stated below:

If to Landlord:    Greeley Flats DST
16B Journey
Aliso Viejo, CA  92656
Attn:  Patrick Nelson

If to Tenant:    Greeley Flats Leaseco, LLC
16B Journey
Aliso Viejo, CA  92656
Attn:  Patrick Nelson

If any lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a mortgage encumbering the Demised Premises and states in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall send a copy of such Notice to such lender in the manner aforesaid.  For the avoidance of doubt, Tenant hereby acknowledges that Lender is the holder of a mortgage on the Property and hereby agrees to provide a copy of any such Notice to Lender.  For the purposes of this Section 27.06, any party may substitute its address by giving fifteen (15) days' notice to the other party in the manner provided above.  Any Notice may be given on behalf of any party by its counsel.

Section 27.07.  The leasehold estate created by this Master Lease runs with the land, and shall be binding upon any future owner of the Property.

Section 27.08.  Notwithstanding anything to the contrary contained in this Lease or in any other agreement between the Landlord and the Tenant, at all times while any obligation remains outstanding under the Loan:  (a) both the Tenant and the Landlord shall observe and perform their respective covenants set forth in the Loan Agreement made by and between Lender and the Landlord with respect to the Loan (the "Loan Agreement") and the other Loan Documents; (b) the Tenant shall execute such documents, instruments and agreements as Lender may reasonably require in connection with the Loan Documents, including as specifically provided for in the Loan Agreement; (c) the Tenant shall not take, or fail to take, any action under this Lease which would result in a violation of the Landlord's obligations under the Loan Documents; (d) no amendment or other modification to this Lease may be made or shall be effective without the prior written consent of Lender; and (e) Tenant hereby grants to Landlord, and to Lender to the extent Lender is acting on Landlord's behalf under the terms of the Loan Documents, an irrevocable power of attorney to act on Tenant's behalf if, and to the extent, Tenant fails to take any action at the Demised Premises that is required by the terms of the Loan Documents, and such failure continues following written notice to Tenant.

Section 27.09.  Tenant represents and warrants to Landlord and to Lender that no brokerage fee or commission is due to any party, arising by or through Tenant, as a result of Tenant's leasing of the Property pursuant to the terms of this Lease.

Section 27.10.  Landlord and Tenant agree that, without the prior written consent of Lender, neither this Lease nor a memorandum hereof shall be recorded in the records of the State or County where the Property is located.

Section 27.11.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF LANDLORD AND TENANT (BY ITS ACCEPTANCE HEREOF) (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS LEASE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LANDLORD AND TENANT THAT IS TRIABLE OF RIGHT BY A JURY, AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH OF LANDLORD AND TENANT, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

Section 27.12.  Tenant agrees that any controversy arising under or in relation to this Lease shall be litigated exclusively in the State where the Demised Premises is located.  The state and federal courts and authorities with jurisdiction in the State where the Demised Premises is located shall have exclusive jurisdiction over all controversies

**GFI's Exhibit 18, Page 181 of 221**

**EXHBIT D**

that arise under or in relation to this Lease.  Tenant irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

Section 27.13.  Time is of the essence with respect to this Lease and all actions to be taken hereunder.

Section 27.14.  The following provisions shall apply and run to the benefit of the Lender, and shall remain in effect so long as the Loan is outstanding:

(a)     Notwithstanding any other provision of this Lease, no surrender or termination of this Lease, prior to the expiration of the term of this Lease, as the term may be extended pursuant to extension rights granted herein, shall be effective without the prior written consent of Lender;

(b)     After Lender takes title to the Property, either through foreclosure, by deed in lieu of foreclosure, or other similar process, Lender shall have the right to transfer its interest in the Property without notice to, or the consent of, Tenant and Tenant agrees that subsequent to any such transfer it shall accept the transferee, subject to the terms of this Lease, as the landlord under this Lease;

(c)     Notwithstanding the other provisions of this Lease, all periods of time during which Tenant may take action to cure the occurrence of an event or a failure to act, which event or failure constitutes a default hereunder, shall be identical in length, and shall run concurrently with, the periods of time provided for the cure of the same event or failure under the Loan Documents, and if no period of time to cure, or a shorter period of time to cure, is provided in the Loan Documents, then such period of time shall be applicable with respect to any cure allowed to Tenant under this Lease;

(d)     Notwithstanding Section 27.06 above, all notices provided by Landlord and Tenant under this Lease shall be provided in the same fashion, using the same methods and in the same time frames, required under the Loan Documents;

(e)     Tenant hereby consents and agrees that both Landlord and Lender shall be permitted to share information concerning Tenant, this Lease (and all documents related hereto) and the Property with other parties to the same degrees and extent that Lender is permitted to disclose information about Landlord, and the assets of Landlord, as the borrower under the Loan Documents;

(f)     Upon the occurrence of a default under the Loan Documents, whether or not Tenant is in default under the terms of this Lease, Lender shall have the right to exercise all of the remedies set forth in the Loan Documents relating to the Demised Premises, including, (i) the termination of this Lease, and (ii) the foreclosure of the Demised Premises pursuant to the terms of the Loan Documents, which foreclosure may be undertaken subject to the terms of this Lease or which foreclosure may terminate this Lease;

(g)     All contracts with third parties (other than Space Leases) shall be terminable upon no more than thirty (30) days' notice and without penalty, whether the Tenant is in default under this Lease, or not;

(h)     Following the exercise of remedies by Lender under the Loan Documents, including by taking possession of the Demised Premises, any liability of Lender under this Lease with respect to its operation, possession or ownership of the Demised Premises shall be limited to its interest in the Demised Premises, except to the extent of its gross negligence, willful misconduct or wrongful acts or omissions;

(i)     This Lease is, and shall at all times remain, subject and subordinate to the Loan Documents and all liens created thereunder and the exercise by Lender of its rights and remedies under the Loan documents shall not be affected or impaired by the terms of this Lease or by whether a default has occurred under this Lease; and

(j)     All representations and warranties made by Landlord on behalf of Tenant under the Loan Agreement are true and correct.

Section 27.15.  Except as otherwise provided in the Loan Documents, this Lease, along with all exhibits attached hereto, encompasses the entire agreement of the parties with respect to the lease and operation of the Demised Premises by Tenant, and supersedes all previous understandings and agreements of Landlord and Tenant with respect to the Demised Premises, whether oral or written.

GFI's Exhibit 18, Page 182 of 221

**EXHBIT D**

**[Signature page to follow]**

**SIGNATURE PAGE**

**TO THE**

**MASTER LEASE**

**FOR**

**GREELEY FLATS APARTMENTS**

**LANDLORD:**

**GREELEY FLATS DST,**
a Delaware statutory trust

By:    Greeley Flats ST, LLC,
       a Delaware limited liability company,
       Signatory Trustee

       By:    _____
                   Patrick Nelson
                   Manager

       By:    _____
                   Brian Nelson
                   Manager

**TENANT:**

**GREELEY FLATS LEASECO, LLC,**
a Delaware limited liability company

By:    _____
Name:  _____
Its:    Authorized Signatory

D-21

**GFI's Exhibit 18, Page 183 of 221**

APPENDIX A TO EXHBIT D

### EXHIBIT "A"

ALL THAT PART OF LOTS 12, 13 AND 14, IN THE NW 1/4 OF THE SE 1/4 OF SECTION 8, TOWNSHIP 5 NORTH, RANGE 65 WEST OF THE 6TH P.M., CITY OF GREELEY, WELD COUNTY, COLORADO, ACCORDING TO THE SUBDIVISION OF LANDS BY THE UNION COLONY OF COLORADO, LYING AND BEING SOUTH AND WEST OF THE RIGHT OF WAY OF THE UNION COLONY NO. 3 CANAL; AND ALSO ALL OF THAT VACATED PART OF EIGHTEENTH STREET IN THE CITY OF GREELEY, COLORADO, ABUTTING SAID LOTS 13 AND 14 ON THE SOUTH THEREOF AS FULLY DESCRIBED IN ORDINANCE NO. 570 OF THE CITY OF GREELEY, RECORDED AUGUST 14, 1931 IN BOOK 918 AT PAGE 169 AS RECEPTION NO. 627532, AND IN ORDINANCE NO. 792 OF THE CITY OF GREELEY, RECORDED NOVEMBER 12, 1958 IN BOOK 1517 AT PAGE 156 AS RECEPTION NO. 1290804, ALL BEING IN THE CITY OF GREELEY, COUNTY OF WELD, STATE OF COLORADO;

EXCEPTING THEREFROM A STRIP OF LAND PREVIOUSLY CONVEYED TO THE CITY OF GREELEY, A MUNICIPAL CORPORATION, BY DEED RECORDED DECEMBER 29, 1928 IN BOOK 818 AT PAGE 575, DESCRIBED AS FOLLOWS:  A STRIP OF LAND APPROXIMATELY 30 FEET IN WIDTH ALONG THE WEST SIDE OF LOT 12 OF THE NW 1/4 OF THE SE 1/4 OF SECTION 8, DESCRIBED AS FOLLOWS:  BEGINNING AT A POINT 70 FEET EAST AND 55.9 FEET NORTH OF THE NE CORNER OF BLOCK 6, ARLINGTON HEIGHTS, A SUBDIVISION OF THE CITY OF GREELEY; THENCE EAST PARALLEL WITH AND DISTANT 33 FEET SOUTH FROM THE CENTERLINE OF THE UNION COLONY ROADS ON THE NORTH SIDE OF SAID LOT 12, A DISTANCE OF 30 FEET; THENCE SOUTH, PARALLEL WITH AND DISTANT 100 FEET EAST FROM THE EAST PROPERTY LINE OF SAID BLOCK 6, ARLINGTON HEIGHTS, A DISTANCE OF 298.95 FEET TO A POINT ON THE SOUTH BOUNDARY LINE OF SAID LOT 12; THENCE WEST, 29.55 FEET; THENCE NORTH 298.95 FEET TO THE POINT OF BEGINNING.

Also Known as:  1750 6TH Avenue, Greeley, CO 80631

**GFI's Exhibit 18, Page 184 of 221**

APPENDIX B TO EXHBIT D


EXHIBIT "B"

INSURANCE COVERAGES

Tenant shall, at Tenant's expense (subject to Section 3.01(e) of the Lease), maintain in force and effect on the Property at all times while this Lease continues in effect the following insurance or, if different, such insurance as may be required by any lender that has made a loan to Landlord secured by the Property:

(a)     Insurance against loss or damage to the Property by fire, windstorm, tornado and hail and against loss and damage by such other, further and additional risks as may be now or hereafter embraced by an "all-risk" form of insurance policy. The amount of such insurance shall be not less than one hundred percent (100%) of the full replacement (insurable) cost of the improvements, furniture, furnishings, fixtures, equipment and other items (whether personalty or fixtures) included in the Property and owned by Landlord from time to time, without reduction for depreciation. The determination of the replacement cost amount shall be Landlord's election, by reference to such indices, appraisals or information as Landlord determines in its reasonable discretion. Full replacement cost, as used herein, means, with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor, and means, with respect to such furniture, furnishings, fixtures, equipment and other items, the cost of replacing the same, in each case, with inflation guard coverage to reflect the effect of inflation, or annual valuation. Each policy or policies shall contain a replacement cost endorsement and either an agreed amount endorsement (to avoid the operation of any co-insurance provisions) or a waiver of any co-insurance provisions, all subject to Landlord's approval.

(b)     Comprehensive Commercial General Liability Insurance for personal injury, bodily injury, death and property damage liability in amounts not less than $1,000,000 per occurrence and $3,000,000 in the aggregate (both inclusive of umbrella coverage). During any construction on the Property, Tenant's general contractor for such construction shall also provide the insurance required in this Subsection (b). Landlord hereby retains the right to periodically review the amount of said liability insurance being maintained by Tenant and, not more than annually (unless an event occurs or a state of facts exists which, with the giving of notice and/or the passage of time, would constitute an Event of Default (such event or state of facts, a "Default") shall exist hereunder, in which case such limitation shall not apply), to require an increase in the amount of said liability insurance should Landlord deem an increase to be reasonably prudent under then existing circumstances.

(c)     General boiler and machinery insurance coverage is required if steam boilers or other pressure-fired vessels are in operation at the Property. Minimum liability amount per accident shall be not less than $500,000.

(d)     If the Property is identified by the Secretary of Housing and Urban Development as being situated in an area now or subsequently designated as having special flood hazards (including, without limitation, those areas designated as Zone A or Zone V), flood insurance in an amount equal to the lesser of: (i) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement basis (or the unpaid balance of the indebtedness secured hereby if replacement cost coverage is not available for the type of building insurance); or (ii) the maximum insurance available under the appropriate National Flood Insurance Administration program.

(e)     During the period of any construction on the Property or renovation or alteration of the Improvements, a so-called "Builder's All-Risk Completed Value" or "Course of Construction" insurance policy in non-reporting form for any Improvements under construction, renovation or alteration in an amount approved by Landlord and Worker's Compensation Insurance covering all persons engaged in such construction, renovation or alteration.

(f)     Loss of rents or loss of business income insurance in amounts sufficient to compensate Tenant for all Rents and Profits during a period of not less than twelve (12) months in which the Property may be damaged or destroyed. The amount of coverage shall be adjusted annually to reflect the Rents and Profits of income payable during the succeeding twelve (12) month period.

GFI's Exhibit 18, Page 185 of 221

## APPENDIX B TO EXHBIT D

(g)      Such other insurance on the Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required by Landlord against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, Sinkhole, Mine Subsidence, Earthquake and Environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

All such insurance shall (i) be with insurers authorized to do business in the state within which the Property is located and which have and maintain a rating of at least "A-" from A. M. Best, (ii) contain the complete address of the Property (or a complete legal description), (iii) be for terms of at least one year, (iv) contain deductibles which do not exceed $50,000 or, (x) with respect to the policy described in clause (d) above $250,000, and (y) with respect to windstorm and hail coverage a deductible not to exceed five percent (5%) of the value of the improvements, unless higher deductibles are approved by Landlord, and (v) be subject to the reasonable approval of Landlord as to insurance companies, amounts, content, forms of policies, method by which premiums are paid and expiration dates.

Without limiting the required endorsements to the insurance policies, all such policies shall include a standard, non-contributory, Landlord clause naming Landlord's lender (x) as an additional insured under all liability insurance policies and (y) as the loss payee on all loss of rents or loss of business income insurance policies.  Tenant further agrees that all such insurance policies:  (1) shall provide for at least thirty (30) days' prior written notice to Landlord prior to any cancellation or termination thereof and prior to any material modification thereof which affects the interest of Landlord; (2) with respect to the property and casualty coverages shall contain an endorsement or agreement by the insurer that any loss shall be payable to Landlord in accordance with the terms of such policy notwithstanding any act or negligence of Tenant which might otherwise result in forfeiture of such insurance; (3) with respect to the general liability coverage a severability of interests; (4) shall waive all rights of subrogation against Landlord; (5) in the event that the real estate or the improvements constitutes a legal non-conforming use under applicable building, zoning or land use laws or ordinances, shall include an ordinance or law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to replacement cost with agreed value endorsement), Coverage B:  "Demolition Cost" and Coverage C:  "Increased Cost of Construction" coverages; and (6) may be in the form of a blanket policy provided that, in the event that any such coverage is provided in the form of a blanket policy, Tenant hereby acknowledges and agrees that failure to pay any portion of the premium therefor which is not allocable to the Property or by any other action not relating to the Property which would otherwise permit the issuer thereof to cancel coverage thereof, would require the Property to be insured by a separate, single-property policy.  The blanket policy must properly identify and fully protect the Property as if a separate policy were issued for 100% of replacement cost at the time of loss and otherwise meet all of Landlord's applicable insurance requirements.

GFI's Exhibit 18, Page 186 of 221

APPENDIX C TO EXHBIT D


EXHIBIT "C"

RENT

| Lease Year | Base Rent | Annual Gross Stated Rent* |
|---|---|---|
| Lease Years 1 and 2 | The "Annual Note Payments" | $668,340 |
| Lease Years 3 and 4 | The "Annual Note Payments" | $679,479 |
| Lease Year 5 | The "Annual Note Payments" | $690,618 |
| Lease Years 6 and 7 | The "Annual Note Payments" | $668,340 |
| Lease Year 8 | The "Annual Note Payments" | $679,479 |
| Lease Years 9 and 10 | The "Annual Note Payments" | $690,618 |

\*     Before distribution of Stated Rent, the Trust will be permitted, in its discretion, to charge the Landlord for Delaware trustee fees, bank fees, legal fees, tax return preparation charges and other expenses incurred by the Master Tenant currently estimated to be $5,000 per year.

Option Term 1    The Total Annual Rent for each Lease Year of Option Term 1 shall be equal to the sum of the Stated Rent for the last Lease Year of the Original Term (calculated on a full year basis) plus the then-annual debt service applicable in each Lease Year of Option Term 1, with a floor equal to the Total Annual Rent payable during the final Lease Year of the Original Term and a maximum equal to 1.05 times the Total Annual Rent during the final Lease Year of the Original Term.

Option Term 2    The Total Annual Rent for each Lease Year of Option Term 2 shall be equal to the sum of the Stated Rent for the final Lease Year of Option Term 1 (calculated on a full year basis) plus the then-annual debt service applicable in each Lease Year of Option Term 2, with a floor equal to the Total Annual Rent payable during the final Lease Year of Option Term 1 and a maximum equal to 1.05 times the Total Annual Rent during the final Lease Year of Option Term 1.

Option Term 3    The Total Annual Rent for each lease year of Option Term 3 shall be equal to the sum of the Stated Rent for the final Lease Year of Option Term 2 (calculated on a full year basis) plus the then-annual debt service applicable in each Lease Year of Option Term 3, with a floor equal to the Total Annual Rent payable during the final Lease Year of Option Term 2 and a maximum equal to 1.05 times the Total Annual Rent during the final Lease Year of Option Term 2.

For purposes of this Exhibit "C", the term "Annual Note Payments" shall mean the aggregate payments falling due during each Lease Year under (a) that certain Promissory Note dated as of the date hereof from Landlord in favor of Lender in the approximate original principal amount of $13,301,000 or (b) such other mortgage financing as may affect the Property from time to time, other than, for the avoidance of doubt, in each case, any balloon payments of principal required in respect of the Loan or such other financing.  If at any time during the Term the amount of the Annual Note Payments or the then-annual debt service, as applicable, changes for any reason (for example, as a result of payment of additional principal, or payment in full of any financing affecting the Property), then in such event the Base Rent and Stated Rent shall be equitably adjusted to take such change into account.  In the event of an increase in Annual Note Payments, such change may include, at the election of the Tenant and if sufficient cash flow from the Property is available, a deemed payment of Stated Rent by the Tenant to the Landlord up to the amount that would otherwise be paid to the Trust as Stated Rent, followed by a remission of such deemed payment by the Tenant on behalf of the Landlord to the Lender in satisfaction of the Landlord's additional obligations under the Loan Documents or such other financing that affects the Property.

GFI's Exhibit 18, Page 187 of 221

**EXHBIT E**

**Form of Supplemental Payment Agreement**

**SUPPLEMENTAL PAYMENT AGREEMENT**
**FOR**
**GREELEY FLATS APARTMENTS**

THIS SUPPLEMENTAL PAYMENT AGREEMENT is entered into to be effective as of April 6, 2018, between Greeley Flats, DST, a Delaware statutory trust (hereinafter called "Owner"), and Greeley Flats LeaseCo, LLC, a Delaware limited liability company (hereinafter called "LeaseCo").

W I T N E S S E T H:

As additional consideration for the execution and delivery by Owner of that certain Master Lease for Greeley Flats Apartments dated as of the date hereof between Owner and LeaseCo (the "Master Lease"), LeaseCo hereby agrees to pay to Owner, in addition to and not in lieu of the Stated Rent set forth in the Master Lease, for the first five years of the term of the Master Lease, the following annual supplemental payments (the "Annual Supplemental Payments"):

| Year | Annual Supplemental Payment |
|---|---|
| Years 1 and 2 | 109,570 |
| Years 3 and 4 | 109,544 |
| Year 5 | 103,962 |

The Annual Supplemental Payments shall be due and payable by LeaseCo to Owner at the same time Stated Rent is due under the Master Lease. In addition, the Annual Supplemental Payments may be accrued by LeaseCo in the same manner and at the same time that Stated Rent may be accrued under the provisions of Section 3.07(b) of the Master Lease.

Notwithstanding the foregoing paragraph, the Annual Supplemental Payments shall not be deemed to be rent under the Master Lease and this Supplemental Payment Agreement shall not be considered to be a modification or supplement to the Master Lease. Rather, as additional consideration for the execution and delivery of the Master Lease by Owner, LeaseCo has agreed to make the Annual Supplemental Payments to Owner from unrestricted funds that otherwise could be distributed by LeaseCo to its member.

**GREELEY FLATS DST**,
a Delaware statutory trust

By:     Greeley Flats ST, LLC,
        a Delaware limited liability company,
        Signatory Trustee

        By:     _____
        Name:   _____
        Its:    Authorized Signatory

**GREELEY FLATS LEASECO, LLC**,
a Delaware limited liability company

By:     _____
Name:   _____
Its:    Authorized Signatory

**GFI's Exhibit 18, Page 188 of 221**

**EXHBIT F**

**Form of Supplemental Collateral Agreement**

**SUPPLEMENTAL COLLATERAL AGREEMENT
FOR
GREELEY FLATS APARTMENTS**

THIS SUPPLEMENTAL COLLATERAL AGREEMENT is entered into to be effective as of April 6, 2018, between Nelson Partners, a Utah limited liability company (hereinafter called "Nelson Partners"), and Greeley Flats LeaseCo, LLC, a Delaware limited liability company (hereinafter called "LeaseCo").

W I T N E S S E T H:

A.        Nelson Partners is the successor to Nelson Brothers Professional Real Estate, LLC ("NBPRE") with respect to certain rights relating to the Greeley Flats Apartments.  Nelson Partners is also the successor to NBPRE with respect to the ownership of (i) Greeley Land, LLC, a Delaware limited liability company ("Greeley Land"), and (ii) LeaseCo, and Nelson Partners is the sole beneficial owner of both Greeley Land and LeaseCo.

B.        Greeley Land is the owner of certain undeveloped real property that lies adjacent to, and accross a flood control channel from, Greeley Flats Apartments (the "Undeveloped Parcel").

C.        LeaseCo is the tenant under the Master Lease for Greeley Flats Apartments dated as of the date hereof between Greeley Flats, DST, a Delaware statutory Trust ("Owner") and LeaseCo (the "Master Lease").  Owner and LeaseCo are also parties to a Supplemental Payment Agreement of even date herewith (the "Supplemental Payment Agreement").

D.        In order to induce Owner to enter into the Master Lease with LeaseCo, Nelson Partners has entered into this Supplemental Collateral Agreement with LeaseCo wherein Nelson Partners agrees to contributed, or to cause Greeley Land to contribute, additional capital to LeaseCo, thereby providing LeaseCo with additional capital, if required, to make rent payments to Owner under the Master Lease or Annual Supplemental Payments under the Supplemental Payment Agreement.

A G R E E M E N T:

With reference to the foregoing, Nelson Partners agrees to contribute to LeaseCo, or to cause Greeley Land to contribute to LeaseCo, Available Capital from the Undeveloped Parcel, when and as Available Capital becomes available to Nelson Partners, at any time LeaseCo does not have sufficient funds available to make payments of Stated Rent under the Master Lease, or Annual Supplemental Payments under the Supplemental Payment Agreement.

For purposes of this Supplemental Collateral Agreement, "Available Capital" means the following capital proceeds that are generated from the Undeveloped Parcel at any time when the Undeveloped Parcel is owned or controlled, directly or indirectly, by Nelson Partners:  (i) net sale proceeds available to be distributed to Nelson Partners upon a sale of the Undeveloped Parcel, or any project developed subsequent to the date hereof on the Undeveloped Parcel, (ii) net finance or refinance proceeds available to be distributed to Nelson Partners following the placement of a lien upon the Undeveloped Parcel, except to the extent such finance or refinance proceeds are intended to be used for the development or operation of the Undeveloped Parcel, and (iii) net casualty and/or net condemnation proceeds that are available to be distributed to Nelson Partners, except to the extent such casualty and/or condemnation proceeds are intended to be used to reconstruct or improve the Undeveloped Parcel.

If Available Capital becomes available to Nelson Partners at a time when LeaseCo has sufficient funds to make all required payments of Stated Rent and all required Annual Supplemental Payments, then Nelson Partners agrees to contribute, or to cause Greeley Land to contribute, the Available Capital to LeaseCo, which Available Capital shall be held and used by LeaseCo for future payments of Stated Rent or Annual Supplemental Payments. Alternatively, Nelson Partners or Greeley Land may hold such Available Capital as restricted capital, to be contributed to LeaseCo when and as additional capital is required to pay Stated Rent or Annual Supplemental Payments.

**GFI's Exhibit 18, Page 189 of 221**

**EXHBIT F**

The maximum amount of Available Capital that Nelson Partners shall be required to contribute to LeaseCo, in the aggregate, is $700,000.  All contributions of capital from Nelson Partners, or on behalf of Nelson Partners, to LeaseCo, other than payments on the existing Demand Note provided by NBPRE to LeaseCo, shall reduce future amounts of Available Capital required to be contributed to LeaseCo pursuant to the terms of this Supplemental Collateral Agreement.

This Supplemental Collateral Agreement shall not restrict or limit the right of Nelson Partners or its affiliates to lease, develop and/or operate the Undeveloped Parcel.  Nelson Partners shall not be required to sell, finance or refinance the Undeveloped Parcel in order to generate Available Capital.

**NELSON PARTNERS, LLC**,
a Utah limited liability company

By: _____
Name: _____
Its:　　Authorized Signatory

**GREELEY FLATS LEASECO, LLC**,
a Delaware limited liability company

By: _____
Name: _____
Its:　　Authorized Signatory

**GFI's Exhibit 18, Page 190 of 221**

**EXHBIT G**

**Financial Forecast**

THE FINANCIAL PROJECTIONS CONTAINED HEREIN SHOULD NOT BE CONSTRUED AS PREDICTIONS OF THE ACTUAL OPERATING RESULTS OF THE PROPERTY OR THE ACTUAL RESULTS OF INVESTING IN THE INTERESTS. THE FINANCIAL PROJECTIONS ARE INTENDED MERELY TO ILLUSTRATE THE POTENTIAL RESULTS THAT THE PROPERTY MIGHT ACHIEVE IF THE ACCOMPANYING ASSUMPTIONS ARE ACHIEVED. WHILE THE SPONSOR BELIEVES THAT THE ASSUMPTIONS ARE REASONABLE, THEY ARE NECESSARILY SPECULATIVE AND SUBJECT TO MANY UNCERTAINTIES AND RISKS. IT IS LIKELY THAT FUTURE EVENTS AND CONDITIONS WILL BE DIFFERENT FROM THOSE ASSUMED AND THAT ACTUAL RESULTS WILL BE DIFFERENT FROM THOSE ILLUSTRATED, AND THOSE DIFFERENCES MAY BE MATERIAL.

THE FORWARD-LOOKING STATEMENTS CONTAINED IN THIS MEMORANDUM AND THE ADDENDUM, INCLUDING, WITHOUT LIMITATION, STATEMENTS REGARDING FUTURE EVENTS, ACTIVITIES, OCCURRENCES OR PERFORMANCES, ARE INTENDED MERELY AS ESTIMATES, PROJECTIONS, PREDICTIONS OR BELIEFS REGARDING THESE FUTURE EVENTS, ACTIVITIES, OCCURRENCES OR PERFORMANCES, UNLESS EXPRESSLY STATED OTHERWISE. FOR VARIOUS REASONS, INCLUDING THOSE SET FORTH IN THE "RISK FACTORS" SECTION OF THIS MEMORANDUM, THERE CAN BE NO ASSURANCE THAT THE ACTUAL EVENTS WILL CORRESPOND WITH THESE FORWARD-LOOKING STATEMENTS OR THAT FACTORS BEYOND THE CONTROL OF THE COMPANY WILL NOT AFFECT THE ASSUMPTIONS ON WHICH THE FORWARD-LOOKING STATEMENTS ARE BASED. THEREFORE, THE ILLUSTRATIVE VALUE OF THESE FORWARD-LOOKING STATEMENTS FOUND IN THIS MEMORANDUM SHOULD NOT, UNDER ANY CIRCUMSTANCES, BE CONSIDERED A GUARANTEE THAT SUCH FUTURE EVENTS, ACTIVITIES, OCCURRENCES OR PERFORMANCES WILL TAKE PLACE.

THE FINANCIAL PROJECTIONS WERE COMPILED BY THE SPONSOR AND REPRESENT THE SPONSOR'S BEST ESTIMATE OF THE EXPECTED PERFORMANCE OF THE PROPERTY. THE FINANCIAL PROJECTIONS WERE NOT EXAMINED OR OTHERWISE PASSED UPON BY THE SPONSOR'S LEGAL COUNSEL.

PROSPECTIVE INVESTORS SHOULD SEEK THE ADVICE OF THEIR OWN INDEPENDENT LEGAL AND TAX ADVISERS WITH RESPECT TO AN INVESTMENT IN THE PROPERTY AND THE PROSPECTIVE RISKS AND REWARDS THEREFROM

**GFI's Exhibit 18, Page 191 of 221**

## EXHIBIT G

| ProForma Analysis: | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Investor Equity | $11,113,000 | | | | | | | | | |
| Revenue Growth Rate | | 12.4% | 3.1% | 3.0% | 1.5% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| Economic Vacancy | | 2.5% | 3.0% | 3.0% | 4.5% | 4.5% | 4.5% | 4.5% | 4.5% | 4.5% |
| Expense Growth Rate | | -10.9% | 21.8% | 2.1% | 1.7% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% |
| Total Units | 93 | | | | | | | | | |

| | 2018-19 | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 | 2025-26 | 2026-27 | 2027-28 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Income/Unit/Month** | 1,808 | 1,863 | 1,919 | 1,976 | 2,035 | 2,096 | 2,159 | 2,224 | 2,291 | 2,360 |
| Rent | 2,018,216 | 2,078,762 | 2,141,125 | 2,205,359 | 2,271,520 | 2,339,665 | 2,409,855 | 2,482,151 | 2,556,616 | 2,633,314 |
| Other Income | 53,407 | 67,826 | 69,861 | 71,957 | 74,115 | 76,339 | 78,629 | 80,988 | 83,417 | 85,920 |
| Economic Vacancy | (50,254) | (62,051) | (63,913) | (98,580) | (101,537) | (104,583) | (107,721) | (110,952) | (114,281) | (117,709) |
| Total Operating Income | 2,021,370 | 2,084,537 | 2,147,074 | 2,178,736 | 2,244,098 | 2,311,421 | 2,380,764 | 2,452,187 | 2,525,752 | 2,601,525 |
| **Expenses** | | | | | | | | | | |
| Payroll Expenses | 159,995 | 163,194 | 166,458 | 169,788 | 173,183 | 176,647 | 180,180 | 183,784 | 187,459 | 191,208 |
| Utilities | 213,966 | 218,245 | 222,610 | 227,062 | 231,603 | 236,236 | 240,960 | 245,779 | 250,695 | 255,709 |
| Contract Services | 34,688 | 35,381 | 36,089 | 36,811 | 37,547 | 38,298 | 39,064 | 39,845 | 40,642 | 41,455 |
| Maintenance & Grounds | 30,272 | 30,878 | 31,495 | 32,125 | 32,768 | 33,423 | 34,092 | 34,774 | 35,469 | 36,178 |
| Repairs | 6,695 | 6,829 | 6,965 | 7,105 | 7,247 | 7,392 | 7,540 | 7,690 | 7,844 | 8,001 |
| Turnover Expenses | 26,520 | 27,050 | 27,591 | 28,143 | 28,706 | 29,280 | 29,866 | 30,463 | 31,072 | 31,694 |
| General & Administrative | 51,135 | 52,158 | 53,201 | 54,265 | 55,350 | 56,457 | 57,586 | 58,738 | 59,913 | 61,111 |
| Marketing | 8,558 | 21,479 | 21,909 | 22,347 | 22,794 | 23,250 | 23,715 | 24,189 | 24,673 | 25,166 |
| Property Taxes | 503 | 110,856 | 113,073 | 113,303 | 115,569 | 117,880 | 120,238 | 122,643 | 125,096 | 127,597 |
| Property Insurance | 33,213 | 33,878 | 34,555 | 35,246 | 35,951 | 36,670 | 37,404 | 38,152 | 38,915 | 39,693 |
| Management Fees | 60,641 | 62,536 | 64,412 | 65,362 | 67,323 | 69,343 | 71,423 | 73,566 | 75,773 | 78,046 |
| **Total Expenses** | **626,186** | **762,484** | **778,360** | **791,557** | **808,041** | **824,875** | **842,066** | **859,622** | **877,550** | **895,859** |
| Expense Ratio | 31.0% | 36.6% | 36.3% | 36.3% | 36.0% | 35.7% | 35.4% | 35.1% | 34.7% | 34.4% |
| **Net Operating Income** | **1,395,184** | **1,322,053** | **1,368,714** | **1,387,180** | **1,436,057** | **1,486,546** | **1,538,698** | **1,592,565** | **1,648,202** | **1,705,666** |
| Debt Service | (543,555) | (594,555) | (594,555) | (594,555) | (594,555) | (805,888) | (805,888) | (805,888) | (805,888) | (805,888) |
| Cash Flow After Debt Service | 851,629 | 727,498 | 774,159 | 792,625 | 841,502 | 680,658 | 732,810 | 786,677 | 842,314 | 899,778 |
| Distributions % | 7.00% | 7.00% | 7.10% | 7.10% | 7.15% | 6.01% | 6.01% | 6.11% | 6.21% | 6.21% |
| Principal Reduction | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 1.94% | 2.03% | 2.12% | 2.22% | 2.32% |
| Total Distribution plus Loan Paydown | 7.00% | 7.00% | 7.10% | 7.10% | 7.15% | 7.95% | 8.04% | 8.23% | 8.43% | 8.53% |
| Cash Distribution Amount | 777,910 | 777,910 | 789,023 | 789,023 | 794,580 | 668,340 | 668,340 | 679,479 | 690,618 | 690,618 |

**GFI's Exhibit 18, Page 192 of 221**

**EXHIBIT H**

**Tax Opinion of Special Tax Counsel**

[See attached]

GFI's Exhibit 18, Page 193 of 221

**EXHIBIT H**

*IRVINE VENTURE LAW FIRM, LLP*
*ATTORNEYS AT LAW*
*19900 MacArthur Boulevard, Suite 530*
*IRVINE, CALIFORNIA 92612*
*TELEPHONE: (949) 660-7700*
*FACSIMILE: (949) 660-7799*

March 5, 2018

NB Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
16 B Journey
Aliso Viejo, CA 92656

Ladies and Gentlemen:

You have requested our opinion (the "Opinion") as to whether, for federal income tax purposes, an investor's acquisition of a beneficial interest (an "Interest") in NB Greeley Flats, DST, a Delaware statutory trust described in Chapter 38 of Title 12 of the Delaware Code (the "Trust"), will be treated as an acquisition of a direct interest in the Real Estate (as defined herein) for purposes of Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code"). Capitalized terms not otherwise defined in this Opinion shall have the meanings ascribed to them in the Private Placement Memorandum dated March 2018.

Based on the relevant facts and applicable law and subject to the qualifications discussed below, we conclude that, for federal income tax purposes, the acquisition by an investor (an "Investor") of substantially all of a beneficial interest in the Trust should be treated as a direct acquisition of an interest in the Real Estate by the Investor for purposes of Code Section 1031. A tax opinion rendered at a "should" level of confidence such as this Opinion involves a greater degree of certainty than a "more likely than not" opinion, but it is not a "will" opinion nor any guarantee of tax consequences. There cannot be complete assurance that the Internal Revenue Service (the "IRS") would not agree with our conclusions, would not challenge our conclusions upon audit, and would not prevail in their challenge if litigated.

In addition, qualification of a transaction pursuant to Code Section 1031 for an Investor involves issues based on numerous specific facts which are not and cannot be known to us; therefore, we give no opinion as to the ability of any Investor to effectuate a tax-deferred exchange of like-kind property under Code Section 1031. This Opinion addresses only one aspect of qualifying under Code Section 1031, *i.e.,* whether the acquisition of an Interest can be treated as a direct acquisition of an interest in the Real Estate for purposes of Code Section 1031. We are not opining as to whether some portion of the Real Estate may be "personal property" as opposed to "real property" for purposes of Code Section 1031, or as to whether any amounts paid by, or deemed paid by, the Investors with respect to certain costs or expenses of the offering, financing costs and amounts paid to fund the reserve for capital expenses will be deemed to constitute other consideration received in the exchange or the acquisition of real estate or to the sponsor

GFI's Exhibit 18, Page 194 of 221

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 2

of the Trust for organizing and syndicating interests in the Trust. Finally, this Opinion does not address any state, local or non-United States income tax consequences, or any non-income tax consequences, of the transactions described herein.

In giving this Opinion, we have reviewed the following:

(i)     the form of Trust Agreement of the Trust (the "Trust Agreement"), to be entered into between The Corporation Trust Company, as Delaware Trustee (the "Delaware Trustee"), up to two unrelated third parties, each as Independent Trustee (collectively the "Independent Trustee"), NB Greeley Flats ST, LLC, as Signatory Trustee (the "Signatory Trustee," and together with the Delaware Trustee and the Independent Trustee, the "Trustees"), NB  Greeley Flats IB, LLC, a Delaware limited liability company, as the initial beneficiary of the Trust (the "Initial Beneficiary") and the Investors;

(ii)     the Purchase Agreement entered into with Greeley Realty Investors, LLC, a Colorado limited liability company, (the "Seller"), pursuant to which the Trust will acquire for a purchase price of $21,834,970 the student housing apartment complex commonly known as The Greeley Flats located at 1758 6th Avenue, Greeley, Colorado (the parcel of real estate and the improvements located thereon are collectively referred to as the "Real Estate");

(iii)     the loan documents (the "Loan Documents") with respect to the loan (the "Loan") in the anticipated principal amount of $13,000,000 entered into with the Lender;

(iv)     the Master Lease (the "Master Lease") to be entered into between the Trust and NB Greeley Flats Lease Co, LLC, a Delaware limited liability company (the "Master Tenant") and an affiliate of Nelson Brothers Professional Real Estate, LLC, the sponsor of the offering of the Interests (the "Sponsor");

(v)     the Private Placement Memorandum with respect to the Interests, including all supplements thereto through the date of this Opinion (the "Private Placement Memorandum") (items (i) through (v) are collectively referred to as the "Transaction Documents");

(vi)     applicable provisions of the Code, final, temporary and proposed Treasury Regulations promulgated thereunder, judicial decisions, Revenue Rulings and other interpretative releases of the IRS; and

(viii)     such other materials and documents as we considered relevant.

Our Opinion is expressly based upon certain assumptions, factual information and representations that have been provided to us, including the following: (i) the Interests will be acquired by the Investors directly from the Trust and the Initial Beneficiary's

GFI's Exhibit 18, Page 195 of 221

## EXHIBIT H

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 3

interests in the Trust will be reduced in proportion to the amount of such acquisitions; (ii) neither the Initial Beneficiary, any Trustee, nor any Investor has made or will make an election, or has taken or will take any other action, that would cause the Trust to be classified as an association taxable as a corporation or a partnership for federal income tax purposes; (iii) the Investors intend to use the proceeds from their sale or exchange of other real estate to acquire the Interests as part of transactions intended to qualify under Code Section 1031; (iv) all parties to the Transaction Documents and their affiliates will comply with all provisions of the Transaction Documents, and will take no action otherwise inconsistent with the Transaction Documents or any terms of this Opinion, including amending any Transaction Documents; (v) there are no other Transaction Documents or other written or oral agreements or understandings inconsistent with or significant to the transactions contemplated herein, and any final Transaction Documents that were not final as of the date of our review will conform with the Transaction Document drafts we have reviewed in all material respects; (vi) there are no other Transaction Documents or other written or oral agreements or understandings inconsistent with or significant to the transactions contemplated herein, and any final Transaction Documents that were not final as of the date of our review will conform with the Transaction Document drafts we have reviewed in all material respects; (vii) all payments made to the Trust, the Trustees and their affiliates will be at fair market value; (viii) the Lender is not related to any Investor or Trustee; and (ix) the Master Tenant reasonably expects to realize a commercially reasonable profit from its participation in the subject transaction. We have assumed the accuracy and completeness of all documents and records that we have reviewed, the genuineness of all signatures, the authenticity of the documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as pro forma or reproduced copies.

RELEVANT PROVISIONS IN THE TRUST AGREEMENT AND MASTER LEASE

*Trust Agreement*

Article I provides in part that all Interests in the Trust shall be of a single class.

Section 2.03 provides that the purposes of the Trust are: (i) to acquire and own the Real Estate and all related personal property; (ii) to enter into or assume and comply with the terms of the Transaction Documents (as defined in the Trust Agreement); (iii) to conserve, protect, manage and dispose of the Real Estate; and (iv) to take such other actions as the Trustees deem necessary and advisable to carry out the foregoing. Section 2.03 also provides that the Trust shall hold the Trust Property solely for investment purposes (and not for the active conduct of a trade or business), that neither the Trustees, the Investors or their agents shall provide non-customary services with respect to the Real Estate pursuant to Revenue Ruling 75-374, and that the Trust shall conduct no activities other than as specifically provided in Section 2.03.

**GFI's Exhibit 18, Page 196 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 4

Section 2.04 states that the Trustees hold the Trust Property for the benefit of the Investors, subject to the obligations of the Trust under the Master Lease, the Loan Documents and other relevant agreements. Section 2.04 further states that it is the intention of the parties to the Trust Agreement that the Trust constitute a "statutory trust" within the meaning of Sections 3801 through 3826 of Chapter 38, Title 12 of the Delaware Code (the "Act"), and that the Trust not constitute an agency, partnership, association or business trust for federal income tax purposes. Instead, each Investor shall be treated for federal income tax purposes as owning a direct interest in the Real Estate and other Trust assets and shall be obligated to report the Interest consistent with such characterization.

Section 2.05(a) prohibits the Trustees and the Investors from causing the Trust to perform any act in contravention of, or constituting an event of default under, the Loan Documents. Section 2.05(b) requires the Trustees and the Investors to maintain the separateness of the Trust by maintaining separate books, records, and bank accounts for the Trust, and holding the Trust out to third parties as a distinct legal entity, in order to prevent a substantive consolidation of the Trust with the bankruptcy of any other person, including any Investor or any affiliate of the Trust. Sections 2.05(c) and (d) prohibit the Trustees and the Investors from taking (or consenting to) certain bankruptcy-related actions with respect to the Trust and the Real Estate.  Section 2.05(e) requires the Trust to comply with Loan covenants.

Section 3.01 provides that any proposed transfer or assignment by an Investor of part or all of its Interest is subject to the prior written consent of the Signatory Trustee and satisfaction of certain preconditions set forth in the Trust Agreement.

Article IV directs the Signatory Trustee to distribute all available cash to the Investors in accordance with their "Percentages" (as such term is defined in the Trust Agreement), only retaining funds as required for a reasonable reserve as necessary to pay anticipated current and future ordinary Trust expenses and liabilities. Undistributed cash may be invested only in short-term government obligations and in certificates of deposit or interest-bearing bank accounts with a bank or trust company having a minimum stated capital. All such obligations must be held until maturity and must mature prior to any distribution to Investors.

Section 5.01(a) states that the Trust Agreement shall not impose a partnership or joint venture relationship on the Investors, and no Investor shall have any liability for debts or obligations of any other Investor, nor have authority to act on behalf of any other Investor with respect to the Trust Property. Section 5.01(c) provides that, from and after the time there is more than one Investor (including the Initial Beneficiary) in the Trust, the Trust "shall not constitute a business entity for federal tax purposes, but shall instead constitute an investment trust pursuant to Regulation 301.7701-4(c)" and a "grantor trust" within the meaning of Subpart E of Part 1, Subchapter J of the Code (Code Sections 671 *et seq.).*

Section 5.02 provides that the Trust and not the Investors shall have legal title to Trust Property, and the Trust Agreement shall not be terminated by reason of the bankruptcy,

**GFI's Exhibit 18, Page 197 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 5

death or other incapacity of any Investor, or the transfer by any Investor of any interest in Trust Property. In addition, Section 5.02 also provides that the Investors shall not be liable for any liabilities or obligations of the Trust or the Trustees or for the performance of the Trust Agreement.

Section 5.04 provides that Investors do not have the right to demand or receive an in-kind distribution or partition of Trust Property from the Trust.

Section 5.05 provides for the avoidance of doubt that, except solely with respect to choosing a successor Trustee, the Investors have no right to make decisions for or to operate or manage the Trust.

Section 6.04 provides that the Trustees shall manage, control, dispose of or otherwise deal with the Trust Property, subject to the restrictions set forth in the Trust Agreement.

Section 7.02 authorizes the Signatory Trustee to take all actions necessary to conserve and protect the Trust Property, including: (a) receive the contribution of the purchase agreement for the Real Estate and to acquire, own, conserve, protect and sell the Real Estate; (b) to enter into or assume and comply with the Master Lease, the Loan Documents and the other Transaction Documents; (c) to conserve and protect the Real Estate in a manner consistent with the Trust's obligations under the Master Lease; (d) to collect rents and make distributions to the Investors; (e) to enter into agreements for purposes of completing tax-free exchanges of real property with a qualified intermediary as defined in the Treasury Regulations under Section 1031 of the Code; (f) to notify the parties of any default in the Transaction Documents; (g) to enter into a management agreement and engage an affiliated or unaffiliated asset manager; and (h) to enter into new leases with respect to the Real Estate or to refinance any debt secured by the Real Estate, but solely to the extent necessitated by the bankruptcy or insolvency of a tenant.

Section 7.03 prohibits the Trustees from taking the following actions if the effect would be that such actions would constitute the exercise of a power under the Trust Agreement to "vary the investment of the certificate holders" under Treasury Regulation Section 301.7701-4(c)(1): (a) reinvest any monies except as provided in Section 4.02 of the Trust Agreement; (b) renegotiate the Loan, enter into new financing, renegotiate the Master Lease or enter into new leases except in the case of a tenant's bankruptcy or insolvency; (c) make other than minor non-structural modifications to the Real Estate, other than as required by law; (d) accept any capital from the Investors or any new investor in the Trust except as provided for in connection with the initial capitalization pursuant to the Private Placement Memorandum; or (e) take any other action which in the reasoned opinion of tax counsel to the Trust should be expected to cause the Trust to be treated as a "business entity" for federal income tax purposes.

Sections 9.01 and 9.04 provide that the Trust will dissolve in accordance with Section 3808 of the Act, and that each Investor's share of the Trust Property shall be distributed to the

**GFI's Exhibit 18, Page 198 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 6

Investors pro rata in proportion to each Investor's percentage interest in the Trust, at the earlier of (a) December 31, 2067, or (b) the sale or other disposition of the Real Estate.

Sections 9.02 and 9.03 provide that, notwithstanding Section 9.01, if (a)(i) the Real Estate or any portion of it is at risk of foreclosure or if there is otherwise an event of default under the Loan Documents beyond any applicable notice and cure period, (ii) the Real Estate or any portion thereof is subject to a casualty, condemnation or similar event that is not adequately compensated through insurance or otherwise, (iii) the Signatory Trustee determines that the Investors are at risk of losing all or a substantial part of their investment, and (b) the Trustees are prohibited by reason of Section 7.03 of the Trust Agreement from taking action to conserve or protect the value of the Real Estate with respect to such items, then the Signatory Trustee (or the Independent Trustee) shall take actions that include terminating the Trust by converting it into (or otherwise effecting the transfer of the Trust Property to) a Delaware limited liability company (the "LLC") and converting or exchanging the Interests with the Investors for equivalent membership interests in the LLC. Section 9.03(c) clarifies that any such conversion shall be characterized as (i) a distribution of the Trust Property to the Investors in termination of the Trust, followed by (ii) the contribution by the Investors of the Trust Property to the LLC in exchange for interests in the LLC.

A. *Master Lease*

Section 2.01 provides that the initial term of the Master Lease is ten years, and that the Master Tenant has the option to renew the Master Lease (upon the terms and conditions set forth in the Master Lease and the Loan Documents) for up to three additional consecutive terms of five years each.

Section 3.01(a) and Exhibit C provide that the amount of rent payable for a year is equal to a base amount (the "Base Rent") equal to sum of the amounts payable by the Trust to the Lender under the Loan Documents for such year; specified for each year in the Master Lease. Exhibit C provides Base Rent and Annual Gross Stated Rent ("Stated Rent") and further provides that if the amounts payable under the Loan Documents change for any reason, the amounts of Base Rent and Stated Rent are subject to equitable adjustment or for payment over to the Lender as additional debt service, as the circumstances require.

Section 3.01(b) provides that the Master Tenant is required to pay all "Operating Costs" and "Impositions" *(e.g.,* taxes on the Real Estate) with respect to the Real Estate, as such terms are defined in the Master Lease.

Section 3.07(b) provides that the Master Tenant may defer (but not eliminate) its obligation to pay Stated Rent so long as the Master Tenant pays all Base Rent and all Operating Costs and impositions relating to the Real Estate. Any such deferred Stated Rent will bear interest at a rate of 2% per year, and is required to be paid no later than 91 days after the Loan is repaid or the Real Estate is sold or exchanged by the Trust.

GFI's Exhibit 18, Page 199 of 221

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 7

Section 3.08 sets forth the agreement of the Trust and the Master Tenant that the Master Lease is a true lease and not a financing arrangement, partnership, joint venture, management or other arrangement, and that all record keeping and reporting with respect to the Master Lease will be consistent therewith.

Section 4.02 provides that the Master Tenant is required, at its own cost, to acquire and maintain insurance in respect of the Real Estate in the amounts and against the risks described in the Master Lease for the duration of the Master Lease.

Section 7.01 provides that the Master Tenant is responsible for all "Operating Costs" (as such term is defined in the Master Lease), and is also responsible taking good care, including paying all costs and expenses required therefor, of the premises, alleyways and passageways and the sidewalks, curbs and vaults adjoining the premises, and keep the same (or cause the same to be kept) in good order and condition, ordinary wear and tear and obsolescence excepted, and make necessary nonstructural repairs thereto, interior and exterior.

Section 7.02 provides that the Trust is responsible for all "Capital Expenses" (as such term is defined in the Master Lease).

Section 7.05 provides that if the Master Tenant uses any "Reserve Funds" (as such term is defined in the Master Lease") established for the benefit of the Trust to pay any obligations of the Master Tenant, then the Master Tenant must reimburse such amounts on or before the expiration or termination of the Master Lease. Section 7.05 further provides that the if Master Tenant bears an expense that is an obligation of the Trust under the Master Lease, the Master Tenant may reduce Stated Rent in order to recover such advances and that any unreimbursed advances are required to be repaid to the Master Tenant out of the proceeds of the sale or exchange of the Real Estate (if not fully reimbursed by the time of such sale).

Section 8.01 provides that the Master Tenant may make alterations to (but not additions to, removals of or substitutions for) the Real Estate with the Landlord's prior written consent, provided that certain other conditions are met.

Section 13.01 provides that the Master Tenant may enter into subleases of the Real Estate with subtenants, but may not assign its rights and obligations under the Master Lease to any other person without the consent of the Trust and the Lender.

Section 13.02 provides that the Master Tenant may not mortgage or otherwise pledge its interest in the Master Lease or in the amounts it receives from subtenants, except as required by the Lender in connection with its Loan to the Trust secured by the Real Estate.

Section 16.01 provides that if any "Event of Default" occurs, the Trust can give notice of such default and terminate the Master Lease after giving notice. Pursuant to Section 16.01, an "Event of Default" includes, but is not limited to: (a) the failure by the Master Tenant to

**GFI's Exhibit 18, Page 200 of 221**

## EXHIBIT H

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 8

pay Rent (subject to the provisions of Section 3.07(b) of the Master Lease); (b) the filing by the Master Tenant of a voluntary bankruptcy petition or the adjudication of the Master Tenant as a bankrupt or insolvent; (c) the mortgage or pledge by the Master Tenant of its interest in the Master Lease; (d) the termination by the Master Tenant of its business; or (c) any act or omission of the Master Tenant that results in the breach of any indenture, deed of trust, mortgage or similar instrument to which the Trust is a party or to which the Real Estate is bound or may be affected.

TAX ANALYSIS

It is our opinion that, for federal income tax purposes, the acquisition by the Investors of the Interests should be treated as the direct acquisition by the Investors of the Real Estate for purposes of Code Section 1031.

The principal authority governing the treatment of interests in Delaware statutory trusts for purposes of Code Section 1031 is Revenue Ruling 2004-86, 2004-2 C.B. 191. As more fully described below, our conclusion as to the treatment of the Interests under Code Section 1031 is based largely on the similarity between the facts described in Revenue Ruling 2004-86 and the facts surrounding the Trust, and the Treasury Regulations and case law that form the basis for the revenue ruling.

*Treatment of the Interests as Qualified Property for Purposes of Code Section 1031*

Code Section 1031 provides that no gain or loss is recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for the productive use in a trade or business or for investment ("Qualified Property").

Code Section 1031 does not apply to certain types of property, including stocks, bonds, notes, other securities or evidences of indebtedness or interest, partnership interests and certain trust interests. However, even though these types of interests do not qualify for like-kind exchange treatment, an exchange of such interests may still qualify under Code Section 1031 if the tax law disregards–or looks through the legal form of ownership and treats the owner of the interests as directly owning the Qualified Property underlying such interests.

The IRS has issued Revenue Ruling 2004-86, which holds that, assuming other requirements of Code Section 1031 are satisfied, a taxpayer may exchange real property for a beneficial interest in a Delaware statutory trust such as the trust described in the ruling (the "DST") in a tax-free exchange under Code Section 1031. The holding of Revenue Ruling 2004-86 is based on certain factual assumptions regarding the provisions of the trust agreement of the DST, although not all the facts described in the ruling are crucial to its holding. The facts in the Ruling are as follows:

On January l, 2005, A, an individual, borrows money from BK, a bank, and signs a 10-year note bearing adequate stated interest, within the meaning of

**GFI's Exhibit 18, Page 201 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 9

Code Section 483. On January 1, 2005, A uses the proceeds of the loan to purchase Blackacre, rental real property. The note is secured by Blackacre and is nonrecourse to A.

Immediately following A's purchase of Blackacre, A enters into a net lease with Z for a term of 10 years. Under the terms of the lease, Z is to pay all taxes, assessments, fees, or other charges imposed on Blackacre by federal, state, or local authorities. In addition, Z is to pay all insurance, maintenance, ordinary repairs, and utilities relating to Blackacre, Z may sublease Blackacre. Z's rent is a fixed amount that may be adjusted by a formula described in the lease agreement that is based upon a fixed rate or an objective index, such as an escalator clause based upon the Consumer Price Index, but adjustments to the rate or index are not within the control of any of the parties to the lease. Z's rent is not contingent on Z's ability to lease the property or on Z's gross sales or net profits derived from the property.

Also on January 1, 2005, A forms DST, a Delaware statutory trust described in the Delaware Statutory Trust Act, Del. Code Ann. title 12, Section 3801 - 3824, to hold property for investment. A contributes Blackacre to DST. Upon contribution, DST assumes A's rights and obligations under the note with BK and the lease with Z. In accordance with the terms of the note, neither DST nor any of its beneficial owners are personally liable to BK on the note, which continues to be secured by Blackacre.

The trust agreement provides that interests in DST are freely transferable. However, DST interests are not publicly traded on an established securities market. DST will terminate on the earlier of 10 years from the date of its creation or the disposition of Blackacre, but will not terminate on the bankruptcy, death, or incapacity of any owner or on the transfer of any right, title, or interest of the owners. The trust agreement further provides that interests in DST will be of a single class, representing undivided beneficial interests in the assets of DST.

Under the trust agreement, the trustee is authorized to establish a reasonable reserve for expenses associated with holding Blackacre that may be payable out of trust funds. The trustee is required to distribute all available cash less reserves quarterly to each beneficial owner in proportion to their respective interests in DST. The trustee is required to invest cash received from Blackacre between each quarterly distribution and all cash held in reserve in short-term obligations of (or guaranteed by) the United States, or any agency or instrumentality thereof, and in certificates of deposit of any bank or trust company having a minimum stated surplus and capital. The trustee is permitted to invest only in obligations maturing prior to the next distribution date and is required to hold such obligations until maturity. In addition to the

**GFI's Exhibit 18, Page 202 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 10

right to a quarterly distribution of cash, each beneficial owner has the right to an in-kind distribution of its proportionate share of trust property.

The trust agreement provides that the trustee's activities are limited to the collection and distribution of income. The trustee may not exchange Blackacre for other property, purchase assets other than the short-term investments described above, or accept additional contributions of assets (including money) to DST. The trustee may not renegotiate the terms of the debt used to acquire Blackacre and may not renegotiate the lease with Z or enter into leases with tenants other than Z, except in the case of Z's bankruptcy or insolvency. In addition, the trustee may make only minor non-structural modifications to Blackacre, unless otherwise required by law. The trust agreement further provides that the trustee may engage in ministerial activities to the extent required to maintain and operate DST under local law.

On January 3, 2005, B and C exchange Whiteacre and Greenacre, respectively, for all of A's interests in DST through a qualified intermediary, within the meaning of Treasury Regulation 1.1031(k)-1(g). A does not engage in a Code Section 1031 exchange. Whiteacre and Greenacre were held for investment and are of like kind to Blackacre, within the meaning of Code Section 1031.

Neither DST nor its trustee enters into a written agreement with A, B, or C, creating an agency relationship. In dealings with third parties, neither DST nor its trustee is represented as an agent of A, B, or C.

BK is not related to A, B, C, DST's trustee or Z within the meaning of Code Section 267(b) or Code Section 707(h). Z is not related to B, C, or DST's trustee within the meaning of Code Section 267(b) or Code Section 707(b).

The IRS's conclusions in Revenue Ruling 2004-86 were as follows:

(1) The Delaware statutory trust described above is an investment trust, under Treasury Regulations §301.7701-4(c) that will be classified as a trust for federal tax purposes.

(2) A taxpayer may exchange real property for an interest in the Delaware statutory trust described above without recognition of gain or loss under Code Section 1031, if the other requirements of Code Section 1031 are satisfied.

The IRS noted that, under the facts of the ruling, if the DST's trustee had the power to do one or more of the following acts, it would be classified as a partnership or other business entity: (i) dispose of Blackacre and acquire new property; (ii) renegotiate the lease with Z or enter into leases with tenants other than Z; (iii) renegotiate or refinance the obligation used to purchase Blackacre; (iv) invest cash received to profit from market fluctuations;

**GFI's Exhibit 18, Page 203 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 11

or (v) make more than minor nonstructural modifications to Blackacre not required by law.

In addition, the DST would not have qualified as an "investment" trust had it been able to (a) accept additional contributions of new cash or assets from existing or new owners, or (b) invest reserves and cash in investments other than short term government obligations, certificates of deposit or interest bearing accounts that are held to maturity and that mature prior to the distribution of cash to the DST's owners.

Other facts in Revenue Ruling 2004-86 in our view are not determinative of the outcome, including (a) that Blackacre was subject to the note and lease prior to being contributed to the DST, (b) that each owner had a right to an in-kind distribution of the DST's property, (c) that the persons who acquired interests in the DST pursuant to exchanges under Code Section 1031 acquired their interests indirectly from the original owner of the DST, rather than the DST itself and (d) that the loan the DST was nonrecourse and not recourse to the DST in that the DST's only substantial asset was its real property.

In determining whether an Investor's acquisition of an Interest should be treated as the direct acquisition of the Real Estate, we analyze below in light of all relevant authorities: (i) the Trust's classification as an entity (and not as an agency or other co-ownership arrangement) for federal income tax purposes; (ii) the Trust's classification as an "investment" trust (and not as a business entity) for federal income tax purposes; (iii) whether the relationship between the Trust and the Master Tenant constitutes for federal income tax purposes either (A) a partnership, or (B) an agency arrangement or management contract; (iv) the Trust's classification as a "grantor trust" for federal income tax purposes; and (v) the treatment of the Investors as holding a direct interest in Trust Property for federal income tax purposes.

   1. *Classification of the Trust as an Entity Separate from the Investors for Federal Income Tax Purposes*

Whether the Trust is treated as an entity separate from the Investors for federal income tax purposes depends upon its treatment under local law and the nature of the relationships created among the parties to the Trust pursuant to the Trust Agreement.

Section 3801(g) of the Act provides that a Delaware statutory trust is an unincorporated association which is created by a governing instrument for the purpose of holding property for business or investment. This section further provides that "any such association ... shall be a statutory trust and a separate legal entity." Section 3803 of the Act provides that owners of a trust are "entitled to the same limitation of personal liability extended to stockholders of private corporations for profit organized under the general corporation law ...." Section 3804 of the Act provides that a statutory trust may sue or be sued, and that its property is subject to attachment and execution as if it were a corporation. Section 3805(a) of the Act provides that, except as otherwise provided in the trust agreement, a beneficial owner of an interest in a trust shall have an undivided

**GFI's Exhibit 18, Page 204 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 12

beneficial interest in the property of the trust and shall share in the profits and losses of the trust pro rata in proportion to the owner's percentage interest in the trust. Section 3805 further provides that no creditor of the trustee or a beneficial owner has any right to obtain possession of trust property, and that, except to the extent otherwise provided in the trust agreement, interests in a trust are freely transferable. Section 3815 of the Act provides that a trust may merge into or consolidate with other trusts or other business entities.

In Revenue Ruling 2004-86, after describing certain relevant provisions of the Act (including those described above), and after observing that the DST was "formed for investment purposes," the IRS concluded that the DST was an entity for federal income tax purposes. We believe that the Trust is substantially similar to the DST described in Revenue Ruling 2004-86. First, and most importantly, both the DST and the Trust are Delaware statutory trusts, subject to the provisions of the Act set forth above. Second, Section 2.03 of the Trust Agreement provides that the purposes of the Trust are to acquire, conserve, protect, hold and manage the Real Estate for investment purposes, and to dispose of the Real Estate, which is consistent with the purpose of the DST in Revenue Ruling 2004-86 (*i.e.*, "to hold property for investment"). Third, Sections 5.01(a) and 5.02 of the Trust Agreement provide that the Trust Agreement does not purport to create an agency relationship between the Investors, on the one hand, and the Trust or the Trustees, on the other, and that the Investors are not liable for any liabilities or obligations of the Trust or the Trustees or for the performance of the Trust Agreement; this provision is similar to provisions in the DST's trust agreement in Revenue Ruling 2004-86.

> *2. Classification of the Trust as an "Investment" Trust Rather than as a Business Entity for Federal Income Tax Purposes*

Under Treasury Regulation Section 301.7701-4(b), a trust may be classified as a business entity if it is an arrangement for profit-making activity with such activity being conducted either by the trustees (when the trust agreement expressly authorizes the trustee to engage in such activity) or by the beneficiary (when the trustee is merely an agent of the beneficiary and the beneficiary directs the trustee to engage in such activity).

Treasury Regulation Section 301.7701-4(c)(1) provides on the other hand that a trust will be treated as an "investment" trust and not as a business entity if it has "a single class of ownership interests, representing undivided beneficial interests in the assets of the trust," and "there is no power to vary the investment of the certificate holders." The DST in Revenue Ruling 2004-86 was held to be an "investment" trust and not a business entity. The courts and the IRS have considered the distinctions between an "investment" trust and a business entity on several other occasions.

In *Commissioner v. Chase National Bank*, 122 F.2d 540 (2d Cir. 1941), a depositor transferred "units" consisting of the common stock of a number of corporations to a trust, and then sold those trust certificates to investors. The trustee was vested with all of

**GFI's Exhibit 18, Page 205 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 13

the rights of ownership of the shares except that the depositor controlled the voting rights of the shares and the trust instrument governed and restricted the disposal of the shares. Under the terms of the trust instrument, property deposited into the trust was held until some disposition of it was made consistent with the terms of the trust instrument. Further, distributions of currently available funds were required. No purchases were to be made by the trustee by way of reinvestment of funds or otherwise. The IRS argued that the trust was taxable as a corporation for federal income tax purposes. The court rejected the IRS's argument, holding that because the trust agreement required the trust property "to be held for investment and not to be used as capital in the transaction of business for profit like a corporation organized for such a purpose," the trust was prevented from becoming more than a "strict investment" trust. (*Id.* at 543.)

In *Commissioner v. North American Bond Trust,* 122 F.2d 545 (2d Cir. 1941), *cert. denied,* 314 U.S. 701 (1942), an opinion issued by the Second Circuit on the same day that it issued the *Chase National Bank* opinion, the court reached a different conclusion regarding the treatment of a trust for federal income tax purposes. In contrast to the terms of the trust instrument in the *Chase National Bank* case, the terms of the trust instrument in *North American Bond Trust* accorded the depositor with the power "to take advantage of market variations to improve the investments of even the first investors." (*Id.* at 546.) This power arose in two ways. First, in making up new units, the depositor was not confined to the same bonds he had selected for the previous units. Second, the bonds of all units constituted a single pool in which each certificate holder shared according to his proportion of all the certificates issued. As a result, the money from new investors could he used to purchase new bond issues which would in turn reduce the existing certificate holders' interests in the old bond issues. Based on these facts, the court held that the depositor "had power, though a limited power, to vary the existing investments of all certificate holders at will..." *(Id.),* and accordingly that the trust was an association taxable as corporation.

Revenue Ruling 75-192, 1975-1 C.B. 384, concerned a trust agreement that required the trustee to invest cash on hand between quarterly distribution dates in short term government obligations or in certificates of deposit issued by banks with minimum stated surplus and capital that mature prior to the following distribution date. The IRS concluded that, because the trust agreement restricted the trustee to a fixed return similar to that earned on a bank account, there was no opportunity to profit from market fluctuations. Accordingly, the power to invest in short term instruments described in Revenue Ruling 75-192 is not a power to vary a trust's investment

In Revenue Ruling 79-77, 1979-1 C.B. 448, the IRS ruled that a trust formed to hold real property was an ordinary trust under Treasury Regulation Section 301.7701-4(a) and a "grantor trust" within the meaning of Subpart E of Subchapter J, Chapter 1 of the Code *(i.e.,* Code Section 671 *et seq.),* and not a "business entity" within the meaning of Treasury Regulation Section 301.7701-4(b) *(e.g.,* a partnership or an association taxable as a corporation), where the trustee's duties were limited to the following: (i) holding title to real estate; (ii) at the direction of the beneficiaries, signing a 20-year "triple net" lease (with

GFI's Exhibit 18, Page 206 of 221

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 14

renewal options) for the real estate; (iii) enforcing the lease; (iv) signing such other agreements as are approved by the beneficiaries; (v) approving minor alterations to the real estate; and (vi) distributing net income of the trust to the beneficiaries on a quarterly basis.

In other situations, however, the IRS has determined that an arrangement formed to hold real estate was properly classified as a business entity. For example, in Revenue Ruling 78-371, 1978-2 C.B. 344, the heirs to certain real estate established a trust and transferred to the trust real estate subject to a net lease. The trust agreement expressly authorized the trustees to acquire additional real estate, to sell assets of the trust, to invest such sales proceeds in certain types of financial products, to borrow money, to mortgage and lease the trust property, and to build or remove improvements from the trust property without the knowledge or consent of the owners of the trust. The IRS concluded that the trustee's power to engage in extensive real estate operations and to invest the sales proceeds in financial products indicated that that the trust was not formed merely to protect and conserve the trust's property and ruled that the trust was taxable as a corporation.

Revenue Ruling 78-371 should be contrasted, however, with Revenue Ruling 75-374, 1975-2 C.B. 261. In the 1975 ruling, the IRS addressed the level of joint business activity that would cause co-owners of real estate to be viewed as partners for tax purposes. The co-owners of an apartment project hired an unrelated management company to manage the apartment project; the management company negotiated and executed the leases for the apartment units, collected rents and other <u>customary</u> services in connection with the maintenance and repair of the project. Section 2.03 of the Trust Agreement confines the Trustee to customary services within the meaning of Revenue Ruling 75-374

See also Private Letter Ruling 9352008 (September 29, 1993), in which the IRS ruled that an ownership interest in real estate was merely an ownership interest in the real estate and not a partnership interest where the real estate was subject to a triple net lease: "mere co-ownership of an interest in real property without providing more than the customary services of maintenance and repair and collecting of rents will not render a co-ownership a partnership . . [The real estate] is already subject to a net lease, under which the lessee is responsible to pay all insurance premiums, general real estate taxes and special assessments, most of the utility expenses and a significant portion of the repair costs. Therefore, co-ownership of [the real estate] is not, in and of itself, a partnership. Payments from tenants, and paid taxes, assessments and insurance premiums relating to the project. The management company performed (i) all services customarily performed in connection with the maintenance and repair of the apartment project (such as providing heat, air conditioning, hot and cold water, unattended parking, normal repairs, trash removal and cleaning of service areas), and (ii) certain additional services such as attended parking, gas, electricity and other utilities. Customary tenant services were furnished by the management company to the tenants at no additional charge above the basic rental payments. The management company paid the costs incurred in providing the additional services and retained the charges paid by the tenants. The ruling concluded that the co-owners were not partners for tax purposes because the furnishing of customary services in connection with the maintenance and repair did not render the

GFI's Exhibit 18, Page 207 of 221

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 15

co-ownership a partnership. The IRS also found that the management company was not an agent of the co-owners because the co-owners did not share any of the profits realized from the rendition of the non-customary additional services by the management company. Based on IRS's conclusions in Revenue Ruling 75-374, Revenue Ruling 78-371 should not be applicable to situations in which owners of real estate (whether direct or indirect) share only in the proceeds from customary services provided to tenants.

We believe that the arrangements provided for under the Trust Agreement and the Master Lease are similar to the arrangements described in *Chase National Bank* and Revenue Rulings 2004-86, 79-77 and 75-192, and are distinguishable from the arrangements discussed in *North American Bond Trust* and Revenue Ruling 78-371. The Trust satisfies the "one class of interests" requirement because Article I of the Trust Agreement expressly states that the Interests are all of one class.

Section 2.03 of the Trust Agreement provides that the Real Estate is held for investment purposes only and not for the active conduct of a trade or business, and that the Trust will only engage in activities that constitute customary services in connection with the maintenance and repair of the Real Estate. Section 2.04 of the Trust Agreement provides that (i) the Real Estate is held for the benefit of the Investors, (ii) it is the intention of the Trustees and the Investors that the Trust not constitute a business entity for tax purposes, and (iii) each Trustee and Investor agrees not to take any action inconsistent with the foregoing. Section 4.02 of the Trust Agreement requires the Trustees to distribute available cash monthly, and permits the Trustees only to invest cash in instruments described in Revenue Rulings 75-192 and 2004-86. Section 5.01(c) of the Trust Agreement provides that, from and after the admission of the first Investor to the Trust, the Trust "shall not constitute a business entity for federal tax purposes, but shall instead constitute an investment trust pursuant to Regulation 301.7701-4(c)." Section 7.03 of the Trust Agreement provides that, notwithstanding any other provision of the Trust Agreement, the Trustees shall not take certain specified actions, on their own behalf or on the instruction of the Investors, if the effect of such action would be to "vary the investment" of the Investors under Treasury Regulation Section 301.7701-4(e)(1). The Master Lease is a net lease pursuant to which the Master Tenant is responsible for all insurance (other than insurance that relates to Capital Expense items for which the Trust is responsible under the Master Lease), maintenance, ordinary repairs and utilities, and the Master Lease may not be renegotiated unless the tenant becomes bankrupt or insolvent. There are two material differences between the facts with respect to the Trust and the facts set forth in Revenue Ruling 2004-86. First, Sections 9.02 and 9.03 of the Trust Agreement direct the Signatory Trustee, if the Investors are at risk of losing all or a substantial part of their investment, to terminate the Trust by converting it into an LLC, and to convert the Interests into membership interests in the LLC. Second, the Master Tenant and the Signatory Trustee are indirectly related to each other through common ownership. These two differences, however, should not affect the classification of the Trust as an "investment" trust under Treasury Regulation Section 301.7701-4(c)(1) because they do not cause the Trust to have more than a single class of ownership interests and do not create a power to vary the investment of the Investors since they do not enable the Trust or any person on behalf of

**GFI's Exhibit 18, Page 208 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 16

the Trust to take advantage of market fluctuations to improve the investment of the Investors.

*3. Characterization of the Master Lease between the Trust and the Master Tenant*

> *A. The Master Lease should not Constitute a Partnership for Income Tax Purposes*

Rent under the Master Lease is comprised of two elements: (a) Base Rent, which is a nonadjustable, fixed annual payment; and (b) Stated Rent, the amount of which is specifically scheduled and provided for in the Master Lease, but which may be deferred (but not reduced) by the Master Tenant in certain limited circumstances, so long as Base Rent and Real Estate operating expenses are fully paid by the Master Tenant.

As discussed below, we believe that the Master Lease should not constitute a partnership between the Trust and the Master Tenant for income tax purposes. The definition of "partnership" for federal income tax purposes is broad, and embraces unincorporated jointly-owned arrangements that are not partnerships under local law. Code Sections 761(a) and 7701(a)(2) define the term "partnership" as including a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of the Code, a corporation or trust or estate. Whether or not a joint enterprise, such as the one between the Master Tenant and the Trust, is a partnership under state law is not determinative of its status for federal income tax purposes. Thus, a joint enterprise may be classified as a partnership for income tax purposes even though it is not a partnership under state law.

There is no specific factor or set of factors to determine when an arrangement (including a lease) constitutes a partnership for federal income tax purposes. However, courts have indicated that the most important factor is evidence that the participants in an arrangement intended to join together to carry on a business or venture and divide the profits therefrom. (*See, e.g., Commissioner v. Culbertson,* 337 U.S. 733 (1949).) As discussed in greater detail below, additional factors that courts have taken into account are sharing of net profits, losses, joint ownership of capital, joint participation in management and filing partnership tax returns. While it is reasonably clear what types of factors are likely to be considered by the courts and the IRS in determining whether a partnership exists for tax purposes, such factors are generally subjective and difficult to apply.

Ever since *Commissioner v. Culbertson,* in which the Supreme Court said a partnership exists when "considering all the facts the parties intended to join together in the conduct of [a joint] enterprise," the parties' intent is a primary indication of the existence of a partnership. The Master Tenant and the Trust have manifested no intent to form a partnership. Section 3.08 of the Master Lease clearly reflects the intent of the parties that the Master Lease is a "true lease," and is not a partnership or joint venture or management arrangement, and the Master Tenant and the Trust will report the arrangement consistent with such

**GFI's Exhibit 18, Page 209 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 17

characterization. This lack of intent to form a partnership is a strong indication that the Master Tenant and the Trust are not in a partnership.

As the Tax Court in *Federal Bulk Carriers, Inc., v. Commissioner,* 66 T.C. 283 (1976), *aff'd mem.* 558 F.2d 128 (2d Cir. 1977), stated, another "central feature" of a partnership is that the parties have "a proprietary interest in the net profits of the enterprise coupled with an obligation to share its losses." Generally speaking, partners share net profits and losses, whereas non-partnership relationships do not provide for such sharing (although they may provide for a sharing of gross revenues). (*See, e.g., White's Iowa Manual Labor Institute v. Commissioner*, TC Memo 1993-364; *Harlan E. Moore Charitable Trust v. United States 9 F.3d 623 (7th Cir. 1993) acq.* Action on Decision 1994013 (March 28, 1994) (IRS will no longer litigate the status of leases providing for gross revenue sharing along with a sharing of certain expenses between tenant and landlord in the context of certain agricultural leases); *but see Univ. Hill Foundation v. Commissioner,* 51 T.C. 548, 569 (1969), *rev'd on other grounds,* 446 F2d 701 (9th Cir.. 1971), *cert. denied,* 405 US 965 (1972) (lease providing for sharing of net profits between landlord and tenant respected as a lease and not recharacterized as partnership).)

In this case, the economic relationships between the Trust and the Master Tenant should be viewed as consistent with the characterization of the Master Lease as a lease and not as a partnership or joint venture. First, Base Rent is an absolute and fixed obligation of the Master Tenant, and is payable without regard to the cash flow generated by the Real Estate. Second, Stated Rent is also an absolute and fixed obligation of the Master Tenant. Third, the Master Tenant is responsible for the Operating Costs and Impositions with respect to the Real Estate, and bears all of the risk associated with them. Accordingly, the Trust does not share in the losses, if any, incurred by the Master Tenant in its operation of the Real Estate, and the Master Tenant is at risk for and obligated to pay the operating expenses of the Real Estate without recourse to the Trust.

This determination is not impacted by the fact that the Master Tenant may defer its obligation to pay Stated Rent in certain circumstances. The right of the Master Tenant to exercise this deferral only arises if (a) Base Rent and all Real Estate operating expenses are paid by the Master Tenant as provided in the Master Lease, (b) all cash flow from the Real Estate over and above the sum of the items described in clause (a) are used to pay Stated Rent (including any past due Stated Rent); and (c) any Stated Rent that is not currently paid accrues interest and must be paid within 91 days of the sale of the Real Estate or the repayment of the Loan. This is because the Master Tenant's ultimate economic obligation to pay rent is not changed by this deferral right, and the right only arises if the cash flow from the Real Estate is not sufficient to pay the full amount of Stated Rent in any period.

This determination is also not impacted by the fact that if the debt service requirements under the Loan change during the term of the Master Lease, the relative amounts of Base Rent and Stated Rent may be adjusted, or (under certain circumstances where the debt service requirements under the Loan increase during the term of the Master Lease) the

**GFI's Exhibit 18, Page 210 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 18

Master Tenant may pay Stated Rent over to the Lender in satisfaction of the Trust's obligations under the Loan Documents. That is because the Master Tenant's obligation to pay Base Rent does not constitute an assumption by the Master Tenant of the Trust's obligations under the Loan Documents. Rather, Base Rent is paid by the Master Tenant directly to the Lender as a matter of convenience, and thus if the Trust's obligations under the Loan Documents change, the aggregate cash flow obligation of the Master Tenant under the Master Lease will not change. Rather what will change is the amount of overall Rent that is paid over to the Lender for the benefit of the Trust, with the remainder being paid over to the Trust. Accordingly, to the extent a change in the debt service requirements results in a change in the total Rent paid in cash to the Trust (versus being paid for the benefit of the Trust to the Lender), such change does not amount to a sharing of losses between the Master Tenant and the Trust because such a change is a product solely of the Trust's varying obligations under the Loan Documents.

Other elements of the relationship further indicate that the Master Tenant and the Trust are not in a partnership for tax purposes.

If parties combine their capital and services so that they are required to deal with each other to realize the economic benefits from the enterprise, the relationship could be characterized as a partnership. (*See, e.g., Bussing v. Commissioner,* 88 T.C. 449 (1987).) However, the Trust and the Master Tenant do not intend to pool their capital or their services. The Master Tenant did not contribute capital to the Trust's acquisition of the Real Estate and there is no provision in the Master Lease that suggests that it is being used by the Master Tenant to obtain an interest in the Real Estate. On the contrary, the Master Tenant at no time obtains an interest in the Real Estate, and any proceeds of the sale of the Real Estate, subject to market rate sales commissions payable to the Master Tenant or an affiliate which are calculated as a percentage of the gross sales price for the Real Estate, will be for the account of the Trust.

Another factor that courts have cited to demonstrate that parties are in a partnership is joint participation in management. (*Arthur Venneri Co. v. United States,* 340 F.2d 337 (Ct. Cl. 1965).) The Master Tenant is solely responsible for operation and management of the Real Estate, and does not jointly manage the Real Estate with the Trust. The Trust's powers over the Real Estate are substantially limited, not only by the terms of the Master Lease (pursuant to which responsibility for day-to-day management of the Real Estate is vested in the Master Tenant), but also by the terms of the Trust Agreement, which impose strict limits on the actions that may be undertaken by the Trust with respect to the Real Estate. Because the Master Tenant and the Trust are not sharing in the management of the Real Estate, the "joint management" of Greeley Flats is not present.

Finally, pursuant to Section 3.08 of the Master Lease, the Trust and the Master Tenant will not take other actions that courts have held to be indicative of a partnership, such as holding themselves out as partners, maintaining joint books or filing a partnership tax return. (*See, e.g., Luna v. Commissioner,* 42 T.C. 1067 (1964).)

**GFI's Exhibit 18, Page 211 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 19

> ### B. The Master Lease should not Constitute an Agency Arrangement or Management Contract for Income Tax Purposes

The Master Lease should not be treated as an agency arrangement or management contract between the Trust and the Master Tenant for federal income tax purposes. Courts have consistently held that the underlying substance of the transaction, and not the form of the contract itself, dictates whether a contract will be treated as agency arrangement or lessor-lessee relationship for federal income tax purposes. (*See e.g., Amerco v. Commissioner,* 82 T.C. 654 (1984).) In determining whether an arrangement should be treated as a lessor-lessee relationship or agency agreement, the IRS and the courts have established two key factors: (1) control over the use of the property; and (2) who bears the risk of loss over the use of such property. (*See, e.g., McNabb v. United States,* 47 AFTR 2d 81-513, 81-1 USTC ¶9143 (W.D. Wash. 1980); *Meagher v. Commissioner* T.C. Memo 1977-270.) Consistent with this case law, Code Section 7701(e) provides certain rules for the mirror image issue of when a service contract should be recharacterized as a lease. This Code section specifically provides that a contract that purports to be a service contract is to be construed as a lease if the contract is properly treated as a lease, taking into account all relevant factors including whether or not (a) the service recipient is in physical possession of the property, (b) the service recipient controls the property, (c) the service recipient has a significant economic or possessory interest in the property, (d) the service provider does not bear any risk of substantially diminished receipts or increased expenditures if there is nonperformance wider the contract, (e) the service provider does not use the property concurrently to provide significant services to entities unrelated to the service recipient, and (f) the total contract price does not substantially exceed the rental value of the property for the contract period.

If a property owner retains control over the use of property and does not sufficiently transfer control to a lessee, the relationship could be characterized as an agency agreement. The issue of whether a lessee has sufficient control over the use of property is a fact-intensive inquiry, but factors such as day-to-day management activities, the ability to set the terms of a sublease, and control over funds tend to indicate the existence of a true lease. Mere retention of supervisory functions that are necessary to protect an owner's position as a lessor-owner of property should not, without more, result in characterization of a lease as an agency agreement. (*Freesen* v. *Commissioner,* 84 T.C. 920 (1985).)

In *Amerco v, Commissioner,* 82 T.C. 654, the Tax Court held that contracts between U-Haul and individuals who owned the trailers used in U-Haul's business were properly treated as true leases and not management agreements. Concerning the control factor, the court relied on the fact that U-Haul managed the day-to-day operations of the trailers, set the terms of leasing the trailers to the public, and had exclusive control over operating expenses. (*Id.*) The owners of the trailers retained the right check on their property periodically and receive periodic reports from U-Haul, but such oversight did not amount to a level of control that would suggest a management contract. (*Id.*)

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 20

The arrangements provided in the Master Lease with respect to control of the Real Estate are consistent with its characterization under the foregoing authority as a lease and not as an agency or management arrangement. As previously discussed, the Master Tenant is in physical possession of the Real Estate and is solely responsible for the operation and management of the Real Estate.

Pursuant to the Master Lease, the Master Tenant is responsible for the day-to-day management of the Real Estate. To the extent that there are limits on the nature of the subleases that the Master Tenant may enter into, they are either consistent with the Trust's prudent management of its properties or mandated by the Lender (or both). These factors taken together are a strong indication that the Master Lease should not be treated as an agency or management arrangement.

In addition, the arrangements provided in the Master Lease with respect to the allocation of the risk of loss are consistent with its characterization as a lease and not as an agency or management arrangement. Arrangements in which the tenant bears the risk of loss, as opposed to the landlord, are likely to be respected as a true lease. Agreements which provide for rent payments only where there the tenant has a net profit tend to be indicative of an agency agreement. (*Meagher v. Commissioner,* TC Memo 1977-270 (noting "if this contract were held to be a lease it would be a strange one, for the 'lessee' would be required to pay 'rent' only if its use of the property resulted in net profit.").) However, agreements that provide for variable rent, as opposed to fixed rent, do not preclude an agreement from being treated as a true lease. (*McNabb,* 47 AFTR 2d 81-513.) In *McNabb,* the tenant's rent payments were set at thirty-five percent of the gross rentals from the property. (*Id.*) However, the tenant was responsible for paying all operating expenses out of its remaining percent share of the gross rentals and had no recourse against the landlord in the event that the operating expenses exceeded the tenant's share of gross rentals. (*Id.*) Thus, a lease which provides for variable rent based on gross revenue should not, by reason of the variable rent, be treated as an agency or management arrangement.

An obligation on the part of the landlord to indemnify a tenant for damages, losses or liabilities with respect to the property is also indicative of an agency relationship. In *Meagher,* the Tax Court determined that the owner retained the risk of loss with respect to the property because the property owner had agreed to defend, indemnify, and hold the tenant harmless from and against any and all loss, damage, or liability. (T.C. Memo 1977-270.) Under the terms of the contract, the tenant was authorized to deduct a portion of the rent payable to the landlord and reserve that amount to cover expenses associated with the use of the property. (*Id.*) The contract went one step further, however, providing that the owners of the property agreed to reimburse the tenant for any expenses incurred in excess of the amount held in the cash reserve allowance. (*Id.*)

Here, the Master Tenant has an unavoidable obligation to pay Base Rent, and although it may defer the payment of Stated Rent in certain circumstances, it also has the unavoidable obligation to pay all Stated Rent prior to the expiration or termination of the Master Lease or

**GFI's Exhibit 18, Page 213 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 21

the repayment of the Loan. In addition, the Trust has no obligation to reimburse the Master Tenant for any losses incurred related to the operation of the Real Estate. Unlike the facts in *Meagher,* the Stated Rent, although it may be deferred in certain circumstances, is payable regardless of the actual expenses incurred by the Master Tenant in operating the Real Estate, and does not create in form or in substance any indemnification obligation on the part of the Trust in favor of the Master Tenant.

    *C. Summary — Characterization of the Master Lease between the Trust and the Master Tenant*

As described above, the Master Lease should not constitute a partnership or an agency/management arrangement for income tax purposes between the Trust and the Master Tenant. While it is true that the Rent structure of the Master Lease may result in some irregularity in the amount of Rent that is paid year to year (if, for example, the Master Tenant is required and permitted to defer payment of Stated Rent), we have identified no authority under the fixed investment trust rules or otherwise that implies that an asset held by a fixed investment trust *is* required to generate predictable cash flow. The Master Lease, including its rent structure, is an inherent Greeley Flats of the investment being acquired by Investors when they acquire an Interest in the Trust, and consistent with Revenue Ruling 2004-86 the Master Lease (including its provisions regarding Rent payment obligations) may not be amended except in the case of a Master Tenant bankruptcy or insolvency. Accordingly, the Master Lease should not affect the classification of the Trust as an "investment" trust under Treasury Regulation Section 301.7701-4(c)(1).

    *4. Classification of the Trust as a "Grantor Trust" for Federal Income Tax Purposes*

Code Sections 671 through 678 describe certain circumstances in which the grantor of a trust or another person will be considered to be the owner of all or a portion of the trust's assets and income for federal income tax purposes. Code Section 677(a) provides that a grantor is treated as the owner of any portion of a trust whose income without the approval or consent of any adverse party or, in the discretion of the grantor or a nonadverse party (or both), may be distributed, held, or accumulated for future distribution to the grantor or his or her spouse. In Revenue Ruling 2004-86, the IRS held that the DST was a grantor trust.

Like the DST in Revenue Ruling 2004-86, the Trust satisfies the Code requirements for qualification as a grantor trust. Section 2.04 of the Trust provides that each Investor is to be treated for federal income tax purposes as owning a direct interest in the Trust Property. Section 4.02 of the Trust Agreement provides that all available cash of the Trust is required to be distributed to the Investors pro rata in proportion to their percentage interests in the Trust. Section 5.01(c) of the Trust Agreement provides that, from and after the admission of the first Investor (other than the Initial Beneficiary) to the Trust, the Trust shall constitute a grantor trust.

**GFI's Exhibit 18, Page 214 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 22

  *5. Treatment of the Investors as Directly Holding Trust Property for Federal Income Tax Purposes*

In Revenue Ruling 2004-86, the IRS, citing prior Revenue Rulings and a Treasury Regulation, held that a person who is treated as the grantor of a grantor trust is considered to own its proportionate share of the assets of the trust for federal income tax purposes. Revenue Ruling 2004-86 went on to hold that an owner of a grantor trust that holds real property is considered to be the owner of an undivided interest in the real property and that, accordingly, real property can be exchanged for an interest in such a grantor trust without the recognition of gain or loss so long as the other requirements of Section 1031 are satisfied. It should be noted that the holding of Revenue Ruling 2004-86 expressly assumed that "the other requirements of Section 1031 are satisfied." This assumption is also being made for purposes of this Opinion.

  *6. The Real Estate as Qualified Property*

The Trust will own fee simple title to the Real Estate.  The Real Estate should qualify as like kind to a fee simple interest in real property for purposes of Code Section 1031. Nevertheless, the opinion applies only to the portion of the Property properly allocated to the Real Estate. It must be noted that the Trust has not yet obtained the Appraisal Report for the Property.  If the appraised value of the Property were determined to be less than the purchase price that the Trust pays, there is a substantial risk that a portion of the amount that an Investor pays for an Interest would not be eligible for treatment as replacement property for purposes of Code Section 1031.

CONCLUSION

Based on the facts and the authorities discussed above, we conclude that the acquisition of the Interests by the Investors should be treated as a direct acquisition of the Real Estate for purposes of Code Section 1031.

This Opinion is given in reliance upon the accuracy and completeness of the documents, facts, assumptions and representations described herein. Any misstatement or change of a material fact referred to or omission of any material fact may require an adverse modification of all or a part of our Opinion.

Qualification of a transaction pursuant to Code Section 1031 for an Investor involves issues based on numerous specific facts which are not and cannot be known to us; therefore, we give no opinion as to the ability of any Investor to effectuate a tax-deferred exchange of like-kind property under Code Section 1031. This Opinion addresses only one aspect of qualifying under Code Section 1031, *i.e.*, whether the acquisition of an Interest can be treated as a direct acquisition of the Real Estate for purposes of Code Section 1031. We are not opining as to whether some portion of the Real Estate may be "personal property" as opposed to "real property" for purposes of Code Section 1031, or as to whether any amounts paid by, or deemed paid by, the Investors with respect to

**GFI's Exhibit 18, Page 215 of 221**

**EXHIBIT H**

NB  Greeley Flats, DST
c/o Nelson Brothers Professional Real Estate, LLC
Page 23

certain costs or expenses of the offering, financing costs, and amounts paid to fund the reserve for capital expenses will be deemed to constitute other consideration received in the exchange or the acquisition of real estate. Finally, this Opinion does not address any state, local or non-United States income tax consequences, or any non-income tax consequences, of the transactions described herein.

We are admitted to practice law in California and this Opinion is based on existing federal law, including judicial decisions, applicable current and proposed Treasury Regulations, and current published administrative positions of the IRS, all of which are subject to change either prospectively or retroactively. We assume no responsibility to inform the addressee or any Investor of any future change in the law.

Although this Opinion represents our best legal judgment, it has no binding effect and, therefore, there can be no assurance that the IRS will not be able to successfully challenge the conclusions reached herein. This Opinion is delivered subject to this understanding and agreement. Finally, this Opinion is intended solely for the use of the Investors in accordance with the terms of this letter and may not be shown to or relied upon by any other party without our express written approval.

IRVINE VENTURE LAW FIRM, LLP

/s/

Michael E. Shaff

**GFI's Exhibit 18, Page 216 of 221**

**EXHIBIT I**

**Organizational Chart**

Nelson Brothers – Greeley Flats – Structure Chart*



* All entities are formed in Delaware unless otherwise noted
** To hold any beneficial interests in DST not acquired by Investors

I-1

EXHIBIT J

## INVESTMENT PERFORMANCE – MANAGED PROPERTIES

| Property | School | Fall 2017 Enrollment | Acquisition Date | Investment Objective | Constructed /Remodeled | Units/ Beds | Occupancy May 1, 2018 | Annualized Distribution Rate on 12/31/18 | Annualized Distribution Rate on 4/30/18 | PPM Distribution Rate for 5/1/18(1) | Offering Proceeds | Ratio of Loan to Total Proceeds(2) | Property Highlights |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Alpine Flats** (DST) 729 E 900 N Logan, UT 84321 | Utah State University (Division I) | 17,850 | June 2017 | Income | 1950/ 2015 | 40/194 | 92.27% | 6.00% | 6.00% | 6.00% | 3,517,316 | 75.00% | The property is located less than two blocks from campus and offers both two- and three-bedroom designs with shared rooms. The property also has a unique roundhouse as well as a studio apartment. There is also a redesigned clubhouse including a spacious barbeque area, fire pit and hot tub with a cascading waterfall. The exteriors were also updated with "Aggie" blue siding. |
| **Auraria Student Lofts** (DST) 1051 14th St Denver, CO 80202 | University of Colorado at Denver (Division I) | 41,219 | July 2014 | Income | 2013 | 125/438 | 100% | 7.75% | 7.75% | 7.50% | 12,920,000 | 67.82% | Auraria Student Lofts consists of 30 floors in a high-rise building located in downtown Denver within walking distance to the Auraria campus which hosts the University of Colorado Denver, Metro State University of Denver and Community College of Denver. The building underwent significant renovations in 2013 and features a rooftop pool, fitness center and amenity deck. |
| **College Crest** (TIC) 1555 NE Marman Drive Pullman, WA 99163 | Washington State University (Division I) | 21,765 | May 2017 | Growth & Income | 1974 | 60/184 | 82.42% | 6.75% | 6.75% | 6.75% | 4,682,563 | 75.00% | College Crest is a Class C student housing property located within a mile from campus. The property currently has mostly four bedroom/two bathroom units, but an extensive renovation is planned with the four bedroom units being converted in to studio, one and two-bedroom units. A new clubhouse is planned with additional units above as well as an outdoor grilling area and pet park. |
| **Duck Abbey** (DST) 1848 Hilyard Eugene, OR 97401 | University of Oregon (Division I) | 23,371 | March 2014 | Income | 2014 | 19/70 | 95.71% | 7.25% | 7.25% (1) | 7.15% | 2,310,000 | 72.70% | Duck Abbey has two and four bedroom units. The property is located less than a mile from the main entrance of the Univ of Oregon and walking distance to dining and shopping. **Investor distributions were suspended in March 2018 primarily due to leaseup challenges as a result of 2000 new beds coming into the market. We anticipate leasing to full occupancy this year. The rents were moderately increased and concessions have been reduced for 2018-19. This will result in an overall increase in income once the property reaches the anticipated 98%-100% occupancy by move in which occurs in mid-September 2018.** |
| **Loft Vue** (DST) 3125 McCart Ave Fort Worth, TX 76110 | Texas Christian University (Division I) | 10,394 | August 2016 | Income | 2013 | 77/147 | 85.62% | 7.00% | 7.00% (1) | 7.00% | 8,485,280 | 60.40% | Loft Vue is a luxury student housing apartment complex and is located within two blocks from campus and across the street from the TCU campus shuttle. The property is also close to restaurants and retail. The property offers free trip and amenities, luxury interiors and condominium quality units. **Investor payments were suspended in March 2018 as a result of a real estate tax increase and increased competition in 2017. The increase was sucessfully challenged with refund due. During 2018 to date, lease up has increased from 37% this time last year to 55%.** |
| **Mountain Valley** (DST) 1000 Mtn. Valley Drive Morgantown, WV 26508 | West Virginia University (Division I) | 29,175 | July 2017 | Income | 2008 | 344/658 | 93.77% | 7.00% | 7.00% | 7.00% | 15,702,591 | 59.83% | Mountain Valley consists of 14 four-story apartment buildings and offers a superior amenities package to students. It is marketed towards the professional and international student base that attend West Virginia University. |
| **Stadium View** (DST) 2119 S 11th Ave Bozeman, MT 59715 | Montana State University (Division I) | 15,000 | June 2016 | Income | 2015 | 139/499 | 99.80% | 7.00% | 7.00% | 7.00% | 20,206,682 | 65.01% | Stadium View is a luxury student housing complex that Stadium View is a luxury student housing complex that is located across the street from Montana State University. The community offers furnished studio, one, two, four bedroom apartments and two-story five bedroom townhomes. Each unit includes granite countertops, all black energy-efficient appliances, vinyl wood planking, pillow top queen-size beds, washers and dryers, private baths, 48" flat screen HDTV's, wireless internet and cable. |
| **Taylor Bend** (DST) 101 Taylor Bend Oxford, MS 38655 | University of Mississippi (Division I) | 24,250 | January 2015 | Income | 2012 | 96/288 | 94.44% | 7.25% | 7.25% | 7.25% | 6,351,000 | 67.18% | Taylor Bend is located three blocs from campus. In addition, the Ole Miss Campus shuttle has a stop in front of the leasing office. The property features larger sized units, high-end luxurious interiors with each unit having three bedrooms and averaging over 1,400 square feet. Recently, a costly lounge and gaming area were added to the upper floor of the leasing office building. |

(1) Distributions for four properties - Loft Vue, The Mark, Duck Abbey and Vue on MacGregor - were temporarily suspended in February and March 2018. Investor distributions are expected to resume as profitability increases during the 2018-2019 school year. See "Property Highlights" for more in formation on the specific properties.

(2) Calculated as the ratio of the Loan Proceeds to the sum of the Loan Proceeds and the Offering Proceeds.

**GFI's Exhibit 18, Page 218 of 221**

EXHIBIT J

| Property | School | Fall 2017 Enrollment | Acquisition Date | Investment Objective | Constructed /Remodeled | Units/ Beds | Occupancy May 1, 2018 | Annualized Distribution Rate on 12/31/18 | Annualized Distribution Rate on 4/30/18 | PPM Distribution Rate for 5/1/18(1) | Offering Proceeds | Ratio of Loan to Total Proceeds(2) | Property Highlights |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **The Mark** (TIC) 1115 E Lemon St Tempe, AZ 85281 | Arizona State University (Division I) | 70,000 | November 2017 | Growth & Income | 1970/ 2017 | 153/229 | 86.46% | 7.00% | 7.00% (1) | 7.00% | 7,323,000 | 71.08% | The Mark is located one half mile from the ASU campus and a short walk to the Dorsey and University Street Valley Metro Light Rail which allows residents to travel to the ASU Downtown campus. The complex offers studio, one bedroom, two bathroom and two bedroom deluxe. All 153 units were renovated in 2015 with polished concrete floors, new stainless steel appliances, etc.  An extensive exterior renovation was recently completed, adding a luxurious lazy river with pool slide, canopy lounges, fire pits and outdoor movie screen. **Investor payments were suspended in February 2018 as a result of costs required to refinance the property and poor lease up during 2017-2018 school year due to the construction.  Although the refinancing was successful, it was at a cost.  Now with construction done, the coming year 2018-2019 the lease up has increased from 33% this time last year to 71%.** |
| **University Gardens** (DST) 74 Elizabeth St. #2 Salt Lake City, UT 84102 | University of Utah (Division I) | 32,274 | February 2017 | Income | 1948/ 2016 | 66/193 | 99.48% | 6.50% | 6.50% | 6.50% | 7,218,310 | 59.60% | The property is located less than two blocks from campus and near downtown Salt Lake City. The property has just completed a dramatic renovation increasing total bed count from 128 to 193 with all new, contemporary interiors, upgraded appliances and modified floor plans. The property has a mix of three-bedroom units, and two town house units with five bedrooms each. A new hot tub and courtyard with fire pits were added to  round out the amenities. The property was bought in 2017 from a group of prior TIC owners of the sponsor's prior company. |
| **University Gateway** (TIC) 643 W 1200 S Orem, UT 84058 | Utah Valley University (Division I) | 36,237 | April 2012 | Growth & Income | 1986/ 2013/ 2017 | 61/286 | 95.44% | 6.20% | 6.20% | 7.21% | 4,864,000 | 72.50% | One of the closest properties to the main entrance of the university, the property has been renovated and rebranded. Interior units have been renovated along with the exterior -replacing an old dull blue siding with an all-new stucco façade. New amenities were added to the property which include a 18 seater hot tub, sand volleyball court and new landscaped grounds. |
| **University Towers** (TIC) 630 S 1200 W Orem, UT 84058 | Utah Valley University (Division I) | 36,237 | December 2010 | Growth & Income | 2003/ 2005/ 2018 | 32/249 | 95.16% | 7.10% | 7.10% | 8.61% | 3,962,841 | 64.50% | This property has been renovated and rebranded by upgrading unit interiors and improving the amenities package, including the renovation of the clubhouse. The property is located across the street from Utah Valley University. |
| **Vue on MacGregor** (DST) 4460 S. MacGregor Way Houston, TX 77021 | University of Houston (Division I) | 43,774 | December 2015 | Income | 2014 | 115/384 | 90.96% | 6.50% | 6.50% (1) | 6.50% | 17,483,875 | 64.08% | Vue on MacGregor is a luxury student housing apartment complex located two and a half blocks from the University of Houston campus. The property consists of 115 units and 384 beds.  **Investor payments were suspended in March 2018 as a result of significant competition during the 2017-2018 school year from new facilities. Now that those facilities are no longer new, our "close-in" location has increased our lease up from 29% this time last year to 74% this year.** |

**(1) Distributions for four properties - Loft Vue, The Mark, Duck Abbey and Vue on MacGregor - were temporarily suspended in February and March 2018. Investor distributions are expected to resume as profitability increases during the 2018-2019 school year. See "Property Highlights" for more in formation on the specific properties.**

**(2) Calculated as the ratio of the Loan Proceeds to the sum of the Loan Proceeds and the Offering Proceeds.**

**GFI's Exhibit 18, Page 219 of 221**

EXHIBIT K

## INVESTMENT PERFORMANCE – NON-MANAGED PROPERTIES

| Property | School | Fall 2017 Enrollment | Acquisition Date | Investment Objective | Constructed/ Remodeled | Units/ Beds | Occupancy May 1, 2018 | Annualized Distribution Rate on 12/31/18 | Annualized Distribution Rate on 4/30/18 | PPM Distribution Rate for 5/1/18 | Offering Proceeds | Ratio of Loan to Total Proceeds(1) | Property Highlights |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **9 & 9** (TIC) 876 E 900 N St. Provo, UT 84604 | Brigham Young University (Division I) | 34,787 | December 2013 | Growth & Income | 1965/ 1989 | 28/111 | 45.37% | 6.00% | 6.00% | 7.50% | 1,522,750 | 59.34% | The property is one of the closest properties to BYU campus. The intent is to take advantage of the prime location and enhance the overall value of the property. |
| **900 Factory** (TIC) 870 N. 600 E. Logan, UT 84321 | Utah State University (Division I) | 17,850 | June 2017 | Growth & Income | 2016 | 80/479 | 93.74% | 6.00% | 6.00% | 6.00% | 21,615,494 | 59.46% | The property was just recently completed in December 2016. The Factory was Nelson Brothers first ground-up development. Located 150 yards from campus, the property offers both shared and private room options. Unit designs offer ample common space for four, five and six bedroom layouts. Kitchens come equipped with two refrigerators and two dishwashers. All units are fully furnished and offer WIFI access and Direct TV satellite package which includes the NFL ticket. |
| **Avalon Apts** (DST) 333 Ss 1000 E. Saint George, UT | Dixie State University (Division II) | 8,350 | September 2015 | Growth & Income | 1986 | 48/288 | 99.18% | 7.25% | 7.25% | 7.25% | 3,642,944 | 63.54% | The property is located just seven steps from the Dixie State University campus and features fully furnished three bedroom and two bedroom two bathroom floorplans. It is the third largest apartment complex in the off-campus market. |
| **Chateau Sera** (DST) 2343 Scarff St. Los Angeles, CA 90007 **Tropicana** (DST) 1256 W. 29th St. Los Angeles, CA 90007 | University of Southern California (Division I) | 45,500 | July 2015 | Income | 1916/ 2015 | 30/60 | 98.00% | 6.25% | 6.25% | 6.25% | 4,708,000 | 62.40% | Both properties originally were acquired by a group of TIC investors sponsored by Nelson Brothers in March 2012. The TIC investors then sold the properties sponsored by Nelson Brothers as a DST to new investors in July 2015. Chateau Sera consist of 30 units comprised of renovated one bedroom and studio floor plans catered to the graduate student. It is located close to USC tram stop in a quieter neighborhood. Tropicana has 30 renovated units consisting of one bedroom and studio apartments and located about a quarter mile north of USC campus in a highly student populated area |
| **CP Cincy** (DST) 195 East McMillan St. Cincinnati, OH 45219 | University of Cincinnati (Division I) | 44,783 | December 2017 | Income | 2005 | 121/440 | 97.95% | 6.25% | 6.25% | 6.25% | 13,253,255 | 56.76% | CP Cincy is located within a half-mile from the University of Cincinnati and features five levels. Over 40% of the beds are master leased by the University for off-campus housing. The property has an extensive list of luxury community amenities including a recording studio for the students of the music conservatory which is located in close proximity to CP Cincy. This property is currently in the process of being sold to investors. |
| **Darby Row** (DST) 624 N Notre Dame Ave. Southbend, IN 46617 **The Belfry** (DST) 624 N Notre Dame Ave. Southbend, IN 46617 | University of Notre Dame (Division I) | 12,467 | February 2014 | Income | 2012 & 2013 | 23/71 | 94.37% | 7.75% | 7.75% | 7.50% | 2,076,000 | 66.11% | Darby Row consists of two properties, Darby Row and The Belfry. Both are located less than one mile from the Notre Dame campus. The properties primarily cater to upperclassman and graduate students. Darby Row has three one-bedroom modern units and six four-bedroom townhomes. |
| **Duck Flats** (TIC) 945 Patterson St. Eugene, OR 97401 | University of Oregon (Division I) | 23,371 | January 2012 | Income | 2012 | 8/40 | 97.50% | 3.50% | 3.50% | 6.50% | 1,674,000 | 46.28% | Duck Flats consists of five bedroom apartment units located less than a mile from the main entrance of Univ of Oregon and walking distance to dining and shopping. The property offers student-centric living, upgraded features, underground and street parking. Distribution was reduced below average due to a large increase in new supply that hit the market 12-18 months ago. A new property management team was recently put in place and the property has continued to improve its position in 2016. |
| **Duck Lofts** (TIC) 1364 Patterson St. Eugene, OR 97401 | University of Oregon (Division I) | 23,371 | November 2010 | Income | 2010 | 14/48 | 100.00% | 5.50% | 5.50% | 6.60% | 2,528,900 | 30.49% | Duck Lofts is comprised of two, four and five-bedroom apartment layouts. The property is located three and a half blocks from the main entrance of the Univ Oregon and walking distance to dining and shopping. The property offers student-centric living, upgraded features, underground and street parking. |

(1) Calculated as the ratio of the Loan Proceeds to the sum of the Loan Proceeds and the Offering Proceeds.

GFI's Exhibit 18, Page 220 of 221

**EXHIBIT K**

| Property | School | Fall 2017 Enrollment | Acquisition Date | Investment Objective | Constructed/ Remodeled | Units/ Beds | Occupancy May 1, 2018 | Annualized Distribution Rate on 12/31/18 | Annualized Distribution Rate on 4/30/18 | PPM Distribution Rate for 5/1/18 | Offering Proceeds | Ratio of Loan to Total Proceeds(1) | Property Highlights |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Grant Street Station** (DST) 320 S. Grant St, West Lafayette, IN 47906 **South Street Station** (DST) 46 N Salisbury St. West Lafayette, IN 47906 | Purdue University (Division I) | 40,451 | January 2017 | Income | 2013 & 2015 | 176/364 | 100.00% | 6.50% | 6.50% | 6.65% | 19,443,329 | 57.35% | Grant Street Station - DST 320 S. Grant St, West Lafayette, IN 47906 & South Street Station - DST 46 N Salisbury St, West Lafayette, IN 47906 Grant Street Station and South Street Station are both located within two blocks from the Purdue Campus and a ten minute walk from the West Lafayette nightlife district. The properties have newer construction and are fully amenitized. Grant Street has an apartment unit mix of one,two, three and four bedroom units and South Street has an apartment unit |
| **Molly Barr Trails** (TIC) 1011 Molly Barr Road Oxford, MS 38655 **Molly Barr Ridge** (DST) 1021 Molly Barr Road Oxford, MS 38655. | University of Mississippi (Division I) | 24,250 | September 2016 | Income | 2012 & 2015 | 125/303 | 89.80% | 6.75% | 6.75% | 6.75% | 11,299,699 | 86.84% | MollyBarr Ridge and MollyBarr Trails are located within one mile from campus. Students have access to the Ole Miss Campus shuttle which has a stop in front of the property. The properties have newer construction and are fully amenitized. Each unit features a bathroom and bedroom for each student which include new appliances. The properties also feature a pool, lounging area and fitness center. MollyBarr Ridge has a mix of three bedroom and three bather room. MollyBarr Trails has a mix of two bedrooms and two bathrooms. |
| **Park Plaza** (TIC) 910 North 900 East Provo, UT 84604 | Brigham Young University (Division I) | 34,787 | May 2016 | Growth & Income | 1965 | 44/175 | 100.00% | 7.00% | 7.00% | 7.00% | 3,267,847 | 61.64% | Located one to two blocks from the BYU campus. Nelson Brothers plans to renovate the property's exterior, interior units and construct a new clubhouse. Overall, the goal is to raise rents, increase income and appreciate property value while also working to improve the overall tenant quality. |
| **Commons at Sawmill** (TIC) 901 S. O'leary Flagstaff, AZ 86001 | Northern Arizona University (Division I) | 27,396 | June 2016 | Growth & Income | 1992 (In Process of Renovation) | 194/392 | 94.64% | 7.00% | 7.00% | 7.00% | 15,862,474 | 63.68% | The Commons at Sawmill is a garden style apartment complex that is adjacent from campus. Nelson Brothers plans on $1.7M to $2M in renovations for amenity upgrades, new unit development, interior renovation and new clubhouse. |
| **The Element** (DST) 6730 4th Avenue Sacramento, CA 95817 | Sacramento State (Division I) | 30,284 | October 2017 | Income | 2005 | 121/440 | 99.11% | 6.00% | 6.00% | 6.00% | 38,575,350 | 57.98% | The Element is located within a half-mile of Sacramento State Univ. and offers students an extensive list of resort style amenities. It has a diverse mix of floor plans. It was most recently renovated in 2016 and is one of the few properties near campus designated for student living. This property is currently in the process of being sold to investors. |
| **The Plaza** (DST) 955 Broadway / 1715 Aurora Boulder, CO 80202 | University of Colorado at Boulder (Division I) | 32,755 | March 2015 | Income | 2013 | 39/152 | 99.34% | 7.00% | 7.00% | 7.00% | 8,350,000 | 69.36% | The Plaza on Broadway is a modern student apartment community located adjacent to the University of Colorado, Boulder campus. The community offers two buildings that are comprised of two, three and four bedroom apartments and private bathroom for every bedroom. |
| **Tuscany Place** (DST) 440 South 2nd West Rexburg, ID 83440 | Brigham Young University Idaho (Division I) | 17,980 | July 2015 | Income | 2004 & 2005 | 48/284 | 91.55% | 7.00% | 7.00% | 7.00% | 4,974,000 | 59.14% | Tuscany Place is located one block west from the heart of the BYU-Idaho campus and close to local restaurants and shops. The unit mix includes 44 six bedroom apartment homes and 4 five bedroom apartment homes. Tuscany Place is one of the few BYU-Idaho approved housing that offers all private bedrooms. |
| **University Downs** 1250 W. University Pkwy Orem, UT 84058 | Utah Valley University (Division I) | | | | | | Vacant property to be developed. | | | | | | |

(1) Calculated as the ratio of the Loan Proceeds to the sum of the Loan Proceeds and the Offering Proceeds.

**GFI's Exhibit 18, Page 221 of 221**